*The City University of New York*

**CUNY SCHOOL OF LAW**

Steven Zeidman
Professor of Law
Zeidman@mail.law.cuny.edu

(718) 340-4357 Tel
(718) 340-4478 Fax

2 Court Square
Long Island City, NY 11101-4356

CU NY

# REPORT

## I. Introduction

### A. Assignment.

I have been retained by counsel for Darryl Boyd and John Walker, Jr. to provide expert testimony on the basic rules of criminal procedure that applied to their trials in 1977, the disclosure and fair-trial obligations that applied at that time to New York prosecutors, how a reasonably competent defense lawyer could and likely would have used the discovery materials that allegedly were withheld from the counsel representing Boyd and Walker in their 1977 murder trials, and whether the summations delivered by the prosecution in the Boyd and Walker trials complied with standards of summation advocacy that applied at that time.

I am being compensated for my time in this case at the rate of $400 per hour. My compensation is not contingent on the opinions I reach or on the outcome of the litigation.

### B. Qualifications.

I am a Professor of Law and Co-Director of the Defenders Clinic at the City University of New York (CUNY) School of Law.

From 1981-1990, I was a staff and supervising attorney with the Legal Aid Society's Criminal Defense Division in Manhattan. In that time, I tried approximately 25 cases and supervised and second-chaired many more. My trials ranged from low-level offenses to homicide and other violent crimes.

From 1990-1999, I taught classes in criminal procedure and evidence at the New York University School of Law and directed a Criminal Defense Clinic where students under my supervision represented people facing charges in the New York City Criminal Courts. I have also taught at Fordham University School of Law and Pace University School of Law.

I am a member of the American Bar Association (ABA) Criminal Justice Section Council and serve on the First Step Act Task Force. Both organizations are comprised of prosecutors, defense attorneys, judges, and academics. I was a member of the committee that drafted the ABA Criminal Justice Standards on Diversion and contributed to the recent revisions to the ABA Criminal Justice Standards for the Defense Function.

I regularly work with court administration, having been appointed to several statewide commissions by Judith Kaye, then-Chief Judge of the New York Court Appeals, including the

Jury Project and the Commission on the Future of Indigent Defense Services. During the Giuliani and Bloomberg administrations, I was a member of the Mayor's Executive Committee on the Judiciary, the body that makes recommendations to the mayor for appointment to the criminal, family, and civil-court benches, and evaluates judges seeking reappointment.

I served on the New York City Central Screening Committee that evaluates applicants for the assigned counsel panel as well as applicants for reappointment to the panel, and I am a member of the Indigent Defense Organization Oversight Committee (IDOOC) charged by New York State's Appellate Division, First Department with evaluating the offices providing indigent defense pursuant to contracts with New York City. As a member of IDOOC, I helped draft standards for the provision of indigent defense. I was retained as a consultant by the Mayor's Office of Criminal Justice to evaluate the quality of defense provided by assigned counsel in homicide cases.

I am part of Accountability NY, a non-profit coalition of law professors that reviews cases where courts or prosecutors' offices have found or acknowledged prosecutorial misconduct—including failure to disclose *Brady* material and summation misconduct—and makes referrals to grievance committees.

I have published over twenty law-review articles on topics including the ethical and constitutional duties of prosecutors and defense attorneys, and more than sixty-five op-eds and essays on similar topics for publications such as Time, the New York Daily News, the New York Law Journal, the Albany Times-Union, the Syracuse Post-Standard, City & State, and Slate.

Currently, I co-direct the Defenders Clinic at CUNY School of Law, where students under my supervision represent people facing charges in the New York City Criminal Courts. I also direct the Second Look Project, which works with people serving life sentences in pursuit of clemency, parole, compassionate release, or resentencing. The "second look" work entails, among other things, reviewing pretrial-hearing and trial transcripts to identify potential legal issues.

In the course of my work, I regularly collaborate with prosecutors. On several occasions, current and former prosecutors have asked me to review a case that they believe merits some form of second look. Similarly, lawyers in the Manhattan and Brooklyn District Attorney's Offices have asked me to represent people they felt deserved parole, clemency, resentencing, or compassionate release. The Attorney General's Office calls me several times a year for input regarding people with clemency applications pending before the Governor. I recently collaborated with federal prosecutors to assist a witness in a high-profile case placed in witness protection.

I was retained as an expert in one previous case, *United States v. Purdy*, where the issue was the defense attorney's obligation to advise their client regarding accepting or rejecting a plea offer.

I have not been deposed or provided trial testimony within the past four years. While I have not previously testified as an expert witness, I have on several occasions testified at legislative hearings on matters relating to criminal justice.

**C. Materials reviewed.**

In reaching my opinions in this matter, I have reviewed the following material:

1. Pretrial motions filed in the prosecutions of Darryl Boyd, Darryn Gibson, Floyd Martin, and John Walker, Jr. (collectively, "defendants");

2. Andre Hough's grand-jury testimony;

3. Tyrone Woodruff's grand-jury testimony;

4. Transcripts of defendants' preliminary hearings, *Huntley* hearings, and *Wade* hearings;

5. Transcripts of the Gibson, Boyd, and Walker trials, and the exhibits introduced;

6. Transcript of ADA Timothy Drury's deposition, held on November 28 and November 29, 2023;

7. ADA Drury's handwritten notes;

8. Transcript of ADA David Henry's deposition, taken on August 11, 2023;

9. Transcript of defense attorney James McLeod's deposition, taken on December 4, 2023 and January 3, 2024;

10. Transcript of Det. Michael Guadagno's deposition, taken on May 31, 2023;

11. Transcript of Det. John Montondo's deposition, taken on June 21, 2023;

12. The amended complaints filed by Boyd and Walker on March 13, 2023;

13. Miscellaneous documents relating to Joseph Tatar;

14. Numerous police records (such as P73s) prepared during the investigation of the murder of William Crawford;

15. Documents from the Plaintiffs' 2012 litigation to vacate their convictions pursuant to CPL § 440.10, including the Cohen notice of motion, dated October 1, 2023, the Cohen memorandum of law dated August 21, 2012, the Cohen affidavit dated October 1, 2012, the Texido affidavit dated November 20, 2012, the Drury affidavit dated November 8, 2012, the Cohen reply affidavit dated February 20, 2013, and the Memorandum and Order dated February 20, 2013.

16. Documents from the Plaintiffs' 2021 litigation to vacate their convictions pursuant to CPL § 440.10, including the Cambria notice of motion dated October 13, 2020, the Cambria affidavit dated October 13, 2020, the Heraty affidavit dated November 2, 2020, the Cambria reply affidavit dated February 4, 2021, the transcript of the hearing held on June 22, 2021, the Cambria post-hearing memorandum dated June 22, 2021, and Heraty

post-hearing memorandum dated July 2, 2021, and the Decision and Order dated August 18, 2021.

**D. Summary of opinions.**

Based on my review of the material set forth above, I have reached the following opinions to a reasonable degree of professional certainty:

1. Assuming, at the Boyd and Walker trials, that the prosecution withheld from defense counsel the evidence that is the subject of the Plaintiffs' claims, it is my opinion that a reasonably competent defense attorney could and would have effectively utilized such evidence by, among other things, developing favorable evidence through case investigation, discrediting the prosecution's primary witnesses, presenting a compelling theory of third-party culpability, and calling into serious question the integrity of the police investigation and the prosecution itself.[1] Considering the apparent weakness of the prosecution's evidence, use of the withheld material by reasonably competent counsel certainly would have made acquittal much more likely in each case.

2. During summations in the Boyd and Walker trials, the prosecutors, contrary to established rules of summation advocacy, and without apparent justification in the record of each trial, appealed to racial prejudice and fear, denigrated the defendants, defense counsel, and defense witnesses, commented on the defendants' failure to produce evidence, personally vouched for the credibility of witnesses, argued facts that were not in evidence, and made false or misleading statements. Given the importance of a prosecutor's summation to the outcome of a criminal trial, particularly in cases such as this where the evidence of guilt was weak, the prosecutors' summation errors in each trial were likely to affect each trial's outcome.

3. The prosecution's admitted non-disclosure, at the time of the initial arraignment and then at the preliminary hearing three days later, of strong exculpatory evidence prevented Plaintiffs' counsel, as reasonably competent counsel would have done, from using such information to argue effectively for their clients' release due to the lack of probable cause to continue with the prosecution or on a low bail. It is my opinion that such effective use would have made release of Boyd and Walker at that time far more likely.

---

[1] I have not been asked for an opinion on the issue of what materials were or were not disclosed by the prosecution to the defense at the Boyd and Walker trials. However, for purposes of my opinion about other issues, I have been asked to assume that the documents and information in question were not disclosed.

**II. Overview of a criminal case.**

**A. Criminal laws.**

In the United States, as in every other country, there are laws that define certain conduct as crimes. More serious crimes are classified as felonies; less serious crimes are classified as misdemeanors. Each crime, whether felony or misdemeanor, is broken down into elements, which typically include both a prohibited act and prohibited mental state. If a person does the prohibited act with the prohibited mental state, he has committed the crime. For example, a person commits the crime of larceny if he wrongfully takes the property of another with the intent to deprive the owner of property. N.Y. Penal Law § 155.05(1). If John accidentally leaves a party with Jane's cellphone in his pocket, he has not committed larceny because although he took Jane's property without permission, the mental element is not satisfied; he did not intend to deprive Jane of her phone but simply made a mistake.

**B. Pretrial procedure.**

The police are responsible for investigating crimes, collecting evidence, pursuing leads, and, if the investigation has identified a perpetrator, making an arrest and swearing out criminal charges in the form of a complaint.

Once a person is arrested and charged with a crime by the police, he is brought before a judge for an initial appearance. From the initial appearance forward, the prosecution is represented by a lawyer employed by the district attorney's office. If the defendant does not have enough money to hire an attorney, the judge will assign an attorney, often a public defender or a private attorney paid by the government, to represent him.

At the initial appearance, the judge will inform the defendant of the charges against him and ask him to enter a plea, either guilty or not guilty. The judge will also determine what conditions need to be set, including any cash bail or bond, to ensure the defendant's return to court for further proceedings. Whether to grant bail, and the amount of bail, will be determined, in substantial part, by the apparent strength of the prosecution's case.

When the defendant is charged with a felony and is in custody pending trial—either because the judge ordered his detention without bail or because he cannot afford the bail that was set—he is, unless indicted first, entitled to a preliminary hearing to determine whether there is probable cause to believe that he committed the felony charged. At this hearing, the prosecution bears the burden to establish probable cause, and the judge decides whether probable cause exists. If the prosecution meets its burden, the defendant remains in custody. If not, the defendant is released.

Before a defendant can be tried for a felony, he must be indicted by a grand jury. A grand jury is a group of 16 to 23 citizens who meet in private and receive evidence presented by the prosecution. Defense counsel is not present, and the defendant cannot question the prosecution's witnesses, cannot call her own witnesses, and cannot submit arguments to the grand jury. Based on this one-sided presentation, the grand jury decides whether there is reasonable cause to believe that the defendant committed the crimes charged. If less than 12 grand jurors find reasonable cause to believe the defendant committed the offenses, the case ends and the

defendant, if detained, is released. If 12 or more grand jurors find reasonable cause to believe the defendant committed the crimes charged, they issue an indictment, prepared by the prosecution, which sets out the crimes charged.

**C. Trial procedure.**

The standards for detaining a defendant pending trial, and for an indictment, is far lower than the standard for a conviction at trial. The United States Constitution requires that the defendant be presumed innocent, that the prosecution bear the burden of proving each element of the offense beyond a reasonable doubt, and that the jury's verdict be unanimous. In other words, the defendant walks into trial an innocent man, and he remains an innocent man unless and until all 12 jurors agree that the prosecution has proved every element of the crime beyond a reasonable doubt. The defendant need not testify, present any evidence, or prove he is innocent; rather, if the jury finds there is a reasonable doubt, it must acquit even if it suspects the defendant is probably guilty.

The first step in a trial is jury selection (also called *voir dire*). In jury selection, a pool of potential jurors (the venire) is assembled. From this pool, a group of 12 trial jurors is selected. In New York, the prosecutor and defense lawyer are allowed to question potential jurors. The main purpose of this questioning is to identify jurors who cannot be fair and impartial, but lawyers also use voir dire to begin acclimating the jurors to their theory of the case.

Once the jury has been selected and sworn, the lawyers deliver opening statements. Lawyers are not permitted to argue at this stage; only to tell the jury what they expect the evidence will show.

After opening statements, the presentation of evidence begins. The prosecution presents its case first, introducing witnesses, records, and physical evidence. After each witness testifies, defense counsel has an opportunity to cross-examine. Once the prosecution has presented all its proof, it rests, at which point the defense may present a case of its own. But because the defense has no burden, it is not required to present any evidence at all, and no inference may be drawn from the defendant's failure to testify or otherwise present a case.

After the presentation of evidence, lawyers on both sides make summations (also known as closing statements) summarizing and synthesizing the evidence and arguing the conclusions the jurors should reach. After the judge explains the law to the jury that it will be required to apply, the jury then deliberates until it reaches a unanimous verdict—either guilty or not guilty. In the absence of unanimity, it may not convict.

**D. The role and duties of the prosecutor.**

The prosecutor's overarching obligation is not to obtain a conviction, but to see justice done. As stated in the ABA Standards, in effect as of 1974, "The legal profession has long been cognizant of the special aspects of the prosecutor's role. The Code of Professional Responsibility, following an ancient tradition, states that 'The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict.' ABA Code of Professional Responsibility EC 7-13 (Final Draft, 1969)." *ABA Standards, The Prosecution Function, Introduction* at p.78.

**1. Disclosure obligations.**

One of the clearest expressions of a prosecutor's obligation to do justice is the rule laid down in *Brady v. Maryland*. There, the Supreme Court held that a defendant is denied due process when the prosecutor withholds, "upon request," exculpatory evidence that is "material either to guilt or punishment." 373 U.S. 83, 87 (1963).[2] After holding for the first time that such a constitutional requirement is binding on state prosecutions in *Brady,* the Court, in ensuing decisions in the years leading up to Plaintiffs' trials in 1977, expanded upon this rule. In *Giglio v. United States*, the Court held that *Brady* material includes not only evidence of the defendant's innocence but also impeachment evidence—that is, evidence undermining a prosecution witness's credibility. 405 U.S. 150 (1972). In *United States v. Agurs*, the Supreme Court held that prosecutors must disclose *Brady* material even if the defense has not specifically requested it. 427 U.S. 97, 110 (1976) ("[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request.")..[3] In subsequent decisions, the Court made clear what was always implicit: a criminal defendant and his counsel are entitled to rely upon the assumption that prosecutors know their obligations and have fully complied with them in good faith. *See Connick v. Thompson*, 563 U.S. 51, 66-67 (2011) ("Prosecutors are not only equipped but are also ethically bound to know what Brady entails and to perform legal research when they are uncertain."); *Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed"); *Strickler v. Greene*, 527 U.S. 263, 286 (1999) (in *Brady* context, citing a "presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties") (internal quotation marks omitted); *Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003) ("conscientious counsel can rely on prosecutors to live up to their obligations").

