LAW OFFICES OF KEVIN T. GAGAN

163 MINNOWBROOK LANE

OLD FORGE, NEW YORK 13420

---

**35 YEAR LAW LEGAL CAREER AS A PROSECUTOR, TRIAL LAWYER, POLICE EXECUTIVE, ETHICS OFFICIAL, AND LAW SCHOOL PROFESSOR**

---

# Expert opinion report of Kevin T. Gagan as it relates to the 1977 robbery and homicide convictions of Mr. Darryl Boyd and Mr. John Walker, Jr. in Erie County, New York.

## Introduction:

I have been retained by counsel for defendant, Erie County in the state of New York, hereafter referred to as the "County", in a case brought by Darryl Boyd and John Walker, Jr., former New York State inmates who claim to have been wrongfully convicted in 1977 for a robbery homicide that occurred in Buffalo, New York. My background and qualifications are described below. My role is to provide opinion testimony on the legality and the ethics of the procedures employed by the police and the prosecutors in the investigation and trials which ultimately led to the plaintiffs' convictions.

After review of the materials provided, it is my opinion that the trials that resulted in the convictions of Mr. Boyd and Mr. Walker complied with the standards of police and prosecution procedures according to the law, the rules of discovery, and the ethics of advocacy that applied at that time.

I am being compensated for my time in this case at the rate of $350 per hour. My compensation is contingent neither on the opinions I reach, nor the outcome of the litigation.

## Qualifications:

Currently, I am an adjunct Professor of Law at Cornell University where I teach the seminar course, "Ethics in Policing" at Cornell Law School. I have also co-taught seminars there titled, "the Government Lawyer" and "Enough is Enough" concerning sexual assault.

After graduating from Cornell Law School in 1989, I joined the Manhattan District Attorney's Office as an Assistant District Attorney. I was assigned to a trial bureau and prosecuted street crimes from 1989 to 1994. In that time, I handled all levels of criminal prosecution from misdemeanors to rapes, robberies, and homicides. In 1994, I earned a promotion to the Homicide

Investigation Unit where I also investigated older "stale" homicides, many of them drug and gang related, with an emphasis on solving, indicting, and trying them.

In 1998, I joined the New York State Office of the Attorney General in its Capital Assistance to Prosecutors Unit. In that role, I had state-wide criminal prosecution jurisdiction and advised District Attorneys' offices throughout New York State in capital cases. Capital cases are homicides whose perpetrators are potentially eligible for the death penalty. During that time, I was cross designated an Assistant District Attorney to investigate and prosecute homicides in the counties of Fulton, Albany, Schoharie, Delaware, and Otsego.

In 2001, I joined the New York State Inspector General's Office as a Deputy Inspector General. My role there was to supervise investigations into waste, fraud, abuse, and corruption in state government. My area of concentration included investigations into potential malfeasance by personnel working in public protection agencies, including but not limited to; the State Police, The Department of Corrections, The Division of Parole, and The Division of Military and Naval Affairs.

In 2003, I joined the Governor's office as Deputy Director of Criminal Justice for New York State within the Division of Criminal Justice Services. There I concentrated on crime reduction strategies and working with the federal government to coordinate law enforcement operations in New York State.

In 2007, I returned to the Office of the Attorney General as Deputy Attorney General and Bureau Chief of the newly formed Office of Sex Offender Management. There I tried cases myself and supervised other attorneys who investigated and tried sexual assault cases in the civil confinement realm under Article 10 of the New York State Mental Health Law.

In 2011, I joined the New York State Police (NYSP) as General Counsel. I was promoted to First Deputy Superintendent in 2012; the first civilian to hold that title. In that role, as the second in command over the entire force, I was responsible to supervise every service the New York State Police provide. I was also the chief ethics officer for the NYSP and responsible for all internal discipline.

For about ten months between 2015 and 2016, I temporarily joined the Joint Commission on Public Ethics as Chief of Staff while the agency was going through a reorganization and conducting a search for a new Executive Director.

I came back to the State Police in 2016 as Executive Deputy Superintendent and Counsel. During that time, I also took on the role of the Director of the Office of Campus Safety responsible for the implementation of New York's newly enacted "Enough is Enough" legislation to strengthen enforcement of sexual assaults on New York's college campuses.

In 2019, I retired from state law enforcement service to concentrate on teaching at Cornell Law School. I also take on some private matters including criminal defense, consulting for police departments and small county District Attorneys. I also represent citizens and businesses

appearing in front of state agency enforcement bureaus. Most of my work in that regard is pro bono.

In my career as a prosecutor, I have presented hundreds of cases to the Grand Jury and tried at least 50 cases to verdict including juvenile crimes, gang related violence, sex crimes, and homicides. In addition, as an Assistant District Attorney, Assistant Attorney General, Deputy Attorney General, Deputy Inspector General, Deputy Director, Bureau Chief, Counsel, Chief of Staff, and State Police Deputy Superintendent, I have supervised hundreds of prosecutions and police investigations.

## Materials reviewed:

In reaching my opinions in this matter, I have reviewed the following material:

- Report for the Plaintiffs submitted by Steven Zeidman

- The amended complaints filed by Mr. Boyd and Mr. Walker

- The Decision and Order of Christopher J. Burns J.S.C. dated August 18, 2021

- Various Buffalo Police Department records prepared during the investigation of the murder of William Crawford

- Transcript of ADA Timothy Drury's deposition, held on November 28 and November 29, 2023

- Transcript of ADA David Henry's deposition, taken on August 11, 2023

- Motions filed in the prosecutions of Darryl Boyd, Darryn Gibson, Floyd Martin, and John Walker, Jr.

- Andre Hough's testimony

- Tyrone Woodruff's testimony

- Transcripts of the Gibson, Boyd, and Walker trials

## Summary of opinion:

Based on my review of the material, I have reached the following opinions to a reasonable degree of professional certainty:

The Boyd and Walker trials were conducted in accordance to the laws and rules of evidence and ethics that applied to New York criminal trials at the time. I found nothing untoward or unethical

in the practices and procedures as they concerned the police officers who investigated the robbery homicide or the district attorneys who prosecuted the cases.

It is also my opinion that speculation on a prosecution 47 years in the past as to what evidence may have existed in addition (or subtraction) to the evidence presented at trial and what a defense attorney or a prosecutor might have done with such evidence had it existed then is specious at best and leads, just as it has done in this civil suit, to unfettered speculation replete with unprovable conspiracy theories that lose their tether to the facts. Speculation is a risky endeavor fraught with more uncertainty than clarity, especially concerning the investigation of an incident so long ago. There is simply no way to reasonably judge the actions, defenses, strategies of the parties and the worth of evidence used (and evidence not used) over the passage of almost half a century.

I am also of the opinion that to opine as to the reasonable competence of a defense attorney's (or prosecutor's) strategies and use of particular evidence after such a passage of time and without the specific knowledge and understanding of the facts and circumstances as they confronted those parties in real time is another specious endeavor fraught with unsurmountable uncertainty. The claim that a reasonably competent defense attorney could or would have effectively utilized this or that evidence in this or that manner thereby discrediting the prosecution's case, is nothing but a guess based on an extremely truncated understanding of the facts and circumstances under which the investigation and the trial actually occurred at the time and under the realities and limitations specific to that time. Further, from the materials I reviewed and given limitations of the record keeping of the era, I cannot find in the available records of these cases any intentional withholding of blatantly exculpatory evidence.

I further found that the prosecutors' summations in the Boyd and Walker trials were consistent with the established rules of evidence, complied with traditional etiquette in advocacy, and were in line with the sensibilities and mores of the period in which the cases were tried. I believe that is why, after numerous appeals in these cases, no appellate judge found the summations to be anything but proper advocacy at the time. I find it unsettling to use the sensibilities, rules, standards, and protocols of 2024 to judge the ethics, actions, and responsibilities of the police and the prosecutors in 1977.

## The *Brady* doctrine:

An important rule that prosecutors must follow is laid down in the famous case <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The *Brady* case mandates that a prosecutor must turn over all evidence that is exculpatory with regard to guilt or punishment. The United States Supreme Court held that withholding exculpatory evidence violates due process "where the evidence is material either to guilt or to punishment." Since the decision in *Brady,* there have been numerous state and federal cases interpreting this requirement under a myriad of fact patterns. Basically, the doctrine has come down to a two-part test for evidence to be *Brady* material. First, the evidence has to be in the possession of the prosecutor and not shared with the defense. Second, it has to be reasonably probable that such evidence would have changed the outcome of the case with regard to a conviction or sentence.

