UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

DARRYL BOYD,

               Plaintiff,

      v.

THE CITY OF BUFFALO, THE COUNTY
OF ERIE, MICHAEL G. GUADAGNO,
JOHN MONTONDO, LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF ROBERT
GRABOWSKI, MARTIN BULLOCK AS
EXECUTOR FOR THE ESTATE OF JAMES E.
HUNTER, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
ROBERT F. ARNET, JENNIFER FLANNERY
AS ADMINISTRATOR FOR THE ESTATE OF
FRANK C. DEUBELL, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF LEO J.
DONOVAN, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
FRANCIS M. MANISTA, AND DAWN
M. DIRIENZO AS EXECUTOR FOR THE
ESTATE OF PAUL R. DELANO,

               Defendants.

———————————————————————

**DECISION AND ORDER**

22-cv-00519

JOHN WALKER, JR.,

               Plaintiff,

      v.

THE CITY OF BUFFALO, THE COUNTY
OF ERIE, MICHAEL G. GUADAGNO,
JOHN MONTONDO, LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF ROBERT
GRABOWSKI, MARTIN BULLOCK AS
EXECUTOR FOR THE ESTATE OF JAMES E.
HUNTER, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF

**DECISION AND ORDER**

22-cv-00520

ROBERT F. ARNET, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF FRANK
C. DEUBELL, JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF LEO J.
DONOVAN, JENNIFER FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
FRANCIS M. MANISTA, AND DAWN
M. DIRIENZO AS EXECUTOR FOR THE
ESTATE OF PAUL R. DELANO,

                 Defendants.

_____

## INTRODUCTION

Plaintiffs Darryl Boyd and John Walker, Jr. each spent over twenty years in prison for the 1976 murder of William Crawford. In August 2021, the New York Supreme Court in Erie County vacated the convictions of both men. Plaintiffs then sued the City of Buffalo, the individual Buffalo Police Department ("BPD") detectives involved in the investigation of Crawford's murder (collectively, the "City Defendants"), and the County of Erie ("County"), alleging multiple violations of their civil rights under federal law and multiple violations of New York state law. Plaintiffs and the City Defendants reached a settlement that involved dismissal with prejudice of all claims against the City Defendants. Therefore, the only remaining claims in Plaintiffs' Amended Complaints are against the County.

The County moved for summary judgment on Plaintiffs' claims against it in June 2024. *Boyd* ECF Nos. 166–71; *Walker* ECF Nos. 164–66. In a text order dated December 13, 2024, the Court denied the County's motion with respect to Count VII of Plaintiffs' respective Amended Complaints, and granted it with respect to Count

X. *Boyd* ECF No. 206; *Walker* ECF No. 200. This Decision and Order memorializes the Court's reasons for the December 13, 2024 order.

## FACTUAL BACKGROUND

The following facts are taken from the Statement of Material Facts Submitted in Support of Defendant The County of Erie's Motion for Summary Judgment (*Boyd*, ECF No. 167-1); Plaintiffs' Response to Defendants' Rule 56(a) Statements and Counterstatement of Additional Material Facts (*Boyd*, ECF No. 176-128); and exhibits submitted by the parties, including the BPD's homicide file (*Boyd,* ECF Nos. 165-4 and 165-5).[1] Unless otherwise noted, these facts are undisputed.

### I.   The Investigation

William Crawford was robbed and murdered in the driveway of his house at 2041 Fillmore Avenue in Buffalo, New York, during the evening of January 2, 1976. ECF No. 176-128 ¶ 1.[2] The detectives conducting the initial investigation on the night of the murder reported that Crawford's wife was the first to spot his body and call 911. ECF No. 165-4 at 3. The detectives inspected the driveway, the area of the house and the adjoining homes, and the backyard, and reported finding a large pool of blood about eight feet to the rear of the side door, as well as three spots of blood on the

---

[1] The motion papers submitted by the parties in support of their positions are nearly identical in both cases, though the docket entries are numbered slightly differently. For the sake of ease, unless otherwise noted, the ECF entries referenced by the Court are from the *Boyd* docket though they also appear on the *Walker* docket with slightly different numbering.

[2] The City Defendants submitted their own statement of facts in this matter before Plaintiffs sought dismissal of their claims against them. Plaintiffs filed a single document (ECF No. 176-128) containing their responses to the City Defendants' and the County's respective statements of material facts, each of which is numbered independently of the other (e.g., ¶ 1, ¶ 2, ¶ 3, *et seq.* for each). The paragraphs referenced in this Decision and Order involve Plaintiffs' responses to the County's statements.

house three to four feet up from the sidewalk. *Id.* at 3–5. Further, the detectives reported that "there were no foot tracks noted, through the[ ]back yards, and it appear[ed] that the assailants came out the drive way the same way they came in." *Id.* at 5.

Shortly after Crawford's body was discovered, detectives also spoke with the owner, the bartender, and several patrons of the Golden Nugget, the tavern across the street from Crawford's house. *Id.* at 4–5. The initial investigation report stated that the bartender, Debbie Jeffrey, said that Crawford had been at the bar on the evening of his murder, carrying a lot of cash. *Id.* at 5. She also stated that Crawford left the bar at about 11:30 PM with a man named Larry Watson, who lived at 2049 Fillmore Avenue. *Id.* The investigating detectives attempted to speak with Watson that night, but his wife said she was unable to wake him because he had had too much to drink. *Id.*

The following day, investigators returned to interview Watson, who reported being in the Golden Nugget from 4 PM until the time he left with Crawford on the night of the murder. *Id.* at 10. Watson said he walked out of the bar at the same time as Crawford, but last saw Crawford in front of the tavern getting ready to cross the street. *Id.* Watson said that he didn't see whether Crawford actually made it across the street because Watson noticed the storm door was open at his own house and hurried away to make sure no one had broken-in. *Id.* Watson told the detectives that after he had ensured his house was secure, he used the restroom, went back to the bar to get his wife, and came home and went to bed. *Id.*

4

A few days later, detectives noted that the bartender, Jeffrey, indicated in a follow-up interview that she suspected Watson of harming Crawford.[3] *Id.* at 11. Nevertheless, the investigation took a different turn on January 7, when the BPD received an anonymous tip that the murder was committed by Darryn Gibson. ECF No. 176-128 ¶ 20.