New York State also had disclosure rules that applied to criminal prosecutions in 1977. Certain limited types of materials had to be disclosed under the Criminal Procedure Law. This was called pretrial "discovery." In addition, in *People v. Rosario*, New York State's Court of Appeals ruled that defendants in criminal cases are entitled to statements by government witnesses that bear on the subject-matter of their direct testimony. 9 N.Y.2d 286 (1961). As the Court of Appeals explained, "a right sense of justice" entitles a defendant to inspect the prior statements of a prosecution witness, before cross-examination, whether or not his statements appear to vary from his testimony on the stand*. Id.* at 289. Recognizing that even statements that appear to be consistent with trial testimony may nevertheless be valuable to the defense, the Court required that if "the statement relates to the subject matter of the witness' testimony and contains nothing that must be kept confidential, defense counsel should be allowed to determine for themselves the use to be made of it on cross-examination." *Id.*

---

[2] In 1985, in *United States v. Bagley*, 473 U.S. 667 (1985), the Court considered *Brady* material in the context of appellate review and held that "materiality" means evidence that could have affected the outcome. In *People v. Vilardi*, 76 N.Y.2d 67 (1990), New York's high court held that the defendant need only show a "reasonable possibility" of a different outcome when the prosecution failed to disclose specifically requested *Brady* material.

[3] Absent a specific request from defense counsel, the prosecution must disclose all evidence that "is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Agurs*, 427 U.S. at 110.

The *Rosario* rule was refined over time to "ensure that a defendant 'receives the full benefit of a [prosecution] witness' statements for impeachment purposes,'" such as by extending it to suppression hearings and to notes and reports of investigating officers. *People v. Ranghelle*, 69 N.Y.2d 56 (1986).[4] Indeed, prior to the Boyd and Walker trials, the Court of Appeals held that *Rosario* requires that handwritten notes, in addition to formal typed and signed statements, be provided to the defense. *People v. Consolazio*, 40 N.Y.2d 446, 453 (1976).

In 1977, the *Rosario* rule and practice, as former ADAs Drury and Henry testified at their depositions, was to disclose witness statements under *Rosario* after each witness testified on direct examination by the prosecutor. *See* Drury Dep. 100-01; Henry Dep. 142-43. This meant that the defense lawyer would not receive the statements in time to prepare for jury selection or the opening statement or, before trial, to develop a defense strategy. However, the *Brady* rule, being a federal constitutional requirement that was binding on all the states, required disclosure of such material upon request or when the prosecutor had possession or control of it. Accordingly, while a witness's prior statement might not have to be disclosed under the state rule until after the witness testified, if the statement was favorable to the defense under *Brady*, it had to be disclosed sufficiently in advance of trial so that defense counsel could reasonably put it to effective use. Prior statements of a witness that were inconsistent with the witness's expected trial testimony, inducements offered to a prosecution witness or other evidence of a witness's motive, bias, or interest in testifying, evidence contradicting the prosecution's theory of guilt, and evidence implicating someone other than the defendant would all have to be timely disclosed to the defense under *Brady*.

**2. Summation.**

A prosecutor's obligation to seek justice continues all the way through summation, where the temptations toward gamesmanship and winning at all costs can be the strongest. As stated by the Supreme Court almost ninety years ago, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones."[5] Prosecutors must always remember that "summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command."[6] In summation, as in every other phase of a case, "our adversarial system of justice is not a game, it has rules, and it is unfortunate when a prosecutor… plays fast and loose with them."[7]

Prosecutors giving a closing argument "must stay within the four corners of the evidence."[8] They are not permitted to make arguments that rely on facts that are not in evidence.[9] Similarly, the law forbids prejudicial or misleading argumentation, such as: making

---

[4] The Court in *Ranghelle* emphasized the critical nature of *Rosario* material by ruling that the wrongful withholding of *Rosario* material required a per se reversal. The per se reversal rule remained in effect until 2001 with the legislative enactment of Criminal Procedure Law § 240.75 that requires a reasonable possibility that non-disclosure contributed to the outcome.

[5] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[6] *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976).

[7] *People v. Payne,* 187 A.D.2d 245, 247 (4th Dep't 1993).

[8] *Ashwal*, 39 N.Y.2d at 109 (internal quotation marks and citation omitted).

[9] *Id.* at 109-10. *See also People v. Wright*, 25 N.Y.3d 769, 779-780 (2015); *People v. Singh*, 128 A.D.3d 860, 863 (2d Dep't 2015).

"irrelevant and inflammatory comments;"[10] expressing "personal belief or opinion as to the truth or falsity of any testimony or evidence,"[11] also known as vouching; appealing to the jurors' sympathies or fears;[12] shifting the burden from the prosecution to the defense;[13] and denigrating the defense, defense counsel or the defendant, including on the basis of race, gender, or sexual preference.[14] Engaging in these prejudicial forms of arguments is improper and can violate the constitutional right to a fair trial.[15]

Such conduct is also unethical. The ABA's Rules of Professional Conduct, for example, which have been in effect since 1974, forbid "arguments calculated to inflame the passions or prejudices of the jury," *ABA Prosecution Function, Part V, Standard 5.8(c)*, arguments expressing the prosecutor's "personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant," *id., Standard 5.8(b)*, and arguments that "intentionally… misstate the evidence or mislead the jury as to the inferences it may draw," *id., Standard 5.8(a)*.

As far back as 1899, the New York Court of Appeals cautioned prosecutors against appealing to "prejudice" or seeking conviction "through the aid of passion, sympathy or resentment."[16] In 1906, the Court of Appeals reversed a criminal conviction because of the prosecutor's improper comments to the jury and expressed its frustration with the frequency of such misconduct:

> We have repeatedly laid down the rule governing prosecuting officers in addressing the jury… We have repeatedly admonished [prosecutors] at times with severity… not to depart from that rule, but our admonitions have not always been regarded, although they were followed by a reversal of the judgment involved, founded solely on the improper remarks of the prosecuting officer… Why should court and counsel violate the law in order to enforce it? What a pernicious example is presented when such officers, intrusted [sic] with the most important duties, in attempting to punish the guilty, are themselves guilty of departing from the law.[17]

---

[10] *Mehmood*, 112 A.D.3d at 853. *See also People v. Damon*, 24 N.Y.2d 256, 260 (1969).
[11] *People v. Bailey,* 58 N.Y.2d 272, 277 (1983) (citation omitted). *See also People v. Lovello*, 1 N.Y.2d 436, 439 (1956); *People v. Weston*, 51 A.D.2d 881, 883 (1976).
[12] *See, e.g., Ashwal,* 39 N.Y.2d at 110; *People v. Moore*, 26 A.D.2d 902, 902 (4th Dep't 1966); *People v. Slaughter*, 28 A.D.2d 1082, 1082 (4th Dep't 1967); *People v. Lindo*, 85 A.D.2d 643, 644 (2d Dep't 1981); *People v. Fernandez*, 82 A.D.2d 922, 923 (2d Dep't 1981); *People v. Fogarty*, 86 A.D.2d 617, 617 (2d Dep't 1982); *People v. Brown,* 26 A.D.3d 392, 393 (2d Dep't 2006).
[13] *People v. DeJesus*, 137 A.D.2d 761, 762 (2d Dep't 1988); *People v. Lothin*, 48 A.D.2d 932, 932 (2d Dep't 1975); *see also Griffin v. California*, 380 U.S. 609 (1965) (prosecutor cannot comment in any way on the accused's personal decision not to testify).
[14] *See, e.g.*, *Damon*, 24 N.Y.2d at 260; *People v. Lombardi,* 20 N.Y.2d 266, 272 (1967); *People v. Gordon,* 50 A.D.3d 821, 822 (2d Dep't 2008); *Brown,* 26 A.D.3d at 393; *People v. LaPorte,* 306 A.D.2d 93, 95 (1st Dep't 2003).
[15] *People v. Adams*, 21 N.Y.2d 397, 403 (1968); *Bellamy v. City of New York*, 914 F.3d 727, 763 (2d Cir. 2019).
[16] *People v. Fielding*, 158 N.Y. 542, 547 (1899).
[17] *People v. Wolf*, 183 N.Y. 464, 471-76 (1906).

**E. The role and duties of the defense attorney.**

The defense attorney's overarching mission is to zealously advocate for his client at every stage of the criminal proceeding. When preparing to defend a criminal trial, the duty of zealous advocacy begins with developing the "theory of the case." New York University School of Law Professor Anthony G. Amsterdam, in his Trial Manual for the Defense of Criminal Cases (originally published in 1967), defines a theory of the case as "a detailed summary of the defense counsel will mount at trial; it weaves together the version of the facts and an articulation of the legal rules or normative precepts on which counsel will rely to secure a favorable verdict." *Trial Manual 6 for the Defense of Criminal Cases*, *Section 7.2.1 Developing the Defense Theory of the Case*. Professor Binny Miller, Dean of Experiential Education at American University Washington College of Law, and a former trial attorney with the U.S. Department of Justice, writes that case theory drives much of the attorney's work, noting that many decisions made during the life of a case rest on the lawyer's case theory, including which, if any, witnesses to call, the content of their testimony, the approach to cross-examination, and the overall very shape of the trial. *Teaching Case Theory*, 9 Clinical L. Rev. 293, 297 (2022).

To identify a case theory, defense counsel must investigate the case. In this, defense counsel is dependent on the prosecutor fulfilling his disclosure obligations. Defense attorneys, especially those assigned to represent indigent defendants, lack anything resembling the support of a team of homicide detectives and a large prosecutor's office to develop and investigate evidence. Detectives who conducted a full-scale investigation would have far more evidence, leads, and information, from the time of the crime through the "closing" of the case with arrests, than a defense lawyer could possibly have. "In the course of many criminal investigations, the state will uncover information that is favorable to the criminal defendant. The likelihood of defense counsel uncovering the same piece of information is usually slim. This unequal access is caused by various factors ranging from a differential in resources to the timing of investigations. The disparity in access to exculpatory evidence is even greater when the defendant is indigent."[18] As a result, defense counsel's investigation relies heavily on the prosecutor's compliance with his disclosure obligations. Police reports of investigation, prior statements of witnesses in any form, photographs, and similar material are indispensable to defense counsel in developing a case theory and then performing supplemental investigation tailored to that theory.[19]

Because the defendant is presumed innocent and can only be convicted by proof beyond a reasonable doubt, a defense lawyer's trial strategy focuses on establishing that the prosecution has not carried its burden. In almost every case, defense counsel will attack the quality of the prosecution's evidence—in particular, the veracity and reliability of its witnesses. Eyewitness testimony is less powerful if the witness had a poor view of the event she claims to have seen or has made inconsistent statements about material facts. A cooperator's testimony is less credible if he is testifying after having been pressured or offered benefits such as immunity from prosecution. A jailhouse snitch's testimony is less credible if he is testifying in exchange for a reduced sentence or other favorable treatment. Such facts are reasons to doubt the prosecution's

---

[18] Capra, *Access to Exculpatory Evidence: Avoiding the* Agurs *Problems of Prosecutorial Discretion and Retrospective Review*, 53 Fordham L. Rev. 391 (1984).

[19] Because *Rosario* required only that witness statements be turned over after the witness's direct examination—in the middle of trial—a defense lawyer would be particularly dependent upon the full and timely disclosure of favorable evidence by the prosecution, consistent with *Brady*.

proof. Defense counsel may also seek to show that the defendant could not have committed the crime—because, for example, he was elsewhere when it occurred—or that a specific person other than the defendant is (or may be) the real perpetrator. These circumstances too may raise a reasonable doubt.

A reasonably competent defense attorney will seek to integrate her theory of the case at every stage of trial, starting with jury selection. Defense counsel will insert aspects of the case theory during questions posed to potential jurors to acclimate the jurors to the defense theory and to exclude jurors who seem the least amenable to that theory. This is only possible if the prosecution has upheld its disclosure obligation and the attorney has been able to develop a theory of defense based upon an informed view of what the evidence favorable to the defendant is or likely will turn out to be.

Opening statements are an opportunity for defense counsel to outline the substance of their case and the central elements of the case theory, to name witnesses and summarize their testimony, to enumerate pieces of physical evidence they intend to introduce and what that evidence will show, and to provide evidentiary reasons to doubt the prosecution's witnesses or its overall case. While counsel may not argue their case in opening statements, they are permitted to describe what they believe the evidence will show, *United States v. Dinitz*, 424 U.S. 600, 612-13 (Burger, C.J., concurring), and prime the jury to view the evidence with a critical eye through a particular lens consistent with their case theory.

As with case investigation, counsel's ability to deliver an effective opening statement is greatly impeded when the prosecution has improperly withheld favorable material. The opening statement is a crucial moment in a criminal trial. Though the jury is repeatedly admonished to presume the defendant innocent, and to withhold judgment until the end of the case, these can be difficult instructions to follow, especially after the prosecution's opening statement lays out the evidence it intends to present. It is vital that the defense counsel's opening rights the ship or even tips it in the defendant's favor by highlighting the evidence that will impeach the prosecution's main witnesses or convincingly incriminate a third-party suspect. However, if the prosecution has not produced favorable material in advance, as *Brady* requires, and defense counsel is unsure how the trial will unfold, he will be forced to keep his opening remarks bland and generic in order to avoid making promises he cannot keep or representations that the trial evidence will disprove.

Once the prosecution's case begins, the defense attorney is called to cross-examine the prosecution's witnesses. As legal scholar Henry Wigmore famously put it, cross-examination is "the greatest legal engine ever invented for discovery of the truth." Wigmore, *Evidence in Trials at Common Law* (1974). Defense counsel can use cross-examination to elicit favorable evidence from a prosecution witness, contradict the witness's testimony, and/or impeach the witness's credibility by revealing their bias, their hostility to the defendant, or their motive for pleasing the prosecution. *Coleman v. New York City Tr. Auth.*, 37 N.Y.2d 137 (1975) (a witness's partiality may be used to impeach credibility); *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (while counsel was permitted to ask the witness whether he was biased, counsel was unable to make a record from which to argue why the witness might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial; thus, defendant's right of confrontation was denied). Proper *Brady* disclosures are crucial to, and often the ammunition for, effective cross-examinations that advance the defense theory.

Once the prosecution rests, the defendant may call witnesses of his own, or take the stand himself. A defendant might, for example, introduce evidence that he was somewhere else when the crime occurred, or introduce evidence that someone else committed the crime.

If the defendant presents evidence, the prosecution has an opportunity to respond with rebuttal evidence.

Finally, during closing arguments, the defense lawyer has the opportunity to, *inter alia*, summarize the evidence, draw inferences from the evidence, and attack the prosecution's case. While lawyers in summation may not instruct the jury as to the law, a defense lawyer can and should key summation to certain known aspects of the judge's jury instructions, such as witness credibility and accomplice corroboration. To be truly effective, the closing argument should be consistent with the lawyer's case theory first raised during jury selection and opening statements. This level of consistency can only be achieved if counsel has been provided with all requisite material with which to fashion a coherent and persuasive case theory from the start of the trial. Summations are the last part of the case presented by each opposing party that the jury will hear and they guide the jury on what evidence to credit and how to integrate it into a total picture. While the defense lawyer's summation may be critical to the outcome of the trial, it may be negated by an effective summation by the prosecutor, who has the last word. Where that summation is pervaded by improper and unfairly prejudicial comments, the defendant's chance to prevail is reduced even further in a way that may deprive him of his constitutional right to a fair trial.