The *Brady* standard seems relatively simple in theory. Yet, it has proven remarkably difficult to apply in many circumstances given the countless scenarios under which crimes and their subsequent investigations occur. *Brady* has spawned hundreds, if not thousands, of cases interpreting its holding and applying its principles to various criminal case fact patterns. Differences of opinion, even among expert criminologists, abound as to what constitutes "exculpatory material." As far back as 1977, the rule was considerably less clear and far less established than it is today. Even today a lawyer can't always count on two experienced and highly intelligent judges to necessarily agree to its applicability in a complicated fact pattern, let alone a multiple defendant homicide with many witnesses and various sources of evidence, some of which are relevant to the crime and some not.

As an example of the continuing evolution of the *Brady* doctrine, as late as 1985 (eight years after the Boyd and Walker trials ended), a U.S. Supreme Court case entitled, the <u>United States v. Bagley</u>, 473 U.S. 667 (1985), narrowed the reach of *Brady* refining the two part analysis described above. According to that holding, the evidence had to be in the possession of the prosecutor and kept from the defense. Second, it also had to be "exculpatory" such that there exists a reasonable probability that the defense could have used it to change the result of the trial or sentence.  For our purposes, the *Bagley* decision's refining *Brady* illustrates that the doctrine was not so clearly understood in 1977 as it is today.

In <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the Supreme Court held that the prosecution's failure to inform the defense of relevant impeachment material was a violation of the same obligation that undergirds *Brady*. The *Giglio* case expanded the definition of exculpatory evidence to include statements of witnesses or physical evidence that conflicts with the prosecution's witnesses. Basically, it includes evidence in the prosecution's possession that the defense could use to impeach the credibility of a prosecution witness. While this case law was in effect in 1977, it was still fairly new and much had yet to be worked out in terms of the practical implications for specific cases under various factual circumstances. In the 1970s, as compared to today, there was a dearth of case law defining the parameters of exculpatory and impeachment evidence. This created a lack of clear guidance delineating under specific fact patterns when and in what manner pertinent evidence must be disclosed to the defense.

Again, we must be careful not to judge the law, the practices, and the policies as they were in 1977 by the law, practices, and policies as they are today. To say the criminal law and criminal investigative practices underwent revolutionary changes between 1960 and 1990 is to say almost nothing of the reach and extent of those changes; almost all of which inform the procedural protections in favor of criminal defendants as we now employ them. Simply put, substantive criminal procedural law was in an extreme state of flux in 1977. The three-decade period between 1960 and 1990 likely encompassed the most expansive change in criminal substantive due process law in our nation's history. The evolving doctrine of the *Brady* obligation was part of that rapidly expansive change.

The same is true of the *Rosario* obligations particular to New York State which I will now address.

## The *Rosario* Rule:

People v. Rosario, 9 NY2d 286 (1961) basically held that prior statements of the prosecution's witnesses which were memorialized by the police or prosecutor must be given to the defense before the defense cross examines the witness in court. This principle became widely known as, "the Rosario rule." It was in effect in 1977 but, similar to the *Brady* doctrine, it was not nearly as refined as it is today.

Over the 35 years of my career this seemingly non-controversial rule has gone through many iterations as to timing of disclosure, manner of disclosure, and whether failure to disclose was fatal to a conviction. The plaintiff's expert in his report cites a number of cases that were decided in the process of working through these issues. Many of the cases he cites were decided after 1977 and would not have been controlling at the time of the Boyd and Walker trials. For example, plaintiff's expert correctly points out that The *Rosario* rule was refined many times including extending it to suppression hearings and to notes and reports of investigating officers. *People v. Ranghelle*, 69 N.Y.2d 56 (1986).  However, the *Ranghelle* decision occurred nine years after the Boyd and Walker trials were completed. At the time of the Boyd and the Walker trials, the prosecution followed the "*Rosario* rule" consistent with the law and the ethical obligations at the time. That is why no alleged violations of those laws and procedures were the subject of any successful appeal of either conviction.

In 1977, it was the common practice and accepted protocol to disclose witness statements after each witness testified on direct examination as former ADAs Drury and Henry did in these trials. This may seem out of step under today's protocols, but it was the practice of nearly every prosecutor in 1977. If ADA Drury and ADA Henry's practice in that regard were such an improper understanding of *Rosario* as to constitute prosecutorial misconduct, so then was virtually every conviction obtained in that time period. Such an interpretation would be absurd.

In his report, the plaintiff's expert conflates the prosecutor's *Rosario* obligations with his *Brady* disclosure requirements. The two are not the same. As far as *Brady* was understood at the time, under some circumstances it could be reasonably determined that certain prior failures to cooperate, non-committal responses, and obfuscations by witnesses to the police were not exculpatory. Anyone who has ever practiced in a big city police department or district attorney's office understands that the level distrust and non-cooperation with law enforcement is quite high in inner-city, lower income, and often minority communities. It is not unusual, in fact it is common, for many in those communities to distrust law enforcement and to be less than candid with them, especially during initial encounters. It is quite reasonable for the witnesses in this case to have been reticent about speaking with the police and reasonable still, or at least common, for them to be reticent when first speaking with law enforcement. It is equally reasonable for the police and the prosecutors not to have considered such regular and ordinary initial conversations to be exoneration material. To them it was the everyday tug and pull of the justice system and understood by all its practitioners.

It is also quite common, routine in fact, that witnesses get cold feet just before formally testifying at proceedings like grand juries and trials. It is also common for them to briefly recant what the parties know to be true. Often, it takes a skilled detective and/or prosecutor to make the person comfortable enough and clear-headed enough to tell the truth in such settings. So, to assume in

1977 that all initial inconsistent statements and all subsequent recantations would have been known to the police and the prosecutors to be *Brady* material, would be a significant leap into the future for anyone investigating or prosecuting a criminal case in 1977.

More about this will be discussed below but, in my opinion, it was reasonable for the police and prosecutors not to consider such common back and forth discussions with witnesses to be *Brady* material. This conclusion is backed by the fact that no appellate court ever reversed these convictions based on lack of disclosed impeachment material. However, if a witness at testified at trial, all of his or her memorialized statements should have been disclosed pursuant to the *Rosario* rule.

## A note about prosecutorial resources:

In the plaintiff expert's discussion of the roles and duties of a defense attorney, he notes unequal access to the evidence and exculpatory materials. In my experience, his explanation isn't entirely accurate in every case. While the police and the prosecutors have some resources available, and at times may have more than a defense attorney, they are also dealing with far more crimes to investigate and prosecute. A better comparison would be the resources available to a particular defense attorney on a particular case and comparing that to the resources available on a particular case in a particular precinct and/or district attorney's office. This more apt comparison will often lead to results that show a more equal distribution of resources. In many cases, depending on the attorney and his caseload and/or firm, it is the defense that has the resource advantage. In any event, it cannot be stated with certainty that the police and the prosecutors in this case had more time and resources available to dedicate to this particular homicide than the defense. Also, one should bear in mind that this crime occurred in the height of an unprecedented rise in violent crime both in the country as a whole and in cities like Buffalo in particular. The literature is clear that the crime rate spikes in the era stretched the resources of most city police departments and district attorneys' offices to nearly breaking. Buffalo was no different.

Additionally, the defense attorney has access to perhaps the greatest source of evidence in criminal cases, his client. Access to which is denied the prosecution. Once a defendant is arraigned, or even before that should he or she request an attorney, all questioning by law enforcement must stop. Thus, the party with access to the richest source of potential exculpatory evidence may be the defense attorney. He can talk to his client freely. Whatever his client tells him can remain confidential. There is no disclosure requirement incumbent of the defense. The defense attorney need turn over nothing of what the defendant tells him or her. This, of course, in no way means or implies that the defendant must testify or that the prosecution should have any deposition-like rights to question the defendant before trial. The Fifth Amendment controls and for good reason. I am merely pointing out the fact that the defendant may possess superior knowledge of facts and evidence that could exonerate him. He can impart that knowledge to his attorney who need not share with the prosecution.

## Police officer notes:

In 1977 every criminal file had to be kept in hard copy and stored in police warehouses. The amount of paper was staggering back then. The area required for storage was massive. It put a significant dent in police resources and was an incredibly expensive burden on police department budgets. There was always pressure to reduce the size of files that had to be stored indefinitely.

That is still true today. Record management is one of the biggest issues facing police departments everywhere. The modern technological revolution has eased that burden to a great degree but hasn't ameliorated it completely. In 1977, it was a major concern. Back then almost every police officer was strongly encouraged, and in some cases forced, to keep extraneous paper out of their stored files. When the substance of handwritten notes was incorporated into the typed report, those notes were almost always jettisoned. That practice had nothing to do with destroying evidence. It had everything to do with the record storage capabilities of the era.

## Trial Summations:

I agree with plaintiff's expert in his recitation of the ethical obligations for a prosecutor on summation. He writes a well-reasoned and clear treatise on the issue. I disagree with him, however, that the prosecutors' summations in either the Boyd or Walker trials ran afoul of the ethics or the rules embedded therein. My position is corroborated by the fact that no appellate court ever overturned either of these verdicts based on improper argument during summation. All the "blows struck," to paraphrase the plaintiff's expert, were proper ones in the context of the trial.