After BPD detectives located Gibson, he denied involvement in the murder and told police that he was at the Glenny Drive Apartments on the evening of January 2, with Plaintiffs Boyd and Walker, and two other friends named Tyrone Woodruff and Floyd Martin (collectively, the "Group"). *Id.* Consequently, BPD detectives sought to find and interview the other members of the Group to corroborate Gibson's story. *Id.* ¶ 22.

In searching for Boyd on January 8, detectives went to the apartment of Thelma Green, who introduced the detectives to her foster son, Andre Hough. *Id.* ¶ 23. Hough told detectives that he was with the Group at the Glenny Drive Apartments on the evening of January 2, and gave a sworn statement that he overheard Walker or Gibson refusing to let Hough go out with them that evening because, "he might tell someone or say something." *Id.* ¶ 25.

BPD detectives ultimately found Boyd on January 8 and transported him to BPD headquarters to give a statement. *Id.* ¶ 27. In his sworn statement, Boyd denied

---

[3] By contrast, Jeffrey's testimony at Boyd's trial suggested that Crawford had not shown the large quantities of cash in his possession to anyone other than her, and although she did testify that she asked Watson to walk Crawford home, there is no suggestion in her testimony that she believed Watson to have committed the crime. ECF No. 168-6 at 281–96. In her testimony in Walker's trial, Jeffrey suggested that Watson offered to walk Crawford home, but again there is no suggestion that she believed Watson to have committed the crime. *Walker* ECF No. 164-7 at 102–14.

involvement in the murder, and – like Gibson – said he spent the evening playing cards with the Group. *Id.*[4]

On January 11, BPD detectives found and questioned Walker, who denied involvement in the murder. *Id.* ¶ 28. At some point during the interrogation, Walker told police that he left the Glenny Drive Apartments in a cab with Woodruff around midnight. *Id.* ¶ 51. This was consistent with what Gibson and Martin had at various times told the BPD. *Id.* ¶¶ 49–50.

BPD detectives also found and questioned Woodruff on January 11. *Id.* ¶ 32. He, too, denied involvement in the murder and provided an alibi similar to Gibson's, Walker's, and Boyd's. *Id.* On January 12, however, Woodruff gave a second sworn statement changing his story. In his second statement, Woodruff told BPD detectives that at some point in the evening on January 2, the Group left the Glenny Drive Apartments and walked down Fillmore Avenue looking for money. ECF No. 165-5 at 15. He further stated that he had observed Gibson find a pipe, approach a man – Crawford – in his driveway, and strike the man in his face and head with the pipe. *Id.* Woodruff stated that he served as a look-out while Gibson and Boyd dragged the man into the driveway, and Boyd took his wallet. *Id.*; ECF No. 176-128 ¶ 33. He said that the Group then ran back to the Glenny Drive Apartments before he and Walker took a cab to their respective homes. ECF No. 165-5 at 15–16.[5] At some point,

---

[4] Plaintiffs do not dispute that Boyd gave police a sworn statement, but point out that at his deposition, Boyd testified that the typed statement did not accurately reflect what he told the detectives. ECF No. 176-128 ¶ 78.

[5] Plaintiffs assert that Woodruff's sworn statement implicating the Group in Crawford's murder was coerced by BPD detectives. ECF No. 176-128 ¶ 33(c)–(d). In 1985, Woodruff gave a sworn statement recanting his testimony. ECF No. 176-19 at 6. Woodruff indicated at that time that he was not involved

Woodruff agreed to testify against the other members of the Group in exchange for prosecutorial immunity. ECF No. 176-128 ¶ 36.

In addition to Woodruff's second sworn statement, Hough also gave a more incriminating sworn statement on January 12. *Id.* ¶ 35. Hough told the BPD that, besides the exchange in the hallway in which either Walker or Gibson expressed concern that Hough might "tell someone," he saw Boyd the following day with "a lot of money." *Id.*; *see also* ECF No. 165-5 at 6. Hough said that after he asked Boyd where the money came from, Boyd ultimately told him that the Group "had killed that man," and that Boyd had gone through his pockets and took his money. ECF No. 165-5 at 6.[6]

Boyd, Walker, Gibson, and Martin were arrested on January 12, 1976, and charged with second degree murder and criminal possession of a weapon. *Id.* ¶ 37. They were arraigned on January 13, and a preliminary hearing was held on January 16. *Id.* ¶¶ 38–39. Woodruff testified at the preliminary hearing and confirmed the two statements that he had given to BPD. *Id.* ¶ 40. Specifically, Woodruff stated that the Group went out looking for money, saw a man crossing the street from the Golden Nugget, ran up and surrounded him, and then Gibson beat him with a pipe and Boyd

---

in the murder and did not witness any others of the Group commit the murder, and that he falsified his testimony because he was scared of the armed police officers conducting his interrogation and the possibility of going to jail for a long time. ECF No. 176-19 at 6–12.

[6] Plaintiffs also contend that Hough's statements to BPD detectives were coerced. ECF No. 176-128 ¶ 25(b). They argue that BPD detectives had a practice of typing witness statements after the interrogation concluded, thus including only a reconstructed portion of the interview. *Id.* at ¶ 35(d). Hough testified by affidavit in 1982 that his testimony against Darryl Boyd was "false and a lie." ECF No. 176-18. He recanted his testimony, and said that he lied because he was scared and had been threatened with being charged with the crime himself if he didn't implicate Boyd. *Id.*

checked his pockets. ECF No. 168-8 at 8. On February 11, Woodruff testified before the grand jury, and again implicated the other four members of the Group in Crawford's murder. ECF No. 176-128 ¶ 45.

## II.    The Trials

The first member of the group to stand trial was Gibson, who was tried and convicted in January 1977. *Id.* ¶ 58. The prosecutor in that case was Assistant District Attorney ("ADA") Timothy Drury, who was also the prosecutor for Boyd. *Id.* ¶¶ 58, 61. Woodruff and Hough both testified against Gibson. *Id.*

Boyd's trial came second, and he was convicted in April 1977 after the jury heard testimony from – among others – Larry Watson, Emergency Medical Technician ("EMT") David Donnelly, Detective Gerald O. Dove, Woodruff, and Hough. *Id.* ¶ 61. In addition to testimony from both Woodruff and Hough that was more or less consistent with their respective second sworn statements to police, Larry Watson testified that he lived "two doors away" from Crawford and, consistent with his prior statement to police, that he and his wife had drinks with Crawford at the Golden Nugget on the evening he was murdered, did not see Crawford with any large sums of money, and last saw Crawford outside of the Golden Nugget. ECF No. 168-6 at 63–84. Further, EMT Donnelly testified that he responded to the initial 911 call, found Crawford laying in his driveway with "a very deep gash or tear in his head, [and an] enormous loss of blood," and was surprised that he even found a pulse. *Id.* at 87. He noted there was a pool of blood in two different places, about two feet apart, "like maybe he had dragged himself or something like that." *Id.* at 91. Lastly, Detective

Dove testified that on the night of the murder, he made a search of the backyard and adjoining yard, and did not find a weapon or observe any footprints. *Id.* at 110–11.