## III. The trial of Darryl Boyd.

### A. Evidence and argument presented at trial.

Darryl Boyd's trial began on April 25, 1977. The opening statement of ADA Timothy Drury made clear that the prosecution's case would rest primarily upon the "so-called accomplice" testimony of Tyrone Woodruff. Boyd Tr. 26. Woodruff alleged that five boys – Boyd, Walker, Darryn Gibson, Floyd Martin, and Tyrone Woodruff – gathered at the Glenny Drive Projects and discussed "get[ting] some money," then two of them cased the Golden Nugget Tavern and joined their friends to lie in wait outside a nearby store known as Simpson's. *Id.* at 26-28. They saw William Crawford come out of the bar and cross the street, at which point they ran toward him, and confronted him at the bottom of his driveway. *Id.* at 28. Gibson repeatedly struck Crawford with a pipe, then the boys carried him up the driveway, where Boyd kicked him and Gibson struck him further with the pipe. *Id.* at 28-29. The boys took his wallet and, leaving him to die, fled back to the Projects, where they divided up the money, Woodruff getting "only" forty or fifty dollars because he "didn't really take part." *Id.* at 29-30.

Defense counsel Mark Hulnick's opening statement, taking up just four transcript pages, was brief and generic, as is to be expected, since at that point Hulnick was unaware of the favorable evidence in the prosecution's possession. He said the jury would hear Woodruff "not be able to describe the crime for you," but said nothing further addressing the substance of his story, or his credibility, just that the prosecution would not be able to prove its case and that "Mr. Boyd did not participate in this crime." *Id.* at 36.

The prosecution's first witness was Buffalo Police Department ("BPD") police photographer Albert Hauser. Hauser testified that he arrived at 2041 Fillmore Avenue, the victim's residence, at 3:20 a.m. on January 3, 1976. *Id.* at 41. The detectives present pointed out blood spots for him to photograph. *Id.* at 41-42. Prosecution exhibits 1 through 5 were Hauser's photographs of the scene. *Id.* at 43. Prosecution exhibits 6 through 10 were additional photographs, taken later, showing the appearance of Fillmore Avenue and the Glenny Drive Projects. *Id.* at 43-44. During cross-examination, Hauser acknowledged that he had taken additional photographs on January 3. *Id.* at 53. ADA Drury, representing that he was disclosing all existing photographs, then showed Hulnick an additional eight photographs. *Id.* at 55-56. None of the photographs introduced into evidence showed footprints in the rear of Crawford's property. The record does not establish whether any of the additional photographs showed footprints in the rear of Crawford's property. If they did, Hulnick did not use them.

The prosecution's next witness was Crawford's neighbor, Lawrence (Larry) Watson, who lived at 2049 Fillmore Avenue. He testified that his wife and the "barmaid," Debbie Jeffrey, were talking with Crawford at the Golden Nugget Tavern. *See id.* at 62-64. Jeffrey asked him (Watson) to take Crawford home. *Id.* at 65. Another man, whom he did not describe and denied knowing, came out of the door with them. *Id*. When he and Crawford stepped outside, however, he noticed that the door to his own house was open. *Id.* at 66. He left Crawford to check if he had been burglarized. *Id.* After checking his house and using the bathroom, he returned to the bar about 15 minutes later, stayed for 10 minutes more, and then, after his wife finished her drink, returned home. *Id.* at 66-68. This was "before midnight probably." *Id.* at 67-68. He told the authorities later that day what he knew and gave a formal written statement on January 7, 1976, which ADA Drury marked as Exhibit 11 and disclosed to the defense. *Id.* at 68-70. Hulnick asked for "a moment" to review this material, noting, "I haven't seen [it] before." *Id.* at 71.

On cross-examination, defense counsel elicited repeatedly that Watson did *not* see Crawford at the bar with a large amount of money and that "[n]obody mentioned it." *Id.* at 75-77. Watson reiterated that he walked Crawford home because "[t]hey asked me." *Id.* at 78. Defense counsel elicited a description of the third man who walked out with them as being in his 30s, with a dark complexion, kinky hair, a mustache, and a beard and that he walked towards the parking lot. *Id.* at 78-80. Watson testified he didn't notice any "youngsters" that night in the bar. *Id.* at 82.

David Donnelly, a member of the Fire Department, testified he was dispatched by 911 to the Crawford house at 1 a.m. on January 3, 1976. *Id.* at 85. He found Crawford lying by the side door in his driveway. *Id.* at 86-87. Drury questioned him using the five photographs of the crime scene he had introduced through Hauser, showing where the body was found and evidence of blood. *Id.* at 90-91. Donnelly testified there was a pool of blood where Crawford was lying near the side door to his house and another pool of blood about two feet away. *Id.* at 91.

On cross-examination, Hulnick elicited that the blood was 10 to 15 feet from the front of the house where the driveway began, that the road conditions were icy, and that there was poor visibility. *Id.* at 98, 102. Donnelly acknowledged he did not notice any trail of blood indicative of dragging. *Id.* at 103.

Gerald Dove, a sergeant assigned to the BPD's homicide bureau, initially arrived at the crime scene around 1:45 a.m. *Id.* at 105. There were two patrol officers present; the victim

already had been removed. *Id.* at 106. He went to the hospital and recovered keys and a watch from the deceased's possessions. *Id.* at 106, 110. He then returned to the scene, where he saw blood splatter three places near the side door. *Id.* at 110-12. It was raining out, with patches of ice in the driveway. *Id.* at 112. He saw no footprints in the yards adjoining Crawford's house. *Id.* at 111. His P-73 report of that night was marked and disclosed as Exhibit 12. *Id.* at 113-114.

Hulnick conducted a very limited cross-examination which did not include showing Dove any crime-scene photos or challenging his testimony of what he saw in the backyard.

Seventeen-year-old Tyrone Woodruff testified next. Woodruff was friends with John Walker, Darryn Gibson, Floyd Martin, and Darryl Boyd. *Id.* at 121. Woodruff testified that, on the night of January 2, 1976, he met John Walker at Walker's apartment and the two of them took a cab to 138 Glenny. *Id.* at 127-29. They went to Floyd Martin's apartment. *Id.* at 130. Darryn Gibson was there. *Id.* They went to find Darryl Boyd and, according to Woodruff's testimony, Gibson said they wanted to "get us some money." *Id.* at 131. Woodruff did not know where Andre Hough was when Gibson allegedly made this statement. *Id.* at 132-33. There was no talk of bringing Hough along. *Id.* at 133.

Woodruff continued that the five boys walked down Fillmore Avenue. *Id.* at 133-34. As they were walking, Gibson picked up a pipe and put it in his sleeve. *Id.* at 134-35. Gibson and Boyd went into the Nugget Inn while the other three remained near Simpson's Store down Fillmore. *Id.* at 135. After a few minutes, Woodruff said, Gibson and Boyd emerged and told the others there was a "big old man" in the bar "with some money" and they would wait until he came out. *Id.* at 135-36. A few minutes later, a man came out, by himself, and crossed the street. *Id.* at 136-37. The boys then "walked" or "trotted up" to him and caught him as he was going up his driveway. *Id.* at 137. Woodruff testified they demanded the man's money, but he refused. *Id.* at 138. Gibson began hitting the man with the pipe. *Id.* The man fell to the ground, and the boys dragged him up the driveway, where, Woodruff claimed, Boyd kicked him "in the side" and the others beat him more, while Woodruff retreated to the street to act as a lookout. *Id.* at 138-46. Boyd took his wallet and the boys fled down Fillmore and returned to the Glenny Projects. *Id.* at 146-47. On the stairway to the roof of 138 Glenny, Woodruff testified, they split up the robbery proceeds. *Id.* at 147. Woodruff received "around" $50 or $40 because he "didn't do nothing." *Id.* at 148-49. Woodruff recalled arguing about it. *Id.* at 149. He said he didn't know how much the others got. *Id.* Floyd Martin called a cab, which Woodruff and Walker took home. *Id.* at 151.

Woodruff testified that when first interviewed on January 11, 1976, he denied any knowledge of the crime and, agreeing with ADA Drury's words, "remained loyal." *Id.* at 153. The next day, brought back by the police in the company of his father and pastor, he told the police "half" the truth. *Id.* at 153-54. Then he got a lawyer and again testified to "half the truth" in City Court (*i.e.*, at a preliminary hearing), while receiving immunity from prosecution. *Id.* at 154-55. He admitted, without elaboration, to also testifying to "half" the truth in the grand jury but he agreed with Drury that he told the "truth" when he testified at a previous trial (that of Darryn Gibson). *Id.* at 155-56.

At the close of Woodruff's direct examination, ADA Drury marked as Exhibits 13 through 17, and handed to defense counsel, the following *Rosario* material: Woodruff's sworn statements to police on January 11 and January 12, 1976; Woodruff's preliminary hearing testimony; Woodruff's grand-jury testimony; and Woodruff's trial testimony in the prosecution

of Darryn Gibson. *Id.* at 157-59. Hulnick stated he had not seen the grand jury testimony before but had seen the other materials. *Id.* at 157.

During his cross-examination of Woodruff, Hulnick did not refer to any document besides those Drury had disclosed. When cross-examined by Hulnick, Woodruff could not remember the times of any of the events he described in his direct examination, the victim's appearance, except that he was white, or the color of his wallet. *See id.* at 177-82, 187, 191-93, 199, 255. Woodruff repeated that his father and his minister went with him to the police station on January 12 and thus were there before he changed his story. *Id.* at 200-01. He first denied the police made any promises to him before he changed his statement, but then acknowledged that they indicated they would go "easy" on him. *Id.* at 201. He insisted that his entire conversation with police on January 12 was contained in his written statement of that date. *Id.* at 204-05. He acknowledged receiving immunity at the preliminary hearing on January 16 but didn't mention being *promised* immunity earlier. *Id.* at 208-10. Woodruff was also questioned about contradictions in some of his earlier statements. For example, in his January 12 statement, he denied receiving any of the robbery proceeds, *id.* at 207, whereas he testified at the preliminary hearing that he received only $5, *id.* at 214-15. Woodruff denied any recollection of telling police he received $15 or $25. *Id.* at 215-16. Woodruff also acknowledged that he did not initially tell the police that two boys had gone inside the Golden Nugget Inn and seen Crawford inside, and that the five of them had waited for Crawford by Simpson's Store. *Id.* at 205-06. Hulnick caused Woodruff to repeat his testimony that (contrary to Watson's testimony) he saw no one come out of the bar with Crawford. *Id.* at 189-90.

A medical examiner, Charles Severson, testified that Crawford had died from massive head injuries. *Id.* at 273. He also had injuries to his face and neck, resulting from at least 11 blows by a heavy, rounded object, *id.* at 274-76; he made no mention of any injuries to any other place on Crawford's body. Crawford had a blood alcohol level of 0.23. *Id.* at 279-80.

Margaret Crawford, the widow of victim William Crawford, testified that she heard a thumping sound on the side of the house where her husband was later found "before 11:00." *Id.* at 345. She said she wasn't worried when he didn't appear at that time, and went back to bed, because "he had a key." *Id.* at 346. ADA Drury did not disclose any prior statement from Mrs. Crawford. On cross-examination, Hulnick only had her reiterate that she heard the thumping noise before 11 p.m. *Id.* at 349.

Andre Hough testified that he was friends with the four defendants but not with Woodruff. *Id.* at 351-53. On January 2, when he was 15 years old, he was with Darryl Boyd in the Washingtons' apartment at 194 Glenny Drive. *Id.* at 353. Geselle Washington was Darryl's girlfriend. *Id.* at 355. About 10 or 11 p.m., Hough said, other boys arrived and asked for Darryl. *Id.* at 356-57. Darryn Gibson mentioned the Golden Nugget Inn and said, "We'll get some money tonight," but when Darryl asked for Hough to come along, another boy objected "no, he might squeal." *Id.* at 357-59. The next day, Hough testified, Darryl accused Hough of killing some man with a pipe, but Hough said he could prove he was at Ms. Washington's (which Darryl would have known because, according to Hough, he had been there too). *Id.* at 360-61. Darryl then confessed, in front of his mother, that he and Hough had killed the man; Darryl's mother said Darryl was lying. *Id.* at 361. According to Hough, Darryl asked Hough to call the police to see if they had their names already, which he did. *Id.* at 362. As Hough was giving their names, Hough testified, Darryl grabbed the phone and hung up after Hough gave his own name

but before he finished giving Darryl's full name. *Id.* at 362-63. They walked down Fillmore and Darryl pointed out 2041 Fillmore where the man was killed. *Id.* at 363. Hough testified they stopped at Simpson's Store where Darryl pulled out a great deal of cash, with a "knot" of money "coming out of his pockets," and purchased some cigarettes and candy. *Id.* at 363-64. As they continued walking to the Projects, Hough continued, Darryl bragged about committing the robbery and murder. *Id.* at 364-67.

Still on direct, Hough acknowledged that he initially told the police that the other boys simply got Darryl from Ms. Washington's house. *Id.* at 368. But, after he took a lie-detector test, the police accused him of lying and threatened to blame him for the murder, at which point he gave another statement. *Id.* at 368-69. He testified that his present testimony was consistent with his testimony in the grand jury. *Id.* at 370. ADA Drury then marked, as Exhibits 19, 20 and 21, and handed to defense counsel, Hough's two typed, signed statements and his grand-jury testimony. *Id.* at 370, 373. Hulnick said he had never seen any of these documents. *Id.* at 371.

On cross-examination, Hough acknowledged telling an investigator in an interview that the boys came to get Darryl between 11 p.m. and midnight. *Id.* at 382. He again claimed that by that time Darryn Gibson was already saying he knew there was a man with money at the Nugget Inn. *Id.* at 386-87. Hough admitted that when he first told police he knew nothing about the murder, he was told he had "passed" a lie-detector test, but police told him it was "nothing but a machine." *Id.* at 408-10.

Following Hough's cross-examination, the prosecution rested.

The defense put on four witnesses. Debbie Jeffrey, the barmaid, testified that about 10:30 or 11:00 p.m., Crawford briefly took money from a billfold to pay his last bill and seemed to have about $300. *Id.* at 457-58. She testified that Crawford did not flash the money around or lay it on the table and was careful not to attract attention with it. *Id.* Larry Watson, Crawford's neighbor, told her he didn't see any money on Crawford. *Id.* at 468. Jeffrey didn't see Darryl Boyd in the bar, which catered to an older crowd. *Id.* at 459-60. She asked Watson to take Crawford home. *Id.* at 462. ADA Drury briefly cross-examined Jeffrey to elicit that she may not have noticed everyone who was in the bar, *id.* at 465-66, but he did not use or disclose any statement she had made to the police to contradict or impeach her.

Alison Zachery, Floyd Martin's sister-in-law, testified that on the night of January 2, 1976, she was home in the Glenny Drive projects. *Id.* at 508-09. Martin, Walker, Woodruff, and Gibson were at her apartment playing cards until 11:15 or 11:30 p.m., at which point they left. *Id.* at 509-13.

Joyce Washington, age 16, testified she was at her family's apartment with Darryl Boyd and Andre Hough until after the 11 o'clock news or midnight, when the other boys (Martin, Walker, Woodruff, and Gibson) came over and got Boyd; Hough remained. *Id.* at 473-78.