As far as language and word choices are concerned, it is my opinion that the plaintiff's expert is unfairly using 2024 sensibilities to judge 1977 terminology. Just as we would not have judged the language used by Clarence Darrow or William Jennings Bryan at the "Scopes Monkey" trial in 1925 by 1977 standards (especially the racially charged words and phrases), we should not judge the words used in 1977 by 2024 mores. Each instance represents about 50 years in the evolution of language and decorum. It makes no sense to use modern linguistic standards and apply them a half a century into the past.

The ABA's Rules of Professional Conduct in 1977 proscribed lawyers from resorting to arguments calculated to inflame the passions or prejudices of the jury. However, nothing suggests that the prosecutors in the Boyd or Walker summations did that. Some words or phrases used then would not spark racial division or stoke prejudice in the way they might today. Language is an evolving tool. Impropriety in one era does not necessarily mean impropriety in another. Discourse concerning race and ethnicity is a classic example. The same is true in discussing youth and youthful wrong-doing.  In sum, I saw nothing improper in either prosecutor's summations. In fact, both were quite staid and both fairly routine considering the time in which they were presented and the nature of the crime they concerned.

## Trial of Darryl Boyd:

Darryl Boyd's trial began on April 25, 1977. The opening statement delivered by ADA Timothy Drury was routine and rather typical, if not even dull, for a homicide. It fit clearly within all the rules and protocols for a prosecutor's opening remarks. Defense counsel Mark Hulnick's opening statement was likewise proper and ethical.

The prosecution's first witness was Buffalo Police Department ("BPD") police photographer Albert Hauser. He took photographs at the direction of the BPD detectives. None of the photographs introduced into evidence showed footprints in the rear of Mr. Crawford's property.

There is no evidence that I saw in the transcripts that mention or allude to any photographs showing footprints in that area.

The prosecution's next witness was Mr. Lawrence Watson, who lived at 2049 Fillmore Avenue. He ws Mr. Crawford's neighbor. Mr. Watson accompanied Mr. Crawford as they left the bar. However, they soon separated because Mr. Watson noticed that the door to his house appeared to be open. He left Mr. Crawford to investigate. (He and Mr. Crawford both lived very close to the bar.) That's the last time Mr. Watson saw Mr. Crawford. Mr. Watson returned to the bar a short time later and stayed a little while before he and his wife both left for the evening. Mr. Watson wasn't exactly sure of the time using the word "probably" when discussing times; as in "probably before midnight." Clearly, he was unsure of the exact times when he left the bar, returned and left again. Nothing in Mr. Watson's statement or his testimony seemed unreasonable, inconsistent, or out of character in recounting the events of the evening.

David Donnelly, a member of the Fire Department, testified he was the first to respond to the 911 call. He found Mr. Crawford lying by the side door of the driveway next to the Crawford home. Mr. Donnelly testified to the pools of blood he noticed near the side door to the house and another about two feet away. On cross-examination, Mr. Donnelly noted that the road conditions were icy and visibility was poor.

Tyrone Woodruff testified that he was friends with John Walker, Darryn Gibson, Floyd Martin, and Darryl Boyd. Mr. Woodruff said that on the night of the homicide, he and John Walker went by cab to Floyd Martin's apartment at the Glenny Projects. Darryn Gibson was there. Mr. Gibson was looking to rob someone using the street phrase common for the time "to go out and get us some money."  At about that time, they went to find Darryl Boyd to help them with their robbery plan.

With Mr. Boyd with them, the group went walking down Fillmore Avenue. At some point, Mr. Gibson picked up a pipe and put it in his sleeve. Mr. Gibson and Mr. Boyd went into the Golden Nugget bar scouting for a potential victim while the others remained near Simpson's Store. Mr. Gibson and Mr. Boyd then came out of the bar with a plan to rob a particular man they saw in the bar, whom they noticed had a considerable amount of cash. That person turned out to be the decedent. The perpetrators waited for Mr. Crawford to leave the bar which he soon did. The group accosted him as he was going up the driveway to his house. They demanded his money. He refused. At that point, Mr. Gibson hit Mr. Crawford with the pipe. Mr. Crawford fell, helpless as the group continued to beat him and kick him senseless. Mr. Woodruff was acting as a lookout during the fatal beating and robbery. Mr. Boyd took the victim's wallet containing the money. The perpetrators then ran down Fillmore Ave. and returned to the Glenny Projects where they divvied the cash to the various participants. Mr. Woodruff testified he received less money because he didn't do much other than act as a lookout. Mr. Woodruff and Mr. Walker eventually left the Glenny Projects by cab.

When Mr. Woodruff was initially questioned on January 11, 1976, he denied any knowledge of the crime wishing not to incriminate himself or his friends. The next day, when questioned in the presence of his parent and his pastor, he told the police some, but not all, of the truth. Finally, under the guidance of an attorney representing him, Mr. Woodruff told the full truth. He did so

again at a preliminary hearing in Buffalo City Court. By the time of the Boyd trial, he had previously testified consistently at Mr. Gibson's trial.

At the close of Mr. Woodruff's direct examination, ADA Drury turned over to the defense attorney all the *Rosario* material pertaining to Mr. Woodruff's testimony consistent with the law, practices, and protocols of the time. Defense counsel made good use of the disclosures. During cross-examination Mr. Woodruff, as is common with most witnesses, did not remember the exact times of the events with any degree of precision. He admitted in front of the jury that he had received immunity in exchange for his testimony. Mr. Woodruff was also thoroughly questioned about the contradictions in some of his earlier statements, including discrepancies in the amount of the robbery proceeds he received and failing initially to tell the police that Mr. Gibson and Mr. Boyd had scouted the bar for a potential victim. Defense counsel was also able to impeach Mr. Woodruff's account in its difference from Mr. Watson's account concerning whether Mr. Crawford left the bar alone.

Andre Hough testified that he was friends with some of the perpetrators but not with Mr. Woodruff. On the night of the murder, he was with Darryl Boyd at the Glenny Projects. The other perpetrators arrived later. According to Mr. Hough, Darryn Gibson was the one who came up with the robbery plan including targeting a patron from the Golden Nugget Inn. The group decided that Mr. Hough wasn't welcome to join them because they were concerned that he couldn't be trusted to keep the robbery a secret among them.

The next day in the presence of his mother, Darryl Boyd accused Mr. Hough of killing some man with a pipe. Mr. Hough knew this to be untrue and he said he could prove he was at 194 Glenny Drive. Darryl Boyd then admitted that he had killed the man. Mr. Boyd's mother thought he was lying. Mr. Boyd then asked Mr. Hough to check to see if the police had their names as suspects. Mr. Hough called the police but Mr. Boyd grabbed the phone and hung it up. However, Mr. Hough had already identified himself.

Mr. Hough acknowledged on cross examination that he was not initially forthcoming with the police. He admitted failing to tell the police the entire truth but, after the police accused him of lying, he gave more accurate statements. Eventually, he told the police and the prosecutors the full extent of what he knew. He testified that his trial testimony was consistent with his testimony in the Grand Jury.

Before the cross examination of Mr. Hough, ADA Drury gave defense counsel all the *Rosario* material relevant to Mr. Hough's testimony. Again, that practice was in accord with the laws and protocols of the time. The prosecution rested after Mr. Hough's testimony.

The defense called the Golden Nugget Inn bartender, Debbie Jeffrey. She testified that, while in the bar and while paying for drinks, she could and others could see that Mr. Crawford had a significant amount of cash in his wallet. She thought it was about $300. Occasionally, when Mr. Crawford had too much to drink, Ms. Jeffrey would walk him home from the bar. On the night of the murder, she was too busy to that. The plan was for Mr. Watson to escort Mr. Crawford home. Ms. Jeffrey was also too busy to notice everyone who may have been in the bar when Mr.

Crawford's cash was visible. Ms. Jefferey was not called as a witness for the prosecution and thus, there was no obligation at the time to turn over any *Rosario* material pertaining to her.

Alison Zachery, Joyce Washington, Dorothea Luster also testified for the defense. Their collective testimony was designed to establish through their recollections that the perpetrators left the Glenny Projects after 11:00 or 11:30pm. All three were friendly with the defendants and motivated to testify on their behalf. The jury had an ample opportunity to assess their credibility and place their testimonies in perspective as they related to the relevant time frames in the case.