Walker was tried third and was convicted in June 1977. ECF No. 176-128 ¶ 70. After ADA Drury handled most of the pretrial discovery in the case, ADA David Henry took over as primary prosecutor and was supported by ADA James Verrastro. *Id.* ¶ 72. The jury heard much the same testimony as in the Boyd case from – among others – Woodruff, Hough, Watson, Donnelly, and Dove. *Walker* ECF Nos. 164-7, 165-23. In addition, the jury heard testimony from Joseph Tatar, a fellow inmate at the Erie County Holding Center while Gibson, Boyd, Walker, and Martin were awaiting trial. ECF No. 176-128 ¶ 76. Tatar testified that while playing cards with Walker and Gibson, Walker said to Gibson, "[W]hy you hit the man so hard in the head, you know, we've been in here all summer . . . ." *Id.* ¶ 77.

The last of the Group, Floyd Martin, was tried in July 1977, with ADA Henry as one of the prosecutors and Martin represented by attorney James McLeod. *Id.* ¶ 79. Woodruff and Hough testified against Martin, and Martin testified in his own defense. *Id.* ¶ 80. Unlike the three members of the Group tried and convicted before him, Martin was acquitted. *Id.* ¶ 79.

### III.   Post-Conviction Relief

Boyd and Walker were sentenced on August 3, 1977. *Id.* ¶ 83. Boyd was represented at sentencing by Martin's trial attorney, McLeod, who confirmed to the court that his office had withdrawn a motion challenging Boyd's conviction filed under Criminal Procedure Law ("CPL") § 440.10. *Id.* ¶ 84. Thereafter, Boyd and Walker challenged their convictions on multiple occasions. Boyd's direct appeal alleging an

improper *Sandoval* ruling, improper summation leading to an unfair trial, and erroneous jury instructions, was denied in 1981. *Id.* ¶ 86; *see People v. Sandoval,* 34 NY 2d 371 (1974) (defendant has the right to a prospective ruling on the scope of his cross-examination concerning prior commission of specific criminal, vicious and immoral acts). Walker's direct appeal was denied in 1989. ECF No. 176-128 ¶ 94.

Further, Boyd filed a CPL § 440.10 motion in 1984 alleging *Brady* violations, but that motion was denied. *Id.* ¶¶ 87–89. Boyd and Walker, represented by McLeod, filed a CPL § 440.10 motion together in 1986 alleging newly discovered evidence – i.e., Woodruff's recantation of his testimony – that was also denied. *Id.* ¶¶ 91–93. Boyd and Walker filed another unsuccessful CPL § 440.10 motion in 2012, arguing additional *Brady* violations, and again pointing to Woodruff's recantation of his trial testimony. *Id.* ¶¶ 100–04.

Boyd and Walker again filed a joint CPL § 440.10 motion in October 2020, this time alleging ineffective assistance of counsel for failing to request photographs as part of their discovery and also a *Brady* violation for the County's failure to disclose photographs. *Id.* ¶¶ 106–07. At the hearing on this motion, McLeod testified that he recalled two photographs (the "McLeod photos") being part of the Martin trial that were not among the photographs produced to Gibson, Boyd, or Walker, or any of the photographs that had been produced to that point in evidence. ECF No. 165-8 at 6. The state court considering the motion described McLeod's testimony:

> [One] photo depicted "footprints in the back of the house" where the deceased, Mr. Crawford was found. Mr. McLeod asserted that the photo "would have shown footprints in the rear" and that those footprints led to the home of the last person seen with Mr. Crawford at the bar. Mr.

McLeod also testified that there was another photo that clearly showed there had been no dragging of Mr. Crawford's body as suggested by the People's witness Tyrone Woodruff . . . . Mr. McLeod also testified that the detective who testified in the [Martin] case suggested the footprints defense counsel was referring to were made by a heavyset individual.

ECF No. 165-8 at 6–7.

After considering the evidence presented, the state trial court noted that "it [wa]s impossible for this Court to say definitively that the photos described by Mr. McLeod existed." *Id.* at 7. Despite this uncertainty, the court decided that "the scales tip[ped] ever so slightly in favor of" Boyd and Walker, and therefore it vacated their convictions and granted them a new trial. *Id.* at 9. The court made clear that its decision did not exonerate Boyd and Walker, but merely provided that they were entitled to a new trial. *Id.* The County elected not to appeal the state court's decision or retry Plaintiffs' cases. ECF No. 176-128 ¶ 520.

Boyd and Walker filed the present case in July 2022, articulating 10 causes of action and naming multiple defendants, including the City Defendants and the County of Erie. ECF No. 1. Of those defendants, only the County remains. ECF Nos. 160, 210. The County sought summary judgment on the two claims that Plaintiffs have alleged against it: a *Monell* claim under 42 U.S.C. § 1983 for violations of their civil rights (Count VII), and a New York state law claim for negligent hiring, supervision, and discipline (Count X). ECF No. 164.

## STANDARD OF REVIEW

"The role of the court on a motion for summary judgment is not to try issues of fact but only to determine whether there are issues of fact to be tried." *Vann v. City*

*of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citations omitted). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation omitted). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." *Vann*, 72 F.3d at 1049. Thus, "[i]n assessing [a summary judgment] motion, a court need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial." *Ortiz v. Stambach*, 657 F. Supp. 3d 243, 257 (W.D.N.Y. 2023). Rather, "[i]f the court is

satisfied that at least one material factual dispute exists, summary judgment must be denied." *Id.* (citing *Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 121 (S.D.N.Y. 1997) ("[I]t is basic, black-letter law that the existence of even one disputed issue of material fact renders a grant of summary judgment inappropriate . . . .")).