Dorothea Luster, the mother of the Washington children, testified as well that Boyd and Hough were inside the apartment, having arrived about 8 p.m., and that, after there was a knock on the door at about midnight, Boyd went outside and left while Hough remained inside. *Id.* at 488-91. ADA Drury impeached her with her written statement to police saying Boyd was with her several hours earlier that day. *Id.* at 503-04.

The prosecution then called a rebuttal witness, Detective Michael Guadagno. Guadagno testified that he participated in the Crawford homicide investigation and took a signed, sworn, written statement from Boyd, in question-and-answer format, which he proceeded to read into the record. *Id.* at 522, 528-30. In the statement, Boyd first said he and Gibson left the Glenny Drive apartments and, after Walker and Woodruff departed in a taxi at about 10:45 p.m., and after Floyd Martin called a second cab, they walked home. *Id.* at 538. Asked to account for Boyd's mother's alleged statement that Darryl got home that night about 1 a.m., Boyd then stated, according to his signed statement that he went to the house of an 18-year-old girl, Cheryl Anderson, at 234 Glenny Drive, 6th floor, and agreed he didn't get home until 1 a.m. *Id.* at 540-41. Guadagno testified that he did in fact interview Boyd's mother. *Id.* at 542. ADA Drury disclosed, in addition to Boyd's signed statement, a *Miranda* waiver form, *id.* at 526, and a P-73 that Guadagno had made in connection with taking Boyd's statement, *id.* at 544-45, but he did not disclose any other report of Guadagno's. On cross-examination, Guadagno acknowledged that Boyd had agreed to take a lie-detector test but testified that he did not know whether one had been administered. *Id.* at 558-59.

The case then proceeded to summations. Defense counsel Mark Hulnick based his defense on the timing of the crime: the prosecution contended it happened before 11:00 p.m., but Hulnick emphasized, relying on the defense witnesses, that Boyd had not left the Glenny Projects until about midnight. *Id.* at 600-02. While Hulnick noted that, according to Watson, an unidentified man had followed Crawford out of the bar, he did so not to suggest that Watson or this man committed the crime, but merely to contradict Woodruff's testimony that Crawford came out of the bar alone. *Id.* at 577, 581. Hulnick advanced no third-party culpability defense.

Hulnick argued that the crime-scene evidence, the testimony of the witnesses who had been in the bar, and the medical-examiner's testimony did not support Woodruff's account, *id.* at 582-83, 602-04, and that Woodruff had contradicted himself in his various statements about how the crime was committed and how much money he received from it, *id.* at 583-87. He blamed pressure on Woodruff, Woodruff's immunity deal, and a course of "indoctrination" by Drury and the detectives for the evolution of Woodruff's story over time. *Id.* at 587-88. As for Hough, Hulnick argued his testimony wasn't credible. *Id.* at 595-97.

ADA Drury's summation will be discussed below.

**B. What a reasonably competent defense attorney would have done with the material withheld from Boyd's counsel.**

I have reviewed video of a press conference given by Erie County District Attorney Flynn in 2021 in which he acknowledged that the case presented to the jury was "weak," *see* BOYD-WALKER-00011523 at 19:35 (Press Conference of John Flynn, Aug. 18, 2021), and, based upon my review of the trial transcripts, his assessment is correct. There were no fingerprints, blood-stained clothing, photographs, or other physical evidence connecting any of the defendants to the murder scene. All four teenage defendants—Darryl Boyd, Darryn Gibson, Floyd Martin, and John Walker—maintained their innocence during police interrogation and each one, when asked, consented to polygraph examinations. The prosecution's case rested on the tentative testimony of 17-year-old Tyrone Woodruff, who initially denied under oath any knowledge of the incident, who admittedly was induced by the police to change his story, and who provided conflicting versions. Because Woodruff was given full immunity and was alleged

to have been a co-conspirator, his testimony required corroboration. New York Criminal Procedure Law § 60.22; *People v. Basch*, 36 N.Y.2d 154 (1975). That corroboration was supplied by 15-year-old Andre Hough, who also initially denied any knowledge of the crime, "passed" a police-administered polygraph examination concerning the truthfulness of his initial statement, and then was induced by police to change his account.

The frailty of the prosecution's case at the Boyd trial (and the trial of Walker) is perhaps best illustrated by the trial of Floyd Martin. The evidence at Martin's trial was essentially the same as the others, except that defense counsel allegedly received a photograph showing footprints leading to Larry Watson's house which other counsel did not have. Counsel recalled relying on this photograph to argue that Watson was the real killer, and Martin was acquitted.

Reasonably competent criminal defense counsel could have made effective and potentially case-dispositive use of the evidence that Boyd and Walker contend was improperly withheld from their defense attorneys. Given that the prosecutions of Boyd and Walker relied on weak evidence, it would not have taken much more to potentially tip the outcomes the other way.

Though a specific request is not required, Boyd's defense attorney, Mark Hulnick, specifically requested *Brady* material well in advance of trial, triggering the prosecution's duty to disclose, under *Brady* itself, "upon request." *See* COE002311-28 (Omnibus Motion by Mark Hulnick, Apr. 6, 1976). Hulnick noted that he would lack sufficient time to contact and interview witnesses if he were forced to wait until the time of trial to receive this material, and that he might not be able to independently acquire this kind of exculpatory material. *See id.* at COE002315-17. Long before Boyd's trial began, as former ADA Drury acknowledged, the court ordered that *Brady* material be disclosed. Drury Dep. 120-22. Nevertheless, according to Boyd and Walker, ADA Drury withheld a wealth of material from Hulnick that a reasonably competent defense attorney in his position would have investigated and been able to effectively use. Such material would have affected reasonably competent counsel's strategy decisions while allowing counsel to (i) make a strong case that Larry Watson and/or Jerome Boyd killed William Crawford; (ii) establish an alibi for Boyd; (iii) further undermine the credibility of essential witnesses Tyrone Woodruff and Andre Hough, and (iv) discredit the integrity and good faith of the BPD investigation and the prosecution.

### 1. Evidence that Larry Watson and/or Jerome Boyd killed William Crawford

In his summation, Hulnick argued, based upon the trial evidence that he had helped develop through witness examinations, that Crawford had not visibly displayed a lot of cash. This was an effort to contradict Woodruff's story that Gibson and Boyd had gone inside the bar and seen Crawford flashing his money. In addition, Hulnick argued, again based in part on his examination of prosecution and defense witnesses, that Crawford had left the bar, and likely been assaulted, before 11 p.m., while Boyd and his friends did not leave the Glenny Projects until later. Reasonably competent defense counsel likely would have pursued a very different strategy had he been aware of the police-gathered evidence that the prosecution allegedly did not disclose to defense counsel before or during the Boyd and Walker trials.

To begin, Hulnick noted that someone followed Crawford out of the bar, Boyd Tr. 577, but he was unable to relate this to any theory that someone else committed the killing. Instead, he

used it only to contradict Woodruff's testimony that Crawford came out alone. *See id.* at 581. The allegedly undisclosed evidence regarding Watson, Jerome Boyd, and the timing of the assault and of the boys' taxicab ride home, supported a much stronger argument: that Watson and/or Boyd saw Crawford flashing his money and followed him out of the bar to rob him, and that the robbery was committed after 11:30 p.m., by which time Walker and Woodruff had gone home in a taxicab and Crawford was walking, or getting ready to walk, home.

An examination of William Crawford's body showed that he died from blunt-force trauma. His wallet was missing, but, according to a police report, a set of keys was found by his corpse at the hospital. COE002125-27 (P-73 by Gerald Dove, Jan. 3, 1976).

In an undisclosed P-73 dated January 3, 1976, the victim's wife, Margaret Crawford, was quoted as telling detectives that when her husband went out drinking, it was their practice for him to come to the side door and ring the bell for her to come unlock the door—suggesting that William Crawford was in the habit of leaving his keys at home and thus that the keys found near his body were someone else's. *Id.* This contradicted the testimony ADA Drury elicited from Mrs. Crawford that her husband would have his keys.

Contrary to her trial testimony that she heard the loud thumping noise on the side of her house before the 11 o'clock news, Margaret Crawford told police, in an undisclosed P-73 dated January 6, that this occurred at about 11:30 p.m. COE002146 (P-73 by Robert Grabowski, Jan. 6, 1976). She also said her husband usually came home from drinking about midnight. *Id.*

Bartender Debbie Jeffrey told police, in an undisclosed P-73 dated January 3, that William Crawford had been drinking at the Golden Nugget on the night of the murder. COE002131-34 (P-73 by Robert Grabowski, Jan. 3, 1976). Also present was Crawford's neighbor, Larry Watson, along with Larry Watson's wife, Julia Watson, and his stepson, Bill Howard. *Id.* In her signed statement dated January 6, Jeffrey said that at one point Crawford pulled out $300 in cash and tried to lay it out on the bar, but Jeffrey told him to put it away. COE004617-19 (Statement of Debbie Jeffrey, Jan. 6, 1976). Watson repeatedly testified at trial that he didn't notice this money, but Jeffrey told police she was certain that Larry Watson and his party noticed Crawford displaying the cash; indeed, police noted in a January 12 report, also undisclosed, that Jeffrey said it was "impossible" that Watson didn't see it. COE002183-84 (P-73 by Vincent Pantano, Jan. 12, 1976).

Ultimately, Jeffrey's undisclosed January 12 statement continued, she told Crawford it was time to go home. *Id.* She further stated that Larry Watson *volunteere*d to walk Crawford back, and the two of them left the bar together. *Id.* This claim contradicted Watson's trial testimony against Boyd that he "was asked" to take Crawford home. Significantly, the police pointedly noted that Jeffrey was "definite" on this point. *Id.* They evidently noted this because they recognized that Jeffrey's statement contradicted an earlier statement Watson had made to police, in a P-73 dated January 3, not mentioning taking Crawford home at all, COE002131-34 (Grabowski P-73), as well as Watson's insistence to police, in a subsequent interview that was consistent with his trial testimony, that he *was asked* to walk Crawford home, as opposed to *volunteering*, COE002160-61 (Statement of Larry Watson, Jan. 7, 1976). While Jeffrey testified this occurred between 10:30 and 11:00 p.m., in her undisclosed January 12 statement, she said it might have been an hour later. COE002183-84 (Pantano P-73).

Jeffrey further told police in her undisclosed January 12 statement that, about 20 minutes after leaving the bar with Crawford, Larry Watson returned, collected his wife, and abruptly left with her without saying goodbye or finishing their drinks. *Id.* This contradicted Watson's trial testimony that he waited for his wife to finish her drink. Jeffrey said their leaving in a rush, without finishing their drinks, was "strange" as he "never" did so. *Id.* Jeffrey also noted that, shortly after the Watsons left, Julia Watson called the bar saying that her husband could not find his keys and was wondering if he left them at the bar. COE002131-34 (Grabowski P-73). Their stepson, William Howard, responded that he had put them in Watson's coat pocket. *Id.*

As noted in the undisclosed P-73 of January 3, Jeffrey told police that she believed Larry Watson murdered William Crawford. *Id.*

Frances Kalb, a Golden Nugget patron, largely corroborated Jeffrey's undisclosed statements in a P-73 interview and a signed, sworn statement – also both undisclosed -- that William Crawford and Larry Watson left the Golden Nugget together around 11:30 p.m., after Crawford had flashed his money; that Watson returned about 20 minutes later, collected his wife, and left again; and that sometime later, Jeffrey received a phone call from Julia Watson inquiring about Larry Watson's missing keys. *Id.*; *see also* COE002147-48 (Statement of Frances Kalb, Jan. 6, 1976).

When Watson's relatives were interviewed, they told conflicting stories. Bill Howard claimed that Crawford left the Golden Nugget alone at 1:30 am—after paramedics had recovered his body. COE002125-27 (Dove P-73). Julia Watson initially said that Crawford left the Golden Nugget alone at 9:30 p.m., and that she and her husband left together at 11:15 p.m. *Id.* Julia Watson later admitted that Larry Watson left the bar with Crawford and returned 20 minutes later, and that after she and her husband left, Larry Watson discovered he was missing his keys. COE002158-59 (Statement of Julia Watson, Jan. 6, 1976).

According to the testimony of James McLeod, attorney for Floyd Martin, a crime-scene photograph that was disclosed at the Martin trial, but apparently was not disclosed to Boyd's (or Walker's) counsel, showed footprints seemingly left by a heavyset man in Crawford's backyard, pointing in the direction of Watson's house, which lies two houses down from Crawford's. McLeod Dep. 137. Such a photograph would have impeached the testimony given by the first detective on the scene, Sgt. Dove, that there were no footprints in the snow in the backyards adjoining the Crawford property.

As noted above, Boyd and Walker allege, and I assume, that ADA Drury did not disclose the above statements favorable to the defense of Margaret Crawford, Debbie Jeffrey, and Frances Kalb, nor did he disclose the footprint photograph testified to by attorney McLeod. Any reasonably competent defense attorney, armed with this material, would have used it to make a plausible, indeed compelling, case that Larry Watson was the real killer. Watson saw Crawford flashing cash at the bar, this argument would run, and when the intoxicated Crawford needed an escort home, Watson volunteered. The two of them left the bar together at 11:30 p.m. (followed by Jerome Boyd) and walked across the street up to Crawford's side door. Before Crawford could ring the doorbell, as he ordinarily would, Watson attacked, causing the thud that Margaret Crawford heard around 11:30 p.m. In the process of attacking Crawford and taking his wallet, Watson accidentally dropped his keys. To avoid being seen by passersby on Fillmore Avenue, Watson left the crime scene through Crawford's backyard, leaving footprints in the snow.

Watson reached his own house, went inside, and ensured that he did not have any blood on his hands or clothes. He then returned to the bar, gathered his wife, and left again, in a rush, only to discover that he was missing his keys, prompting Julia Watson's phone call to Debbie Jeffrey. Police interviewed Bill Howard and Julia Watson before they'd had a chance to coordinate their stories, so they told contradictory lies about when and how Crawford left the bar. When Watson was interviewed, he revealed his consciousness of guilt by lying about what he saw and did.

This is the sort of concrete counter-narrative that jurors find most appealing, and defense counsel could have compared it favorably with the prosecution's case. Whereas the prosecution was relying on biased and coerced witnesses, the evidence implicating Watson would have been based upon unbiased testimony of civilians Debbie Jeffrey, Frances Kalb, and Margaret Crawford, and on a police crime scene photograph, as well as Watson's own admissions. And whereas Woodruff's account was markedly *inconsistent* with the physical evidence, the theory of Watson's guilt was entirely consistent with the physical evidence. Counsel could have emphasized this comparison by reminding the jury that the prosecution bears the burden of proof: Boyd could be convicted only if the jury found Woodruff's weak account convincing beyond a reasonable doubt, whereas Boyd would have to be acquitted if the jury reasonably believed Larry Watson *might* have killed Crawford.