The prosecution then called Detective Michael Guadagno in rebuttal. Detective Guadagno testified that he took a signed, sworn, written statement from Darryl Boyd. In that statement, Mr. Boyd first said he and Mr. Gibson left the Glenny Projects after Mr. Walker and Mr. Woodruff departed in a taxi at about 10:45 p.m. and after Floyd Martin called a second cab. Asked to account for Mr. Boyd's mother's statement stating that he got home that night about 1:00 a.m., Mr. Boyd said that he went to Cheryl Anderson's place in the Glenny projects. He then claimed that he didn't get home until 1:00 a.m.

Defense counsel summation concentrated on timing, contending the murder happened before 11:00 p.m. Relying on the defense witnesses, Mr. Boyd's attorney argued that Mr. Boyd had not left the Glenny Projects until about midnight. He never suggested or intimated that Larry Watson committed the murder. Defense counsel argued that the evidence, including the other witnesses' testimonies, failed to coincide with the testimonies of Mr. Woodruff and Mr. Hough. Based on the statement disclosures, the defense attorney emphasized that Mr. Woodruff had contradicted himself in his various statements about how the crime was committed and how much money he received as a result of his participation. He emphasized that Mr. Woodruff's immunity deal and the pressure brought to bear on Mr. Woodruff from the law enforcement caused the change in Mr. Woodruff's account over time. The defense repeatedly highlighted that the main witnesses, Mr. Woodruff and Mr. Hough, weren't credible.

It was a very capable defense professionally handled. Again, the defense attorney, like the police and prosecution, should be judged under the law, practices, and procedures that existed for criminal trials at the time. He should not be judged in accordance to how he might handle the case in accordance with how those laws, practices and procedures have changed over the last 47 years. When evaluated under those laws, standards, and protocols during the appeal process, neither the defense nor the prosecution was found to have been lacking in any respect.

## ADA Drury's summation:

ADA Drury's summation was likewise professionally presented. It was as routine for a homicide of the period as one could conceive. There was nothing unprofessional or inflammatory within it. There was no racially charged language, especially when evaluated within the linguistic conventions of the times. As discussed above, only when contrasted with the terms that polite society might discuss race or ethnicity in 2024 is there even a whiff of impropriety. Language use changes over time. What was a common and accepted term in 1977 easily can be viewed as crass or rude in 2024. During the 1970s many terms were not considered crass or improper that might be today. This principle certainly applies to the words and phrases we use to discuss race and ethnicity today as compared to the 1970s.

The perpetrators were African-American teenagers who lived in lower income projects. Those facts were mentioned using language considered appropriate for the time but there was nothing racially charged about those circumstances. Those facts merely set the stage for a potential robbery motive possessed by poverty-stricken minority youths living in a government project. In 1977, the terms "poor product of his environment," "ghetto kid," and a "junkyard" (to describe a poor neighborhood) were in no way out of the ordinary or used in order to stoke racial prejudices. Only "junkyard" is even colorful language and that term had (and still has) no racial connotation.

That ADA Drury mocked and denigrated Mr. Woodruff was in no way improper or out of step with the law, rules, or procedures concerning trial advocacy and proper argument. Contrary to the opinion of plaintiff's expert, mocking and denigrating witnesses has always been a strategy in advocacy for both sides in most trials. Criminal trials are not conducted under the Roberts Rules of Order. Frankly, I don't believe I have ever tried a case where one or more of the witnesses were not mocked, denigrated, or belittled in a far more caustic manner than ADA Drury did in this trial. My position is corroborated by the fact that these trials were not reversed in any appellate court for improper, illegal, or unethical argument.

As for personally vouching for the truth of one's witness, again ADA Drury stayed within proper and legal decorum in trial advocacy. Plaintiff's expert takes many of the prosecutor's statements out of context. During summation, while submitting to the jury that his witnesses were telling the truth, ADA Drury did so within proper confines. He argued that they were truthful because their statements aligned with the evidence. He did not "vouch" for them claiming they were telling the truth because he knows them to be good people or upstanding members of the community or anything to that effect. In fact, he was arguing quite the contrary.

Plaintiff's expert is arguing contradictory points simultaneously. First, he claims it was improper for the prosecutor to besmirch his main witnesses and then he argues that the prosecutor improperly vouched for the general good character of those same witnesses. That seems a bit disingenuous. Again, had there been any issue as to ADA Drury's argument style in that regard, it most certainly would have presented itself on appeal. It didn't because it was proper argument within the context of the case.

## Value of the evidence:

The Plaintiff's expert argues that the cases against Mr. Boyd and Mr. Walker were "weak." That is best rebutted by the fact that both were convicted under a standard of guilt established "beyond a reasonable doubt." That is the toughest standard of proof in law anywhere and at any time in history. All veteran prosecutors can attest that it would be exceedingly rare to secure a criminal conviction on evidence that was "weak." Even in 1977 to carry that burden to a unanimous agreement in front of twelve people in the community means that the evidence was quite convincing. Here the prosecution accomplished it twice. In fact, the prosecution accomplished three times when we include the first trial convicting Darryn Gibson. I find it hard to credit the assertion that three separate trials, using essentially the same evidence, could obtain three guilty verdicts all subjected to a standard of proof beyond a reasonable doubt based on "weak"

evidence. In addition, the Judge in the Boyd case said at sentencing that he had no doubt in the jury's verdict. It is unlikely that an experienced criminal justice professional, who rose to the level of a trial judge, would be convinced of guilt based on "weak" evidence.

Next, the plaintiff's expert contends that the "frailty" of the prosecution's case at the Boyd and Walker trials is illustrated by Mr. Martin's acquittal. I disagree. First, it should be noted that by the time of the Martin trial, the prosecution had lost the cooperation of Andre Hough. His failure to testify at the Martin trial may well be the foremost reason why that trial resulted in a different verdict than the first three. In addition, when analyzing criminal cases, all subject to twelve people unanimously agreeing that the proof presented exceeds the threshold established beyond a reasonable doubt, it is not surprising that different trials with the same evidence can have different results. This is a feature of our criminal justice system, not a bug. In this country, we abide by the principle that it is better to have many guilty people go free, than it is to convict an innocent person. So, it happens within our criminal justice systems that persons who commit the same or similar crimes, at the same or similar times, under the same or similar circumstances but face separate trials can obtain different verdicts. That does not mean necessarily mean the evidence was weak. It could mean that one defense attorney was more skillful than another or that one prosecutor less skillful than another. One jury could be more skeptical and/or more apt to doubt the proof than another. This can happen for countless reasons. The criminal justice system is far from perfect. It is not designed to be perfect or even necessarily consistent. It is designed to allow guilty people to go free far more often than innocent persons are convicted. And, as any crime statistics from any reputable source will show, we achieve that careful imbalance. This often inures to the detriment of general public safety but, on the other hand, it is much to the benefit of those that find themselves accused. We accept the inconsistencies that result from this trade-off because we prefer the value of the trade.

## The mystery photograph:

Plaintiff's expert focuses on an alleged "missing photograph" from the Boyd and Walker trials that was supposedly used to help secure an acquittal in the Floyd Martin trial. The alleged missing photograph supposedly depicts footprints leading to Mr. Crawford's neighbor's house. (The same neighbor who walked out of the tavern with the decedent.) That this photograph ever existed is highly doubtful based on the record of the investigation in its totality. My understanding is that no one has been able to locate this mystery photograph and there is no record of it being introduced in the Martin trial as claimed. Most of the people associated with these trials who are still alive recall no such photograph. The only one who claims to remember it is Mr. Martin's defense attorney who has no record of the photograph and is relying on memory 47 years old. Therefore, it is far from established that any such photograph ever existed, let alone that it was withheld from Mr. Boyd's or Mr. Walker's attorneys.

Additionally, it is quite doubtful that such footprints ever existed. Buffalo Police Sgt. Dove testified that he checked the area for foot traffic behind Mr. Crawford's house and there was none. His testimony is corroborated by his report of January 3, 1976 wherein he memorializes the results of the police efforts to determine where the perpetrators may have fled after the attack. In that report he states, "*there were no foot tracks noted through the back yards and it appears the assailants came out the drive way (sic) the same way they came in*." Had there been some conspiracy to exclude footprint evidence behind the Crawford residence in order to frame

the defendants, it would have been in set motion almost two weeks before the defendants were ever considered suspects. That would be quite an amazing prognostication.

Had the photograph existed (and, as discussed above, conceding that is monumental stretch…), the claim that a reasonably competent criminal defense counsel could have made effective use of it is speculation on top of unproved supposition. The crime scene was littered with foot traffic before the police photographer arrived to photograph the scene. Putting aside whether the defendants were there, or Mr. Watson or another mystery person were there, the police and EMS personnel were certainly there. They had walked all over the scene. Any one or more of those responders could have made the type of footprints described by Mr. Martin's attorney. The decedent was still alive when EMS arrived and there were doubtless many life-saving attempts and medical interventions occurring at the scene. Also, it was January in Buffalo late at night. Those prints could have been made at any time by anyone earlier in the day or in the last few days and then froze, unfroze, and re-froze in various stages. The police reports also note that it had rained that evening. A January rain in Buffalo would have played all kinds of havoc on the integrity of footprint evidence had it ever existed.