## DISCUSSION

### I. Count VII: *Monell* Liability for Prosecutorial Misconduct

Boyd and Walker each allege that ADA Drury and ADA Henry, respectively, violated their constitutional rights by each (1) failing to disclose certain materials to the defense as required pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963); and (2) delivering improper summations to the jury at their trials. *See* 42 U.S.C. § 1983; ECF No. 176 at 61; *Boyd* ECF No. 78 ¶¶ 375–91, 524–32, 648–50; *Walker* ECF No. 78 ¶¶ 518–24. As the parties acknowledge, the individual prosecutors here are immune from suit under section 1983. *See, e.g., Boyd* ECF No. 176 at 50; *see also Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012). Plaintiffs have therefore sued the County pursuant to what is known as "*Monell*" liability, which requires a showing that a policy or widespread practice of the County caused the prosecutors' alleged misconduct. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

With respect to the constitutional violations under *Brady*, the County maintains in its motion for summary judgment that Plaintiffs are unable to establish that any violation occurred in their cases, and that "[n]othing in the record raises a question of fact to even suggest, let alone establish by proof in admissible form, the existence of any custom or practice to commit prosecutorial misconduct in the form of

*Brady* violations." ECF No. 170 at 14–15. For the reasons discussed below, the Court finds that an examination of the record in light of the parties' arguments reveals the existence of genuine disputes of material fact regarding whether the prosecution violated Plaintiffs' constitutional rights by failing to disclose the McLeod photos, and whether such failure was caused by widespread customs and practices in the Erie County District Attorney's Office ("DA's Office") during the same time period. Accordingly, Count VII survives summary judgment.

### A. 42 U.S.C. § 1983 and Municipal Liability Under *Monell*

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." Under a Supreme Court decision that has come to be known simply as "*Monell*," municipalities may be held liable as "persons" under § 1983 if the plaintiffs can establish that a municipal custom, policy, practice or usage of the municipality caused their injury. *Monell*, 436 U.S. at 690–91; *see Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (municipalities can be held liable under § 1983 for "practices so persistent and widespread as to practically have the force of law").

The threshold inquiry of any *Monell* analysis is whether an underlying constitutional violation occurred. *See Oliver v. City of New York*, 540 F. Supp. 3d 434, 436 (S.D.N.Y. 2021) ("In a lawsuit containing a *Monell* claim, if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants,

the *Monell* claim will also fail." (citing *Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013)). If the threshold issue is satisfied, "[a] municipality may be liable under § 1983 when, by implementation of 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that municipality's officers' or through practices that are so 'permanent and well settled' as to constitute governmental 'custom,' it deprives the plaintiff of a constitutional right." *Miller v. Cnty. of Monroe*, No. 23-CV-06649-FPG, 2024 WL 2804435, at *4 (W.D.N.Y. 2024) (brackets omitted) (quoting *Monell*, 436 U.S. at 690).

*Monell* liability is not a theory of *respondeat superior*, where an employer may be held vicariously liable for the tort of its employees. *See Monell*, 436 U.S. at 691; *Connick*, 536 U.S. at 60. Rather, under § 1983, local governments are responsible only for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986). In other words, the municipality must be the "the moving force" causing the underlying constitutional violation. *Monell*, 436 U.S. at 694. Causation may be proven either by showing that a final policymaker directly committed or commanded the violation of the plaintiff's federal rights, "or that while the policymaker himself engaged in 'facially lawful . . . action,' he indirectly caused the misconduct of a subordinate municipal employee." *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405–07 (1997)). Provided it is adequately alleged, "the issue of whether the relevant conduct of the pertinent policymaking official caused the injury of which the plaintiff complains is a question of fact for the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Over the years, courts have commonly recognized that there are several theories by which a plaintiff can establish that a municipality caused – directly or indirectly – the misconduct of its employees:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester Cnty.*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quotations omitted); *see also Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

## B. The Alleged Underlying Constitutional Violations

Because the threshold inquiry of any *Monell* analysis is whether an underlying constitutional violation occurred, the Court's first task is to determine if any genuine disputes of material fact exist as to whether ADA Drury and ADA Henry violated Plaintiffs' constitutional rights by failing to disclose *Brady* material in their respective cases.[7]

Plaintiffs each detail multiple possible *Brady* violations that appear for the most part to be common to both of their cases, including the failure to disclose two

---

[7] The County is incorrect that the determination of whether ADA Drury and ADA Henry violated Boyd and Walker's constitutional rights, respectively, is "not relevant to the instant motion as Plaintiffs only make claims against the County pursuant to *Monell*." ECF No. 182 at 2 (reply brief); *see, e.g.,* *Brown*, No. 2016 WL 616396, at *2 ("To establish liability against municipal defendants in a *Monell* claim, a plaintiff must prove both that he suffered a constitutional violation and that the constitutional harm suffered was a result of a municipal policy or custom.").

crime scene photographs (the McLeod photos) and a variety of "P-73"[8] police reports drafted by the BPD, tending to undermine the credibility of Woodruff's and Hough's testimony, or point to viable alternative suspects. *See, e.g., Walker* ECF No. 78 ¶¶ 495–694. For purposes of the instant motion, the alleged failure to disclose the two McLeod photos raises a genuine issue of material fact regarding whether Plaintiffs' constitutional rights were violated.[9]

A prosecutor's failure to turn over evidence rises to the level of a constitutional violation under *Brady* when the following three elements are satisfied:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. To establish prejudice, a plaintiff must show the evidence was material; *i.e.,* whether the evidentiary suppression undermines confidence in the outcome of the trial. Materiality is assessed in light of the evidence adduced against the defendant at trial.

*Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 297–98 (E.D.N.Y. 2022) (quotations and citations omitted).

"The government is obligated to turn over *Brady* material no later than the point at which a reasonable probability will exist that the outcome [of defendant's

---

[8] *See, e.g., Guinyard v. Kirkpatrick*, No. 11-CV-06352 MAT, 2012 WL 2450767, at *6 (W.D.N.Y. 2012), *aff'd*, 554 F. App'x 61 (2d Cir. 2014) ("At trial, Detective Evans testified that a 'P-73' report form 'is a memorialization of whatever activity [a BPD detective] might have done that day.'").

[9] The Court's analysis should not be construed as a complete recitation of Boyd's and/or Walker's evidence of possible *Brady* violations, from the preliminary hearing through post-trial, or evidence of possible summation misconduct, but rather what the Court deems sufficient to decide the County's motion for summary judgment. *See Bonnie & Co. Fashions*, 170 F.R.D. at 121 (declining as unnecessary to consider other alleged breach of a contract in an order denying summary judgment because a genuine dispute of material fact with respect to one alleged breach was sufficient to deny the motion).

trial] would have been different if an earlier disclosure had been made." *United States v. Hamilton*, 373 F. App'x 95, 97 (2d Cir. 2010) (quotation omitted). Therefore, "suppression" of favorable evidence is not limited to the wholesale withholding thereof, but also includes delayed disclosure that prevents the defendant from making beneficial use of the evidence at trial. *See United States v. Kelly*, 91 F. Supp. 2d 580, 585 (S.D.N.Y. 2000).