Then-ADA Drury also is alleged to have failed to disclose material implicating Jerome Boyd. On January 3, 1976, police received an anonymous tip that "Andre Howe" and "Gerry Boyd" killed William Crawford. COE002135 (P-73 by Robert Grabowski, Jan. 3, 1976). The next day, detectives interviewed witnesses using a mugshot of Jerome Boyd (no relation to Darryl Boyd), a man who lived near the Golden Nugget. COE002140 (P-73 by Vincent Pantano, Jan. 4, 1976). Ralph Davis, owner of the Golden Nugget, recognized Jerome Boyd as a regular patron. *Id.* Bartender Teddy Love told police that Jerome Boyd was drinking at the Golden Nugget the night of Crawford's murder. *Id.* Frances Kalb recognized Jerome Boyd, and said he was talking to Julia Watson the night of the murder. COE002147-48 (Kalb Statement). Larry Watson said that he and Crawford were followed out of the bar by a tall, dark man with a moustache and kinky hair in his 30s, which also was similar to Jerome Boyd's appearance. Boyd Tr. 78-80. A reasonably competent defense attorney could have used this evidence to sow further doubt as to Darryl Boyd's guilt by suggesting that Jerome Boyd helped Watson commit the murder, or that he did it himself after Watson went home, assuming the jury chose to believe that part of Watson's testimony.

Such counsel could also have used the allegedly undisclosed Larry Watson and Jerome Boyd evidence to attack the integrity of the police investigation. *See, e.g., Kyles v. Whitney*, 514 U.S. 419, 446 (1995). As late as January 12, police were still filing reports revealing their suspicion of Watson. *See* COE002183-84 (Pantano P-73). As late as January 15, a police report containing a paragraph about Jerome Boyd ended with the line: "This investigation will continue." COE00215 (P-73 by John Montondo, Jan. 15, 1976). But it didn't. There was no reported further investigation of Watson or Jerome Boyd, despite the evidence suggesting one or both were the perpetrators. Jerome Boyd, according to police records, was never interviewed, and Larry Watson, far from being grilled by police, was subjected to soft interviews and called as a prosecution witness at trial. A reasonably competent defense attorney would have used these facts to show that, once they succeeded in turning Woodruff against his friends, the detectives seized the opportunity to make arrests and close their case rather than concentrating on apprehending the true perpetrators.

The significance of the third-party culpability evidence was acknowledged by Drury himself during his deposition. He admitted that, based upon the evidence, at the time he was presenting his case to the grand jury to obtain an indictment of the four boys, *he* still suspected Larry Watson and Jerome Boyd of joint involvement in the homicide. Drury Dep. 402-03. Yet he allegedly did not disclose the evidence supporting his suspicion to the defense.

**2. Evidence contradicting Woodruff's account.**

As set forth above, Woodruff's story at trial was that Darryn Gibson said to other boys (Walker, Boyd, Martin, and Woodruff) that he wanted to "get us some money"; that the five of them walked down Fillmore Avenue; that Gibson and Boyd went into the Golden Nugget and observed a "big old [white] man" at the bar with some money; that the five boys lay in wait at Simpson's Store; that when Crawford crossed the street they walked or ran up to him and assaulted him at the bottom of his driveway; that they dragged Crawford up the driveway to the side door and took his wallet; that they returned to the Glenny Projects and split up the proceeds; and that Woodruff and Walker then took a cab home. Mark Hulnick defended by attempting to argue that Woodruff's account was inconsistent with the crime-scene evidence, which didn't show any evidence of dragging, with the medical examiner's lack of finding of any injuries to Crawford's body consistent with Boyd having kicked him, and with bartender Debbie Jeffrey's testimony that Crawford was not flashing his money. However, in my opinion, had ADA Drury promptly disclosed all material favorable to the defense, Hulnick's defense likely would have been different and much stronger.

The evidence that most dramatically demonstrated Boyd's innocence, contradicted Woodruff's testimony, and impugned the police investigation was the evidence obtained from the Fillmore Cab Company. The police set out to see if they could confirm Darryn Gibson's statement of January 7, 1976—that Woodruff left the scene and went home with Walker at about 11:30 p.m.—and in fact did corroborate it. According to Guadagno's P-73 of January 8, they found, in the records of the Fillmore Cab Company, that there were just two pickups that night at the Glenny Projects: one at 11:28 p.m. and the other at 11:44 p.m. COE002173-74 (P-73 by Michael Guadagno, Jan. 8, 1976). Not only did this almost exactly correspond to what Gibson told the police, but it also was consistent with Darryl Boyd's January 8 statement. Boyd said that after Walker and Woodruff took the first cab (although he estimated the time as 10:45 p.m.), Floyd Martin called a second cab to take other friends home just as Boyd and Gibson were leaving to walk home. *See* COE002170-71 (Statement of Darryl Boyd, Jan. 8, 1976).

A reasonably competent defense attorney would have used the taxicab evidence, in combination with the allegedly suppressed witness statements discussed above, to contradict Woodruff's entire story and give Boyd a convincing alibi. As previously noted, the witness statements of Frances Kalb and Margaret Crawford put Crawford's departure from the Golden Nugget, and thus the time of the murder, at 11:30 p.m. or later. In the same undisclosed report containing Kalb's statement, Watson was quoted as saying Crawford didn't leave the bar until midnight. Meanwhile, Jeffrey estimated for police that Crawford may have left as late as 11:30 p.m. If Crawford did not leave the Golden Nugget until 11:30 p.m. or later, and Woodruff and Walker were in a cab heading home at 11:28 p.m., Woodruff's account of the five boys assaulting Crawford is simply impossible. One thing that Woodruff was definite about in all his

statements, including his initial statement of January 11 and every subsequent statement, was that he and Walker left the Projects that night in a taxi and went directly home.

The taxicab evidence would have stained not only Woodruff's testimony but also the police investigation. Confronted with unbiased witness testimony putting the time of the murder around 11:30 p.m., and an alibi in the form of the taxicab evidence, the police filed away their report and apparently did no further investigation of the taxi rides or of the timing of the crime. Instead, knowing of this powerful evidence of the boys' innocence, they pressured Woodruff to falsely accuse Boyd, Walker, and the other boys of the crime while abandoning their investigation of the two other likely suspects. A reasonably competent defense attorney would have highlighted such conduct to show that the police had no interest in pursuing justice; rather, they single-mindedly pursued the low-hanging fruit of a group of black teenagers once they extracted a confession from one of them, and simply discontinued their investigation of the two other likely suspects.[20]

**3. Additional evidence impeaching Woodruff.**

Tyrone Woodruff was the single most important witness to the prosecution's case, and the only source of direct evidence against Boyd. In his summation, Mark Hulnick questioned whether Woodruff had been present when the crime was committed, given the inconsistencies in his various accounts, the pressure he had faced from police, and the immunity he eventually had received in exchange for his testimony. But the material that Hulnick was allegedly denied is the material he needed for a maximally compelling cross-examination. From Woodruff's trial testimony and the limited material ADA Drury disclosed,[21] Hulnick was able to show the jury that Woodruff's story had changed. He could not, however, show the jury *why* Woodruff's story changed—the intense police pressure to adopt facts fed to him and align his statement with Hough's and the other evidence police had previously developed – which was necessary to show the jury that it should not accept as reliable the later version.

When Woodruff was initially interviewed on January 11, he said the same thing as the other boys: on the night of the murder, he was with Boyd, Walker, Martin, and Gibson at Sheryl Floyd's apartment, until he and Walker took a cab home. Interviewed again on January 12, 1976, Woodruff initially repeated his prior denials before later implicating Darryn Gibson in the murder. On direct examination, ADA Drury led Woodruff to testify that he went down with his

[20] Drury did belatedly disclose the P73 containing the taxicab evidence to Gibson's counsel well into Gibson's trial, but explained on the record only that he was doing so because of a paragraph in the report containing a statement arguably favorable to the defense by a witness named Shirley Floyd. Gibson Tr. 184, 512-13. He made no mention on the record of any investigation of the taxicab company. *Id.* Without simultaneous disclosure of the statements of witnesses putting the time that Crawford left the bar at 11:30 p.m. or later, the timing of the taxicab pickups would have been meaningless. The original court complaint filed in City Court alleged, and Drury's theory at trial appeared to be, that the crime occurred well before 11:30, and the defense lacked any contrary evidence. There is no evidence I am aware of showing that Hulnick (or John Walker's counsel) ever received either the taxicab evidence disclosed to Gibson's counsel or the witness statements needed to make effective use of the taxicab evidence.

[21] As noted above, at the close of Woodruff's direct examination, ADA Drury handed to defense counsel Woodruff's sworn statements to police on January 11 and January 12, 1976; Woodruff's preliminary hearing testimony; Woodruff's grand-jury testimony; and Woodruff's trial testimony in the prosecution of Darryn Gibson.

father and pastor and just decided to come clean. What ADA Drury did not disclose was the tactics police used to break him down, and the apparent lies they told in their reports.

Woodruff, under cross-examination by Hulnick, did acknowledge he was promised leniency in exchange for his cooperation and that, eventually, at the preliminary hearing held four days after his January 12 statement, he was formally granted judicial immunity. However, Drury did not reveal what he admitted in his recent deposition: that Woodruff did not change his story until *police*, on January 12, having arrested him for the murder and threatened him with lengthy imprisonment, gave him a life-line of complete immunity. Drury Dep. 235, 262-63. Drury admitted that such a promise by police, without the District Attorney's authorization, "probably" was improper, *id.* at 234, and this is certainly so. Police have no authority to promise or grant immunity—only the court can grant immunity on the District Attorney's application. But, as Drury testified, once the police made the improper promise, he honored it. Skilled defense counsel could have shown that this was a principal reason Woodruff changed his story.

Of additional importance are two P-73s, one prepared by Detective Manista and the other prepared by Detective Hunter, memorializing Woodruff's about-face. The two reports are completely inconsistent, permitting the defense argument that one, or most likely both, were false. The Manista P73 states that at 5:40 p.m., he received a telephone call from a "negro female who wished to remain anonymous." COE002202 (P-73 by Francis Manista, Jan. 12, 1976). The caller told him that Walker, "Darryl Gibson," Martin, and "Toni" were responsible for Crawford's murder. *Id.* Manista also claimed in this report that Tyrone (Tony) Woodruff was at the precinct "listening" to the anonymous call as it occurred. *Id.* Manista noted that Woodruff became visibly nervous and was barely able to raise his coffee cup. *Id.* After the call concluded, Manista wrote, he asked Woodruff "if he could remember anything now." *Id.* It was then that Woodruff said, "Gibson was hitting him, *I think*" (emphasis added). *Id.*

A reasonably competent defense attorney would have used this evidence to show that Woodruff's changed story, and the prosecution's case, was built on police coercion of a terrified teenager, and that the police investigation lacked integrity. Only after being threatened with a murder prosecution, offered complete immunity, and directed toward Gibson and the other boys, who were named for him (according to Manista's report) by the anonymous caller, did Woodruff abandon his prior account of the evening and implicate Darryn Gibson. Even so, his first statement was tentative: he said Gibson hit the victim, "I think." The undisclosed police report documented how terrified the purported call made Woodruff. Manista's account of an anonymous phone call just happening to come in while Woodruff was present, and the caller just happening to implicate Woodruff and the other boys, and Woodruff just happening to overhear it despite being in the control of the police, would have been effectively challenged by defense counsel. Counsel could have effectively argued that Manista made the whole thing up to explain Woodruff's change of heart, or that the call was staged to terrorize this 17-year-old boy.

The Hunter P-73, memorializing the very same interview with Woodruff, gave an entirely different explanation of what led Woodruff to change his story and begin to confess. It portrayed Woodruff calmly "munching on a piece of Devil food cake that his mother had sent down with him," and then, of his own volition, without any intervening call from an anonymous "negro female," admitting that he was a witness to the Crawford homicide. COE002197-99 (P-73 by James Hunter, Jan. 12, 1976). This account and Manista's could not both have been true. A defense attorney could have argued that one or both detectives lied because they evidently

believed the stories they made up were better than the truth—that they had threatened Woodruff with arrest and imprisonment, despite having no evidence against him, and then offered him the lifeline of complete immunity to overwhelm him into falsely confessing.

The two P-73s would have been useful to the defense for additional reasons as well. First, Drury had Woodruff testify that his father and pastor accompanied him from his home to the precinct and were there the entire time he was there and spoke to police. Obviously, this testimony was meant to dispel any inference that police took advantage of Woodruff's youth or isolation. However, the Hunter report suggested that Woodruff came down alone, and only when he already had been coerced into changing his story did his father and minister appear. Second, when questioned by Drury, Woodruff insisted that his entire interview with police was memorialized in the statement in question-and-answer format, whereas the two reports, whichever one is credited, showed that events happened that weren't in the statement at all. Counsel could have argued that the alleged events were omitted from Woodruff's signed statement to cover up how he was terrorized into changing his truthful original story into a false one.

These arguments attacking Woodruff's story and the integrity of the investigation would have drawn further strength from Woodruff's meeting with police at the Erie County District Attorney's office the day of his scheduled grand-jury testimony. During this meeting, according to a P-73 report dated February 11, 1976, Woodruff again was so nervous that he was shaking. COE002228-30 (P-73 by Paul Delano, Feb. 11, 1976). Police did not document their interaction with Woodruff that left him shaking and nervous—perhaps he had recanted—but Detective Delano accused Woodruff of lying. *Id.* Detectives then "confronted" Woodruff with a statement which the police had elicited from a similarly stricken Hough earlier that day—namely, that Gibson and Boyd conducted reconnaissance inside the Golden Nugget before the assault. *Id.*; *see also* COE002231-32 (P-73 by Michael Guadagno, Feb. 11, 1976). It is only after Woodruff received this information from Detective Delano that his statements began to assert that Gibson and Boyd had briefly entered the Golden Nugget before regrouping outside Simpson's Store. The police reports documenting these interactions, according to Boyd and Walker, were never disclosed to defense counsel.[22] Neither, allegedly, was a separate statement, written by a detective and signed by Woodruff that same day, asserting that "Darryl and Darryn had opened the door in the Golden Nugget Bar and seen the old man with a lot of money." COE002182

[22] I have examined the Gibson trial transcript, which shows that Drury there did disclose to Gibson's counsel the two February 11 P-73 reports after Woodruff's direct examination. Gibson Tr. 184. However, Drury testified at his deposition that his practice was to take back exhibits after making them available for cross-examination, Drury Dep. 102-03, and I'm aware of no evidence that Gibson's attorney either retained a copy or gave it to Hulnick. Hulnick's cross-examination of Woodruff, asking only whether he told police he received $15 or $25 from the crime, prompting Woodruff to deny any such recollection, appears taken from the Gibson transcript in which his attorney asked the same questions (and Woodruff gave the same denials). Hulnick neither showed Woodruff the underlying police reports to see if they refreshed his recollection nor tried to impeach him with them, either directly or by cross-examining the detectives. Indeed, Det. Guadagno testified as a rebuttal witness, but Hulnick did not ask him about his report. In both proceedings, Woodruff flatly denied any recollection of making inconsistent statements on February 11 about the amount of money he claimed to receive, and the issue just died. A reasonably competent attorney provided with these reports in advance would have been able to utilize them for a far more effective cross-examination of Woodruff and impeachment of Woodruff through the detectives. Drury's failure to disclose the February 11 reports to Hulnick, in contrast to Gibson's counsel, implied that the reports didn't contain favorable information as to his client (Boyd). As the Supreme Court cases that I cite above hold, counsel is entitled to assume the prosecutor is acting in good faith and not deliberately holding back favorable evidence.

(Handwritten Statement Signed by Tyrone Woodruff, Feb. 11, 1976). This statement contradicted Woodruff's trial testimony that the two boys went *inside* the bar for a "few minutes."