The supposition that such prints were made by a large heavy man is incredible. Determining the size and heft of a man based on an iced, snowed on, rained on footprints could never be accomplished with any degree of scientific certainty. That type of conjecture is something for television or a movie but is not in accord with actual forensic capabilities, especially back in 1977.

Therefore, it is my opinion that even had such a photograph existed, it would have been essentially worthless as evidence implicating Mr. Watson or anyone else. It would not have been considered exculpatory *Brady* material in 1977.

## Theories on other suspects:

The defense attorney in the Boyd trial argued that Mr. Crawford was killed before 11p.m. He contended that Mr. Boyd and the other perpetrators did not leave the Glenny Projects until after that. He knew the evidence that Mr. Crawford displayed a lot of cash while inside the bar. He also pointed out that someone followed Mr. Crawford out of the bar. He had all the material he needed to assert a third-party culpability defense. Instead, he chose not to. Presumably, he was concerned that to make such a wild allegation would hurt his client's chances. That was most likely the best strategy. Accusing the neighbor, Mr. Watson, would have been a huge gamble at the trial. Mr. Watson was an older man with no history of violence. He had no known animosity toward Mr. Crawford. He had no criminal history. Had the defense used this evidence to assert that Mr. Watson was the real killer, the likely outcome would have been an even more certain conviction.

The wild theory that Mr. Watson killed Mr. Crawford is simply not supported by the physical evidence either. Mr. Crawford's wallet was missing and his keys were found by his body. That those keys belonged to the decedent was established by his wife during her testimony. The intimation that the keys belonged to Mr. Watson because, coincidentally, Mr. Watson had misplaced his keys that night and called the bar to check if they were there, doesn't comport with the evidence. It is improbable to assert Mr. Watson lost his keys during the attack in the area

where the body lay and afterward, in full knowledge that he had committed a brutally savage robbery, then decided to check with the bar personnel to see if they could find them.  If he had committed this crime, his first thought as to where he dropped his keys certainly would be at the crime scene during the scuffle. He would have never called the bar and advertised the fact his keys were missing while knowing they were most likely at the crime scene. That makes no sense.

As it turns out Mr. Crawford's keys, not Mr. Watson's keys, were at the crime scene. They were noted and inventoried by the police investigators. Law enforcement determined them to be of no evidentiary value as to the identity of the perpetrators because Mrs. Crawford's widow claimed them and identified them as her husband's. She testified accordingly. Are we to believe Mrs. Crawford received keys that came from her husband's crime scene, realized they weren't her husband's keys, had no idea whose keys they were, never contacted law enforcement to tell them that, and then testified falsely about it at trial? That seems inconceivable.

The fact that the perpetrators took the wallet but left the keys is not surprising. The perpetrators were looking for money. They were not looking for keys. The wallet contained ready and usable cash. The keys were essentially worthless to them. When they rifled through Mr. Crawford's pocket to take his wallet, it makes perfect sense that they left the keys. The keys found next to Mr. Crawford's body belonged to Mr. Crawford. Mrs. Crawford's testimony corroborates that fact.

Plaintiff's expert makes much of Mrs. Crawford telling detectives that when her husband went out drinking, it was their practice for him to come to the side door and ring the bell for her to come unlock the door. He then leaps to the unfounded and rather startling conclusion that Mr. Crawford did not carry keys. In 1977, a 60 plus year-old disabled man who doesn't carry his house keys in his pocket would be exceedingly rare. The innocent statement that Mrs. Crawford told the police about her husband ringing the bell when he came home is much more likely to suggest that Mr. Crawford was notifying his wife that he was entering the house in case she was fearful of an intruder.

Mrs. Crawford heard a loud thumping noise on the side of her house on that night. Presumably, that may have been when her husband was attacked. Had she been aware that he had no keys and that he needed her assistance to enter the house, she would have no doubt investigated the noise to make sure it wasn't her keyless husband coming home from drinking on a frigid January night in Buffalo. That she didn't do that further implies that she knew he had his own set of keys.

Most importantly, Mrs. Crawford testified at trial and under oath that her husband would have his keys with him and that the keys recovered at the scene were, in fact, his. Are we to believe that the police and the prosecutors enlisted Mrs. Crawford in their elaborate conspiracy to convict innocent suspects of murdering her husband? Getting her so committed to the cacophony of lies to the extent that they had her commit perjury in order to accomplish this feat. This is an implausible theory to say the least. Thus, that the police recovered Mr. Crawford's keys in the vicinity of Mr. Crawford's body is hardly *Brady* material.

## Debbie Jeffrey's unfounded suspicion:

Despite that bartender Debbe Jeffrey disclosed her unsubstantiated suspicion that Mr. Watson might have had something to do with Mr. Crawford's death, none of her statements constituted *Rosario* material at the Boyd trial because she was not called to testify by the prosecution. That practice was consistent with the laws, rules and ethical standards of the era. The only issue that remains is whether Ms. Jeffrey's speculation would have been considered exculpatory material under *Brady* as it was understood in 1977. Since the police and the prosecution had no corroborating evidence that Ms. Jeffrey's suspicion had any merit, it was reasonable for them to conclude that such "feelings" of a non-eye witness, non-participant in the crime wouldn't qualify as exculpatory.

While, it is true that Ms. Jeffery claimed Mr. Crawford displayed his money in such a way that Mr. Watson must have seen it, Mr. Watson said he never took any notice of it. In addition, that would make suspect every person who had been in the bar. It would not be enough to reasonably suspect that Mr. Watson was the culprit, especially given all the other evidence the prosecution possessed which pointed clearly in the direction of the charged defendants.

Additionally, whether Mr. Watson volunteered to walk Mr. Jefrey home or was asked to do so by Ms. Jeffey is not an inconsistency so dramatic as to lead to any reasonable degree of suspicion toward Mr. Watson. The slight discrepancy Mr. Watson and Ms. Jeffrey had with regard to how long Mr. Watson stayed at the bar after his return is equally irrelevant. The juries were aware in both trials that Mr. Watson left the bar with his wife shortly after he had returned. Additionally, had Mr. Watson been guilty of the crime, why would he leave the bar again so quickly? If he were guilty, the better practice would have been to stay at the bar for a longer period thereby helping establish an alibi.

The *Brady* obligation is not interpreted to include wild innuendo and unproven theories from every person who opines as to a police investigation. In many cases, such an obligation would lead to massive amounts of irrelevant speculative material having to be turned over to the defense. In 1977, there was no such obligation incumbent on the prosecution. Neither did the obligation extend to the prosecution concocting theories from the evidence as to potential alternative perpetrators and giving those theories to the defense. *Brady* does not include a duty for the prosecutor to do the defense attorney's job for him or her.

The musings and fanciful speculations by plaintiff's expert are sensational and speak to a fantastic grand conspiracy designed to wrongfully accuse the defendants and protect Mr. Watson. They are indeed shocking and scandalous but, upon inspection, lack merit. Mr. Watson was friendly toward Mr. Crawford. He had a clean criminal history with no reputation for violence. Added to all of that, the prosecution had clear evidence that the defendants in the eventual trials were responsible for the murder. In fact, that evidence was so strong that the prosecutors were able to prove guilt beyond a reasonable doubt as to all of the defendants except Mr. Martin.

The statements of Mr. Frances Kalb, a Golden Nugget patron, that Mr. Crawford and Mr. Watson left the Golden Nugget together, that Mr. Kalb had seen Mr. Crawford's money, that Mr. Watson returned to the bar and left again sometime later, and that he heard the bartender discuss Mr. Watson's report of missing keys over the phone, is all consistent with the evidence the prosecution and the defense already had. None of it was exculpatory.

The counter narrative painted by the plaintiff's expert is constructed on a virtual mountain of improbable suppositions, full of speculation and innuendo. While it makes a compelling story, it wouldn't have held up under the scrutiny of cross examination in court. I see very little to no physical evidence corroborating the "Larry Watson did it" theory. Furthermore, no competent defense attorney would attempt such outlandish speculation in an actual courtroom for the reasonable fear that such a fantastic and easily disprovable tale would only serve to convince the jury that the defense's desperate attempt to pin guilt on an innocent man must mean the prosecution's case was all the more accurate and Mr. Boyd all the more guilty.

In addition, given the short-comings of 1970s document sharing technology and the lack of memorialization as to which documents were shared, we do not know for certain that the prosecution failed to disclose any of the leads as they pertained to other possible suspects. Thus, the suggestion that they would have been used to prove the weakness of the investigation and could have resulted in an acquittal in the trials is simply conjecture without a basis in fact.