In the years before Plaintiffs' 1977 trials, the United States Supreme Court expanded the requirements under *Brady* in two notable ways. In *Giglio v. United States*, the Supreme Court expressly included impeachment evidence within *Brady's* disclosure rule. 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady's* disclosure] rule."). Additionally, the year before Plaintiffs' trials, the Supreme Court in *United States v. Agurs* clarified that prosecutors have an obligation to voluntarily turn over *Brady* materials even absent a specific request by the defense. 427 U.S. 97, 107–14 (1976).

The record in the present case reflects that McLeod represented Floyd Martin at trial – who was the only member of the Group acquitted of Crawford's murder. ECF No. 176–128 ¶¶ 488, 490–91. McLeod testified before the state court that vacated Plaintiffs' convictions in 2021, and at his deposition in this litigation, that he based his successful theory of Martin's defense on the use of two crime scene photographs (the McLeod photos), which showed (1) a single set of footprints leading away from Crawford's body through the backyard of Crawford's house in the direction

of Larry Watson's home; and (2) an absence of drag marks in the driveway. *Id.* ¶¶ 495, 535.

There is no transcript of Martin's trial. ECF No. 165-8 at 5. However, McLeod stated that the photograph of the footprints "would have shown footprints in the rear and that those footprints led to the home of the last person seen with Mr. Crawford at the bar." ECF No. 165-8 at 6 (internal quotation marks omitted). In addition, McLeod testified "that there was another photo that clearly showed there had been no dragging of Mr. Crawford's body as suggested by the People's witness Tyrone Woodruff." *Id.* Neither Boyd's nor Walker's trial counsel had these two photographs, and they are not now part of the BPD's Crawford homicide file. *See, e.g.,* ECF No. 176-6 (Plaintiffs' exhibit of photos from the BPD homicide file).

In arguing for summary judgment, the County contends that the McLeod photos never existed.[10] ECF No. 170 at 8–9. To be sure, the photographs themselves are not part of the record, nor, again, is there a trial transcript from Martin's trial to decidedly confirm that they did in fact exist. ECF No. 165-8 at 4. Further, the County accurately points out that the state court decision vacating Plaintiffs' convictions did not definitively conclude that the photographs existed, and it argues that the reliability of McLeod's testimony can be called into question given other evidence in the record. ECF No. 170 at 89. For example, the County observes that McLeod represented Boyd at his sentencing but did not address the missing photographs, and

---

[10] The County does not argue in the alternative that even if the photographs existed and were not disclosed to Boyd and Walker, that such failure to disclose did not rise to the level of constitutional violation.

that Boyd and Walker each attempted to challenge their convictions multiple times but did not raise an issue about the McLeod photos until 2020. *Id.* at 8.

Nevertheless, the question of the existence of the two McLeod photos is a genuine dispute of fact for a jury to resolve at trial. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (reversing grant of summary judgment, stating that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment"). For the purposes of summary judgment, the Court finds that, viewing the evidence in the light most favorable to the non-movant Plaintiffs, a reasonable jury could find that the McLeod photos existed.

A jury could also find that Drury and Henry failed to disclose the photographs to the defense, "either willfully or inadvertently." *See Rodriguez*, 607 F. Supp. 3d at 298. Each member of the Group tried for Crawford's murder had different defense attorneys. Yet McLeod was the only trial counsel of the four to specifically request all "photographs" in discovery, and, if McLeod's testimony is credited, was the only trial counsel to receive the two photographs at issue. ECF No. 165-8 at 5–9. Only 10 photographs were introduced as exhibits in Boyd's trial and only nine in Walker's, and ADA Drury admitted in his deposition for these cases that there were more photographs in the BPD records than he disclosed to Gibson and Boyd. ECF No. 176-128 ¶¶ 349, 373; ECF No. 168-14 at 155:6–158:23. ADA Henry testified that he has no recollection of making any *Brady* disclosures before Walker's trial beyond a statement concerning another witness, Tatar, because he had taken the case over

from Drury and "assumed" Drury had sufficiently handled pretrial discovery. *Id.* ¶¶ 365–66, 386.

Further, neither Boyd's nor Walker's trial counsel attempted to impeach Woodruff's or EMT Donnelly's testimony that Crawford's body was dragged. There was no cross-examination of Detective Dove's observation that there were no footprints in the backyard, or any other questioning that would suggest the McLeod photos were in the defendants' possession. ECF No. 176-128 ¶¶ 356, 358, 378, 383. Plaintiffs' expert, Zeidman, opined that reasonably skilled defense counsel would have likely used the two McLeod photos to, among other things, cast reasonable doubt on the Group's guilt and point to Watson as a more likely perpetrator. *Id.* ¶ 411.

The third element needed to demonstrate a constitutional violation under *Brady* is prejudice, meaning that the suppressed evidence was "material" in light of the evidence adduced against the defendant at trial such that "the evidentiary suppression undermines confidence in the outcome of the trial." *Rodriguez*, 607 F. Supp. 3d at 298. Here, neither the weapon used in the murder nor Crawford's wallet were ever recovered, and there was no physical evidence tying either Boyd or Walker to the crime. Hence, Woodruff's testimony incriminating Boyd and Walker was "indispensable" to the cases against both Plaintiffs. *See, e.g.,* ECF No. 168-14 at 101 (ADA Drury agreeing that Woodruff was an "indispensable witness" for the prosecution). In light of the lack of physical evidence, the McLeod photos were clearly material insofar as what they depicted could seriously undermine the prosecution's

theory of the case by raising questions as to Woodruff's credibility, and Watson as a potential suspect.

Furthermore, Plaintiffs' cases are unusual in the sense that while three of the four defendants were convicted, the other co-defendant – Martin – was acquitted after a trial based on similar evidence. ECF No. 176-28 ¶¶ 58, 61, 70, 79. According to McLeod, he was the only trial counsel to receive the McLeod photos, which were critical to his theory of the case leading to Martin's acquittal. ECF No. 165-8 at 5–9. If credited at trial, this is strong evidence of prejudice to Plaintiffs.