In the hands of a reasonably competent defense attorney, this additional material would have redoubled the jury's doubts about Woodruff, and thus the prosecution's case. It explained why Woodruff changed his story still again: from his claim at the preliminary hearing that the boys just happened to run across Crawford, to his expanded story in the grand jury and at trial that they conducted reconnaissance inside the bar, laid in wait down the block, and then accosted Crawford after they watched him cross the street. It showed that Woodruff was led or "indoctrinated," as Hulnick, without much evidence, argued in summation and Drury vehemently, but falsely, denied. The absurdity of Woodruff's signed statement (asserting that Gibson and Boyd peeked into the Golden Nugget just when Crawford was flashing his money), and its inconsistency with the statement attributed to him by detectives (that Gibson and Boyd entered the Golden Nugget) further discredits Woodruff's testimony.

**4. Evidence contradicting Hough's account.**

As noted above, at trial Hough testified that on January 3, 1976, the day after the murder, he and Boyd went into Simpson's Store on Fillmore Avenue and noticed that Boyd had a lot of money on him—the implication being that the money was proceeds from the robbery the night before. Allegedly unbeknownst to the defense, the police had attempted to corroborate this account on January 15, 1976. As set forth in another allegedly undisclosed P73, Detectives Regan and Montondo went to Simpson's Store and spoke with the owner and her daughter. COE002215 (Montondo P-73). They said that while they knew Boyd and his friends, they did not recall them standing outside the store on the evening of January 2 (as Woodruff claimed) and did not recall them in the store on January 3 (as Hough claimed). *Id.* After reporting these negative findings, the undisclosed P73 sought to minimize their significance, stating: "Simpson's Delicatessen is a very small store and it would be easy for the workers to overlook anyone, especially if they were busy." *Id.*

A reasonably competent defense attorney would have interviewed the Simpson's Store employees and called them and/or Montondo himself to further contradict the notion that Boyd and the other boys ambushed Crawford on the night of January 2. Counsel would also have offered the report as further evidence of a corrupted investigation: that Montondo sought to minimize the facts he obtained, instead of simply reporting them, because he (and his colleagues) had a vested interest in the outcome. They had decided to make a case against Boyd, Walker, Gibson, and Martin, whether or not they were truly guilty, and prepared their reports accordingly.

**5. Evidence impeaching Hough.**

As he had with Woodruff, ADA Drury disclosed Hough's typed statements and grand-jury testimony. He allegedly did not disclose the P73s showing the pressure and suggestion used to construct Hough's testimony.

Fifteen-year-old Andre Hough, as he admitted under cross-examination, initially told police that he knew nothing about the Crawford murder. He repeated these statements during a

polygraph examination and was told that he passed. Boyd Tr. 408-10. Detectives did not document Hough's initial statements or the results of his polygraph.

On January 12, Hough was questioned by Detectives Guadagno and Deubell, who accused him of knowing about, and participating in, Crawford's murder. *Wade* Tr. 59-60, 65-66. Hough then claimed, in a signed statement, that Darryl Boyd had confessed to seeing Crawford in his driveway, beating him, and stealing his wallet. COE002194-95 (Statement of Andre Hough, Jan. 12, 1976). But pressed to supply additional information, Hough asserted in his formal, signed statement that he could not think of any other details. ADA Drury, by his own admission at his deposition, did not disclose his knowledge, which he learned from the BPD polygraph examiner, that after Hough changed his story, he refused to be polygraphed a second time about his new account. *See* Drury Dep. 366-69. Hough's January 12 signed statement asserting that he could not remember any additional details contradicted his subsequent statement and grand-jury testimony of February 11, 1976, and his trial testimony, that he *did* recall obviously significant further details: the alleged casing of the victim inside the Golden Nugget bar and the new scenario of how the boys lay in wait and then ran down the street and attacked him.

The allegedly undisclosed reports of February 11, 1976, the date of Hough's testimony in the grand jury, reveal how Hough came to "remember" additional details he previously told police, in his sworn statement, he didn't recall. On that date, prior to testifying in the grand jury, Hough met with Detectives Delano and Guadagno. Both prepared P-73s that allegedly were withheld from the defense and, had they been disclosed, would have supplied compelling impeachment material.

Guadagno's P-73 recounted that, during a meeting with ADA Drury and Detective Delano, Hough recanted, saying that Darryl Boyd never admitted complicity in the Crawford murder. COE002231-32 (Guadagno P-73). According to Delano's P73, Hough was accompanied by his mother when he made his recantation. COE002228-30 (Delano P-73). However, the reports omitted the back and forth between Hough and the detectives, and the specifics of what he said—all fodder for cross-examination. After a period of time, Hough's mother left, leaving the 15-year-old Hough in ADA Drury's office alone with Detectives Delano and Guadagno. *Id.* Delano then accused Hough of lying and told him that "he had better tell the truth." *Id.* Delano also suggested to Hough that he was recanting because he was afraid of retaliation from people involved in the homicide. *Id.* Hough picked up on this cue and, according to the P73, said that was indeed why he was recanting. *Id.* Delano stated that Hough went on to retract his recantation and add fresh details to his statement—namely, that he had been told that Gibson and Boyd entered the Golden Nugget, looked around, and then waited for Crawford down the street. *Id.* Hough was then brought to the Grand Jury room and locked into those new "facts." *Id.*

A reasonably competent defense attorney likely would have used the undisclosed evidence to undermine Hough and to reinforce the strikingly similar impeachment of Woodruff. Hough and Woodruff both initially gave an account similar to that of the other boys. Hough and Woodruff both were threatened with prosecution and then succumbed to the pressure to implicate their friends. Hough's refusal to take a polygraph after implicating Boyd and the others, when he initially consented to a polygraph and apparently passed it, would have enabled defense counsel to argue that Hough knew his change of story was a lie. Later, according to the undisclosed police reports, Hough and Woodruff both recanted or refused to cooperate and then,

under redoubled pressure, retracted their recantations and, accused of lying, were pressured to add new details to their accounts. Counsel could further have pointed out that the new details Hough supplied were immediately fed to Woodruff by Detective Delano, creating a false impression of matching stories.

**6. Evidence impeaching Guadagno.**

Although then-ADA Drury called Guadagno as a rebuttal witness, the trial record shows that Drury disclosed none of his P-73s except for the one relating to his interview of Boyd, and did not disclose the police interview of Boyd's mother, COE002165 (P-73 by Michael Guadagno, Jan. 8, 1976). In that interview, she said her son came home *between* approximately midnight and 1 a.m. not *at* 1 a.m. Yet, Guadagno read into the record his question of Boyd in which he represented to this 16-year-old that his mother had said he came home *at* 1 a.m. and used that to influence the boy to change his story. The mother's interview statement showed that Guadagno's tactic was deceitful. Had it been disclosed, it would have impugned the integrity of his interview of Boyd and his record of it.[23]

**C. ADA Drury's conduct during summation.**

Boyd, Walker, Gibson, and Martin were Black teenagers on trial before white juries for the crime of murdering a white man. During his summation, ADA Drury sought to exploit the racial division by referring to Woodruff as a "poor product of his environment" and a "ghetto kid," Boyd Tr. 614, and calling the Glenny Projects, where Boyd and his co-defendants lived, "a junkyard," *id.* at 634.

ADA Drury also engaged in many other types of arguments long condemned by courts. For example, he repeatedly mocked, denigrated, and insulted witnesses, including his own, with improper statements. In an apparent effort to overcome inconsistencies and the overall questionable testimony of his primary witness, Tyrone Woodruff, Drury mocked and belittled him as a "blithering idiot," *id.* at 607; a "snook," an "idiot," a "nitwit," *id.* at 614; "[h]apless, stupid," *id.* at 623; and concluded by saying "he is as bad as the rest of them," *id.* at 634.

Similarly, when speaking about Boyd's interrogation at the police precinct, ADA Drury belittled the fear a teenager would experience when interrogated about a murder: "The poor kid is confused, the poor kid is only 16. He is in there without his mommy and daddy" *Id.* at 612. He treated defense witnesses the same way. In reference to defense witness Joyce Washington, he implored the jury, "I also hope you don't believe that kid for a minute." *Id.* at 621. He then, with apparent sarcasm, referred to defense witness Dorothea Luster as, "the mother, precious thing, Dorothea Luster." *Id.* He characterized the testimony of defense witness Allison Zachery as "worthless." *Id.* at 623.

---

[23] In withholding from the defense the witness statements discussed above, ADA Drury apparently failed to comply with *Rosario* as well. Specifically, ADA Drury appears to have not disclosed witness statements that were unsworn and unsigned even though they were summarized in formal police reports. Drury also appears to have acquiesced in the BPD practice of destroying handwritten notes of witness interviews. Drury testified in his deposition that the police justification for this practice, which he apparently agreed with, was to avoid the detectives' files getting too thick. Drury Dep. 94-97, 99.

ADA Drury also personally vouched for Woodruff's veracity, stating unequivocally, "I submit to you still he is telling the truth." *Id.* at 624. ADA Drury also expressed his personal belief that Woodruff was truthful because he had a lawyer: "[Woodruff became] a little bit more forthcoming, he got himself a lawyer. A lawyer told him to tell the truth and eventually he did." *Id.* at 613-14.

In a similar vein, ADA Drury inserted his own credibility into his summation, thereby making himself an unsworn witness. In response to the defense attorney raising an issue about a particular police witness, Drury said, "Is two policemen better than one? I put one on, I thought it was sufficient." *Id.* at 608.

ADA Drury also appealed to the jurors' sympathy for the deceased and his family (*id.* at 612 ("If you tend toward sympathy you know what happened to that man, you know his family circumstances")), and he shifted the burden of proof to the accused (*id.* at 626 ("[Y]ou see what Darryl [Boyd] has to offer. Zilch")).

Drury ended his summation by again vouching for the police officers, his office, and himself, and disparaging the defense: "I would just say this to you, I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs of the police or our office or myself had anything to do with changing Tyronne's testimony or making it fit in any pattern." *Id.* at 635. Of course, he *knew,* either through his own personal presence or the undisclosed police reports of February 11, 1976, that both the police and his office were involved in "changing Tyrone's testimony." He concluded his remarks with the similarly misleading contention: "Any suggestion that there is any conspiracy here to make the testimony fit the facts or do anything like that, it is absolutely ridiculous." *Id.* at 635-36.

Finally, when defense attorney Mark Hulnick argued that law enforcement had pressured Woodruff to change his story and had indoctrinated him, ADA Drury objected, stating: "These are wild allegations, there is no proof of it." *Id.* at 589. This objection, made in front of and to influence the jury, itself was a false statement.

While a prosecutor may, within reason, respond to defense counsel's summation with arguments that would ordinarily be forbidden, I have examined defense counsel's summation in this case, and nothing there justified the arguments ADA Drury made in contravention of the rules of summation advocacy that existed in 1977.

## IV. The trial of John Walker, Jr.

### A. The evidence and argument presented at trial.

Walker's trial began on June 9, 1977. ADA David Henry, in his opening statement, said he would prove that Walker and his friends robbed Crawford, and kicked him until "the blood was running onto the sidewalk." Walker I. Tr. 23.[24] He said that although Woodruff has

---

[24] The Walker trial transcript I reviewed is divided into two volumes. "Walker I" refers to the first volume, which includes the proceedings of June 6-9, 1977. "Walker II" refers to the second volume, which includes the proceedings of June 10 and 13, 1977.

difficulty telling the story, left things out, and lied at first, he would testify that after two of the boys went inside the Golden Nugget and spotted Crawford with money, they laid in wait and then assaulted Crawford at the bottom of his driveway before dragging him up to the side of the house and taking his money. *Id.* at 25-27.

Defense attorney David Jay concentrated his opening on Woodruff's grant of immunity and incentive to lie against Walker. He did not dispute that Woodruff had been present for Crawford's murder, or that Walker was as well. He argued only that Walker, according to Woodruff's initial statements, did not do anything to aid and abet the crime. (*Id.* at 31 ("We simply say that Mr. Walker had no part in it, did not know it was going to happen, was absolutely amazed that something did happen.").)

Albert Hauser, Lawrence Watson, David Donnelly, Gerald Dove, Dr. Charles Severson, Margaret Crawford, and Tyrone Woodruff gave essentially the same testimony as at the Boyd trial. Hough's testimony was more limited. He did not claim that Darryl Boyd admitted to having committed the robbery, but only that Darryn Gibson made a statement, in Walker's presence, about getting money that night. Walker II Tr. 4-6. Hough also testified that either Gibson or Walker said he (Hough) should not come along because he might squeal. *Id.* at 8. On cross-examination, however, Hough said he did not know if Walker made the statement or heard it. *Id.* at 16. The prosecution did not disclose any statements on the record by these witnesses in addition to those it disclosed at the Boyd trial.

The prosecution presented two witnesses in addition to those it presented at the Boyd trial: Debbie Jeffrey and a jailhouse snitch named Joseph Tatar. On direct examination, Jeffrey testified that Crawford asked her to reach into his billfold and take money out, which she did, and that Crawford went home around 10:30 p.m., after Watson said he would make sure Crawford got home safely. Walker I Tr. 104-07. On cross-examination, Jeffrey testified that only older people go to or are admitted into the Golden Nugget and that the establishment checked IDs. *Id.* at 108-10. Jeffrey also said she did not see John Walker or any other young people there. *Id.* at 114-15. Watson left with Crawford at 10:30 or possibly 11 p.m. *Id.* at 112.

Tatar claimed that in September 1976, while being held at the Erie County Holding Center, he was in a card game with Gibson and Walker when Walker said, "why did you hit the man so hard in the head," complaining that Gibson had caused them to be "in here eight months." Walker II Tr. 20-22. Walker laughed that "we have this stuff beat, ain't no evidence against us," and, "I murdered once, I'll murder again." *Id.* at 23-25. Later, after learning Tatar was a witness against him, Walker threatened to kill him if he testified. *Id.* at 27.

Tatar first testified in the trial of Darryn Gibson as to statements he claimed he heard Gibson and Walker make admitting their role in the murder of William Crawford. At that time, Tatar was facing an eleven-count indictment for five residential burglaries and an arson, as well as a parole violation. Gibson Tr. 412-15. Tatar also had matters pending against him in Family Court. COE011036-37 (Gibson Trial Ex. 35, Memorandum by Jerry Solomon re: Joseph Tatar, Nov. 4, 1976). Tatar was apparently a frequent government cooperator—at the same time he was cooperating against Gibson and Walker, he was also cooperating with the New York State police about other matters. *Id.* The ECDA attended Tatar's parole revocation hearing and talked with the hearing officer on Tatar's behalf. Walker II Tr. 40. The ECDA also arranged for Tatar to plead guilty to the eleven-count indictment in exchange for the lenient sentence of five years'

probation. *Id.* at 41-42. At the time of Walker's trial, Tatar was already back in jail on a new attempted robbery charge. *Id*. at 31. At one point prior to Walker's trial, Tatar wrote a letter to ADA Drury stating: "if you want good testimony, let's talk and don't test me by waiting till the last minute." *Id.* at 54.