## Jerome Boyd and Andre Howe:

The anonymous tip supposedly implicating persons named Jerome Boyd and Andre Howe was similarly worthless. Those types of tips are common in homicides such as this. There was no evidence that any person named Andre Howe was in the bar that night. And, as for Jerome Boyd, there was no evidence that he had anything to do with the murder. Nothing corroborated that tip. Contrast that to the anonymous tips implicating the defendants that were, in fact, corroborated by the evidence, including witnesses who testified in person, under oath and cross-examined by skilled and experienced defense attorneys in front of multiple juries.

## Evidence pertaining to Mr. Woodruff:

Mr. Woodruff testified that the plan to attack someone originated with Darryn Gibson who suggested to the other defendants that they "get us some money" by finding an appropriate victim to rob. Mr. Gibson and Mr. Boyd went into the Golden Nugget bar saw Mr. Crawford at the bar drinking and noticed that he had a good amount of cash. The perpetrators then waited for Mr. Crawford to leave the bar, which he soon did. The group approached him and attacked him in his driveway, took his wallet with the cash and then returned to the Glenny Projects where they split the money. Some of the group later left the Glenny Projects in a cab. Mr. Woodruff and Mr. Walker left together in the same cab.

Mr. Boyd's attorney capably cross-examined Mr. Woodruff in an effort to show that Mr. Woodruff's account was inconsistent with the crime-scene evidence, with the medical examiner's findings, and with testimony from the people in the bar.

I agree that Tyrone Woodruff was an integral witness for the prosecution. Based on the evidence disclosed at trial and available to the defense, the attorneys were able to question, cross-examine, and argue that Mr. Woodruff might not have been present when the crime was committed based on his prior inconsistent statements, the pressure he had faced as an accomplice, and the immunity bargain he earned in exchange for his testimony. The experience and skilled defense attorneys in these trials made good use of that impeachment evidence.

Reports prepared by Detective Manista and by Detective Hunter, memorializing Woodruff's statements are certainly *Rosario* material as Mr. Woodruff was a witness for the prosecution. Under the laws at the time, those reports must have been turned over to the defense attorneys prior to Mr. Woodruff's cross examination. Detective Manista report memorializes a telephone call from an anonymous "negro" female. (Highlighting the use of language to describe race common and considered proper then that we may find offensive today.) The caller informed Detective Manista that Mr. Walker, Mr. Gibson, Mr. Martin, and a person named "Toni" (presumably Mr. Woodruff) were responsible for the homicide. Mr. Woodruff was at the police station listening to this call as it was occurring. He became visibly nervous as a result of the call. After the call, Detective Manista continued to question Mr. Woodruff. Afterwards, Mr. Woodruff gave the police more information as to how the crime happened. All of that information should have been available to the defense. I have seen nothing in the record that proves those reports weren't disclosed.

However, those reports do not prove in any way that the case against the defendants was built on unethical police coercion. That Mr. Woodruff's cooperation with the police occurred in steps and was aided by a promise of leniency was fully explored at the trials. There was nothing uncommon, unethical, or in any way surprising about the police tactics used. It was rather routine for a homicide investigation at the time.

The report Detective James Hunter made memorializing an interview discussing with Mr. Woodruff his role as a participant and witness to the homicide should have been turned over as well. Again, I see nothing in the record that proves these reports were kept from the defense. As previously discussed, it may be worthwhile to emphasize here that the record keeping delineating which documents were shared with the defense and when they were shared fails to accord with the meticulousness with which such records are made today. That happened due to the lack of easy and reliable information technology back then. In the 1970s, the labor intensity required to have reliably accurate modern style record keeping would have exceeded the capability of any city police department or county district attorney's office. In sum, based on what we know about this case, there is no way to claim with any degree of certainty that the Buffalo Police Department and/or the Erie County DA failed to turnover these reports. The fact that none of the reports were the subject of appellate review leads me to the conclusion that they were most likely disclosed properly.

Further, the Gibson trial transcript showing that ADA Drury did disclose those reports to Mr. Gibson's attorney leads one to reasonably conclude they were also disclosed in the other trials. If these reports were kept hidden in an elaborate conspiratorial attempt to frame Mr. Boyd and Mr. Walker, one would assume the same would be true as to Mr. Gibson. Disclosing the report in the Gibson trial would upend this supposed conspiracy. It makes no sense that the allegedly unethical law enforcement officers bent on framing innocent young men would intentionally withhold reports in two of the trials but disclose them in another.

## Cab company evidence:

Plaintiff's expert makes much about the timing of the cab rides leaving the Glenny Projects. He implied that this conclusively proves that the defendants could not have been in the area when

Mr. Crawford was killed. The mistake here is assuming the times given by the witnesses were precisely accurate. In fact, none of the witnesses could be exactly sure of the time that Mr. Crawford left the bar or of the time of his subsequent murder. Most were simply guesses within the parameter that all the pertinent events occurred late in the evening of January 2, 1976 after drinking in a neighborhood bar. Nothing about the time of the murder conclusively shows that the defendants could not have been there.

The evidence does not even prove that the cab company's records are accurate. Almost 50 years ago technology such as timed stamped receipts were notoriously unreliable. Once again, we must be cautious to avoid using 2024 standards and technologies and importing them onto an event that happened nearly half a century ago.  However, assuming technological accuracy and assuming that the defendants occupied those cabs at those precise times, they still could have committed the attack on Mr. Crawford. In sum, none of the timing evidence is dispositively exculpatory. Therefore, I disagree that a reasonably competent defense attorney could have made much use of the cab company timing evidence.

In addition, we know that ADA Drury did disclose the cab timing evidence to Mr. Gibson's counsel during Mr. Gibson's trial. The reasonable assumption here is that the prosecution also disclosed it the other trials. It doesn't seem consistent or reasonable to disclose the evidence in one trial but none of the others. The fact that the records were known to have been disclosed in the Gibson trials should dispose the idea that there was some grand conspiracy to withhold these records in order to frame the other defendants. If that were the case, the records would have been equally kept from Mr. Gibson's counsel. In addition, had there been such a stark inconsistency in disclosure, no doubt it would have been noted in the subsequent appeals.

In any event, the prosecution's case did not rely on the whether the murder occurred before or after 11:00 or 11:30pm. The only time that could be reasonably pinpointed by the aggregation of the witnesses' testimonies is that Mr. Crawford left the bar late in the evening and he was murdered shortly thereafter. Those facts comport with the cab company evidence. There is no *Brady* violation there.

## Evidence pertaining to Mr. Hough:

Mr. Hough testified that the day after the murder he noticed that Mr. Boyd had a lot of cash when they were together in the Simpson Store on Fillmore Avenue. Buffalo PD Detectives had tried to verify this information. They went to the store to see whether the store owners might remember seeing Mr. Hough and/or Mr. Boyd in the store on the night of the murder or on the day after. They did not. They were not called as witnesses, so their statements to the police were not *Rosario* material in 1977. As for the interview being exculpatory, the fact that store owners did not remember seeing two people in a store after over two weeks had passed is hardly surprising and it would not be considered exculpatory material as *Brady* was understood in 1977.

As with Mr. Woodruff, statements made by Mr. Hough and memorialized by law enforcement should have been turned over to the defense before cross examination. I saw no proof in the materials I reviewed proving that the prosecution failed to disclose any such documents.

Mr. Hough acknowledged in his testimony that he initially told the police that he knew nothing about the Crawford murder although that wasn't true. Reference is made to Polygraph tests despite that polygraph results are inadmissible in court because they are notoriously unreliable. But, of course, the records of any statements made by Mr. Hough to the police or the prosecutors must be disclosed to the defense. Again, from the records I reviewed, there is no conclusive proof of a failure to disclose such records. What I found is a failure to memorialize disclosure which was common for the era given the limitations in information technology that existed at the time.

That Mr. Hough failed to give a full and thorough account of what happened that night until such time as he was repeatedly questioned by law enforcement is again unsurprising. As discussed above, it is common that witnesses, especially young inner-city minority witnesses distrustful of law enforcement, do not disclose all they know about a crime until after a considerable period of time elapses during which the police or prosecutor earns the witness' trust. No witness I ever encountered gave a full and complete account of a crime upon an initial interview. Preparing testimony for preliminary hearings, grand juries, and trials is a process that often requires time and an evolution of shared trust. Facts concealed, left unmentioned, or intentionally lied about at first are often elicited and developed in detail over time after the witnesses are appropriately prodded by skilled investigators and attorneys. This does not mean the results are fabrications. It means only that witnesses who are distrustful of the process and/or without legal training are not always initially willing or able to disclose all they know. In many cases they aren't aware of the legal significance of pertinent information they possess. Drawing them out takes time and patience. That testimony is developed and refined over time is common to every trial. In this context, there was nothing about the continued or repetitive questioning of Mr. Hough that was out the ordinary or mis-aligned with the standards, ethics, and practices of the 1970s.