Beyond the disputed facts surrounding suppression of the McLeod photos, which the Court finds are alone sufficient, the record reveals genuine disputes of fact as to whether several additional pieces of favorable evidence were suppressed by ADA Drury and ADA Henry, which a jury could reasonably find further undermines confidence in the outcomes of Boyd's and Walker's trials. For example, it is disputed whether multiple P-73s, which contained a range of content favorable to Boyd and Walker, were turned over. One such P-73 stated that, before Hough testified to the grand jury, he admitted that his January 12 statement to police—which included a statement that Boyd had confessed his role in Crawford's murder to Hough—was a lie. ECF No. 165-5 at 43; *see also* ECF No. 168-21 at 135, 140, 149 (McLeod testifying that he did not see at the time of trial the P-73 report documenting Hough's purported recantation). Another documented a statement by Golden Nugget bartender Debbie Jeffrey confiding that she suspected Watson of Crawford's murder. ECF No. 165-4 at 11.

The County argues that these P-73s and others were undisputedly disclosed because "Drury stated at the *Huntley* [h]earing that he had turned over all P-73s to the defense." ECF No. 170 at 9. However, Boyd's and Walker's trial transcripts show that their defense counsel did not, for example, use Hough's recantation or Jeffery's documented suspicions at trial. ECF Nos. 168-6 (Boyd's trial), 168-7 (Walker's trial). When deposed, neither ADA Drury nor ADA Henry could recall disclosing the P-73 containing Hough's recantation or the P-73 containing Jeffery's suspicions of an alternative suspect. ECF Nos. 168-14 at 215–18 (ADA Drury); 168-17 at 313:14–316:22 (ADA Henry). ADA Henry further testified that Jeffery's suspicions and Hough's waffling did not amount to *Brady* material at all. ECF No. 168-17 at 368:10–370:22.

On the record before the Court, a reasonable jury could find that Plaintiffs' constitutional rights were violated as a result of ADA Drury's and ADA Henry's failure to disclose certain *Brady* material.

## C. The Alleged Municipal Practices Causing the *Brady* Violations

Plaintiffs maintain that they "have pled, and there is evidence to support, at least three theories of *Monell* liability," including that the DA's Office "tolerated an affirmatively illegal series of practices regarding *Brady* compliance." ECF No. 176 at 72. Because this Court "need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial" to adequately address the present motion, the Court considers only this latter theory here. *See Ortiz*, 657 F. Supp. 3d at 257. After a thorough review of the evidence, the Court finds that there

are genuine disputes of fact as to whether there were widespread customs and practices in the DA's Office during the relevant period that resulted in widespread failures to turn over *Brady* material that caused the alleged violations of Plaintiffs' constitutional rights detailed above.[11]

"It is well settled that a policy or custom can be found in 'an act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker . . . but is so widespread as to have the force of law.'" *See Miller*, 2024 WL 2804435, at *4 (brackets omitted) (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404); *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) ("persistent and widespread" practices of city officials may constitute a municipal custom). "A practice is 'widespread' when it is 'common or prevalent throughout the entity.'" *Miller*, 2024 WL 2804435, at *4 (brackets omitted) (quoting *Gleeson v. Cnty. of Nassau*, No. 15-CV-6487 (AMD) (RL), 2019 WL 4754326, at *16 (E.D.N.Y. 2019)).

In the present case, a reasonable juror could interpret the record evidence to suggest that there were widespread practices showing a misunderstanding across the

---

[11] The County argues in its reply brief that Plaintiffs "have abandoned their theory that Plaintiffs 'was a practice that was so persistent or widespread as to carry the force of law' and [that] they instead rely on the theory that the 'misconduct of subordinate employees [ ] was so manifest as to imply the constructive acquiescence of senior policy-making officials.'" ECF No. 182 at 4. In support of this contention, the County points to Plaintiffs' opposition to its motion for summary judgment, which notes that because Plaintiffs have evidence of "testimony admitting or establishing that a given unlawful act was consistent with municipal practice," they do not need to rely on "the alternative method of proof the County argues is lacking in this case: an overwhelming number of demonstrably prior similar acts" to prove the existence of a practice. *Id.* at 4, n.4. (quoting ECF No. 176 at 61). The Court does not agree with the County. Much of Plaintiffs' opposition focused on the "widespread practices" of the DA's Office during the relevant period, and the language the County quotes in support of its theory of "abandonment" explicitly states that the testimony Plaintiffs are referencing "can meet this standard and establish the existence of an unlawful practice." *See* ECF No. 176 at 61–67. Plaintiffs are simply, and correctly, pointing out that the fact that the record does not contain a laundry list of decided cases showing similar constitutional violations occurred is not fatal to their theory that the underlying constitutional violations in their cases were caused by widespread practices of the DA's Office.

DA's Office of *Brady's* requirements. For instance, when asked whether the DA's Office should have disclosed to defense counsel the police report documenting Hough's statements that he lied in his January 12 sworn statement, ADA Henry maintained that the police report was not *Brady* material because Hough eventually testified under oath consistent with his January 12 statement. ECF No. 168-17 at 313:14–316:22. ADA Henry testified that his judgment about *Brady* material at the time was consistent with the *Brady* policies of the DA's Office. *Id.* at 355:8–11. *But see, e.g.*, *Giglio*, 405 U.S. at 154 (decided in 1972, holding that evidence that may be used to impeach a witness's testimony falls under *Brady's* "favorable" requirement).

This flawed understanding of the requirements of *Brady* was consistent with that of ADA Drury, who also indicated that he believed the decisions he made to produce documents or information under *Brady* were consistent with the practices and policies of the DA's Office. ECF No. 168-14 at 160–61. The County's expert testified that "in the '70s and '80s" the DA's Office's position was that evidence "had to be exculpatory" to constitute *Brady* material and that evidence that could be used only for impeachment purposes did not need to be disclosed. ECF No. 176-128 ¶¶ 775–76. A jury could reasonably find that ADA Drury's and ADA Henry's actions in Boyd's and Walker's trials were consistent with that view. ADA Drury had no recollection of turning over to defense counsel in the Gibson trial or the Boyd trial the police report documenting Hough's recantation. ECF No. 168-14 at 215–18. Nothing at Boyd's trial suggests that defense counsel was aware of that information. *See* ECF No. 168-6 (transcript of Boyd's trial).