When Erie County's current District Attorney spoke about Walker's conviction on August 18, 2021, he acknowledged the dubious nature of Tatar's evidence:

> Again, do I know exactly what went down? I don't know how who contacted who or what? But I agree with the notion overall that jailhouse snitches are not the greatest witnesses in the world. I only use jailhouse snitches when I am 110% certain that they're not BSing me. I am very reluctant to use a jailhouse snitch. They obviously have an ulterior motive in order to, hey in exchange for me testifying, I'm facing charges now and I want a benefit for what I'm doing. Now that can be, a lot of the times, they don't even get a benefit. We say we're not going to give you anything all right? It all depends on the case. But listen here, on the scale of my top ten witnesses who I want to use, you know, jailhouse snitch would be the bottom of the list. So, yeah, I'm not going to, uh, I'm not going to sit and argue that I love jailhouse snitches and I think that they're great witnesses. I'm not going to.

BOYD-WALKER-00011523 at 33:28 (Flynn Press Conference).

During his relatively brief closing argument, Walker's attorney basically acknowledged that his client was present at Crawford's murder but argued that Woodruff initially did not tell police that Walker did anything and that his change of story lacked credibility. Walker II Tr. 114-22. He argued that Hough's testimony implicated only Gibson, not Walker, *id.* at 113-14, and that Tatar had no credibility, *id.* at 108-13. ADA Henry's summation will be discussed below.

**B. What a reasonably competent defense attorney could have done with the material withheld from Walker's counsel.**

Because *any* reasonable doubt as to *any* element of the offense requires an acquittal, defense counsel will often accept as much of the prosecution's case as possible, in an effort to make the trial a referendum on the weakest point in the prosecution's case. Walker's counsel took that approach, conceding that Walker was present for Crawford's murder and focusing on the evidence of individual participation, or lack thereof. (i.e., stating in his summation, "He was there at most," *id.* at 118, and "the key to this case is what did Walker do," *id.* at 120).

Had a reasonably competent defense counsel received the *Brady* disclosures to which he was entitled and which the defense specifically requested during pretrial motions, he likely would not have pursued this strategy. Instead, any reasonably competent defense attorney would have introduced evidence and delivered arguments implicating Larry Watson and perhaps Jerome Boyd, and, thoroughly contradicting and discrediting Tyrone Woodruff, Andre Hough, and the police investigation, arguing that Woodruff and Walker had not even been present when the crime occurred. For the reasons given above with respect to the trial of Darryl Boyd, if ADAs Drury and Henry had fulfilled their disclosure obligations, as they allegedly did not, a reasonably

competent attorney representing John Walker would have been able to present compelling evidence that there was reasonable doubt precluding his client's conviction. The existence of Tatar's severely impeached and, as the District Attorney acknowledged, inherently unreliable jailhouse "snitch" testimony does not alter this analysis.

**C. ADA Henry's conduct during summation.**

Like ADA Drury, ADA Henry seems to have sought to stoke racial bias during his summation. In an apparent nod to Woodruff's dubious credibility, ADA Henry argued that Andre Hough supplied the necessary support for Woodruff's testimony, stating: "Andre gives you all five of them together, the planning, in a sense, sixteen year old black kids plan." *Id.* at 136. It is hard to fathom the rationale for referring to how "sixteen year old black kids plan," beyond suggesting that a robbery is in some way typical of teenage black kids or that you can't expect more intelligent testimony from black kids. This summation does not appear to have been properly responsive to any argument made by defense counsel in his summation.

Also, like ADA Drury, ADA Henry engaged in many of the other types of summation behavior that was not invited by the defense summation and was inconsistent with principles of advocacy developed by the courts. For example, ADA Henry asserted that neither Woodruff nor Hough had a motive to lie. *See id.* at 135, 143-44. Not only was this a form of impermissible vouching, it also, given the record known to ADA Henry, was untrue. Both Woodruff and Hough had, at various points, faced the prospect of being arrested and charged with murder if they failed to provide evidence against the others. And Woodruff was given full immunity to encourage his testimony. As for Hough, ADA Henry stated that "[h]is testimony is the same" and that he relates it "without any mistake," *id.* at 134, but he was aware of undisclosed police reports showing Hough recanted, was pressured, and refused a lie-detector test after changing his story to provide details implicating the defendants. ADA Henry also argued that Hough and Woodruff corroborated each other despite not having "gotten together" to conform their stories, *id.* at 147-148. However, Henry was aware of how on February 11, prior to their appearance in the Grand Jury, the detectives relayed Hough's new story to Woodruff who then fell in line.

ADA Henry also vouched for Larry Watson by including him among the category of non-interested witnesses who lacked any motive to lie. *Id.* at 132-33. By virtue of the allegedly undisclosed evidence pointing to Watson as the perpetrator, including Watson's own statements that conflicted with his trial testimony, Henry knew that Watson appeared to have a huge motive to lie.

ADA Henry also resorted to inflammatory rhetoric through his repeated, exaggerated references to "blood spattered, splashed up on the house," *id.* at 130; "two puddles of blood," *id.* at 130; "blood is just absolutely splattered all over," *id.* at 146; and "blood spattering on the walls," *id.* at 131. Toward the end of his summation, just in case any juror missed his repeated references to "pools of blood," he returned to his theme of a savage and vicious crime: "One of the worst things probably about this homicide, the puddles of blood, blood on the walls . . ." *Id.* at 153. This kind of rhetoric, designed to inflame the passions of the jury, was forbidden and was irrelevant to the sole issue in the case, which was the identity of the perpetrators, as opposed to their intent, and whether, as Woodruff contended, the assault began at the bottom of Crawford's driveway.

The intentional resort to inflammatory language is perhaps best captured by ADA Henry's referring to Darryn Gibson "flaying away on the man's head, and the blood splattering the walls, and runout out on the sidewalk." *Id.* at 153. Not only is this impermissibly hyperbolic but it is also untrue. Even though defense counsel Jay stated earlier during Henry's summation that he "rarely interrupts summations," *id.* at 150, he felt compelled to object by noting "Your Honor, excuse me. This is the fourth time the District Attorney is alluding to this particular evidence and I'm going to object to it as being inflammatory, and ask that it be stricken." *Id.* at 153. After the judge overruled the objection an emboldened ADA Henry added, "it's disgusting." *Id.*

**V. The probable effect of nondisclosure on pretrial detention.**

The prosecution's alleged failure to disclose highly exculpatory evidence is very likely to have adversely affected Boyd and Walker not only during their trials, but also during their arraignment, held on January 13, 1976, and their preliminary hearing, held on January 16, 1976.

As explained above, during a defendant's arraignment, the judge must decide whether to set bail and the amount. New York Criminal Procedure Law § 530.20. During a preliminary hearing on felony charges, the judge must decide whether there is sufficient evidence to continue to hold the defendant in custody while awaiting action of the grand jury. *Id.* § 180.10(2).

I am informed by Plaintiffs' counsel that Boyd, Walker, and their two co-defendants were remanded on January 13 following their arraignment on a City Court complaint alleging they acted in concert with Woodruff to commit the crime about 10:30 p.m. on January 2. Woodruff's signed, sworn statement of January 12 was the sole supporting evidence furnished with the Complaint. Walker never made bail and remained in complete custody for the next 17 years. Boyd was released on bail on January 22 but, following his indictment, his bail was raised, and he was again detained, through trial and thereafter for 20 years until he was paroled.

For many of the reasons stated above, the undisclosed evidence showing that Woodruff's statement was false because he had gone home in a taxicab with Walker before Crawford was assaulted, that police had coerced Woodruff into implicating the four boys notwithstanding the detectives' awareness of the boys' likely innocence, and that either Larry Watson or Jerome Boyd, or both, likely committed the crime, would almost certainly have affected a reasonable jurist's initial decision to remand Boyd and Walker, and his later decision finding probable cause to hold defendants in custody pending grand-jury action. This was not merely impeachment but exculpatory or exonerating evidence. Competent counsel would have been able to use such evidence to achieve a more favorable bail and probable-cause determination for their clients.

Moreover, it is apparent, based upon evidence that did emerge following the preliminary hearing, that ADA Drury failed to correct false testimony given by Woodruff at the hearing on the critical issue of his motive to change his story from one exonerating Plaintiffs to one accusing them. During the preliminary hearing, Woodruff denied that BPD officers had told him he was being arrested or that he would be charged with murder, or that he had been induced to change his story by police promises. PH Tr. 51-53. ADA Drury knew this was untrue. He knew that police had arrested Woodruff without probable cause and then offered him immunity from prosecution *before* he changed his story. Yet ADA Drury did nothing to correct Woodruff's false testimony and objected when Walker's counsel tried to inquire into the matter. *See id.* Had

defense counsel been aware of the truth, he would have been able to discredit Woodruff. Had all the evidence favorable to the defense been promptly disclosed and utilized by a reasonably competent defense attorney, it is likely that all the defendants would have been released on their own recognizance rather than held in jail, or that the judge would have found that the prosecution failed to meet its burden at the preliminary hearing and dismissed the case.

**VI. Conclusion**

For the foregoing reasons, it is my opinion, to a reasonable degree of professional certainty, that reasonably competent defense counsel, had they received the allegedly undisclosed evidence discussed above, could and would have been able to use such evidence to substantially undermine the prosecution's case by discrediting the prosecution's key cooperating witnesses and by showing the likelihood that a third party or parties committed the crime. Further, the prosecutors at each trial had no reasonable basis arising from defense counsel's summation to make arguments that flouted established principles of summation advocacy and were likely to improperly influence the jury's verdict in what was an inherently weak case.

*Steven Zeidman*

Steven Zeidman

Dated: March 1, 2024

**PROFESSOR STEVEN ZEIDMAN**
CUNY School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4357
zeidman@law.cuny.edu

**EMPLOYMENT**
CUNY School of Law
Professor, September 2007 – present
Courses: Criminal Defense Seminar and Clinic; Juvenile Defender Clinic; Criminal Procedure

Interim Associate Dean for Clinical Programs, June 2011 – June 2012

Outstanding Professor of the Year Award, May 2011

**Teaching**
NEW YORK UNIVERSITY SCHOOL OF LAW
Associate Professor of Clinical Law. April 1996 - August 1999. (Assistant Professor, August 1992 - March 1996; Acting Assistant Professor, January 1989 - July 1992)
Courses: Criminal Defense Seminar and Clinic; Evidence: Litigation Planning; Criminal Litigation

Great Teacher Award, New York University Alumni Association, June 1997

PACE UNIVERSITY SCHOOL OF LAW
Adjunct Professor. January 2000 - December 2000
Course: Criminal Procedure - Investigation

FORDHAM UNIVERSITY SCHOOL OF LAW
Adjunct Professor. August 2001 – May 2002
Course: Foundation Skills

**Practice**
THE FUND FOR MODERN COURTS
Executive Director, August 1999 - August 2002. Managed statewide, nonprofit, nonpartisan court reform organization. Responsibilities included researching and writing, lobbying, and fundraising. Consultant, August 2002 – August 2003

THE LEGAL AID SOCIETY CRIMINAL DEFENSE DIVISION
Supervising Attorney, May 1986 - January 1989
Staff Attorney, September 1981 - April 1986

**PROFESSIONAL ACTIVITIES**

New York State Bar Association -- Parole Task Force. January 2020 – present.

The American Bar Association -- Criminal Justice Section Council, August 2016 – present. Task Force on Diversion Standards, January 2017 - present

Appellate Division, First Department -- Indigent Defense Organization Oversight Committee. January 2003 – present

Prisoners' Legal Services of New York -- Board of Directors. January 2000 - present

Parole Preparation Project – Board of Directors. 2018 – present

The New York City Bar Association -- Criminal Courts Committee, 2014 – 2015. Chair, Subcommittee on Criminal Discovery Reform

Floyd v. City of New York Academic Advisory Council -- September 2013 – 2014 (Council created by District Court Judge Shira Scheindlin to help implement her remedial order issued in the Floyd stop-and-frisk trial). Appointed to Joint Remedial Process Advisory Committee by federally appointed facilitator, Hon. Ariel Belen, 2015 – 2019

Mayor's Advisory Committee on the Judiciary -- January 2008 – January 2010 (the committee evaluates applicants for the New York City Family and Criminal Courts as well as judges seeking reappointment)

The Commission on the Future of Indigent Defense Services -- Committee Co-Chair. June 2004 – June 2006 (statewide Commission created by New York State Chief Judge Judith Kaye)

The New York County Lawyers' Association, Criminal Justice Section -- Task Force on Reform and Enhancement of the New York City Criminal Court. June 2004 – May 2006

The Sentencing Reform Act Commission -- Statewide Commission created by the Sentencing Reform Act of 1995. Appointed by New York State Chief Judge Judith Kaye, August 1996 - December 2000

Appellate Division, First Department -- Assigned Counsel Plan, Central Screening Committee, October 1993 - February 1999 (the committee evaluates candidates for the Assigned Counsel Panel as well as attorneys seeking recertification to the Panel)

The Jury Project -- Co-Chair, Selection and Utilization Subcommittee. Appointed by New York State Chief Judge Judith Kaye, August 1993 - May 1994

Neighborhood Defender Service of Harlem, Inc., A Project of the Vera Institute of Justice, New York -- Consultant, October 1990 - 1997

**GRANTS/AWARDS**
CUNY Collaborative Incentive Research Grant (with Professors Elizabeth Jeglic and Cynthia Calkins Mercado of John Jay College of Criminal Justice), "Sex Offender Management, Treatment, and Civil Commitment: An Empirical Analysis of Four Sex Offender Populations", July 30, 2008

**RECENT PRESENTATIONS**

Keynote speaker, "Second Look Legislation Conference," Vermont Law School Center for Justice Reform, November 2023

Moderator, "Reducing Recidivism," Prisoners' Legal Services of New York, Annual Pro Bono Awards and Event, Albany Law School, October 2023

"Who Lives, Who Dies, Who Decides," Columbia Center for Contemporary Critical Thought at Columbia Law School, October 2023

"Potential Pathways to Freedom: Clemency, Resentencing, and Parole," Green Haven Correctional Facility, September 2023

Moderator, first annual Second Look Network Conference sponsored by the Sentencing Project in Washington, D.C., September 2023

NYS Justice Task Force re "second looks," July 2023

Perlmutter Center for Justice of Cardozo Law School, July 2023

"Potential Pathways to Freedom – Clemency, Parole Litigation, Compassionate Release, and Resentencing Motions," Sing Sing Correctional Facility, April 2023

Columbia University School of Law's "Clemency Town Hall," April 2023

"Clemency, Parole, and Resentencing," Lifers and Longtermers Organization, Sing Sing Correctional Facility, April 2023

New York Senate Standing Committee on Crime Victims, Crime and Corrections and Senate Standing Committee on the Judiciary Hearing on Elder Parole and Fair and Timely Parole bills, December 2022

American Criminal Law Review/Georgetown University Law School symposium "Reform-Minded Prosecutors," October 2022

AALS Clinical Legal Education Annual Conference, "Approaching Decarceration Through Post-Conviction Representation," May 2022

Center for Community Alternatives, "The New York Court of Appeals: Its History, Present, and Future," May 2022
“Differing Visions of State and Local Prosecution: Implications of the Progressive Prosecution Movement,” Southeastern Association of Law Schools (SEALS) – August 2020

“Clemency Project,” Craig Newmark CUNY Graduate School of Journalism, August 2020

“Black Lives Matter: Moving Forward,” CUNY TV Specials, July 2020

“Decarceration: Parole and Clemency,” CUNY TV Eldridge and Co., May 2020

“Beyond the Bars: Strategies for Challenging a Carceral Society,” Columbia University Center for Justice, Tenth Annual Justice Conference, March 2020

“Early Conditional Parole for Deportation Only,” Caribbean African Unity Organization, Green Haven Correctional Facility, January 2020

“Clemency Actions,” WCNY Capital Region Radio, Capital Pressroom, January 2020

“First Step Act: The PATTERN Risk Assessment Tool,” American Bar Association, Criminal Justice Section, Fall Institute, November 2019

“Youth Sentencing and Resentencing Pursuant to Roper, Graham, Miller and Montgomery,” Project for a Calculated Transition (PACT), Green Haven Correctional Facility, November 2019

“The Sixth Amendment: Past, Present and Future,” New York State Bar Association, Haywood Burns Memorial Award Ceremony, October 2019.