The experienced and able defense attorneys were able to use the evolving nature of Mr. Hough's disclosures to undermine his credibility and to reinforce any inconsistencies and/or similarities with the other witnesses to effectively impeach Mr. Hough.

## Testimony of Detective Guadagno:

ADA Drury called Detective Guadagno as a rebuttal witness. The trial record shows that ADA Drury disclosed the police report relating to Detective Guadagno's interview of Mr. Boyd. It is unclear whether the prosecution disclosed the police interview of Mr. Boyd's mother. However, she did not testify for the prosecution thereby creating no *Rosario* obligation to disclose it.  Mr. Boyd's mother claimed her son came home sometime between midnight and 1:00 am. Detective Guadagno used the mother's statement to question Mr. Boyd's credibility as to when he came back to the Glenny Projects. Plaintiff's expert claims that Detective Guadagno was deceitful with Mr. Boyd about his mother's claim regarding his arrival home. That isn't clear from the record. In any event, whether Mr. Boyd came home at midnight or 1:00 am is not exculpatory as the timing of the murder ws never established with any certainty other than "late at night." Nothing the mother told Detective Guadagno, or that Detective Guadagno told Mr. Boyd is exculpatory with regard to the timing of the homicide.

## The trial of John Walker, Jr.:

Mr. Walker's trial took place in June of 1977. ADA David Henry represented the prosecution. He informed the jury at his opening that his main witness, Mr. Woodruff had at first failed to cooperate with the police, that he had lied to them, and had obfuscated for a period of time before he had finally come to tell the truth about the murder. During the trial, the defense attorney did not dispute that Mr. Woodruff and the other defendants were present when Mr. Crawford was killed. The defense argued instead that Mr. Walker took no role in the murder. The defense attorney contended that Mr. Walker's lack of participation was corroborated by Mr. Woodruff's initial statements to the police. He argued that his client was shocked at what happened and that it was not Mr. Walker's intention to take part in any robbery, let alone a murder. Essentially, the defense contended that Mr. Walker was an innocent bystander to the violence and lacked culpability for it.

Many of the same witnesses that testified at the Boyd trial testified at the Walker trial. Most gave testimony consistent with their prior testimony including Mr. Watson, Mr. Hauser, David Donnelly, Mrs. Crawford, and, most importantly, Mr. Woodruff and Mr. Hough.

Mr. Hough's again testified that Darryn Gibson proposed the idea of committing a robbery that night to the rest of the defendants and that the defendants didn't allow Mr. Hough to join because they didn't trust him to keep quiet. As far as can be determined by the record, the prosecution seems to have made the same disclosures of the witnesses' statements as they did in the Boyd trial.

Mr. Hough's testimony was a source of some controversy at the Walker trial because the prosecution was late in turning over some of the *Rosario* material pertaining to him. The reason for the delay was that a secretary who had taken the documents home had fallen ill. This issue was dealt with at trial and never became a reason for overturning the eventual conviction. However, it highlights the nature of the 1970s era document production and disclosure. What was enormously cumbersome 50 years ago has become much easier and routine today.

The bartender, Ms. Debbie Jeffery testified for the prosecution and told the jury that Mr. Crawford had asked her to reach into his wallet and take money out, thereby corroborating that Mr. Crawford had indeed exposed his cash while at the bar. She guessed that Mr. Crawford left the bar around 10:30 or 11:00 pm in the company of Mr. Watson but, of course, she was tending a busy bar that night and her recollection of the time wasn't one the prosecution relied upon as exact or precise. This simply established that Mr. Crawford left late in the evening.  Ms. Jeffrey testified that she didn't notice the defendants in the bar. It was busy bar and she was busy tending it. There was no testimony, nor was it part of the prosecution's case, that the perpetrators who entered the Golden Nugget Inn ever bought a drink or approached the bar area. It was established that the defendants were not in the bar for very long.

An incarcerated informant named Joseph Tatar also testified in the Walker trial. He claimed that in September of 1976, he was playing cards at the Erie County Holding Center with Mr. Gibson and Mr. Walker. In a conversation during that game, Mr. Tartar heard Mr. Walker complain to Mr. Gibson that Mr. Gibson had used too much force during the robbery. Mr. Walker complained that Mr. Gibson hit the man on the head too hard. Mr. Walker was upset contending that Mr. Gibson's actions were the reason they were in jail. Mr. Walker laughed in response. He

ensured Mr. Walker that they would beat the robbery and murder charges and eventually be set free because of the lack of evidence against them. Mr. Gibson then bragged that he had killed before and gotten away with it and that he would do it again. Mr. Tartar's testimony also included that Mr. Walker had threatened to kill him should he testify. Both the defense and the prosecution elicited various reasons why Mr. Tartar might benefit from his testimony including his hope to obtain leniency in a burglary indictment, a potential parole violation, and with Family Court matters.

The fact that incarcerated witnesses might have ulterior motives for testifying is well known and was fully considered during the trial. Ultimately, as a result of the informant (or despite him for all we know), the jury decided to convict based on the totality of the evidence. While the use of incarcerated informants is controversial and the subject of many strategic risks, ultimately it as up to the jury to decide the veracity of the witness and the worth of such testimony. It is not unethical, illegal, or against policy for the prosecution to use incarcerated informants. In the era around 1977, such informants were used in thousands of cases like this one. Despite its potential flaws, the practice was not considered prosecutorial misconduct or reversible error. That remains the case today.

Throughout the trial, Mr. Walker's capable and experienced attorney made sound strategic decisions based upon the evidence. He concentrated his defense on attacking the credibility of Mr. Woodruff. He emphasized to the jury that Mr. Woodruff did not initially tell police that Mr. Walker did anything wrong and that Mr. Woodruff's inconsistencies and clearly established self-interest showed a pronounced lack of credibility. The defense also argued that Mr. Hough's testimony implicated only Mr. Gibson, not Mr. Walker. The attorney also skillfully made the point that Mr. Tatar was an incarcerated informant looking for leniency for his own criminal wrongdoing and had no credibility.

Overall, the defense attorney presented a reasonable, well-constructed theory to attack the prosecution's case and sow the seeds of reasonable doubt. That it didn't work is by no means an implication that some different strategy would have been successful, including one that would engage in the risky endeavor to try to prove that the defendants were not at the scene. That tactic had already failed at the Boyd trial.

None of us were there in 1977. None of us know what the defense attorney knew then. It appears that the defense attorney in the Walker trial made his strategic decisions not to contest the defendant's presence at the scene because to do so was fraught with more risk than reward. The point here is that because we weren't there and we were not privy to all the evidence (including what the defendants may have told their attorneys in confidence), we cannot sit here in 2024 and say, with any degree of certainty, how the trials would have differed if this or that piece of evidence (or lack of evidence) was used in this or that way. That is all conjecture. Conjecture should be avoided.

## ADA Henry's Summation:

As noted above in regard to both trials' prosecution summations, I saw nothing improper in either one. In fact, both were quite staid, thorough, and professionally delivered considering the

time period in which they were presented and the nature of the crime they concerned. Like ADA Drury, ADA Henry stayed within all ethical and legal boundaries concerning trial advocacy. His summation at the Walker trial was professional and rather routine for a crime of this kind. My opinion in this regard is corroborated by the fact that no appellate court, after reviewing either trial, ever criticized the prosecutors' summations let alone overturned either for improper argument or prosecutorial misconduct.

## Pretrial detention:

Because, as discussed above, the prosecution was not responsible for withholding exculpatory evidence within the bounds of the laws, ethics and practice of the time, there was no adverse effect on any of the rulings regarding pre-trial detention for any of the defendants found guilty of Mr. Crawford's murder.

## Conclusion:

For the foregoing reasons, it is my opinion that the Boyd and Walker trials were conducted in accord with the laws, ethics, and standard prosecution practices in place in 1977. My opinion is bolstered by the fact that none of these convictions were overturned by any appellate court for any of the reasons discussed in plaintiff's report. It is easy to criticize these prosecutions when comparing them with modern prosecutions conducted under modern standards and protocols. Much has changed in criminal prosecution over the last half century as it has in all other areas of our society. Many of those changes have ushered in welcome progress. Many of them have furthered our shared goals in treating the criminally accused fairly and preventing convictions unsupported by sound evidence. However, we shouldn't import modern standards and protocols onto past prosecutions and hold those in the past liable for failing to adhere to that future progress.

One of the most striking areas of change in prosecution protocols is, of course, due to the revolutionary progress in information technology. As we celebrate these improvements and are grateful to be working under a more modern system of document discovery, we should also keep in mind the stark differences in modern document discovery processes today as contrasted to the 1970s.