Beyond ADA Henry's uncertainty regarding whether he disclosed the police report detailing Hough's waffling with respect to his statements indicating Boyd's guilt, ADA Henry admitted he did not disclose a police report that may have supported a theory of an alternate suspect. As noted above, in the early days of the investigation into Crawford's murder, bartender Debbie Jeffrey confided to investigators that she suspected Watson was responsible for harming Crawford. *See* ECF No. 165-4 at 11. Yet when asked at his deposition whether he believed the police report documenting her suspicions was *Brady* material that should have been turned over to defense counsel in the Walker trial, ADA Henry indicated that the report was not *Brady* material, and that there was no policy in the DA's Office that would have required him to turn over the report. ECF No. 168-17 at 368:10–370:22. ADA Drury also could not recall turning over the police report detailing Jeffrey's suspicions. ECF No. 168-14 at 215–18.

In addition to providing testimony supporting allegations that he failed to turn over the potentially useful evidence regarding Hough and Jeffery, ADA Drury also testified to questionable handling of photographic evidence. He indicated that there were at least 18 photographs of the Crawford crime scene taken by the police photographer. ECF No. 165-9 at 146–48. Yet he admitted that he only turned over 10 photographs to Boyd's defense counsel, and 12 photographs to Gibson's counsel because he made the decision that the others "were irrelevant to any proper use in a trial." *Id.*

Viewing the evidence in the light most favorable to Plaintiffs, the two photos at issue that McLeod testified to were instrumental to Martin's acquittal and could have been among those that Drury deemed "irrelevant." As particularly germane to the McLeod photos, ADA Henry testified that his understanding of *Brady*, in 1977, was that the obligation to disclose was triggered by a request from the defense. ECF No. 168-17 at 216:6–218:21, 223:7–12. *But see, e.g., Agurs*, 427 U.S. at 107–14 (decided in 1976, holding that material need not be specifically requested by defense counsel to fall under the auspices of *Brady* material). McLeod testified that when he wrote to Henry to request *Brady* materials in Martin's case, Henry responded that McLeod needed to specify what material he was asking for. ECF No. 176-128 ¶ 808. It was only after McLeod asked for all "photographs" that the McLeod photos were disclosed to him for use in Martin's defense. *Id.* ¶¶ 493, 495.

Although then-District Attorney Ed Cosgrove testified that he recalled that the DA's Office "operated under . . . the theory that the police file was open to the defendant . . .," Plaintiffs offered additional evidence beyond that described above to support their claims and raise a question of fact as to the practices in the DA's Office at that time. ECF No. 166-16 at 46; *see also Miller*, 2024 WL 2804435, at *4 (explaining that a plaintiff may show the existence of *de facto* customs or policies by citing to other cases that involve factually similar misconduct, is contemporaneous to the misconduct at issue, and result in an adjudication of liability) (citations omitted)). For example, Plaintiffs have submitted a newspaper clipping from the same time period reporting an Erie County Supreme Court decision to call a mistrial in an

unrelated 1976 homicide case, where another ADA – ADA Quinlan – failed to timely disclose to defense counsel the incriminating testimony he would elicit from a state police trooper. *See, e.g.*, ECF No. 176-87 at 2. Plaintiffs also point to the New York State appellate division's decision in *People v. Cadby*, 75 A.D.2d 713, 714 (1980), which reversed a sexual abuse conviction obtained during DA Cosgrove's tenure in which it was discovered that prosecutors had failed to turn over to defense counsel a police report that contained statements of the complainant to which they were entitled. *Id.* at 714.

Were a jury to find that there was a widespread practice in the DA's Office during that time period of not properly disclosing *Brady* material, the "direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation" would be evident. *City of Canton*, 489 U.S. at 385. In particular, a jury could find that the practices demonstrating widespread misunderstanding of *Brady* requirements within the DA's Office caused the constitutional violations described in the previous section. *See, e.g., Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 613–15 (S.D.N.Y. 2023) (denying summary judgment on plaintiff's *Monell* claim because a reasonable jury could find that the police department had a "widespread practice of conducting strip and body cavity searches that did not comport with acceptable police practices" given evidence of civilian complaints, evidence suggesting insufficient police investigations, and officers' testimony of "an overbroad and inaccurate understanding of when it was permissible to conduct strip searches").

In sum, viewed in the light most favorable to Plaintiffs, there are genuine disputes of fact as to whether there were widespread practices in the DA's Office of failing to disclose *Brady* material that caused the violations of Plaintiffs' constitutional rights detailed above. Accordingly, the County is not entitled to summary judgment on Plaintiffs' *Monell* claims in Count VII of the Amended Complaints. *See Ortiz*, 657 F. Supp. 3d at 257 (explaining it is not necessary to analyze every legal or factual theory on which plaintiff could potentially prevail at trial at summary judgment). The narrow finding of this sub-section does not preclude Plaintiffs from presenting other evidence to support this or any other properly pleaded theories of a municipal policy at trial. *Bonnie & Co. Fashions*, 170 F.R.D. at 121 ("Once this Court found that there existed one material issue of disputed fact regarding Count One, this Court did not need to consider any of BTC's other alleged violations of the Factoring Agreement in order to deny summary judgment, and therefore, did not consider them . . . . As a result, all of BTC's conduct which was alleged by plaintiffs in Count One to violate the Factoring Agreement survived BTC's summary judgment motion.").

Thus, the County's motion for summary judgment on Plaintiffs' *Monell* claims under § 1983 (Count VII) must be denied.

## II. Count X: State Law Negligent Failure to Hire, Train, Supervise, and Discipline

In their Amended Complaints, Plaintiffs allege that under New York law, the County is liable for "its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents,

servants and/or employees with regard to their . . . duties." ECF No. 78 ¶¶ 702–03. In other words, they suggest that the County's failure to properly train, supervise, and discipline its prosecutors caused the alleged prosecutorial misconduct committed by ADA Drury and ADA Henry that led to Plaintiffs' respective convictions. *Id.*

In its motion for summary judgment, the County maintains that the record lacks any evidence to suggest that it was negligent in hiring, training, supervising, and disciplining its employees, and that, in any event, the alleged improper conduct occurred within the scope of ADA Drury's and ADA Henry's employment, thus precluding Plaintiffs' claims as a matter of law. ECF No. 170 at 23.