“Plea Bargaining: Reforming an [Un]necessary Evil?,” Eighth Annual Conference of the NYU Center on the Administration of Law, April 2019

“Parole Law and Reform,” New York City Bar Association, 44th Street Podcast, April 2019

“Criminal Justice Reform and Progressive Prosecution,” Pa’Lante IX, Ninth Annual Metro LALSA Conference, March 2019

“Prison Reform and Rehabilitation,” 46th Annual History Conference, Adelphi University, February 2019

“Unbecoming,” narrative film produced by the incarcerated community at Otisville Correctional Facility, November 2018

“Progress in State Board of Parole Reforms,” New York State Senate Forum, November 2018

“Handling Parole Appeals,” Skadden, Arps, Slate, Meagher & Flom pro bono training, October 2018

“The Shifting Boundaries of Criminal Law: A Chinese-Common Law Dialogue,” Chinese University of Hong Kong (CUHK), April 2018

“Integrating Experiential Learning Across the Curriculum,” Waseda University Japan, April 2018

“Stop-and-Frisk and Floyd. v. City of New York,” New York City Civilian Complaint and Review Board (CCRB), February 2018

“Punishment, Redemption & Mercy,” NYU Law School Goldstock Criminal Law Faculty Seminar, November 2017

“Newjack, Guarding Sing Sing,” CUNY School of Law Salon event with author Ted Conover, November 2017

“The Status of Parole in New York State,” NYU School of Law, November 2017

"The Impact of Marijuana Enforcement on Policing and Criminal Justice," Drug Policy Alliance, October 2017

"Parole Summit," Lifers and Longtermers Organization at Otisville Correctional Facility, September 2017

“Still Life: America’s Increasing Use of Life and Long-Term Sentences,” Sentencing Project video press conference, May 2017

“Arm Bending vs. Arm Breaking: Counseling Adults and Juveniles Facing Difficult Decisions and Harsh Criminal Punishment,” Association of American Law Schools (AALS) Clinical Legal Education Conference, May 2017

"Judicial Responsibility for Justice in the Criminal Courts," Hofstra Law School, April 2017

WBAI radio show "Law and Disorder," April 2017

"What Public Defenders Don't (Have to) Tell Their Clients," New York State Defenders' Association's 31st Annual Metropolitan New York Trainer at NYU Law School, March 2017

"Police Practices and Accountability in New York City," U.S. Civil Rights Commission's New York State Advisory Committee, March 2017

“Clemency, Parole and Women in Prison,” St. Ann's Warehouse Brooklyn, NY in conjunction with the Donmar Warehouse, London, England, February 2017

“Clemency,” with Investigative Journalist Tom Robbins, CUNY TV Eldridge and Co., January 2017

"Examining the City's Plans for the Provision of Indigent Defense Trial-Level Services for Homicides,” New York City Council hearing held jointly by the Committee on Courts and Legal Services and the Committee on Public Safety, November 2016

"Evaluating the Progression of Justice Reboot," New York City Council Committee on Courts and Legal Services, October 2016

“Clemency and Judith Clark,” CUNY TV Eldridge and Co., August 2016

“The Underbelly of the Beast: Misdemeanor Practice in the Era of Broken Windows and Saturation Policing,” Cardozo School of Law, December 2014

“Advising and Counseling: Professional Responsibility, Effective Assistance and Morality,” The Legal Aid Society, November 2014

“Padilla, Lafler, and Frye: Counseling Clients Now that the Court is Watching,” Dutchess County New York Public Defender, August 2014

“Justice for the Poor: Fixing Broken Public Defender Systems in New York and Beyond,” New York City Bar Association, May 2014

“Clinicians as Curricular Change Agents: Incorporating Experiential Learning Across the Curriculum,” Association of American Law Schools, April 2014

**PUBLICATIONS**

**Law Review Articles**

*Progressive Prosecutors or Zealous Defenders, from Coast-to-Coast*, 60 Am. Crim. L. Rev. 1467 (2023).

*Rotten Social Background and Mass Incarceration: Who is a Victim,?* 87 Brook. L. Rev. 1299 (2022).

*Virtuous Prosecutors?*, 25 CUNY L. Rev. F. 1 (2022).

*Some Modest Proposals for a Progressive Prosecutor*, 5 UCLA Crim. Just. L. Rev. 23 (2021).

*From Dropsy to Testilying: Prosecutorial Apathy, Ennui, or Complicity?*, 10 Ohio St. J. of Crim. Law 423 (2019).

*Raising the Bar: Indigent Defense and the Right to a Partisan Lawyer*, 69 Mercer L. Rev. 697 (2018).

*Eradicating Assembly-Line Justice: An Opportunity Lost by the Revised American Bar Association Criminal Justice Standards*, 46 Hofstra L. Rev. 293 (2017).

*What Public Defenders Don't (Have To) Tell Their Clients*, 20 CUNY L. Rev. F. 14 (Nov. 11, 2016), http://www.cunylawreview.org/what-public-defenders-donthave-to-tell-their-clients/.

*Due Process and the Failure of the Criminal Court*, 42 Fordham Urb. L.J. City Square 1 (2015).

*Sexual Violence Legislation: A Review of Caselaw and Empirical Research*, with Cynthia Calkins Mercado, Elizabeth Jeglic, Robert Beattey, and Anthony Perillo, Journal of Psychology, Public Policy, and Law, Vol. 20(4), Nov. 2014.

Gideon*: Looking Backward, Looking Forward, Looking in the Mirror*, 11 Seattle J. for Soc. Just. 933 (2013).

*Whither the Criminal Court: Confronting Stops-and-Frisks*, 76 Alb. L. Rev. 1187 (2012/2013).

Padilla v. Kentucky*: Sound and Fury or Transformative Impact*, 39 Fordham Urb. L.J. 203 (2011).

*Introduction, Notes from the Field: Challenges of Indigent Criminal Defense*, 12 N.Y. City L. Rev. 204 (2008).

*Careful What You Wish For: Tough Questions, Honest Answers, and Innovative Approaches to Appointive Judicial Selection*, 34 Fordham Urb. L.J. 473 (2007).

*Policing the Police: The Role of the Courts and the Prosecution*, 32 Fordham Urb. L.J. 315 (2005).

*Judicial Politics: Making the Case for Merit Selection*, 68 Alb. L. Rev. 713 (2005).

*To Elect or Not to Elect: A Case Study of Judicial Selection in New York City, 1977-2002*, 37 U. Mich. J.L. Reform 791 (2004).

*Who Needs an Evidence Code?: The New York Court of Appeals' Radical Reevaluation of Hearsay*, 21 Cardozo L. Rev. 211 (1999).

*To Plead or Not to Plead: Effective Assistance and Client-Centered Counseling*, 39 B.C. L. Rev. 841 (1998).

*Sacrificial Lambs or the Chosen Few?: The Impact of Student Defenders on the Rights of the Accused*, 62 Brook. L. Rev. 853 (1996).

**Other Publications**

*N.Y. Must Have Mercy for Convicted*, NY Daily News, January 14, 2024

*Judicial Independence or Intimidation?*, City & State, August 4, 2023

*New York's Compassionate Release Laws Were Designed to Keep People from Dying Behind Bars; They're Failing*, Gotham Gazette, May 9, 2023

*No One Can See the Future: New York Needs Second-Look Sentencing Before More Lives are Wasted*, Gotham Gazette, December 8, 2022

*People Age Out of Crime: Prison Sentences Should Reflect That*, TIME, September 9, 2022

*Whose Case is it Anyway? Florida v. Nixon and McCoy v. Louisiana: Pro-Defendant or Pro-Government*, ABA Criminal Justice Magazine, Summer 2022

*Mass Incarceration and Broken Promises*, NY Daily News, June 24, 2022

*Governor Hochul Misses the Mark in First Clemency Considerations, Leaving Despair*, Gotham Gazette, January 6, 2022

*Say Their Names – The People Deserving Clemency*, Gotham Gazette, December 23, 2021

*Dying Behind Bars: The N.Y. Way*, NY Daily News, October 27, 2021

*Grant More Clemencies, Governor: Cuomo Using Too Little of His Power to Decarcerate, Too Late*, NY Daily News, August 22, 2021

*The New York Commission on Judicial Nomination Must Get the Next One Right*, Gotham Gazette, August 12, 2021

*Governor Cuomo, Take the Reins on Elder Parole Reform*, Albany Times Union, July 16, 2021

*Let All New Yorkers Vote for Manhattan DA*, NY Daily News, June 10, 2021

*The New York Senate Should Reject Cuomo's Nominees to the State's High Court*, Slate, June 1, 2021

*Remake New York's Highest Court*, NY Daily News, May 7, 2021

*The Governor's High Court*, Gotham Gazette, April 22, 2021

*New York's Prisons are a Time Bomb of Fear, Isolation and Despair*, Syracuse Post-Standard, February 4, 2021

*Governor, How About Clemency,?* NY Daily News, November 28, 2020

*Sitting Ducks: COVID Threatens Many NYS Prisoners; Why Won't Cuomo Grant More Clemency,?* NY Daily News, September 13, 2020

*Toppling Statues, and Prisons*, Gotham Gazette, July 14, 2020

*Life and Death at the Stroke of the Governor's Pen*, Gotham Gazette, June 17, 2020

*Shatter 'Broken Windows' Policing*, NY Daily News, June 10, 2020

*Coronavirus Makes Reducing New York Prison Population a Matter of Life and Death*, Syracuse Post-Standard, May 28, 2020

*Legislature Must Address the COVID Threat to People in Prison*, City Limits, May 27, 2020

*The Governor's Clemency Negligence*, Gotham Gazette, April 29, 2020

*Think Bigger on Clemencies: Coronavirus, Prisons and Public Health*, NY Daily News, March 28, 2020

*What's Really Behind Efforts to Reform Bail Reform? A Familiar Theme*, Gotham Gazette, March 11, 2020

*Judicial Discretion Isn't a Fix for Bail Reform; Bail Reform was the Answer to Judicial Discretion*, Gotham Gazette, February 14, 2020

*Cuomo's Clemency and Cruelty of False Hope*, Gotham Gazette, January 9, 2020

*Tis the Season for Clemency: Gov. Cuomo Should Let More New Yorkers Out of Prison Now*, NY Daily News, December 17, 2019

*Close Attica – and Build No New Prisons*, Gotham Gazette, November 6, 2019

*Mass Incarceration and Remorse*, Gotham Gazette, October 22, 2019

*Sentenced to Death by Incarceration in New York State Prison*, Gotham Gazette, September 21, 2019

*Depraved Indifference and Second Look Sentencing*, Gotham Gazette, August 27, 2019

*The Year of the Public Defender*, Gotham Gazette, July 11, 2019

*The State Legislature's Criminal Justice Reform Failures*, NY Daily News, July 8, 2019

*Public Defenders as Prosecutors: Unanswered Questions*, Gotham Gazette, June 20, 2019

*How to Separate District Attorney Candidates All Claiming to be Progressive*, Gotham Gazette, April 22, 2019

*Criminal Justice Reforms Will Not Make Enough Progress If We Don't Also Change the Criminal Court*, Gotham Gazette, February 21, 2019

*Let More Juvie Felons Out: Raise the Age is only a First Step*, NY Daily News, October 15, 2018.

*Fear-mongering Versus Reality in New York Parole*, Gotham Gazette, October 5, 2018.

*For Justice and Decarceration, Enact Second-Look Sentencing*, Gotham Gazette, June 25, 2018.

*New York City's 'Serious' Crime Problem*, City Limits, March 28, 2018.

<u>McCoy v. Louisiana</u>*: Whose Case is it Anyway?*, N.Y.L.J., January 19, 2018.

*Governors, Think Big on Clemency*, NY *Daily News, November 29, 2017.*

*Rikers May Close. So Should Attica*, Gotham Gazette, July 19, 2017.

*The Treatment Court Cottage Industry and Its Unintended Consequences*, Gotham Gazette, October 27, 2016.

*NYPD "Peace Dividend" Reveals Truth About Unnecessary Arrests*, Gotham Gazette, May 17, 2016.

*The Adversarial Justice Court*, Gotham Gazette, April 26, 2016.

*Shut Down the Criminal Court*, Gotham Gazette, February 25, 2016.

*Punishment, Redemption, Mercy and Clemency*, N.Y.L.J., February 16, 2016 at 6.

*Due Process and the Failure of the Criminal Court, 40 Fordham Urb. L.J. City Square 116 (2015).*

*Justice is Swift as Petty Crimes Clog Courts*, ccresourcecenter.org, December 7, 2014.

*Playing Nice in Criminal Court: "Crashing the Misdemeanor System*", ccresourcecenter.org, November 20, 2014.

*A System in Crisis,* N.Y.L.J., August 20, 2014 at 6.

*Is 'broken windows' broken? Yes,* Daily News, August 3, 2014 at 34.

*New York's Solitary Confinement Reforms May Spark Larger Discussion*, JURIST - Forum, Mar. 5, 2014, http://jurist.org/forum/2014/03/steven-zeidman-solitary-confinement.php.

*Equal Protection Examined in the Context of Policing*, N.Y.L.J., February 7, 2014 at 6.

*Criminal Court After Stop-and-Frisk*, N.Y.L.J., August 28, 2013, at 6.

*Indigent Defense: Caseload Standards*, N.Y.L.J., March 24, 2010, at 6.

*Racial Impact of Quality of Life Policing*, N.Y.L.J., April 2, 2009, at 6.

*Time to End Violation Pleas*, N.Y.L.J., April 1, 2008, at 2.

*The Miracle of Jury Reform in New York*, 88 Judicature 178 (2005).

*Caseload and Trial Capacity in the Criminal Courts*, 54 Rec. N.Y.C. Bar Ass'n 768 (1999) (primary contributor).

*The Strange Case of Roland B. Molineux: 100 Years Old and Counting*, N.Y.L.J., March 25, 1999, at 2.

**BAR ADMISSIONS**
New York State, United States District Courts for the Eastern and Southern Districts of New York.

**EDUCATION**
DUKE UNIVERSITY SCHOOL OF LAW
Durham, North Carolina
J.D., May 1981
Honors: Moot Court Board, 1979-1981
Student Funded Public Service Fellowship, 1980

STATE UNIVERSITY OF NEW YORK AT ALBANY
Albany, New York
B.A., Magna Cum Laude, May 1978
Major: Political Science
Honors: Signum Laudis Academic Honor Society