I started in the Manhattan District Attorney's Office in the 1980s. At that time that DA's Office was the largest and perhaps most sophisticated county district attorney's office in the country. However, even by then, a decade after the trials here, police officers and prosecutors didn't have the use of word processing or personal computers at their desks. We had to rely on secretarial staff for document production. It took us hours upon hours to produce documents for discovery. It was exponentially more difficult to share and memorialize documents in the 1970s.

Therefore, assuming that in 1977 a document was not shared with the defense in a criminal investigation based on a lack of a record of the disclosure or a failure to memorialize it, is an extremely misleading thing to do. It is conjecture. Conjecture should have no place in a court of law. That is as true in 2024 as it was in 1977. With that in mind and, after a review of the materials in this case, it is my opinion that the police and the prosecution in the Boyd and Walker

trials complied with their legal and ethical obligations in these cases as best they could during the period in which they labored.

# KEVIN T. GAGAN

---

**35 YEAR LAW ENFORCEMENT CAREER AS A TRIAL LAWYER, POLICE EXECUTIVE, ETHICS OFFICIAL, SEX CRIMES EXPERT, AND LAW SCHOOL PROFESSOR**

---

## EDUCATION

**J.D., Cornell University School of Law**, Ithaca, NY (1989) Cum Laude
**B.A., Hamilton College**, Clinton, NY (1986) Magna Cum Laude

## PROFESSIONAL HISTORY

**CORNELL UNIVERSITY LAW SCHOOL,** Ithaca, NY                    2017 - present
**Adjunct Professor of Law**
      **Courses: Ethics in Policing**
              **Enough is Enough; the Evolution of Title IX**
              **The Government Lawyer**
Law school courses; one on the proper role of policing in today's society; another dealing with the interplay between Title IX, New York State Education Law 129-b and campus sexual assault; a third lecturing on the role of a public service attorney.

- The main topics in "Ethics in Law Enforcement" include; police behavior on and off duty, community and race relations, uses of force and challenges associated with modern media.

- Other lectures include; police administrative disciplinary process, collective bargaining, hate crime legislation, and freedom of speech.

- The main topics in "Enough is Enough" include; the evolution of Title IX, its role in adjudicating campus sexual assault, the interplay between Title IX with the criminal and civil justice systems, and the relatively new and expanding role of New York State Education Law 129-b.

- The Government Lawyer course is a clinic type course where the students intern at the NYS Office of the Attorney General to obtain real experience working in the public sector. I lectured the students at the school as to the laws, functions, responsibilities and ethics involved with representing the citizens of New York in various courts.

- Have been lecturing at Cornell Law School since spring of 2013.

- Have also lectured at SUNY Albany.

**NEW YORK STATE POLICE,** Albany, NY                    2016 – 2019
**Executive Deputy Superintendent and Counsel**
Served as New York State Police Executive Deputy Superintendent and Counsel. Responsible for the entire legal bureau of the State Police including criminal, civil and administrative litigation.

- Oversaw all aspects of State Police legal policy including administration, field command, employee relations, professional standards, training, internal affairs, forensic laboratory, planning and research, legislation and intergovernmental affairs.

- Also served as the State Police special counsel for ethics, risk and compliance.

- Acted as the New York State Police liaison to the federal and state governments regarding immigration enforcement matters.


**NEW YORK STATE OFFICE OF CAMPUS SAFETY,** Albany, NY                    2016 - 2019
**Director**
While serving as Executive Deputy Superintendent and Counsel for the New York State Police, also headed New York's Office of Campus Safety to implement the recently enacted New York State Education Law, Section 129-b also known as "Enough is Enough".

- Directed a staff of lawyers to ensure the proper implementation of the law.

- Implemented a new civil definition of "affirmative consent" at all colleges and universities in New York.

- Supervised a statewide task force of police officers to respond to complaints of sexual assault, dating violence, harassment, and stalking at every college and university in New York State.

- Conducted audits and other civil enforcement for each college and university in the state.

- Ran an inter-agency consortium with SUNY and other state agencies to address all aspects of the law.

- Collaborated with advocacy groups, local law enforcement, civil liberties organizations, public and private college/university associations and law firms to address best practices for handling college campus sexual assaults.


**NEW YORK STATE JOINT COMMISSION ON PUBLIC ETHICS,** Albany, NY          2015- 2016
**Chief of Staff**
Headed the New York State's Joint Commission on Public Ethics (JCOPE) while taking a leave of absence from the New York State Police.

- Managed the agency while its commissioners conducted a search for a new Executive Director.
- Directed all aspects of the agency.
- Prepared and submitted all investigations to JCOPE's commissioners for determination.
- Handled all personnel matters.
- Worked with the governor's office and the legislature on comprehensive ethics reform.
- Collaborated with the US Attorney for the Southern District of New York on the prosecutions of the Speaker of the New York State Assembly and Majority Leader of the New York State Senate.


**NEW YORK STATE POLICE,** Albany, NY                                    2011 – 2015
**First Deputy Superintendent**
Second in command for a 5000+ sworn member full-service police force with over 800 civilian employees. Responsible for all phases of administration including; Field Command, Bureau of

Criminal Investigation, Employee Relations, Internal Affairs, Public Information, and Planning and Research.

- Directed all State Police services including criminal investigation, highway safety, drug enforcement, homeland security, counter terrorism, and emergency management.
- Directly responsible for state trooper and civilian discipline.
- Chief ethics and internal control officer for the State Police.
- Trained all recruits in police ethics.
- Primary State Police liaison with the Office of the Governor.
- Handled, negotiated, and directed State Police matters with Native American and tribal authorities.

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL,** Albany, NY          2007 – 2011
**Special Deputy Attorney General and Bureau Chief**
Responsible for implementing the 2007 Sex Offender Management and Treatment Act (SOMTA). Created New York's first ever Bureau of Sex Offender Management. Worked with executive agencies to coordinate New York's sex offender civil management apparatus including case identification, referral, hearings, trials, appeals, confinements to psychiatric institutions, releases into parole supervision, annual review hearings, violation hearings and recommitment proceedings.

- Directed the Attorney General's Sex Offender Management Bureau from inception in 2007 to 2011.
- Earned the Attorney General's Award for Excellence in 2008.
- Personally litigated New York's first Frye hearing to determine the scientific applicability and legal admissibility of sexual offender psychiatric testing and treatment protocols. Succeeded in applying them to Article 10 of the New York Mental Hygiene Law. See *In the Matter of the Application of the State of New York v. Richard Rosado, 25 Misc. 3d 380 (Bronx Co. Sup. Ct. 2009)*.

**NEW YORK STATE DIVISION OF CRIMINAL JUSTICE SERVICES**, Albany, NY          2003 – 2007
**Deputy Director**
Responsible for creating and implementing innovative methods to reduce crime with emphasis on immigration, DNA, sex offenders, financial crime, insurance fraud, and motor vehicle theft.
- Director and lead member of the New York State Criminal Alien Improvement Strategy.
- Division of Criminal Justice liaison to the state's appellate courts.
- Advanced the governor's legislative agenda for the collection of DNA samples from convicted offenders.
- Teamed the New York State Department of Taxation and Finance with the New York State Police to investigate excise tax fraud.
- Policy advisor to the Motor Vehicle Theft and Insurance Fraud Prevention Board.

**OFFICE OF THE NEW YORK STATE INSPECTOR GENERAL**, Albany, NY          2000 – 2003
**Deputy Inspector General**
Directed investigations concerning public corruption and official misconduct.

- Headed the Inspector General's Public Protection Unit and Governmental Affairs Unit.
- Managed teams of investigators, attorneys and auditors.
- Oversight responsibilities included detecting, investigating, and reporting waste, abuse, and fraud within the state's criminal justice agencies, the Division of Military and Naval Affairs, and all of New York State's Authorities.

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL,** Albany, NY          1998 – 2000
**Assistant Attorney General**
- Represented state agencies on civil and criminal matters.
- Supervised investigations and carried out prosecutions of homicides eligible for the death penalty.
- Tried several cases to verdict in state and federal court.
- Cross designated as an Assistant District Attorney in Delaware, Fulton, Schoharie, Albany, and Otsego Counties.
- Investigated a homicide which had remained unsolved for eight years and successfully prosecuted the case to a jury verdict in New York State Supreme Court.

**OFFICE OF THE NEW YORK COUNTY DISTRICT ATTORNEY**, New York, NY          1989 – 1998
**Assistant District Attorney**
> Trial Bureau (1989 – 1994)
> Homicide Investigations Unit (1995 – 1998)
- Presented over 250 felony cases to the Grand Jury and conducted over 40 successful felony trials to verdict.
- Led numerous undercover investigations and secured jury verdicts against members of homicidal narcotics organizations in complex, multi-witness prosecutions.