In response, Plaintiffs argue that "the County has not conceded (or denied) in any binding pleading or stipulation that its prosecutors acted at all relevant times in the scope of their employment." ECF No. 176 at 87. They also contend that, because *respondeat superior* is not available to them, their negligent hiring theory should be allowed to proceed. *Id.* Plaintiffs' arguments are unpersuasive. The Court finds that the County has demonstrated an absence of evidence on an essential element of Plaintiffs' state law claims, namely, that County employees were acting outside the scope of their employment when committing the complained-of actions.

As noted above, summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Nevertheless, "[w]hen the nonmoving party will bear the ultimate burden of proof at trial, the moving party's burden is satisfied if it can point to an absence of evidence to support an

essential element of the nonmoving party's claim." *Pavel v. Plymouth Mgmt. Grp., Inc.*, 198 F. App'x 38, 40 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). Once a movant has made that showing, the opposing party "'must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial.'" *Ross v. New Canaan Env't Comm'n*, 532 F. App'x 12, 13 (2d Cir. 2013) (quoting *United States v. Rem*, 38 F.3d 634, 643 (2d Cir. 1994)).

Under New York law, there are two ways that a municipal employer can be held liable for negligence based on the acts of an employee. *Baumeister v. Erie Cnty.*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *13 (W.D.N.Y. 2024). On the one hand, if the employee acted within the scope of his or her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of *respondeat superior. Id.* (citing *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013) (italics omitted)). "A claim for negligent hiring or supervision," on the other hand, "can only proceed against an employer for an employee acting outside the scope of her [or his] employment." *Id.* (quoting *Colodney v. Continuum Health Partners, Inc.*, 2004 WL 829158, at *8 (S.D.N.Y. 2004)).

Here, Plaintiffs allege only negligent hiring, supervision, training, and retention. ECF No. 78 ¶¶ 302–03. "To maintain a claim against a municipal employer for the 'negligent hiring, training, and retention' of a tortfeasor under New York law, a plaintiff must show that the employee acted 'outside the scope of her employment.'" *Velez*, 730 F.3d at 136–37 (citing *Gurevich v. City of New York*, No. 06 Civ. 1646(GEL),

2008 WL 113775, at *6 (S.D.N.Y. 2008) (internal quotation marks omitted) (collecting cases)). "[A]n employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or with what disregard of instructions." *Powell v. City of Jamestown*, No. 1:21-CV-721, 2022 WL 1913581, at *20 (W.D.N.Y. 2022) (quoting *White v. Montesano*, 466 F. Supp. 3d 331, 335 (W.D.N.Y. 2020) (internal quotation marks omitted)). By contrast, an employee will not be considered within the scope of employment "if, for purely personal reasons unrelated to the employer's interests, the employee engages in conduct which is a substantial departure from the normal methods of performing his duties." *Id.*

In the present case, all of the tortious acts that Plaintiffs allege regarding County prosecutors relate to their prosecution. For instance, Plaintiffs maintain that ADA Henry and ADA Drury failed to disclose *Brady* material during Plaintiffs' preliminary hearing and during Plaintiffs' trials, and engaged in summation misconduct that deprived Plaintiffs of a fair trial. ECF No. 172 at 51–61. There are no allegations that the County prosecutors acted for purely personal reasons unrelated to the County's interests. *See, e.g., Magassouba v. City of New York*, 2024 WL 2979825, at *3–4 (S.D.N.Y. 2024) (dismissing claims for negligent supervision where "the acts Plaintiff alleges relate to his prosecution, all of which seem to have occurred in the course of their employment as prosecutors."). Indeed, Plaintiffs' Amended Complaints specifically allege that the County was liable for its "failure to adequately train, supervise, and discipline its . . . employees with regard to their aforementioned duties . . . ." ECF No. 78 ¶ 703; *see, e.g., Jones v. City of New York*,

988 F. Supp. 2d 305, 319 (E.D.N.Y. 2013) (dismissing claim where the plaintiff did "not allege defendants acted outside the scope of their employment. The conduct complained of was attributable to prosecutors . . . acting properly within the scope of their employment.").

Plaintiffs make the ambiguous suggestion that their claims should survive even though there is no allegation that ADA Drury and ADA Henry acted outside the scope of their employment because *respondeat superior* is not available to them, and therefore their negligent hiring claim is not "superfluous" or "duplicative" of any other claim. ECF No. 176 at 87–90. However, the only support Plaintiffs cite for this point is the New York Court of Appeals case of *Hall v. Smathers*, 240 N.Y. 486, 490 (1925), which is silent on the issue as to whether the facts demonstrated that the tortfeasor was acting within the scope of his employment, and did not directly address the theory of *respondeat superior*. *See* ECF No. 172 at 87. In other words, the 1925 ruling in *Hall* does not alter the fact that *respondeat superior* on the one hand, and negligent failure to hire, train, supervise, and discipline on the other hand, are two different claims with distinct elements. Only one of the claims would be appropriate, depending upon the underlying facts alleged regarding the scope of employment. If a plaintiff were to plead both claims, under alternative theories, the claims would not be "duplicative" or "superfluous" of each other as Plaintiffs suggest; instead, each would require different forms of proof.

Further, Plaintiffs have not argued why and whether a *respondeat superior* claim was not available to them, nor do they explain why – notwithstanding the

Second Circuit's distinction between *respondeat superior* and negligent supervision claims – it is or should be necessarily true that a negligent supervision claim would be available to Plaintiffs *because respondeat superior* is not available. *See Velez*, 730 F.3d at 137 (providing that *respondeat superior* is the appropriate claim if the employee acted within the scope of her employment). The Court has "no obligation to review issues that are raised, but not independently and sufficiently developed, in [a party]'s main brief." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994). Accordingly, the Court declines to further consider Plaintiffs' ambiguous and underdeveloped argument on this point. *See, e.g., Johnson v. Panetta,* 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("It is not the obligation of this Court to research and construct the legal arguments available to the parties . . . . To the contrary, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

Therefore, the County's motion for summary judgment on Plaintiffs' claim under New York state law for negligent hiring, supervision, training, and discipline (Count X) must be granted.

## CONCLUSION

For the reasons set forth above, the County's motion for summary judgment [*Boyd* ECF No. 166; *Walker* ECF No. 164] was granted as to each Plaintiff's state law claim for negligent failure to hire, train, supervise, and discipline set forth in Count X of the Amended Complaints, and was otherwise denied. *See Boyd* ECF No. 206; *Walker* ECF No. 200.

SO ORDERED.

Dated:        January 14, 2025
              Rochester, New York

                                    HON. MEREDITH A. VACCA
                                    United States District Judge