**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| JOHN WALKER, JR. | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:22-cv-520** |
| | ) | |
| - against - | ) | |
| | ) | |
| THE COUNTY OF ERIE, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF ROSS E. FIRSENBAUM IN SUPPORT OF PLAINTIFF'S**
**APPLICATION FOR ATTORNEYS' FEES AND COSTS**

I, Ross E. Firsenbaum, an attorney duly admitted to practice in the State of New York and in the United States District Court for the Western District of New York, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following statements are true to the best of my knowledge and belief:

1.      I am a Partner in the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), co-counsel for Plaintiff John Walker, Jr., in the above-captioned matter.  I am fully familiar with the facts and circumstances of this case, and I make this Declaration in support of Plaintiff's application for reasonable attorneys' fees and costs incurred by WilmerHale pursuant to 42 U.S.C. § 1988.  The relevant law in support of this application is discussed in the accompanying Memorandum of Law (the "Memo").  Separate declarations have been submitted by co-counsel Joel B. Rudin and Spencer Durland in support of Plaintiff's application for attorneys' fees and costs incurred by the Law Offices of Joel B. Rudin P.C. (the "Rudin Firm") and Hoover & Durland LLP ("Hoover & Durland").

**INTRODUCTION**

2.    WilmerHale began work on this federal civil rights action in December 2021, which resulted, following a 15-day jury trial in March and April 2025, in a resounding victory for Mr. Walker against the Defendant County of Erie (the "County").  It involved numerous complex issues of fact and law, and was heavily litigated by the County, including through motions (mostly unsuccessful) to bifurcate discovery, for summary judgment, and *in limine*.  The County forced Plaintiff's counsel to expend a great deal of time and financial resources to litigate it, after repeated efforts from our team along the way to try to streamline or settle the matter.  Trial preparation and the trial itself—with nearly every exhibit, every line of designated deposition testimony, and every legal issue contested by the County—took up a great deal of time by the members of Mr. Walker's trial team.  The County should not be heard to complain about the magnitude of this application (and those of Mr. Walker's other counsel, the Rudin Firm and Hoover & Durland) given the way they chose to litigate the case.

3.    Notwithstanding that the County itself necessitated the high hours worked by Mr. Walker's legal team through its recalcitrance and stonewalling, as discussed herein and in the accompanying Memo, we have proactively and significantly reduced the number of WilmerHale hours for which we are seeking statutory fee shifting.  Recognizing that our representation of Mr. Walker pro bono provides a benefit to the firm in the form of training, development, and experience for our associates, among other things, as detailed herein, we reduced or eliminated hours incurred by senior members of our team training and supervising more junior team members, many hours spent coordinating among our team and with our co-counsel, and hours spent by more than one team member on the same project.  We also have applied reasonable allocations of time and costs to account for work that was also performed for the benefit of Darryl Boyd, whose case was consolidated for pre-trial purposes with Mr. Walker's, and to account for Mr. Walker's settlement

1

with the City Defendants, as defined in the Memo.  What remains are those hours worked by the WilmerHale team on tasks reasonable and necessary to secure and uphold Mr. Walker's trial victory against the County.

4.      As we set forth herein and in the accompanying Memo, the hourly rates requested for WilmerHale are reasonable.  The WilmerHale team, which I led in this matter, is one of the nation's preeminent law firms, with extensive experience and expertise in complex, high-stakes litigation and trials, including high-profile civil rights and public interest matters.  And while WilmerHale's standard rates are competitive with other firms of similar size and prominence, we have substantially reduced our standard rates in this application so they are more commensurate with rates charged by firms with expertise necessary to prevail in a complex *Monell* case such as this one.

5.      In this Declaration, I review the history of the lawsuit and the factors courts look to in analyzing an appropriate fee award.  I also set forth the credentials and qualifications of each of the principal WilmerHale attorneys and paralegals for whom WilmerHale seeks fee reimbursement to establish the reasonableness of their requested rates.  I also list costs and expenses and why they were reasonably necessary.  I also describe the substantial reductions implemented to WilmerHale's invoices—both in terms of hours not included in this application and reduced rates—to show why this application is reasonable.  This application is further supported by the Declaration of James W. Grable, Jr., a partner at Connors LLP and a leading practitioner of complex federal criminal and civil litigation in Western New York, who attests to the need to bring a firm like WilmerHale into a matter of this size and complexity, the Declaration of Shelley C. Chapman, a former U.S. Bankruptcy Judge for the Southern District of New York and Senior Counsel at Willkie Farr & Gallagher, who attests to the reasonableness of WilmerHale's requested

2

rates and hours spent on this matter, and the Declaration of Nick Brustin, who attests to the expertise necessary to pursue a *Monell* case like this one and the reasonableness of the Rudin firm's rates.

6.      Plaintiff requests a total of at least $3,014,196.61 in attorneys' fees and $171,141.52, in costs and expenses incurred by WilmerHale from December 1, 2021 through April 30, 2025.  To arrive at this figure for fees, WilmerHale calculated a lodestar by multiplying the actual hours worked by each timekeeper (all significantly reduced, as described below)[1] and a substantially discounted hourly rate.

7.      WilmerHale's billing rates used for this petition are attached as Ex. A, a chart of the hours billed by timekeeper for whom Plaintiff is seeking fee-shifting is attached as Ex. B,[2] WilmerHale's time records submitted for this petition are attached as Ex. C, and its expenses submitted for this petition are attached as Ex. D.  Plaintiff intends to supplement this request for fees and costs incurred by WilmerHale after April 30, 2025 on a periodic basis, as the Court deems appropriate

**THE WILMERHALE TEAM**

8.      The lawyers on the core WilmerHale team that represented Mr. Walker at trial were a partner, two counsel (one of whom was promoted to that role from the senior associate position

---

[1] While Mr. Walker was not billed for the firm's services because of the pro bono nature of our representation, attorneys and support staff working on the matter contemporaneously keep track of the hours spent working on the case, as well as the costs incurred, just as they do with the firm's billable matters.

[2] WilmerHale has redacted certain time entries in Exhibit C to protect attorney work product and any other privileged information.  Concerns regarding work product are heightened in a case such as this, where the County is still seeking to overturn the jury's verdict and the claims of Mr. Boyd are due to be adjudicated in November 2025.  To the extent the Court wishes to review any unredacted records in adjudicating any dispute about specific entries, we are prepared to submit an unredacted Exhibit C for the Court's in camera review.

3

shortly before trial), three senior associates (all of whom were promoted to that role from the associate position shortly before trial), an associate, and two senior paralegals (with only one working on the trial at a time). Over the course of this multi-year litigation, other attorneys and staff assisted the WilmerHale team as well, but, with two exceptions (some hours billed by a senior associate who worked on the matter in 2021 and 2022 and hours and costs billed by an associate to accommodate the County's expert's remote trial testimony), we are seeking fee shifting only for the core team members.

**Ross E. Firsenbaum**

9. I am a Partner in the New York office of WilmerHale. I have 19 years of experience in complex, high-stakes litigation, including high-profile civil rights matters focused on wrongful convictions, and am a member of WilmerHale's Commercial Litigation Group and Trial Practice Group.

10. From 2007 to 2009, as a WilmerHale associate, I led a team of WilmerHale lawyers in the representation of Dewey Bozella, a Dutchess County man who was serving a prison sentence of 20 years to life for a 1977 murder in Poughkeepsie, New York. I led a multi-year investigation into the crime, and the submission of a motion to vacate Mr. Bozella's conviction pursuant to Section 440 of New York's Criminal Procedure Law based on multiple *Brady* violations by the Duchess County District Attorney's office. In October 2009, the Dutchess County Court concluded that the evidence we unearthed in our investigation was "overwhelming," granted our motion, and released Mr. Bozella from custody. *People v. Bozella*, 2009 WL 3364575 (N.Y. Co. Ct. Oct. 14, 2009).

11. For my representation of Mr. Bozella, I received the John Minor Wisdom Public Service and Professionalism Award by the American Bar Association's Section of Litigation on April 23, 2010 and the *Gideon* Champion of Justice Award from the New York State Association

4

of Criminal Defense Lawyers on January 28, 2010. Mr. Bozella was awarded ESPN's Arthur Ashe Award for Courage at its 2010 ESPY Awards, which I attended with him, and an ESPN 30-for-30 documentary titled "26 Years: The Dewey Bozella Story" details Mr. Bozella's heroic story, including my team's representation of him.

12. Shortly after Mr. Bozella's release from prison, I led a larger team of WilmerHale attorneys in the representation of Mr. Bozella in a civil lawsuit against Dutchess County pursuant to 42 U.S.C. § 1983, alleging that an unconstitutional policy, custom, or practice of the Duchess County District Attorney's office caused the *Brady* violations that led to Mr. Bozella's wrongful conviction. Specifically, we alleged that the Dutchess County District Attorney's office had an unlawful policy of applying *Brady* only to exculpatory evidence, but not to impeachment evidence or evidence of a third-party suspect. After more than three years of litigation, our team secured a $7.5 million settlement for Mr. Bozella on the eve of trial.

13. From 2017 to 2020, I led another team of WilmerHale lawyers in the representation of Jaythan Kendrick, who was serving a sentence of 20 years to life for a 1995 murder in Queens, New York. After a multi-year investigation alongside The Innocence Project as our co-counsel, we successfully pursued the Queens County District Attorney's Office's Conviction Integrity Unit to join our motion to vacate Mr. Kendrick's conviction based on newly discovered evidence. While the CIU did not join our motion with respect to *Brady* violations committed by the Queens County District Attorney's Office, we discovered several, and included those as well in our motion to vacate. When ordering the release of Mr. Kendrick from custody in 2020, the Queens County Supreme Court referred to our team's work as "a textbook example of how a terrible wrong can be made right." Mr. Kendrick tragically passed away shortly after his release and his estate was

represented in a 42 U.S.C. § 1983 civil case against New York City and a separate action against New York State by Mr. Rudin.

14.    I have represented former U.S. Attorney General, Edwin Meese, the National Association of Criminal Defense Lawyers ("NACDL"), the Innocence Project, and other organizations in other wrongful conviction cases before the U.S. Supreme Court, the Second Circuit, and the New York Court of Appeals.

15.    In one matter specifically relevant to Mr. Walker's *Monell* claim, I authored an amicus brief on behalf of the Innocence Project, the Innocence Network, the NACDL, and the New York State Association of Criminal Defense Lawyers, in an appeal pending before the Second Circuit captioned *Bellamy v. City of New York*.  In 2019, the Second Circuit adopted the reasoning of the amicus brief in reversing and vacating the District Court's dismissal of a *Monell* claim brought by Kareem Bellamy, holding that Mr. Bellamy could assert a *Monell* claim based on the City's allegedly unconstitutional disclosure policy under *Brady v. Maryland*, notwithstanding recent U.S. Supreme Court precedent barring a civil claim for damages against an individual prosecutor for *Brady* violations under the absolute immunity doctrine.  The District Court below had ruled that the U.S. Supreme Court's recent decision in *Van de Kamp v. Goldstein* barred Bellamy's (and any similar *Monell*) claim against the City.  If adopted by the Second Circuit, that reasoning would have effectively immunized municipalities in New York from civil lawsuits seeking damages for wrongful convictions based on *Brady* violations and most other prosecutorial misconduct at trial.  The Second Circuit's ruling made clear that individuals wrongfully convicted in New York based on *Brady* (and other) constitutional violations can bring such claims under § 1983.

6

16.    In addition to my extensive civil rights and wrongful convictions work focusing specifically on *Brady* violations and *Monell* claims, I have a broad civil litigation practice with an emphasis on complex commercial litigation, bankruptcy litigation and arbitration, including trial work.  I have tried and won cases for some of the world's largest financial institutions, and represented other leading global financial institutions, technology companies, and other entities and individuals in complex cases with up to billions of dollars at stake.

17.    I graduated *magna cum laude* from Amherst College in 2002 and *cum laude* from Boston College Law School in 2005.  Before starting at WilmerHale, I clerked for the Honorable Susan Beck on the Massachusetts Appeals Court.

18.    My standard billing rate in 2025 is $1,800 per hour, which is commensurate with other attorneys of my experience and skill at leading firms in the New York area.  As the law permits Mr. Walker to seek recovery for all of the work I performed to date in this matter based on my current rate, in this Fee Application, we have used my 2025 rate as a baseline rate in this petition for my rate and that of all WilmerHale timekeepers.  However, we have applied a substantial discount to such rates for this petition, using a billing rate of 56% of such rates based on a discount applied in the case captioned *Robinson v. New York City Transit Authority*, in which a district court in the Southern District awarded a partner at Faegre Drinker Biddle & Reath, LLP approximately 56 percent of his standard rate in a large civil rights litigation matter.  2024 WL 4150818, at *11.[3]  As set forth in Exhibit A, the Fee Application applies the following hourly rate: $1,008.00.

---

[3] We also identified *Parks v. Saltsman*, a Western District case in which the court awarded the lead partner from Emery Celli Brinckerhoff Abady Ward & Maazel LLP slightly over 72 percent of his standard rate.  2024 WL 4440994, at *3 (W.D.N.Y. Oct. 8, 2024).  We have not selected this smaller discount in an effort to be conservative and reasonable.

**Ryanne E. Perio**

19.     Ryanne Perio was a Counsel in WilmerHale's New York office, where she worked since her graduation from law school in 2013 (with the exception of a few months when she left the firm before returning).  She was a member of the firm's Commercial Litigation Group and Trial Practice and has significant experience with both civil rights claims and trials.

20.     From 2017 through 2020, Ms. Perio represented a putative class of bail bond customers in a federal Racketeer Influenced and Corrupt Organizations Act and Truth in Lending Act class action against a New Orleans bail bond company, an ankle monitoring company, and a bail bond insurer in the Eastern District of Louisiana.  The class alleged that the bondsman, ankle monitoring company, and insurer had conspired to kidnap and extort them for payments they did not legally owe on threat of being returned to jail.  Ultimately, her team obtained a favorable settlement for the class in the weeks leading up to trial, which included significant compensation as well as structural reform, oversight, and enforcement.  The case was profiled by the *New York Times* in a front-page article in March 2018.

21.     In 2018, Ms. Perio was awarded WilmerHale's Pickering Fellowship and worked for six months at the Southern Poverty Law Center in Montgomery, Alabama, where her practice focused exclusively on civil rights impact litigation.  While at SPLC, she managed teams in several high-profile federal lawsuits in the criminal and economic justice space, including matters relating to cash bail reform, prison conditions, and the criminalization of poverty through unlawful conditions on Medicaid, debtor's prisons, and driver's license suspensions.

22.     In addition to the above-mentioned matters, Ms. Perio's practice at WilmerHale included a wide array of complex commercial litigation matters, including contractual, securities, intellectual property, and bankruptcy disputes.  She represented clients at trial in federal court and

before arbitration panels in financial services, mergers and acquisitions, ERISA, intellectual property, licensing, and bankruptcy matters.

23.     Ms. Perio graduated in 2013 from Columbia Law School, where she was a Harlan Fiske Stone Scholar and an Editor of the Columbia Journal of Transnational Law.  During her time at Columbia, she interned for the Honorable Nathaniel M. Gorton of the U.S. District Court for the District of Massachusetts.

24.     Ms. Perio's standard billing rate in 2025 was $1,500 per hour, which is commensurate with other attorneys of her experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of her standard billing rate and therefore applies the following hourly rate: $840.00.

**Gideon Hanft**

25.     Gideon Hanft is a Counsel in WilmerHale's New York office and a member of the firm's Commercial Litigation Group, Appellate Practice Group, and Trial Practice Group.  Mr. Hanft was promoted to Counsel in January 2025.

26.     Mr. Hanft served as a law intern at the United States Attorney's Office for the Southern District of New York in 2016, where he assisted Assistant United States Attorneys in the Narcotics and Public Corruption units throughout indictments, trials, and sentencings.  In 2019 and 2020, prior to his Second Circuit clerkship, Mr. Hanft served on a WilmerHale team that prepared a currently pending application for post-conviction relief to the Kings County District Attorney's Office Conviction Review Unit, for an individual convicted of murder in Brooklyn, New York.

27.     Mr. Hanft has served on a WilmerHale trial team representing a Fortune 500 company in a billion-dollar trademark infringement suit, playing a critical role at all stages of the

9

pre-trial process. WilmerHale obtained a victory on a summary judgment motion less than a month prior to the trial.

28.     In addition to his experience detailed above, Mr. Hanft's practice focuses on complex commercial matters. Mr. Hanft has led discovery in large litigation matters including managing discovery in the aforementioned trademark infringement matter and helping to lead discovery in a complex class action. Mr. Hanft has also played a critical role in complex discovery and complicated factual investigations in connection with class actions with national scope.

29.     Mr. Hanft is a 2018 graduate of Columbia Law School, where he was a James Kent Scholar, a Senior Editor of the Columbia Law Review, and was awarded the Ruth Bader Ginsburg Prize for outstanding academic achievement and the Paul R. Hays Prize in Civil Procedure. In addition to his experience at WilmerHale, Mr. Hanft clerked for the Honorable Rosemary S. Pooler of the U.S. Court of Appeals for the Second Circuit and for the Honorable Katherine P. Failla of the U.S. District Court for the Southern District of New York.

30.     Mr. Hanft's standard billing rate in 2025 is $1,400 per hour, which is commensurate with other attorneys of his experience and skill at leading firms in the New York area. As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of his standard billing rate and therefore applies the following hourly rate: $784.00.

**Phoebe Silos**

31.     Phoebe Silos is a Senior Associate in WilmerHale's New York office and a member of the firm's Commercial Litigation Group and Trial Practice. Ms. Silos was promoted to Senior Associate in January 2025.

32.     From 2021 to 2023, Ms. Silos represented Engracia Hernandez-Garcia in a civil rights lawsuit against her former employers and labor traffickers in the Southern District of

10

California, which was resolved by a settlement in Ms. Hernandez-Garcia's favor. The complaint pled claims that the defendants violated the Trafficking Victims Protection Reauthorization Act, as well as various California state laws. Ms. Silos drafted successful oppositions to the defendants' motion to dismiss and to compel discovery and took a leading role in the discovery process, including second chairing multiple key depositions.

33.    Ms. Silos also had trial experience prior to Mr. Walker's trial in an administrative action against the Federal Trade Commission, which was tried to an administrative judge in March 2023. Ms. Silos prepared one of the client's high-level executives to testify and second-chaired her direct and cross examination. She also assisted in various other pre-trial and trial matters, including drafting motions *in limine*, managing the exhibit list, and preparing cross examination outlines. The case is currently on appeal in the Fifth Circuit.

34.    In addition to her experience detailed above, Ms. Silos' practice focuses on complex commercial litigation matters, including significant FTC and False Claims Act matters and class actions. Ms. Silos has managed complex, large-scale discovery processes, prepared for and second chaired the depositions of several executives, and deposed a consumer witness. She has also played a key role drafting successful motions to dismiss and summary judgment motions as well as oppositions to the same.

35.    Ms. Silos is a 2021 graduate of University of Pennsylvania Carey Law School, where she graduated *cum laude*. Ms. Silos was the Production Editor for the Penn Law Journal of Business Law, as well as a Student Editor for the international academic publication Journal of Law and Philosophy. Ms. Silos served on Penn Law's Moot Court board and was a member of its national mock trial team. During law school, she also coached mock trial at a Philadelphia high school.

11

36.    Ms. Silos's standard billing rate in 2025 is $1,210 per hour, which is commensurate with other attorneys of her experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of her standard billing rate and therefore applies the following hourly rate: $677.60.

**Trena Riley**

37.    Trena Riley is a Senior Associate in WilmerHale's New York office and a member of the firm's Commercial Litigation Group and Appellate and Supreme Court Litigation Practice. Ms. Riley was promoted to Senior Associate in January 2025.

38.    Ms. Riley has extensive experience in civil rights litigation, representing clients in state and federal courts in matters involving the rights of incarcerated individuals, wrongful conviction litigation, voting rights, habeas corpus litigation, reproductive rights, and immigrant rights.

39.    In addition to her civil rights experience, Ms. Riley's practice focuses on complex commercial litigation, representing large corporations all stages of litigation.  She has prepared for and second-chaired depositions of fact, expert, and class certification witnesses.  Immediately following Mr. Walker's trial, Ms. Riley was part of a team representing a Fortune 500 company in a four-week mass-tort federal jury trial.  She also maintains an active appellate practice.

40.    Ms. Riley is a 2021 graduate of Cardozo School of Law, where she graduated *magna cum laude*.  Ms. Riley was a Notes Editor on the Cardozo Law Review, a public service scholar, and recipient of the Service and Achievement Award.  She was a clinical student in the Civil Rights Clinic, participating as a law student in civil rights litigation involving the rights of incarcerated individuals.  Ms. Riley was a clinical intern at the Innocence Project, representing clients in post-conviction litigation seeking to access and use DNA evidence to prove their

wrongful convictions.  Prior to joining WilmerHale, Ms. Riley was a clerk for the Honorable Barry T. Albin of the Supreme Court of New Jersey.

41.     Ms. Riley's standard billing rate in 2025 is $1,210 per hour, which is commensurate with other attorneys of her experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of her standard billing rate and therefore applies the following hourly rate: $677.60 for 2025.

**Erin Hughes**

42.     Erin Hughes is a Senior Associate in WilmerHale's New York office and a member of the firm's Government and Regulatory Litigation Group and Commercial Litigation Group.  Ms. Hughes was promoted to Senior Associate in January 2025.

43.     Ms. Hughes's practice focuses on complex commercial and government regulatory matters.  Ms. Hughes represents large corporations in complex litigation matters and has assisted in complex fact discovery in which she has second chaired over a dozen offensive depositions and played a critical role in the fact development that informed defensive strategies. Ms. Hughes also deposed the corporate representative of a "Big Five" American technology company.

44.     Ms. Hughes is a 2021 graduate of Duke University School of Law, where she was an editor of the Duke Journal of Constitutional Law & Public Policy and served as Director of the Duke chapter of Street Law, Inc., providing legal education to children at the Durham County Youth Home.

45.     Ms. Hughes's standard billing rate in 2025 is $1,210 per hour, which is commensurate with other attorneys of her experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of her standard billing rate and therefore applies the following hourly rate: $677.60.

13

**Melissa Zubizarreta**

46.    Melissa Zubizarreta is an Associate in WilmerHale's New York office and a member of the firm's Securities Litigation & Enforcement Group.

47.    Ms. Zubizarreta has been the lead counsel for two trials in Immigration Court, representing her clients with their asylum claims.

48.    In addition to her experience detailed above, Ms. Zubizarreta's practice focuses on complex commercial matters.  She has assisted with challenging multi-year investigations, during which she has managed complex discovery processes, represented clients testifying before the Securities and Exchange Commission, and coordinated strategic responses to regulatory subpoenas.

49.    Ms. Zubizarreta is a 2022 graduate of Georgetown University Law Center, where she participated in the school's asylum clinic (Center for Applied Legal Studies) and was an editor of the Georgetown Journal of Gender and the Law.

50.    Ms. Zubizarreta's standard billing rate in 2025 is $1,090 per hour, which is commensurate with other attorneys of her experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of her standard billing rate and therefore applies the following hourly rates: $610.40.

**Other Attorneys and Paralegals**

51.    Zulkifl Zargar is a Senior Associate in WilmerHale's New York office and a member of the firm's Government and Regulatory Litigation Group.  He is a 2021 graduate of Fordham Law School, from which he graduated *magna cum laude*.  Mr. Zargar served on Mr. Walker's case team in 2021 and 2022, prior to his leaving WilmerHale to serve as a law clerk to

14

the Honorable Laura T. Swain of the U.S. District Court for the Southern District of New York from 2022 through 2024. Mr. Zargar returned to the firm in the fall of 2024.

52.     Mr. Zargar's standard billing rate in 2025 is $1,210 per hour, which is commensurate with other attorneys of his experience and skill at leading firms in the New York area. As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of his standard billing rate and therefore applies the following hourly rate: $677.60.

53.     Walker Schneider is an Associate in WilmerHale's New York office and a member of the firm's Litigation Group. He is a 2023 graduate of New York University School of Law, where he served as an Articles Editor for the New York University Law Review. Mr. Schneider's only involvement in this case was traveling to North Carolina to be present with the County's expert Kevin Gagan during Mr. Gagan's trial testimony, just as the County sent a representative to be present with Mr. Gagan for such testimony.

54.     Mr. Schneider's standard billing rate in 2025 is $975 per hour, which is commensurate with other attorneys of his experience and skill at leading firms in the New York area. As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of his standard billing rate and therefore applies the following hourly rate: $546.00.

55.     Stanley Maderich is a Senior Paralegal in WilmerHale's Palo Alto Office. Mr. Maderich is a highly experienced trial paralegal who has worked for WilmerHale since 2006 after beginning his career at another major international law firm. Mr. Maderich has served as lead paralegal at over 30 trials and arbitrations.

56.     Mr. Maderich's standard billing rate in 2025 is $800 per hour, which is commensurate with other paralegals of his experience and skill at leading firms in the New York

15

area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of his standard billing rate and therefore applies the following hourly rate: $448.

57.     Zane Stucker is a Senior Paralegal in WilmerHale's New York Office.  Mr. Stucker is a highly experienced trial paralegal who has worked for WilmerHale since 2003.  Mr. Stucker is a 1999 graduate of the Boston University School of Law.

58.     Mr. Stucker's standard billing rate in 2025 is $785 per hour, which is commensurate with other paralegals of his experience and skill at leading firms in the New York area.  As set forth in Exhibit A, this Fee Application applies a billing rate of 56% of his standard billing rate and therefore applies the following hourly rate: $439.60.

## HISTORY OF THE CASE

### Mr. Walker's Retention of WilmerHale

59.     On January 12, 1976, John Walker, Jr., was arrested by Buffalo police and charged with robbery and homicide.  He was convicted at trial on June 9, 1977.  He spent 22 years in jail or state prison, inclusive of 4.5 years on work release, and 17 years on parole.  On August 18, 2021, a state Supreme Court Justice vacated his conviction under Criminal Procedure Law 440.10 on the basis that the Erie County District Attorney's office (the "ECDA") had violated his *Brady* rights by failing to disclose crime scene photographs in its possession.

60.     On November 4, 2021, Mr. Walker and his co-defendant, Darryl Boyd, retained the Rudin Firm to handle their civil cases.  Recognizing the significant undertaking that would be required to investigate and ultimately prove a *Monell* claim from nearly 50 years ago and that it would not be able to handle that undertaking alone, the Rudin Firm enlisted WilmerHale as co-counsel in large part due to my experience successfully litigating wrongful conviction and *Monell*

16

cases, as well as the firm's long and storied history of public interest representation and its track record of success in trials.

61.     We worked with the Rudin Firm previously on multiple occasions.  I consulted with Joel Rudin on an informal basis during the *Bozella* civil case in light of Mr. Rudin's expertise in the area.  Following my work in the *Bozella* and *Kendrick* matters discussed above, I was retained to represent the NACDL (and others) as amici in the *Bellamy* appeal described above, a case where Mr. Rudin represented the plaintiff.  As noted, I worked with the Innocence Project in representing Jaythan Kendrick in his successful motion to vacate his conviction, and Mr. Rudin, as counsel to Jaythan Kendrick's estate in certain civil litigation arising from Mr. Kendrick's wrongful conviction and incarceration, also has consulted with me in connection with that litigation.  David Rudin also previously worked as an Associate at WilmerHale.

62.     Messrs. Walker and Boyd retained WilmerHale to represent them as co-counsel with the Rudin Firm in December 2021.

**Pre-Complaint Investigation**

63.     Prior to engaging the Rudin Firm and WilmerHale, Mr. Walker had obtained some documents from his criminal case through a Freedom of Information Law request.  The materials Mr. Walker obtained consisted primarily of the Buffalo Police Department file for his criminal indictment as well as certain other materials pertaining to his arrest and prosecution.  Aside from these materials, which Mr. Walker provided to his counsel, all other pre-Complaint investigation and fact development—including on the constitutional violations in Mr. Walker's case and on the policies, customs, and practices of the ECDA—was conducted by the Rudin Firm and WilmerHale.

64.     In the early days of the pre-suit investigation, we were required to read and analyze the records of Mr. Walker's criminal investigation, trial transcripts, parole records, 440 motions

17

and orders, as well as the records in the cases of his co-defendants, along with other materials to learn the case. While the records were voluminous, necessitating some expenditure of time by our teams, this was a basic step that any lawyer pursuing a *Monell* claim would need to take to adequately and appropriately represent his client.

65. However, our teams did not merely passively read the records; we also organized and synthesized the information into functional work product like chronologies and key players lists for future use preparing the complaint, throughout discovery, defeating summary judgment, and ultimately at trial.

66. The Rudin Firm and WilmerHale conducted a significant documentary investigation prior to preparing Mr. Walker's civil complaint. Our teams prepared and served Freedom of Information Law and other document requests on the ECDA, the BPD, the Erie County Sheriff's Office, the Erie County Clerk's Office, New York State Department of Corrections and Community Supervision, New York State Office of Children and Family Services, Buffalo Board of Education, and further requests for information on the New York State Court of Claims, the United States District Court for the Western District of New York, Collins Correctional Facility, and many of Mr. Walker's former attorneys, employers and health care providers. The Rudin Firm and WilmerHale followed up regularly on the production of the documents from those entities and reviewed and analyzed the documents produced. Those documents included trial and hearing transcripts from four separate prosecutions in connection with the Crawford homicide, medical, parole, educational, juvenile, correctional, and employment records, as well as records concerning the BPD's investigation of the Crawford homicide, Mr. Walker's appeals and 440 motions made in connection with his prosecution for the Crawford homicide, and records related to the ECDA's misconduct in other criminal cases.

18

67.    The Rudin Firm and WilmerHale also invested significant time and resources conducting witness interviews prior to filing a lawsuit on behalf of Mr. Walker. This included detailed, multi-day interviews of Mr. Walker and Mr. Boyd (whose testimony was relevant to Mr. Walker's case both for purposes of developing a record of policy, custom, or practice for *Monell*, and as someone who had experienced the conditions at many of the same prisons as Mr. Walker and could provide corroborative evidence relevant to his damages), as well as many others reasonably likely to have knowledge of either Mr. Walker's case or the policies, customs, and practices of the ECDA in the 1970s.

68.    In March 2022, members of our teams traveled to Buffalo and spent several days interviewing witnesses, examining the crime scene and other pertinent locations, and reviewing and collecting files at the County Clerk's office. (As noted below, this Fee Application does not seek reimbursement for WilmerHale's fees for travel time to and from New York City unless the timekeeper was performing substantive work while traveling with the exception of Mr. Schneider's trip to Mr. Gagan's location during trial). To prepare for those critical interviews, the Rudin Firm and WilmerHale coordinated to review documents relevant to each witness and draft interview outlines. Among others, our teams prepared for and interviewed seven witnesses (including James McLeod, Mark Hulnick (Mr. Boyd's criminal trial counsel), an attorney at Lipsitz Green Scime Cambria LLP (Messrs. Walker and Boyd's 440 counsel), along with other current and former Buffalo detectives and several former criminal defense attorneys and prosecutors in Erie County.

69.    In April 2022, Mr. Rudin and Ms. Perio traveled to Atlanta to interview Tyrone Woodruff, the cooperating witness in Mr. Walker's criminal trial, who ultimately testified to the coercion he was subjected to by the BPD and ECDA at Mr. Walker's trial in this matter.

70.     Mr. Hanft and David Rudin made a second trip to Buffalo in June 2022 to conduct additional interviews.

71.     Our teams continued to conduct witness interviews, occasionally assisted by a local investigative firm, including of former counsel to Messrs. Walker and Boyd, witnesses interviewed by the BPD at the time of the underlying crime, cold case detectives, and several former criminal defense attorneys, and follow up on informational leads in the months leading up to our filing of Mr. Walker's complaint.

72.     Following each interview, we coordinated for the attorney or attorneys who conducted the interview to prepare a memorandum of key testimony and the interviewer's mental impressions for future strategic use drafting the complaint, conducting discovery, amassing the summary judgment record, and preparing for trial.

73.     In preparation for filing the lawsuit, the Rudin Firm and WilmerHale associates also conducted significant legal research into various issues related to *Brady* violations, summation misconduct, and *Monell* liability, as well as the viability (or lack thereof) of potential defenses, to ensure that we pursued viable claims and theories that could withstand motions to dismiss and for summary judgment, and ultimately be successfully litigated at trial.

74.     The Rudin Firm and WilmerHale's pre-suit investigation also included significant research into other instances of *Brady* violations and summation misconduct by the ECDA before, during, and after the 1970s.  Our teams conducted research for overturned convictions or appellate court decisions criticizing ECDA prosecutions, as well as newspaper articles reporting on the same dating back 50 years or more.  At times, that required reviewing articles on microfiche at libraries due to the age of the newspapers.

20

75.     Once we identified a list of potentially relevant cases, we then worked to collect the court files from those cases as well as other publicly available materials to assess whether they provided evidence of a relevant policy, custom, or practice at the ECDA.  That effort required coordinating with the County Clerk and many hours at a copy machine in Buffalo scanning physical files.

**The Complaint**

76.     Drafting Mr. Walker's complaint was a joint effort between the Rudin Firm and WilmerHale.  Ms. Perio was the primary drafter of the factual allegations regarding the BPD investigation of the Crawford homicide, the *Brady* evidence, and the prosecution of Mr. Walker and his co-defendants by the ECDA.  Mr. Rudin was the primary drafter of the allegations regarding the policies, customs, and practices of the ECDA to support the *Monell* claim, as well as the legal claims.

77.     I reviewed the draft, provided comments and edits, and conferred with Mr. Rudin and Ms. Perio on strategic direction.  Other members of the Rudin Firm and WilmerHale teams reviewed and edited the draft complaint and supplied information and evidence underlying the allegations, which they uncovered in their analysis of the investigation and prosecution record as well as their research on other cases of *Brady* violations, summation misconduct, and other fair trial violations at the ECDA.

78.     We filed Mr. Walker's complaint on July 6, 2022.  To announce the filing of the complaint, several members of our teams, including Joel Rudin, David Rudin, Ms. Perio, Mr. Hanft, and Ms. Hughes travelled to Buffalo to give a press conference and answer questions from the media.  We also used the time in Buffalo to meet with our clients, discuss the strategy for the next steps in their cases, and collect hard copies of documents from them and their former lawyers.

**Early Case Work**

79.    Upon assignment of Mr. Walker's case to Judge Lawrence J. Vilardo and Magistrate Judge Jeremiah McCarthy, the WilmerHale team reviewed their practices and procedures, and researched their published opinions in 42 U.S.C. § 1983, *Brady*, and *Monell* cases and dispositive motions more broadly, and their average case schedules.

80.    The County did not move to dismiss the case and instead sought an extension until the end of August 2022 to answer, which the Court granted.

81.    While we were waiting for the County's Answer, the WilmerHale team, assisted by the Rudin Firm, established a process for the efficient review and production of documents and the receipt and review of documents received from the defendants and third parties.  Discovery in a half-century old case was bound to be (and in fact proved to be) messy.  Documents we received in response to FOIL requests, at the County Clerk's office, and from our clients and their former lawyers were provided in hard copy or in single, nondelineated PDF files and were frequently disorganized, missing pages, or suffering from other defects like unidentified handwritten notations.

82.    With the assistance of our in-house litigation support staff (whose time WilmerHale ordinarily charges clients for but has written off in connection with this Fee Application), we set up a matter database using WilmerHale's proprietary electronic discovery platform, which we use in matters with complex, large-scale discovery.  These tools, which require the resources of a large law firm, allowed for efficient organization, review, and production of thousands of documents.

83.    We set to work separating, organizing, and scanning documents, ensuring that they had the correct pages and were in the correct order, categorizing them on our database, reviewing

them for privilege and applying redactions where necessary, and preparing them for production with our initial Rule 26(a) disclosures.

84.    The Rudin Firm and WilmerHale also prepared for the opening of fact discovery by drafting our initial disclosures and our first set of document requests and interrogatories to the County and preparing a document review and coding protocol for incoming productions.

85.    The County filed its Answer on August 29, 2022.  We reviewed, analyzed, and annotated the Answer, tracking favorable admissions in work product ultimately used in preparing our exhibit list for trial.

**Mr. Walker's Retention of Hoover & Durland**

86.    After the County filed its Answer, and as discovery got underway, the Rudin Firm and WilmerHale determined that it would serve Mr. Walker's interests to retain a Buffalo law firm to serve as local counsel.  Mr. Rudin and Ms. Perio interviewed multiple firms and decided, with Mr. Walker, to engage Tim Hoover and Spencer Durland of Hoover & Durland.  At the time, Hoover & Durland were handling the *Ortiz* case from the Western District of New York before Chief Judge Wolford and had experience with civil rights cases, as well as extensive experience practicing in federal court in the Western District.

87.    Originally, we expected Hoover & Durland's role to be that of traditional local counsel, providing guidance on local practice, reviewing and assisting with filings, and contributing a local perspective to strategic decisions.  However, over time and as the case proceeded, it became clear that Hoover & Durland's contributions went well beyond that of "mere" local counsel, and they took on the role of co-counsel with the Rudin Firm and WilmerHale.

23

**Document Discovery and the County's Delay**

88.    Following the County's filing of its Answer, the parties conducted a meet and confer pursuant to Federal Rule of Civil Procedure 26(f) to prepare for a Rule 16 conference with Judge McCarthy scheduled for the end of September 2022.  The County immediately showed that its plan was to stonewall discovery and delay the case proceeding.

89.    Judge McCarthy's Order of Preliminary Pretrial Conference provided that "absent extraordinary circumstances, dispositive motions are due within 12 months of the Rule 16(b) conference, meaning that all discovery (fact and expert) must be completed prior to that deadline." *See* Dkt. 29 at 2.  With that timeframe as our guide, we prepared and circulated a draft case management order that provided six months for fact discovery, three additional months for expert discovery, and three more months for the completion of summary judgment briefing.  Under our proposed schedule, discovery and summary judgment would be completed, and the case would be trial-ready, a year from the Rule 16 conference as Judge McCarthy's order required.

90.    After initially proposing modest extensions of 30 days at the meet and confer, the County reversed course and proposed deadlines extending fact discovery by seven months and exceeding Judge McCarthy's one-year directive for summary judgment motions by eight months. The County gave no explanation except a counterintuitive argument that discovery would take longer because documents likely no longer exist and witnesses are no longer available.

91.    We proposed an amended schedule that, while keeping with Judge McCarthy's expectation that summary judgment would be complete within a year, extended some of the deadlines the County appeared to be most concerned about.  The County did not agree, and we were forced to file competing schedules with mini-briefs explaining our respective positions with

24

the Court. Judge McCarthy entered an order splitting the difference, with fact discovery to conclude in August 2023, and summary judgment motions due in January 2024.

92.    On September 29, 2022, we served our first set of document requests and interrogatories on the County. Those requests called for basic information like identification of the attorneys employed by the ECDA around the time of Mr. Walker's prosecution, the ECDA's organizational structure, and the policies and practices of the office, as well as documents relating to the Crawford homicide, training materials, disciplinary records of prosecutors, and transcripts, discovery, and appellate briefs from cases we had previously identified as potentially relevant to a policy, custom, or practice under *Monell*.

93.    The parties exchanged initial disclosures pursuant to Federal Rule of Civil Procedure 26(a) in October 2022, and due to all of our preparatory work in the past months, we were able to make a substantial production of documents at that time. Specifically, we immediately produced approximately 25,000 pages of documents, consisting of documents related to the investigation and prosecution of the Crawford homicide, records of Plaintiff's appeals, motions, and other work to have his conviction for the Crawford homicide overturned, and records relating to the ECDA's policies, patterns, and practices. We were prepared to produce immediately another 25,000 pages of documents regarding Plaintiff's educational, juvenile, medical, corrections, and parole records, but this production was delayed by the Defendants' resistance to a protective order. After Judge McCarthy approved a protective order on June 2, 2023, *see* Dkt. 105, Plaintiff immediately produced these documents.

94.    On the other hand, the County produced only a handful of hearing transcripts. The County listed other categories of documents in their Rule 26(a) disclosures but did not produce them, and said it would do so "as soon as practicable."

25

95.     The County responded to our discovery demands on October 31, 2022 but did not produce a single document or provide a single substantive response to an interrogatory, requiring us to send an 11-page deficiency letter on November 17.

96.     We met and conferred with the County on December 6 and sent a follow up letter on December 12.  At the meet and confer, the County agreed to produce documents and provide substantive responses to interrogatories, but still did not do so at that time.

97.     Also at the end of December 2022, we prepared an Amended Complaint on behalf of Mr. Walker that (1) added allegations regarding statements from Larry Watson that Mr. Walker and his friends did not commit the crime, produced by the City of Buffalo, (2) added as defendants the estates of several Buffalo Police detectives, and (3) corrected minor inaccuracies in the initial Complaint, and filed a motion to amend.  While the County did not ultimately oppose the motion to amend, it did not respond to our inquiries regarding its position, requiring us to prepare motion papers requiring substantially more detail and argument than if the County had consented at the outset.

98.     When the County still had not produced documents or responded to our interrogatories three months after they were served, despite multiple promises and missed deadlines, we wrote to Judge McCarthy on January 6, 2023 notifying him of the pending discovery dispute and requesting a conference.

99.     Only when Judge McCarthy set a status conference for January 13 did the County finally produce additional documents—at that time, the ECDA's file on the *Boyd* and *Walker* prosecutions.  The County produced these documents hours before the conference, requiring us to scramble to try to review what they had provided and what deficiencies remained.  Judge McCarthy reset the conference for January 25 to give us a chance to review the production.

26

100.   On January 23, we provided a letter status update to Judge McCarthy on outstanding discovery issues and the County's deficiencies.  Despite producing what it purported to be the ECDA's files in the *Boyd* and *Walker* cases, the County did not produce, among many other things, any notes from the trial prosecutors or internal communications (or a privilege log).  The County also failed to produce any of the requested *Monell* evidence, including personnel files, disciplinary records, complaints and records of ADA misconduct, training materials, and the files of other cases with identified *Brady* violations, summation misconduct, or other fair trial violations, or provide substantive responses to related interrogatories.

101.   Judge McCarthy held a conference on January 25.  The County for the first time took the position that they would seek bifurcation of discovery on the constitutional violations in Mr. Walker's case and *Monell*, and therefore they would not search for or produce the requested *Monell* evidence, notwithstanding that they had said for months they were in the process of collecting that information.  Judge McCarthy ordered briefing on Plaintiff's motion to compel discovery and the County's motion to bifurcate discovery, and discovery from the County came to a halt while the parties briefed their respective motions.

102.   We filed our motion to compel and the County filed its motion to bifurcate and stay discovery on February 15, 2023.  Oppositions were filed on February 28, and replies were filed on March 7.

103.   These were not routine discovery motions on limited issues.  The County's position on bifurcation was that Mr. Walker should first have to prove that a constitutional violation was committed in his case before proceeding to take discovery on the County's policies, customs, and practices for *Monell* purposes, and that *Monell* discovery should be stayed in the interim.  In support of its motion, the County argued that "discovery on Plaintiff['s] own prosecution[] will

27

likely lead to a dispositive summary judgment motion"—in other words, it expected the Court to grant summary judgment in its favor on the underlying constitutional violation, thus dispensing of the need for *Monell* discovery. In order to oppose the motion and convince the Court that discovery should continue in parallel, we had to essentially brief summary judgment on the constitutional violation on the existing record.

104. That was no small undertaking, but all of our pre-suit work amassing a record paid off. In addition to a 35-page brief, we prepared a 25-page declaration from Mr. Rudin, attaching 40 exhibits and laying out the entirety of the record to date supporting that the ECDA had committed *Brady* violations and summation misconduct in Mr. Walker's case. Given the importance of the issue and what was at stake, the briefing of the motion to compel and the bifurcation motion was an entire team effort, with the WilmerHale team focusing on the factual record in the brief and in Mr. Rudin's declaration and supporting exhibits, and the Rudin Firm and Hoover & Durland focusing on the legal arguments. Amassing the record was akin to preparing an opposition to a summary judgment motion.

105. Judge McCarthy held a conference on March 13, 2023 on multiple issues. Ms. Perio, Mr. Hanft, and I travelled to Buffalo for the conference, and Messrs. Hoover and Durland attended in person as well. At the conference, the Court heard argument on our motion to amend Mr. Walker's complaint, our request for a privilege log and production of non-privileged documents, and the motion to compel and bifurcation motion. We won on all resolved issues. Judge McCarthy granted our motion to amend the complaint and ordered the County to produce a privilege log and any responsive documents in its possession not subject to a privilege claim. With respect to the motion to compel and bifurcation motions, Judge McCarthy indicated that he was

28

inclined to deny the bifurcation motion but asked the parties to attempt to work on a narrowed scope of *Monell* discovery and set a further conference.

106.    We promptly filed the Amended Complaint on March 13, 2023, and the County filed its Answer on March 30.

107.    By letter dated March 27, 2023, we substantially narrowed our requests for *Monell* and other discovery from 30 to 16 other cases involving prosecutorial misconduct, and from entire case files to hearing and trial transcripts, motion papers, and court orders.  We also offered to do the work of reviewing and scanning hard copy case files ourselves, if it would reduce the County's burden and get discovery back on track.  The County did not change its position, arguing that most of the cases were irrelevant, and for the handful of cases for which it conceded relevance, searching for the files would constitute an undue burden.  The County continued to waffle on whether it was actively looking for the files, or whether even looking for the files would be a burden too great to bear.  We also substantially narrowed our requests for disciplinary and personnel records and training materials without any movement from the County.  Inexplicably, the County simultaneously refused to search for and produce the records while also refusing to stipulate that it could not locate such records and would not rely on any such records at trial.

108.    On April 13, 2023, Ms. Perio, Mr. Hanft, and I traveled to Buffalo for the second conference on the bifurcation motion.  Mr. Hoover appeared in person as well, and David Rudin attended by videoconference.  Judge McCarthy heard additional argument on the bifurcation motion.  We agreed to certain representations by the County that it had located no training, disciplinary, and personnel records, subject to a stipulation that the County had searched for and failed to locate such records.  Judge McCarthy ordered additional briefing on the motion to compel and bifurcation motions to be submitted by the end of the week.

29

109.    Recognizing the importance of the discovery that the County refused to produce, we prepared a 15-page, single-spaced letter brief laying out the relevance, discoverability, and admissibility of each category of information we sought, including a case-by-case discussion of the 16 other cases for which we were seeking trial and hearing transcripts, motion papers, and court orders.

110.    We also sent the County a draft stipulation regarding the training, disciplinary, and personnel records, but the County would not agree to stipulate that it would not rely on any such records at trial, notwithstanding its emphatic representations that it looked for but could not find any such records.  Therefore, we were forced to submit our own proposed order to the Court on that issue.

111.    On May 19, 2023, Judge McCarthy entered an order denying the County's motion to bifurcate and granting our motion to compel.  *See* Dkt. 102.  In its order, the Court noted the "detailed account of the alleged conduct of the ECDAO prosecutors" we provided, and that "[a]part from generalized assertions, the County offers no specific argument as to why plaintiffs will not be able to establish that constitutional violations were committed by its prosecutors." *Id.* at 7.  The Court held that "[w]ithout determining whether plaintiffs will ultimately be able to establish at summary judgment that constitutional violations were committed by the ECDAO prosecutors, from what has been presented thus far at this early stage, it seems likely that bifurcation will only defer, but not eliminate, the need for *Monell* discovery." *Id.*  The Court further ordered the County to produce documents from the 16 cases we identified and, if it was unable to produce any of those files, "file a detailed statement of its efforts to locate the missing files by June 29, 2023." *Id.* at 17.  The Court set a briefing schedule for any further disputes arising out of the County's June 29 submission and set a conference for July 12, 2023.

112.    The County waited until the deadline to provide an update to the Court—June 29, 2023—to produce additional documents arising from the Court's May 19 order.  Its production consisted of "case cards" from the 16 identified cases, a file destruction procedures memo, and photos from its storage facility.

113.    Until that date, nearly a year after we served our discovery requests, the County had not provided the destruction procedures memo, which would have informed our decisions on which cases to request had we known of it earlier in the process.  Based on that new information, we requested case cards from additional cases on our original list of 30, some of which the County eventually produced over the next few months.

114.    Ms. Perio and Mr. Hanft, along with Joel and David Rudin, attended the July 12, 2023, status conference set by Judge McCarthy to resolve any remaining document discovery issues.

115.    While we were completely successful in litigating these document discovery issues, the County created what ultimately amounted to a year's worth of work to avoid checking its files and producing what ultimately amounted to its records of the *Walker* and *Boyd* cases, a handful of case cards from other cases, and a stipulation that it had no records of training or discipline and no personnel files.

116.    Ultimately, the County's intransigence necessitated amendments to the case management order to extend the discovery deadlines.  In its July 18, 2023 Amended Case Management Order, the Court moved the deadline for fact discovery to November 2, 2023, expert discovery to February 19, 2024, and dispositive motions to March 18, 2024, extending the schedule by three months.

31

117.    As we sought discovery from the defendants, we also conducted an independent investigation of other cases of ECDA and BPD misconduct from around the time of Plaintiff's trial to develop our *Monell* claims.  Mr. Rudin's paralegal examined many years of Buffalo newspaper articles in archives for reporting on prosecutorial misconduct, as mistrial orders and other trial court rulings are generally not available on Westlaw.  We also obtained and reviewed court files for cases we uncovered of ECDA misconduct.  The results of this investigation provided evidence for the attorneys' use in depositions, summary judgment, and at trial.

118.    The County caused unnecessary delay even in this independent avenue of discovery.  Through our review of newspaper articles and deposition of John Montondo, we discovered a case where a judge dismissed a homicide case upon finding that BPD detectives had committed "blatant and egregious misconduct" in coercing a confession from a teenager named Tommy Rollins.  ADA Albert M. Ranni, chief of the Felony Trials Bureau, was the prosecutor at the pretrial phase of the prosecution, as well as an "advisor" to the BPD Homicide Bureau.  Because the case was dismissed and we were unable to locate Mr. Rollins, we needed an order unsealing the court file.  Though the case involved BPD coercion of a teenage homicide suspect was clearly related to our claims against all of the defendants, including the County; though the case was highly publicized when it was prosecuted; and though we sought unsealing only on a limited, non-public basis for the purpose of Plaintiff's federal section 1983 lawsuit under a confidentiality order, the County opposed our motion in state court and again in federal court.  Judge McCarthy granted our motion to unseal, but not before the County's opposition caused Plaintiff to spend many hours litigating the motion.

119.    Ultimately, by the conclusion of fact discovery, the Parties exchanged more than 75,000 pages of documents.

32

**Depositions**

120.    Notwithstanding the pending document discovery disputes with the County, we began preparing for, scheduling, and taking depositions of witnesses not impacted by those disputes in an effort to maximize efficiency and keep the schedule moving.

121.    All depositions were taken or defended by the Rudin Firm or WilmerHale.  Hoover & Durland provided strategic insights and assisted with logistical tasks, but did not take or defend any of the depositions so as not to duplicate efforts.

122.    Generally speaking, we staffed each deposition with a first chair supported by one or two associates or senior associates, who generally prepared the draft exam or prep outline, compiled the exam or prep materials, and second chaired the deposition.  Whether we were taking the deposition of a party or non-party, or defending our clients' depositions, that work involved review and analysis of the record pertaining to that witness, outlining the topics of inquiry, and designing the strategy for the information and admissions we hoped to obtain.  Other senior members of the team reviewed and provided feedback on the draft outlines and materials.

123.    Many depositions were taken or defended by an associate or senior associate, in which case a partner or counsel attended to supervise.  For videotaped depositions, there was typically a virtual link that other attorneys on the team could use to watch and listen remotely. While it was certainly beneficial for the team and the case for other team members to hear the testimony live so that they could adjust the strategy for other witnesses or more readily incorporate information and admissions into work product, those attorneys did not bill time to observing the deposition (or, in the rare instance where one did, such time was written off and is not submitted for fee-shifting with this Fee Application).

124.    Due to the age of the case, the age of the witnesses, the legibility of many of the documents, the large volume of documents to be covered, and other logistical hurdles, we took many depositions in person to ensure a smooth and efficient process.  However, wherever appropriate, we took remote depositions to reduce travel costs.

125.    In the early summer of 2023, while the County was still working to produce documents following Judge McCarthy's May 19 order, we proceeded with the depositions of several Buffalo Police Department witnesses, including Michael Guadagno on May 31, John Montondo on June 21, and John Regan and Mary Evans on July 17.  Joel Rudin took the Guadagno, Montondo, and Regan depositions, with David Rudin and a WilmerHale associate assisting.  David Rudin took the Evans deposition, with Joel Rudin supervising and a WilmerHale associate assisting.  Each of these depositions was taken in Buffalo and required the participating team members to travel to attend.  And while many of the Buffalo Police Department witnesses were defendants in the action and later settled with Mr. Walker, their testimony was relevant to Mr. Walker's claims against the County (as illustrated by the County's offer of Guadagno's deposition designations into evidence at trial).

126.    We deposed the remaining Buffalo Police Department witnesses, John Paradowski and Ronald Jentz, in September 2023.  David Rudin took the Paradowski deposition on September 6, supervised by Joel Rudin and assisted by a WilmerHale associate.  Mr. Hanft took the Jentz deposition on September 27, supervised by Joel Rudin.  Both depositions were taken remotely and did not require travel.

127.    Once the majority of the discovery issues with the County were resolved, we began taking the depositions of County witnesses in earnest.  On August 11, 2023, Joel Rudin took the deposition of David Henry, assisted by Rudin Firm paralegal, Thelo Coleman.  To streamline

proceedings, we agreed that Mr. Henry could testify in both a personal capacity and as the County's designated representative pursuant to Federal Rule of Civil Procedure 30(b)(6) simultaneously at the same deposition, rather than appearing and testifying twice. The deposition took place in Buffalo, and Messrs. Rudin and Coleman traveled to attend.

128. On September 5, we prepared and served supplemental disclosures pursuant to Federal Rule of Civil Procedure 26(a) adding Jerry Solomon and Nils Olsen as individuals with discoverable information Plaintiff may use to support his claims or defenses. This reflected and resulted from our ongoing factual investigation while the case was proceeding.

129. On September 12, Ms. Perio took the deposition of Jerry Solomon, joined by Mr. Rudin and assisted by a WilmerHale associate. The deposition was conducted remotely and did not require travel. Due to a scheduling conflict Mr. Solomon had in the afternoon, we continued the deposition on October 3 in Buffalo, when Ms. Perio was scheduled to depose another County witness.

130. On October 3, Ms. Perio took the deposition of James Verrastro, joined by Mr. Rudin and assisted by a WilmerHale associate. They traveled to Buffalo for the deposition and coordinated to finish Mr. Solomon's deposition on the same day to make the most of the trip.

131. With three depositions of County witnesses left for us to take, the County notified us that scheduling the remaining depositions before the fact discovery deadline of November 12 would be impossible due to a trial the County's counsel had in another matter during the month of October. To avoid motion practice we agreed to a brief extension of the fact discovery deadline and the subsequent deadlines until just after the new year, subject to the County's agreement to provide dates certain for the remaining County witness depositions in November, and that the

35

depositions of Messrs. Walker and Boyd, and the two non-party witnesses the County wished to depose, James McLeod and Tyrone Woodruff, would be scheduled before January 16, 2024.

132.    The parties stipulated to the extension of the fact discovery deadline to January 16, 2024, with expert discovery to be completed by May 1, 2024, and dispositive motions due on May 31, 2024, an approximately two-month extension. Judge McCarthy entered the Second Amended Case Management Order on October 16, 2023.

133.    On November 10, Ms. Silos took the deposition of County records custodian Debra Carosa, and I supervised. The deposition was conducted remotely and did not require travel.

134.    On November 28 and 29, Joel Rudin took the deposition of Timothy Drury, assisted by David Rudin. Joel and David Rudin traveled to Buffalo for the deposition.

135.    On November 30, Mr. Hanft took the deposition of Edward Cosgrove, I supervised, and Joel and David Rudin attended. Mr. Hanft and I traveled to Buffalo for the deposition. Joel and David Rudin were already in Buffalo, having just taken Mr. Drury's deposition.

136.    On December 4, 2023, the County took the deposition of James McLeod, a non-party witness. Mr. Rudin traveled to and attended the deposition in Buffalo and conducted a lengthy exam of Mr. McLeod for the Plaintiff. The deposition was not completed on December 4 and was continued to and completed on January 3, 2024.

137.    On January 2, 2024, David Rudin took the deposition of Nils Olson, a non-party witness, supervised by Joel Rudin. The deposition was conducted remotely and did not require travel.

138.    On January 4, the County took the deposition of Mr. Walker. Mr. Rudin defended the deposition, assisted by David Rudin, and conducted a lengthy exam of Mr. Walker. The

36

deposition was conducted in Buffalo, and Joel and David Rudin traveled to attend. Mr. Walker's deposition continued to and was completed on January 5.

139. On January 10, the County took the deposition of Mr. Boyd. Ms. Silos defended the deposition, supervised by Mr. Rudin, and Mr. Rudin conducted a lengthy exam of Mr. Boyd. The deposition was conducted in Buffalo, and Ms. Silos and Mr. Rudin traveled to attend. Mr. Boyd's deposition continued to January 11 and was completed on January 19 (by agreement of the parties to extend a few days beyond the fact discovery deadline).

140. In defending Messrs. Walker and Boyd's depositions, we needed to review hundreds of pages of material with our clients. These two then-64-year-old men were asked to testify about events beginning nearly 50 years ago, and then about some of the most traumatic experiences in their lives. This preparation needed to occur when each man was dealing with significant health challenges, and Mr. Boyd was dying of cancer. For this preparation, the attorneys handling the depositions needed to demonstrate enormous patience, empathy, and skill.

141. The parties also agreed to schedule the County's deposition of Tyrone Woodruff on January 25 and 26, a little over a week past the fact discovery deadline, due to the holidays and the County's trial schedule. The County took the deposition of Mr. Woodruff on January 25. Ms. Hughes first chaired the deposition on behalf of Plaintiff, and Ms. Perio conducted a lengthy exam of Mr. Woodruff.

142. On January 12, four days before the close of fact discovery, the County notified us that they were amending their Rule 26(a) disclosures to add a witness, Franco Kroese—a juror in Floyd Martin's 1977 trial—that they wanted to depose Mr. Kroese, and that they wanted to extend the fact discovery deadline to March 1, 2024 to accomplish that.

143.    Despite the fact that the County waited over a year to notice fact depositions, even of Messrs. Walker and Boyd, and the multiple extensions of the discovery deadlines that were necessitated by the County's unsuccessful motions and scheduling conflicts, to avoid the cost of another discovery dispute we agreed to allow the County to depose Mr. Kroese on February 2, 2024, outside the fact discovery period, but did not agree to any further extensions of the case deadlines.

144.    The County took the deposition of Franco Kroese on February 2.  Mr. Hanft attended the deposition and conducted an exam of Mr. Kroese, supervised by Mr. Hoover.  The deposition took place in Buffalo, and Mr. Hanft traveled to attend.

145.    In total, Mr. Rudin took the depositions of ADAs Drury and Henry as well as the police witnesses, Regan, Montondo, and Guadagno.  Each of the depositions of the key trial ADAs required Mr. Rudin to not only prepare dozens of pages of questions about the facts underlying Mr. Walker's case, but also the cases of his co-defendants, (Boyd, Gibson and Martin).  The depositions also required him to examine the ADA regarding the ECDA's training, policies, custom and practice in all areas relevant to the case including, pretrial discovery, the *Rosario* and *Brady* rules, the handling of witnesses, and summations.  Mr. Rudin endeavored to uncover how the events in these cases were tied to these policies and practices to establish causation.  In pursuing Mr. Walker's *Monell* claim, Mr. Rudin also needed to question the ADAs regarding their disciplinary policies and practices, other misconduct cases and the absence of discipline, the relationship between the BPD and the ECDA in the investigation and prosecution of homicide cases.  The carefully planned deposition examinations of Drury and Henry produced admissions that were critical to establish municipal liability, including the essential element of causation.

146.    In examining police witnesses, particularly Michael Guadagno, Mr. Rudin discredited the investigation using detailed questions that drew upon both the police documentary and the trial records.    These examinations proved pivotal at the trial where the videotaped deposition of Mr. Guadagno illustrated how the *Brady* material withheld by the ECDA could have been used to discredit the police investigation.

147.    Following each deposition, Mr. Rudin's paralegal prepared a digest summarizing the key testimony and admissions for later use in amassing the summary judgment record and preparing for trial.

**Mr. Boyd's Diagnosis and Motion to Expedite**

148.    In December 2023, Darryl Boyd received a devastating diagnosis of Stage IV pancreatic cancer.    Up until then, Mr. Boyd had been in relatively good health compared to Mr. Walker, who was battling myriad health issues, including a heart condition that caused him to suffer multiple heart attacks, chronic lung disease and a growth on his lung, a crippling back injury and various dental issues that affected his ability to eat and maintain a healthy weight, and our focus had been on getting Mr. Walker's case to trial as quickly as we possibly could.

149.    While we had been pressing to move the case along expeditiously from the earliest stages of the case, including a case schedule that would have had fact discovery completed by March 2023, the County's delay strategy had set the schedule back more than a year from our initial proposal.    With fact discovery now nearly complete, and Messrs. Boyd and Walker's health in precarious condition, time was now of the essence to get these cases to trial.

150.    On February 15, 2024, we moved to set trial dates in Messrs. Walker and Boyd's cases.    Judge Vilardo promptly set a hearing for February 23, at which he set a briefing schedule for oppositions and replies and set a further hearing for March 1 to address the issue.    Judge Vilardo

39

also set a tight schedule for the completion of summary judgment briefing based on the May 31 dispositive motion deadline and set tentative trial dates in October 2024.

151.    True to form, the County opposed our motions to set expedited trial dates for dying men.  It argued that summary judgment would be voluminous and daunting for the Court to decide on an expedited basis and that it could not prepare for the trials while its motions, which according to Judge McCarthy were unlikely to be successful, were pending.

152.    Judge Vilardo was unmoved by the County's arguments.  At the hearing on March 1, he confirmed the October 2024 trial dates, with trial in Mr. Boyd's case to start on October 15, 2024, and trial in Mr. Walker's case to start immediately upon completion of the *Boyd* trial.  Once again, the County's refusal to cooperate in setting trial dates over two years after the cases were filed caused us to expend time and resources briefing the issue and preparing for two hearings.

**Expert Reports and Depositions**

153.    The Rudin Firm and WilmerHale began evaluating potential experts as far back as January 2022, and focused more time on such work in the summer of 2023.  The work included interviewing potential experts, reviewing curriculum vitae and other materials relating to their educational and professional experience, conducting public records searches and researching published judicial opinions commenting on their opinions and qualifications, and reading their public writings.

154.    We ultimately retained Professor Alan Hirsch, an expert in police interrogation practices and false confessions, Professor Steven Zeidman, an expert in criminal defense practices, and Dr. Sanford Drob, a forensic psychologist.  We also retained Christopher Puckett, a crime scene reconstructionist.  Although Mr. Puckett did not testify at trial, our work with Mr. Puckett on his report, deposition testimony, and prior to trial informed the examinations of multiple

40

witnesses at trial regarding the impossibility of Woodruff's testimony at Mr. Walker's criminal trial.

155.    We assembled case materials for the experts to review, including materials requested by the experts after their preliminary review of materials we provided.  In assisting the experts to become familiar with the case, we spent time with each of them, providing the requisite background for, in some circumstances, the thousands of pages of material that we asked them to read and analyze.  We also held teleconferences with the experts to discuss their initial findings based on their review of the record, discuss their opinions, and confer on timing and other logistical matters.

156.    The Rudin Firm took the lead on reviewing the drafts of the experts' report and discussing the drafts with the experts.  For each expert report, a WilmerHale associate assisted by reviewing and commenting on the drafts and checking them against the factual record to ensure that the expert's statements were appropriately supported with citation, as well as proofreading and other similar tasks.  Each expert finalized his own report.

157.    We served Professor Hirsch's expert disclosures and report on February 28, 2024, Dr. Drob's on February 29, and Steven Zeidman's on March 1.  Following the disclosures, and at the Defendants' request, we made small productions of case materials the experts had prepared or relied upon in forming their opinions.

158.    The County sought a one-week extension to serve the disclosures and report of its expert, Kevin Gagan, from April 8 to April 15, 2024 on the grounds that the County was at trial defending another civil rights action.  We did not oppose, provided that the extension not be used to derail the summary judgment or trial schedule, and that the County's expert be made available for deposition at the end of April.  The County agreed, and the Court granted the request.

159. Expert depositions proceeded in April 2024. Our teams divided the work preparing for the depositions. WilmerHale took the lead on preparing for and defending the Drob, Hirsch, and Puckett depositions, and the Rudin Firm took the lead on preparing for and defending the Zeidman deposition and taking the Gagan deposition. As with the fact depositions, we generally assigned an associate to draft the exam or prep outline and compile the materials, with review and feedback by a more senior member of the team.

160. The County took Dr. Drob's deposition on April 25. Mses. Zubizarreta and Perio prepared Dr. Drob for his deposition. Ms. Zubizarreta defended the deposition, and Ms. Perio second-chaired. The deposition was conducted at WilmerHale's New York office, which did not require them to travel.

161. The County took Professor Zeidman's deposition on April 26. Joel and David Rudin prepared Professor Zeidman for his deposition. Joel Rudin defended the deposition, with assistance from David Rudin. The deposition was conducted in New York, which did not require them to travel.

162. We took Mr. Gagan's deposition on April 29. Joel Rudin took the deposition, with assistance from David Rudin. The deposition was conducted at WilmerHale's New York office, which did not require them to travel.

163. Mr. Rudin drafted his own detailed examination outline, and his examination of Mr. Gagan, the County's expert, yielded critical admissions that Mr. Walker ended up using in his affirmative case.

164. The County took Professor Hirsch's deposition on April 30. Mses. Riley and Perio prepared Professor Hirsch for his deposition. Ms. Riley defended the deposition, and Ms. Perio second-chaired. Mses. Riley and Perio traveled to Williamstown, Massachusetts for the deposition

42

(although the Fee Application does not include our travel time to and from New York City, or any travel time incurred by the WilmerHale team in traveling to and from New York City while not also performing substantive work, with one exception noted above and discussed below).

165.    As with the fact depositions, following each deposition, Mr. Rudin's paralegal prepared a digest summarizing the key testimony and admissions for later use in amassing the summary judgment record and preparing for trial.

166.    Over the course of fact and expert discovery, Mr. Walker's attorneys took and defended 18 fact and 5 expert depositions.  The transcripts of these depositions constitute 5,163 total pages.

**<u>Mediation</u>**

167.    Pursuant to the Court's ADR plan, we conferred with the County (and the City of Buffalo) to identify a suitable mediator back in October 2022 and selected Michael A. Brady. However, due to an injury Mr. Brady sustained, as well as the parties' assessment of when a mediation session was most likely to be productive, we did not conduct a mediation session until June 2024.

168.    We took the exercise seriously.  Ms. Hughes took the lead preparing a PowerPoint presentation to the mediator and the Defendants, as our expectation was that decision makers for both the City and the County would be present and were not as familiar with the facts, legal arguments, comparable case jury verdicts and settlements, and risks as their outside counsel.  Ms. Perio, Mr. Rudin, and I reviewed the draft presentation and provided feedback.  Joel Rudin took the lead in drafting a confidential mediation statement, laying out the strength of Mr. Walker's case and his demand.  Ms. Hughes, Ms. Perio, and I reviewed and provided feedback on this statement, and strategized regarding the session with Mr. Rudin, Mr. Hoover, and Mr. Durland.

169.    Mses. Hughes and Perio and Mr. Rudin traveled to Buffalo on June 10, 2024 for the mediation session with Mr. Brady and Defendants.  Ms. Hughes presented for nearly an hour to Mr. Brady, the City decision maker and outside counsel, and outside counsel for the County.

170.    Unfortunately, no decision maker for the County was present, limiting the session's usefulness.  While we will not disclose the confidential demand and counter in a public filing, it suffices to say that the session was not productive and ended quickly with the County.  (I note that the County's own internal lawyer, Jeremy Toth, did not bother to show up at this or any other session and also did not adhere to the confidentiality requirements imposed by this Court in connection with mediation discussion when unlawfully revealing mediation discussions to the media.  His misconduct only caused us to incur additional expense seeking relief in the middle of trial, as discussed below).

171.    The session with the City Defendants, on the other hand, was productive, and conversations continued throughout the summer and fall, ultimately leading to the settlement with the City Defendants in November 2024.

**Summary Judgment**

172.    The County filed its summary judgment motion on June 3, 2024.  Opposing the motion was a massive undertaking that required the focus and contributions of all three of our firms.  The County filed a 31-page brief, accompanied by a 23-page statement of [claimed] undisputed facts, and 24 exhibits consisting of hundreds of pages.  The County's motion referred to and incorporated arguments and facts from the City Defendants' summary judgment motion, which consisted of a 47-page brief, accompanied by a 28-page statement of claimed undisputed facts and 35 exhibits consisting of thousands of pages.

44

173. To maximize efficiency and speed, we prepared a combined response to the County and the City Defendants' motions, as many of the legal issues and almost all of the factual issues overlapped. The same amount and intensity of work would have been required without the City Defendants' motion because of those overlapping issues.

174. Now with discovery complete, we amassed an overwhelming record to oppose summary judgment. We prepared a 91-page opposition brief, supported by a 13-page declaration by Mr. Rudin attaching 126 exhibits, and a 330-page response to Defendants' statements of undisputed facts and statement of additional material undisputed fact. Of the 157-page response to Defendants' Rule 56(a) statement, 78 pages were in direct response to the County's 56(a) statement. The entirety of our 172-page counterstatement of facts was relevant to both the County and the City (indeed, the County sought to admit most of it into evidence at trial, and the Court admitted portions of it).

175. Amassing this record was careful, painstaking work, requiring us to pick through the thousands of produced documents and hundreds of pages of deposition testimony, as well as the significant record of the ECDA's policy, custom, and practice for *Monell* that we had largely collected ourselves. We, of course, could not and did not wait until the County filed its motion on June 3 to begin work on these massive filings. Indeed, we began outlining and drafting months earlier.

176. We divided our resources to maximize efficiency and avoid duplicative work. The WilmerHale team drafted the factual background of the brief and most of the Rule 56(a) Response and Counterstatement, with the Rudin Firm handling the sections relating to the *Monell* claims, and responding to the section of the County's statement on Plaintiff's post-conviction motions.

45

The Rudin Firm and Hoover & Durland did the vast majority of the research and drafting for the legal arguments in the brief.

177.    To ensure that we were aligned on approach, and that the papers were both internally consistent and consistent with what we expected our strategy would ultimately be at trial, senior members of our team, including Messrs. Rudin and Durland, Ms. Perio, and I reviewed the entire set of papers, raised comments and questions, made edits, and provided direction.

178.    The associates and senior associates on our teams fact-checked the papers, record-checked the citations, checked the substantive accuracy and formatting of the legal citations, and proofread the papers.  Other members of our team and support staff prepared the papers for filing.

179.    Strategy and planning sessions among the firms were necessary in order to coordinate these massive filings.  As noted below, WilmerHale has not included in this Fee Application a request for hundreds of hours spent during internal and larger team meetings coordinating these and other massive filings, as well as strategy sessions more broadly.

180.    The very next day, the County and City Defendants jointly requested an extension of their time to file replies.  The Court granted a 10-day extension over our objection, and the County filed its reply on July 8, 2024.

181.    Following reassignment of Mr. Walker's case to this Court, discussed below, this Court granted summary judgment for the County on Plaintiff's New York state law claim for negligent failure to properly hire, train, supervise, and discipline prosecutors, but denied the County's motion on Plaintiff's primary claim—the *Monell* claim—which the Court directed would proceed to trial.  The Court issued a written opinion on January 14, 2025.

**Case Reassignment, City Settlement, and Rescheduled Trials**

182.    On September 11, 2024, Messrs. Walker and Boyd's cases were reassigned to this Court.  We requested a scheduling conference to get the trials back on calendar, and the Court held a conference on October 7, 2024.  Messrs. Rudin and Hanft traveled to Rochester to appear, and Mr. Durland traveled from Buffalo.

183.    At that conference, the Court set Mr. Boyd's trial for January 27, 2025 in light of Mr. Boyd's ongoing battle with terminal cancer and set Mr. Walker's trial for March 10, 2025.

184.    Over the course of the Fall of 2024, settlement negotiations continued with the City Defendants following from the initial mediation session back in June.  Eventually, in November 2024, prompted by our clients' serious health circumstances and their need to obtain near-term financing to sustain them in what has proven to be a long and drawn-out battle with the County, they reached a settlement with the City Defendants.  We and the City Defendants filed a stipulation of dismissal of the claims against the City Defendants on December 5, 2024.

185.    Inexplicably, the County refused to consent to Messrs. Walker and Boyd's voluntary dismissal of the claims against the City, and the Court set a hearing for December 10.

186.    Given the importance of resolving this issue expeditiously and not letting it derail the upcoming trials as the County argued it should, and the fact that we were meeting with our trial judge for the first time, Messrs. Joel Rudin, David Rudin, Hanft, Hoover, and Durland, Ms. Perio,

47

and I all appeared for the hearing. The hearing was conducted virtually and did not require our team to travel.

187. The County articulated no legally valid theory to object to the dismissal of claims against an unrelated defendant at the hearing and indeed admitted that it had "no objection" to the settlement. Nevertheless, it refused to consent to the dismissal of claims and insisted that Messrs. Boyd and Walker must amend their complaints to remove allegations relating to the City Defendants, and that Messrs. Boyd and Walker must "condition" their settlement on the County's right to seek apportionment against the City.

188. The Court directed us to file a motion to dismiss Messrs. Boyd and Walker's claims against the City Defendants and set an expedited briefing schedule. We filed the motion to dismiss on December 12, 2024.

189. Instead of merely filing an opposition to Plaintiff's motion, on December 17, the County filed what it styled as a "cross-motion to amend its answers" to Messrs. Boyd and Walker's complaints. The County filed this motion without prior notice to the other parties and a mere 24 hours before our reply on the separate issue of stipulated dismissal of the City claims was due. As such, we filed a reply in support of our motion to dismiss by the December 18 deadline and asked the Court for two additional days to consider the County's motion to amend.

190. The Court promptly granted our motion to dismiss the claims against the City the next day, December 19. On the County's motion to amend its answer, the Court ordered us to file our opposition by January 3, 2025, with the County's reply due January 10.

191. Following submission of that briefing, the Court ultimately granted the County's motion to amend its answer in limited part, only to add an apportionment of fault affirmative

48

defense, denied it as to the County's other requests to amend to add legally invalid defenses, and dismissed the City of Buffalo and the individual defendants from the case.

192.    Through its unsuccessful attempts to throw a wrench in Messrs. Boyd and Walker's settlement with the City Defendants, the County nevertheless succeeded in delaying Mr. Boyd's trial from January 27 (when Mr. Boyd was still alive, albeit in poor health) to March 10, the date originally reserved for Mr. Walker's trial (and by which time Mr. Boyd ended up tragically passing), and pushed Mr. Walker's trial to March 24.

193.    The County also succeeded in forcing us to engage in two separate rounds of briefing—the first of which, on our motion to dismiss the City claims, was essentially unopposed, though the County went through the motions of filing an opposition—when our time would have been better spent preparing for trial.  That wholly unnecessary motion practice required our teams to incur additional attorney time and expense researching and drafting briefs and preparing for and attending court conferences, as well as additional time incurred as a result of the delayed trials.

194.    Our teams also spent time during this period opposing consolidation of the *Boyd* and *Walker* cases for trial.  At the County's suggestion that the cases should be consolidated for trial, we conducted extensive legal research and drafted multiple letters and emails to the Court explaining why consolidation would confuse the issues for the jury and create significant inefficiencies.  The Court, as did Judge Vilardo, ultimately agreed that the cases should be tried separately.

**Pre-Trial Preparation, Filings, and Conference**

195.    While the County's creation of needless obstacles occupied much of our teams' time and resources in the Fall of 2024, we also spent the final months of 2024 preparing for trial.

196.    To prepare for motions *in limine*, we assessed the entire factual and legal record in the case and prepared a list of potential motions we would file as well as motions we expected the County to file.  We then coordinated to divide the list among our three firms and began drafting motions *in limine* and oppositions to expected motions *in limine*.  Generally, an associate at the Rudin Firm or WilmerHale conducted the legal research and prepared the first draft of a motion *in limine*, with review, edits, and feedback from more senior members of the team.  While Mr. Durland prepared drafts of motions assigned to Hoover & Durland himself, as he is highly experienced, his work was efficient and required less review.

197.    We also coordinated on strategy for the upcoming trial, including what witnesses we expected to call in our case in chief, what topics we expected to cover with each witness, how we would prepare to admit and present key documents, the order of witnesses, and whether and how to use testimony from the County's witnesses in our case in chief.  As this case was exceedingly complex—both due to the inherent challenges in prosecuting a *Monell* claim and due to its age and lack of living witnesses—these decisions required several lengthy planning sessions at which the pros and cons of various approaches were debated and new ideas were brainstormed and workshopped.  (Again, to avoid overlap for meetings involving numerous attorneys, WilmerHale has not requested fee-shifting for most of these sessions).

198.    Finally, we began drafting our pretrial submissions based on the Western District's local rule requiring a pretrial statement that includes: a statement of contested and uncontested facts; issues of law; proposed jury instructions and verdict form; and witness and exhibit lists.  The

50

Rudin Firm prepared the first draft of the submission with review and coordination from the rest of the team. When the Court issued its pretrial order on January 16, 2025, we were able to easily convert our draft into a submission compliant with the Court's order without any inefficiencies or wasted work.

199. Ms. Perio and I had a two-week arbitration hearing scheduled in another matter in January and early February 2025. As such, the majority of the work preparing for trial in January and the first two weeks of February was done by the Rudin Firm and Hoover & Durland, and by WilmerHale associates at the direction and with the supervision of Messrs. Rudin and Durland.

200. During this time, our teams finalized the 15 motions *in limine* we filed on February 12, 2025, as well as our other pretrial submissions, including our exhibit list, proposed voir dire, deposition designations and objections to the County's designations, our statement of claims and damages, summary of the case, and list of attorneys, clients, witnesses, and experts.

201. This was a herculean effort that required the near-complete attention of all members of our teams, particularly with Ms. Perio and me on the west coast for another trial (although I did have a chance to review and comment on the motions before they were filed). Nevertheless, we took steps to make the process more efficient and reduce duplicative work. Each of the motions *in limine* was revised by its initial drafter, incorporating feedback from senior members of the team. We used a paralegal to proofread, cite check, and format the briefs and exhibits. The WilmerHale team took the lead on drafting and finalizing the proposed voir dire questions and voir dire information. The Rudin Firm's paralegal prepared the initial draft of the exhibit list, and Ms. Perio reviewed and worked with her to finalize it. And we assigned the review of depositions for designations to either the person who took the deposition or the person who would be handling the witness at trial. For instance, Mr. Durland conducted the review of Messrs. Walker and Boyd's

51

depositions, as he would be doing the directs of those witnesses at trial, and Mr. Hanft conducted the review of Mr. Cosgrove's deposition, since he took that deposition.

202.    There was no rest for our teams in the coming weeks, as the County filed eight motions *in limine* we needed to respond to and lodged five more "objections" in their pre-trial filing, though they did not file those as "motions."

203.    Where we had already anticipated the motion or had done prior research and drafted memos on an issue raised in the motion—such as the County's motion to exclude our *Monell* evidence or apply collateral estoppel to previous 440 decisions—we quickly and efficiently adapted the work product into an opposition to the motion.    Where we found a motion unobjectionable—such as the County's motion to preclude us from referencing the "Central Park 5"—we said as much and moved on.

204.    However, most of the issues the County raised were new and required our team to conduct extensive factual and legal research and analyze the issues before ultimately drafting a response and preparing for argument.    As just one example, the County stated in its trial document that it intended to impeach James McLeod's character for truthfulness with evidence of a "prior conviction for [a] drug-related crime"—a serious accusation for a retired judge and practicing criminal defense attorney.    Knowing of no such criminal conviction, our team spent hours conducting public records research, conducting legal research on the propriety of admitting such evidence (to the extent it even existed), drafting an opposition brief, and preparing to argue that the "evidence" should not come in.    Ultimately at trial, when asked directly by the Court "does Mr. McCleod have a prior criminal conviction that you were seeking to cross examine him on?" the County's counsel answered "no."    What took the County a moment to falsely state took us many hours to prepare to address and disprove.

52

205.    Once again, we endeavored to be efficient in assigning and staffing the preparation of our oppositions to the County's motions *in limine*.  Where an associate had previously conducted research on an issue raised by the County, we assigned that associate to prepare the draft opposition.  Or if an associate was assigned to prepare for a particular witness's testimony, we assigned that associate to draft the opposition to any motion *in limine* relating to that witness.  In the example above, Ms. Hughes was working with me to prepare for Mr. McLeod's testimony, and so it was she who drafted the brief responding to the statement in the County's trial document that it intended to impeach his character with a drug-related conviction, and it was she who prepared to argue the issue.

206.    We filed a sixteenth motion *in limine* on February 14, 2025, relating to a potential witness, Jerry Solomon, precipitated by the County's filing of its witness list.  In meet and confers prior to the filing, the County had not stated whether it intended to call Mr. Solomon or not, and for what purpose.  After seeing the County's February 10 filing, we moved promptly to address this additional issue.  (This proved to be another example of wasted effort, as the County told us, even after we rested at trial, that it "may call" Mr. Solomon to testify, but never did).

207.    The County also declined to file its exhibit list by the due date of Monday, February 10, 2025, instead waiting until Friday, February 14 to finally file it, which gave us a week less time to review and analyze the list, meet and confer with the County over potential stipulations as to authenticity and admissibility, and prepare for trial.

208.    Another significant filing we prepared was the proposed jury instructions we filed on February 14.  The submission was 30 pages of dense legal instructions that required considerable research on complex legal issues.  Mr. Rudin was the primary drafter, as he had the most experience instructing juries on constitutional violations and *Monell* issues.  He was assisted

by a WilmerHale associate who consulted model jury instructions and checked citations, and me and Mr. Durland, who weighed in on strategic direction. Mr. Durland then took the lead on responding and objecting to the County's proposed jury instructions, which we filed on February 24.

209.    We also filed our oppositions to the County's motions *in limine* and our responses to the other objections raised in its trial document on February 24.

210.    During the period between the exchange of exhibit lists, deposition designations, and motions *in limine* and the pretrial conference, we attempted to work with the County to resolve as many disputes as possible.

211.    Mr. Hanft spent hours analyzing the County's exhibit list to determine which exhibits we could consent to admission, which we could stipulate to authenticity, and which we would object to admission. He similarly spent hours analyzing the County's positions on our exhibits, and went through both sides' lists one-by-one with the County on several multi-hour meet and confer videoconferences.

212.    Between the two lists, the Parties proffered over 600 exhibits.

213.    Several members of our team, including Messrs. Rudin, Durland, and Hanft, similarly spent hours attempting to resolve disagreements over deposition designations on meet and confer videoconferences.

214.    Despite our many concessions, particularly on deposition designations, our attempts to resolve disputes over the exhibits lists and deposition designations were largely unsuccessful without the Court's intervention before or at trial. One notable exception was that we were able to agree on the admissibility of documents on the parties' exhibit lists that had been disclosed to Mr. Walker or his co-defendants' counsel at various pretrial proceedings or at their

54

trials, and Mr. Hanft and other WilmerHale associates prepared a detailed stipulation noting which documents had been disclosed at which proceedings.

215.    In addition to conducting these frequent meet and confers, our teams spent the week of February 24, 2025 preparing in earnest for the final pretrial hearing on March 3.  With 29 motions *in limine* or other objections to address, as well as objections to the exhibit lists, witness lists, and deposition designations, we put our whole team to work.  We divided arguments among the attorneys on our team, with each of the WilmerHale associates preparing for and conducting argument on one or more motions, and Messrs. Rudin and Durland, Ms. Perio, and I dividing the rest.  Each argument required researching and drafting talking points and mooting the argument. Preparations to address the exhibit and witness lists and deposition designations required painstaking analysis of each document or designation and the basis for admissibility or the objection to admissibility.

216.    With our entire team utilized, we all traveled to Rochester for the final pretrial conference on March 3 and appeared in court.

217.    Of course, the other significant work our team was doing in the weeks and months leading up to trial was preparing for the trial itself, including voir dire, opening and closing arguments, direct and cross exams, compilations of evidence to read and show the jury, and graphics presentations.

218.    To prepare to conduct voir dire, Mr. Durland worked with our jury consultant, Dr. Gilleland from Magna, to design a strategy for questioning prospective jurors.

219.    To prepare for opening argument, Ms. Perio drafted our opening with contributions from Mr. Rudin, mooted it several times for various constituencies in our team and incorporated feedback, and worked with Ms. Zubizarreta to prepare graphics to accompany the narrative.

55

220.    Generally speaking, to prepare for direct exams, we assigned each witness a first chair (one of Messrs. Rudin or Durland, Ms. Perio, or myself) to be assisted by an associate as the second chair.  The associates generally prepared first drafts of the direct exams and compiled sets of exhibits we anticipated introducing through and using with the witness, as well as any necessary prep materials.  The first chair reviewed the outline and materials and provided feedback, which the associate incorporated.

221.    We also spent time with each witness to prepare for testimony, the duration and frequency of which varied markedly depending on the witness.  For instance, we prepared our client, Mr. Walker, over multiple sessions, which were generally kept short due to Mr. Walker's health, whereas Mr. McLeod was available to speak with us only briefly via phone and during a brief in person meeting.  Depending on the witness, some prep sessions were conducted by both the first and second chair, and many were conducted by the second chair alone.  Following preparation sessions, the associate made any necessary changes to the exam outline to better reflect the witness's anticipated testimony.

222.    Preparation for cross exams was conducted a bit differently.  Generally, the first chair prepared the draft questions—as that person knew best where he or she wanted to direct the testimony and what admissions he or she hoped to elicit—and the associate identified the evidence that could be used to control, impeach, or refresh the witness, filled in citations to that evidence in the exam outline, and compiled copies of the exhibits to be used by the examining attorney.  The first chair and associate worked closely together to refine the exam, often conducting mocks of particular modules to test them with a live witness.

223.    In preparing the experts to testify, we needed to carefully review the record with each of them, as each had taken on other matters and work since their prior intensive involvement in the case during the report and deposition phases.  With Professor Zeidman, for example, we worked to refresh his recollection about three trial transcripts (the criminal trials of Messrs. Gibson, Boyd, Walker), all the pretrial hearings, all pretrial and trial discovery, and numerous deposition transcripts.  With Professor Hirsch, we worked to help refresh his recollection of the entire record of the police investigation.  With Dr. Drob, we reviewed all our clients' medical and other records, prior statements and testimony.  By ensuring each expert was fully up to speed on the factual record relevant to their field of expertise, we ensured that they were able to articulate their well-reasoned opinions to the jury in their testimony.

224.    Mr. Rudin drafted his own outlines for examining both ADA Drury (direct and cross) and Henry (cross).  Given these witnesses' crucial role in the case, these examinations needed to deal with all issues in the case and had to be painstakingly and methodically prepared.  Mr. Rudin needed to anticipate where the witnesses would try to deviate from their deposition testimony.  As part of his preparation, he worked to prepare to impeach both witnesses on virtually every statement they provided at their depositions, as we anticipated possible changes in response from both men at trial.  Across multiple weeks, Mr. Rudin worked to identify the right passages and statements from prior testimony and to properly formulate his questions with respect to both sequence and language.  Ms. Silos provided critical assistance in ensuring every impeachment citation could be identified at a moment's notice during the examination.  The collaborative efforts between firms and long hours of preparatory work produced Mr. Rudin's highly successfully examinations at trial.

225.    Another significant aspect of preparing for witness exams was working with our trial support vendor (Impact Trial).  To ensure the evidence was presented smoothly, we ensured that exam outlines were clearly marked with exhibit numbers and page cites and conducted dry runs with our vendor.  We also worked together to ensure that precise portions of deposition video were clipped for use as impeachment.  The majority of this work was done by our associates, but the examining attorney also worked with our vendor to ensure they were on the same page about how directions would be communicated live in court.

226.    Beyond witness exams, our team prepared evidence that would be received by the jury in other formats, such as the Buffalo Police Department reports and witness statements we read to the jury to open our evidence, the excerpted deposition videos we offered from David Henry, Edward Cosgrove, and James Verrastro, and the Monell articles and opinions we offered near the close of our evidence.  The vast majority of the work on these presentations was done by associates, with a senior member of our team reviewing the near-final work product and offering feedback.

227.    At the March 3, 2025 pretrial conference, in light of Mr. Boyd's passing and the need to substitute his estate as the plaintiff in his case, the Court scheduled Mr. Walker's trial first and adjourned Mr. Boyd's trial to June (and later adjourned it to November).  As such, all work from March 4 through the present application was solely on behalf of Mr. Walker in preparation for his separate trial.  Thus, in the weeks leading up to trial, our teams were working nearly full-time exclusively on Mr. Walker's case.

**Settlement Conference with Judge Vacca**

228.    In one final attempt to explore settlement prior to trial, this Court offered to conduct a settlement conference between Mr. Walker (and Mr. Boyd) and the County.  Judge Vacca traveled

to Buffalo from Rochester so that the parties could be present.  On February 10, 2025, the Court issued an order setting a settlement conference for February 19.

229.    As with the mediation session with Mr. Brady in June 2024, we and our clients took the settlement conference with the Court seriously.  The Court's order directed the parties to exchange demands and offers before the conference and make a serious effort to settle the case on our own, and accordingly, Mr. Rudin spent hours in meet and confers with the County's counsel walking them through our case, comparable jury awards and settlements, and the risks to the County of proceeding to trial.

230.    The order also directed us to submit a confidential settlement report and to prepare a presentation outlining the factual and legal highlights of our case.  A WilmerHale associate prepared the initial draft of the settlement report, with review and edits from Mr. Rudin and Ms. Perio.  Given the timing and the other commitments of our team preparing for trial, Ms. Perio was the primary drafter of the mediation presentation, with assistance from Ms. Zubizarreta.  Mr. Rudin also reviewed both documents and provided feedback.

231.    The Court's order also stated that "[u]nless excused by the Court in advance of the conference, parties are required to be present," as "[t]he requirement of the parties' personal appearance is intended to increase the efficiency and effectiveness of the settlement conference, by reducing the time for communication of offers and expanding the ability to explore options for settlement."  Messrs. Walker and Boyd did not view that order as optional, nor would they have declined to attend in any event, as their cases have been at the center of their lives for nearly 50 years.

232.    Mr. Walker, who cannot walk unassisted, attended the conference supported by his son, John Walker, III.  Mr. Boyd joined via Zoom from his literal deathbed at Erie County Medical

Center, joined by his power of attorney and the executor of his estate, Kathy Weppner. Mr. Rudin, Ms. Perio, and I traveled to Buffalo from New York in the middle of trial preparations. But, just as with the June 2024 mediation, neither Mr. Toth nor any other representative from the County deigned to attend. I am not aware whether the County sought to be excused from attending by the Court in advance, as the Court's order required, but the County did not tell us that it would not have a decision maker present.

233.    Notwithstanding our disappointment that the County once again did not appear to be serious about settlement, we were appreciative of the Court's time and spent the day informing the Court of our positions and negotiating in good faith. The Court is well aware of the County's offer during this conference.

**Trial**

234.    After a final pretrial conference on March 17, 2025, trial in Mr. Walker's case began with jury selection on March 18 and concluded with the jury's verdict in Mr. Walker's favor on April 8. The WilmerHale team arrived in Rochester on March 15. The Rudin Firm and Mr. Durland arrived the next day, March 16. From that point through the day of the verdict, our teams devoted their sole focus and attention to securing Mr. Walker's victory.

235.    The WilmerHale attorney team that attended trial was Ms. Perio, Mr. Hanft, Mses. Hughes, Silos, Riley, and Zubizarreta, and me. We were also joined by a trial paralegal and an information technology support professional. (For approximately the first week of trial, we had a second paralegal, Taryn McCarthy, working with us in Rochester. While her contributions were invaluable, this was a developmental opportunity for her, and we have not sought reimbursement for her time or costs in this Fee Application). Each member of the team was essential. As discussed at length above, the work preparing for witnesses and other aspects of the trial was spread out

60

among the members of our team, and while it is always theoretically possible to do more work with fewer attorneys, we could not have done the comprehensive, detailed work to make our presentation of evidence so seamless without our entire team. As trial progressed, two of our associates had to depart prior to the verdict to attend to other pre-existing commitments.

236. Likewise, our paralegals—Stan Maderich who attended the first two weeks of the trial and Zane Stucker who attended the third and final week—are highly experienced trial paralegals who have spent their careers developing the skills to make trials run smoothly. They set up our office in Rochester so that our team of attorneys could work efficiently away from their home offices, prepared all our witness binders, court filings, exhibit books, and other materials, maintained the exhibit list, and attended court each day to ensure that we had everything we needed. I also note that we had many hours of support from paralegals and project assistants (the WilmerHale title for a junior paralegal, often employed after graduating from college) through the course of this matter but have submitted virtually none of that time in this fee petition.

237. Similarly, our IT professionals—Lornie Martinez for the first two weeks of trial and Jim Donnelly for the third week of trial—had to set up and break down an entire remote office at a hotel in Rochester, including workstations with monitors and internet connections for our attorneys, plus paralegals and our graphics vendor, multiple high-speed printers, a display screen so that we could moot openings and closings and witness exams, and other technology. Beyond set up and break down, our IT professional had to remain onsite throughout the trial to ensure continuity of services and fix problems as they arose (which happened more than once, including losing internet for a number of hours, which Mr. Donnelly was able to address quickly and minimize disruption to our work by finding a work around). We do not ordinarily bill clients for our IT professionals' time and have not done so here as part of this Fee Application; however, their

61

presence in Rochester was reasonable and necessary, and we therefore have included their reasonable costs incurred during trial.

238.    As a general matter, most members of our team attended court each day. Messrs. Joel Rudin and Durland, Ms. Perio, and I were lead counsel and needed to be present for the entirety of the proceedings, both in front of the jury and in conferences with the Court. Mr. Hanft was the "manager" of the team and was the primary person responsible for directing and managing the workstreams that needed to be completed for the upcoming court days.

239.    One or more of our associates also attended court each trial day. Where the associate was serving as second chair for a witness they had prepared for or was otherwise presenting evidence, we included that associate's court time in our Fee Application. Where an associate's time could be described as observational—even where that observation served a significant and beneficial purpose, such as the associate preparing Professor Hirsch observing Mr. Woodruff's testimony in order to update the exam outline for Professor Hirsch's testimony—we have not included that associate's time in our fee application.

240.    The County presented testimony from its expert, Kevin Gagan. However, the County informed Plaintiff and the Court at trial that Mr. Gagan could not appear in person to testify. The County requested the Court allow Mr. Gagan to testify remotely from North Carolina. While Mr. Walker did not seek to block Mr. Gagan from testifying remotely, Mr. Gagan's inability to attend trial required an attorney from WilmerHale to travel to North Carolina with an exhibit binder so that Ms. Perio's cross examination could proceed without delay. As the County was responsible for this last-minute travel requirement, Mr. Walker seeks reimbursement of the time one of WilmerHale's associates, Walker Schneider, spent traveling to and from North Carolina during the trial.

62

241. As we know the Court is well aware, this was an intense trial with new issues and developments arising nearly daily. In addition to all of the preparatory work described in detail above, which continued daily throughout the trial, several issues arose that needed to be briefed or otherwise raised to the Court's attention and argued. Just to name a few: (1) the County violated the Court's direction not to reference the City of Buffalo being a party to this case or the basis of Mr. Walker's successful 440 motion in its opening, and we were forced to seek curative instructions; (2) we briefed the admissibility of *Monell* evidence under the "ancient documents" exception to hearsay; (3) we responded to the County's arguments during the first week of trial that its intent to argue an ineffective assistance of counsel defense to nondisclosure was impermissible; (4) we briefed *multiple times* the County's attempts to admit irrelevant and prejudicial portions of the Gibson trial transcript for no permissible purpose; (5) we opposed the County's several attempts to admit the entirety of the Buffalo Police Department file, as well as its attempt to admit a police organizational chart and nearly the entirety of Plaintiff's Amended Complaint and Rule 56.1 Statement; (6) we spent half a Saturday dealing with the County's improper disclosure of a confidential settlement demand to the Buffalo press in what appeared to be an acknowledgement that trial was going poorly and an attempt to manage the amount of a jury verdict; and (7) we revised our proposed jury instructions based on the factual and legal theories that developed at trial and responded to the County's proposed instructions.

242. Nearly every night after court, a team typically led by Mr. Durland, Mr. Hanft, and/or me, depending on who did not have a witness the next day to prepare for, researched and drafted whatever briefs were necessitated by the day's proceedings with the help of one or more associates and drafted talking points and prepared for upcoming arguments.

63

243.    We also spent significant time preparing for witnesses the County ultimately did not call.  Even when the County opened its case, they continued to keep open the possibility that they "may" call Jerry Solomon, Franco Kroese, and a "police witness."  While that was certainly their prerogative, it did require us to prepare for those witnesses as intensely as we did for witnesses they actually called, including expending attorney time and resources.

244.    My closing was also a collaborative effort by the team.  Each day in and after court, the team noted ideas for points to raise in the closing.  As early as the first week of trial, I began outlining our closing, and Ms. Zubizarreta took the lead on preparing the graphics to accompany those points.  By the final days of trial, Mses. Silos and Hughes and I reviewed the trial transcripts for admissions, drafted the narrative of the closing, prepared and edited the graphics for the slides, and fact checked the statement.  Mr. Durland also drafted important portions of the narrative.  I mooted the closing to the team multiple times and incorporated feedback with the assistance of our associates.

245.    Mr. Walker's $28 million victory (plus interest, fees, and costs) would not have been possible without the total focus and dedication of our entire team.

**This Fee Application**

246.    Mr. Walker is seeking fee shifting for the time incurred preparing and prosecuting this Fee Application and all future supplements thereto.  This application was no small undertaking, and once again, multiple members of our team made significant contributions to prepare it.

247.    As detailed in their separate declarations and memoranda, the Rudin Firm and Hoover & Durland reviewed their time records, prepared fact declarations detailing the work they

64

did on Mr. Walker's case and researched and drafted legal memoranda supporting their applications for fees.

248.    For the WilmerHale team, I reviewed three and a half years of billing records for dozens of WilmerHale attorneys and staff, made substantial, proactive reductions of time to account for work for which Plaintiff is not seeking fee shifting, and did the same with respect to hard costs incurred by WilmerHale over the life of this litigation.

249.    Ms. Perio drafted this declaration, outlining the broad brushes of the work our teams did on this matter since 2021, until she departed the firm on May 16. Mr. Hanft was the primary drafter of the Memo supporting our Fee Application and spearheaded finalization of all of the teams' papers for filing. Ms. Hughes was our principal liaison for Mr. Grable in connection with his supporting declaration. Ms. Silos was our principal liaison for Ms. Chapman and her team in connection with her supporting declaration. All of our Senior Associates and Associates on our core team conducted legal research, assisted in the drafting of these documents, and fact checked them.

**WILMERHALE VOLUNTARY REDUCTIONS**

**Voluntary Reductions to Requested Rates**

250.    As noted above, WilmerHale has significantly reduced its requested hourly rates to 56% of its standard hourly rates.  This application follows from applicable caselaw, described in our Memo, where courts in the Second Circuit have accepted the same (or smaller) discounts from standard hourly rates of firms on a percentage basis in civil rights cases.  It also results in a maximum hourly rate ($1008 per hour for my time) that is approximately the same as Joel Rudin's requested rate.

**Voluntary Reductions to Requested Hours**

251.    The WilmerHale team billed approximately 11,969.900 hours to this matter from inception in December 2021 through April 30, 2025, resulting in $14,540,361.50 in legal fees at our standard hourly rates as detailed above.  While we believe that nearly all of the work of the WilmerHale team was both justified and necessary in obtaining this remarkable outcome for Mr. Walker against the County, we have chosen to proactively and substantially reduce the amount of hours for which we are seeking fee shifting in this case to account for myriad factors as detailed below.  Ultimately, we are seeking fee-shifting for 3877.20 hours, and $3,014,196.61,[4] an over 75% reduction resulting from the complete exclusion of over 4,400 hours of work and substantial reductions in the remaining hours billed.

252.    As an initial matter, we litigated Messrs. Walker's and Boyd's cases jointly up until the Court stayed Mr. Boyd's case on March 3, 2025, and as such, nearly the entirety of the work done jointly for both cases would have been necessary had Mr. Walker been the only plaintiff and proceeded through the pretrial phases of litigation alone.  Nevertheless, applying what we believe

---

[4] We also ask the Court to increase the fees awarded to all attorneys by 15% to reflect the exceptional result achieved in this case.

to be an overly-conservative (and clearly reasonable) approach, we have reduced our hours substantially to account for the fact that work done in the pretrial phases was conducted on behalf of both Mr. Walker and Mr. Boyd.

253.    At the March 3, 2025 pretrial conference, the Court ruled that Messrs. Walker's and Boyd's trials would proceed separately and that Mr. Boyd's case would be stayed and scheduled Mr. Walker's trial first, in light of Mr. Boyd's passing and the need to substitute his estate as the plaintiff in his case.  As such, all work from March 4, 2025 through April 30, 2025 was solely on behalf of Mr. Walker, and we have included it in this Fee Application, without any allocation to Mr. Boyd's case, subject to other reductions discussed herein.

254.    For work conducted from the inception of the matter through March 3, 2025, if the work was clearly attributable to only Mr. Boyd's case, it was written off and not submitted with this Fee Application.

255.    For work conducted prior to March 4, 2025 that was attributable to both Mr. Walker and Mr. Boyd (*e.g.*, time spent preparing the draft complaint that was used as the template complaint in both cases) or that was done jointly (*e.g.*, depositions taken once for both cases), we applied a 50% reduction in hours to reflect that a portion of the work could be allocated to Mr. Boyd's case.

256.    This 50/50 split is extremely conservative, works to the County's favor, and in all events is reasonable.  Just as we have written off 100% of the work that we concluded was only relevant to Mr. Boyd's case, we could have attempted to identify work prior to March 4, 2025 that was only relevant to Mr. Walker's case (or identified a mathematical proxy for such work).  We have not done so.  Moreover, nearly all of the work that was performed for Mr. Walker's case would have been performed even if we had not represented Mr. Boyd.  Thus, allocating 50% of

67

the work to a different matter (Mr. Boyd's case) results in a fee application for far less work than what was reasonable and necessary in representing Mr. Walker.

257.    Mr. Walker's case was also originally litigated against both the County and the City Defendants.  Mr. Walker settled with the City Defendants on December 5, 2024.  All work after that date through April 30, 2025 is attributed solely to the County, and we have included it in this Fee Application, subject to other reductions discussed herein.

258.    For work conducted from inception of the matter through December 5, 2024, if the work was clearly attributable to only Mr. Walker's case against one or more of the City Defendants (*e.g.*, working forming the estate of a deceased police officer defendant), it was written off and not submitted with this Fee Application.

259.    For work conducted prior to December 5, 2024 that was equally attributable to both the City Defendants and the County (*e.g.*, time spent preparing the combined draft summary judgment opposition and Rule 56.1 Statement), we applied a 15% reduction in hours to reflect that a portion of the work could be allocated to the City Defendants.  A reduction of 15% is reasonable as it tracks the proportionate awards to Mr. Walker paid by the City Defendants and the County. Mr. Walker's total recovery was $32.35 million.  Of that amount, $4.35 million (13.4%) was paid by the City by way of a settlement, and $28 million (86.5%) will be paid by the County by way of a jury award (presumably plus post-judgment interest, which we have not accounted for—another assumption that benefits the County in this Fee Application).

260.    Finally, in addition to the two substantial, across-the-board reductions described above, in acknowledgement of the learning opportunities for our associates and other benefits to our firm that our representation of Mr. Walker created, we also wrote off significant categories of

68

time that was appropriate for our teams to bill and necessary for our successful representation of Mr. Walker. These are categories of time that we would ordinarily bill to clients.

261. For instance, in this Fee Application, we only submitted hours incurred by the core members of our team—the trial team identified above, our trial paralegals, one senior associate who worked on an earlier phase of the case, and Mr. Schneider's time related to Mr. Gagan's trial testimony. We did not submit the time of other associates who worked on the case in earlier stages of the case, or who conducted legal research on evidentiary issues on the eve of and during trial.

262. We also did not submit hours of the many other team members who had direct and significant contributions in support of our core team, such as our project assistants (junior paralegals), litigation support staff, librarians and research experts, and document processing specialists. WilmerHale ordinarily bills clients for the work of these individuals but voluntarily chose to write off those hours here. We also did not submit for the many hours worked by summer associates, although we sometimes bill clients for such work depending on the matter.

263. Even for the work of our core team members, we eliminated time for coordination, teaching, supervision, and any other tasks that arguably could have been done by fewer lawyers. For instance, in earlier phases of the case, the WilmerHale team generally had internal team meetings every other week to discuss case strategy, ongoing, and upcoming tasks. We wrote off all team members' time for those full team meetings.

264. Senior members of the WilmerHale team—generally Mr. Hanft, Ms. Perio, and I— also met with the Rudin Firm and Hoover & Durland on alternating weeks to discuss strategy and coordinate amongst our firms. We wrote off most time for those meetings as well, although we have submitted for certain strategy sessions among senior members of the entire team, which were reasonable and necessary for the case.

69

265.    When it came to the trial, as explained above, we did have most of our team members in attendance for most witnesses on most days.  However, it was on very rare occasion that any of their work could be described as "observation."  In most instances, a WilmerHale associate served as second chair for witness exams, and associates also assisted in coordinating with our trial graphics vendor so that our graphics presentation was seamless.  Other associates took notes of arguments and decisions on evidentiary issues, topics and potential lines of cross to prep upcoming witnesses on, and ideas for closing.  Nevertheless, in the interest of being reasonable, we wrote off all time of associates appearing in court except when the associate was serving as second chair for a witness or otherwise presenting evidence (*e.g.*, when Ms. Silos read from the Buffalo Police Department records or supported my examination of Mr. Zeidman).  We also substantially reduced associate time spent preparing for trial during the trial itself—*i.e.* time spent working on trial-related tasks beyond time spent in court.

266.    Beyond the extensive categorical reductions detailed above, I went through each and every time entry from the inception of our representation in 2021 and reduced the hours if I felt, in my judgment with 19 years of experience, that a task could or should have been performed in less time, or if a task performed by more than one attorney could or should have been performed by one attorney.

267.    Finally, we applied an across-the-board 10% reduction of all submitted time-entries to account for block-billing.  Again, this was a conservative step that favors the County, as I could have excluded (but did not exclude) the many entries that were not blocked billed.  (I also could have then included the time I spent conducting that analysis).

70

268.    Ultimately, the reduction of WilmerHale fees submitted with this Fee Application from $14,540,361.50 to $3,014,196.61 demonstrates our good faith effort to submit an application that is conservative and eminently reasonable.

**WILMERHALE COSTS**

269.    WilmerHale incurred significant out of pocket expenses over the course of this litigation, with the vast majority of those expenses incurred in connection with Mr. Walker's trial. While expenses incurred prior to the trial were minimal—and expenses directly attributable to Mr. Walker's trial were clearly necessary and appropriate—we nevertheless endeavored to reduce or eliminate certain categories of costs to ensure this Fee Application is reasonable.  Ultimately, we are seeking $171,141.52 in reimbursement of costs through April 30, 2025.

270.    WilmerHale applied the same application methodology for costs as it did for fees. For costs incurred prior to March 3, 2025, we reduced the total at issue by 50% as allocated to Mr. Boyd's case.  For costs incurred prior to Mr. Walker's settlement with the City Defendants on December 5, 2024, we submit only 85% of the costs allocated to Mr. Walker's case, with the remaining 15% allocated to the settlement with the City Defendants.

271.    The largest single expense, totaling $57,063.91, was for hotel rooms in Rochester for members of our team traveling to attend trial for three and a half weeks, as well as the conference space in the hotel we used as an offsite office.  The hotel we chose was not extravagant by any standard.[5]  We obtained quotes for rooms and conference space from multiple hotels near the courthouse that could accommodate a group of our size during the trial dates and ultimately

---

[5] Merely, dividing this cost by the ten individuals WilmerHale had present for the trial across twenty-five nights yields a result of $228.26.  This is a reasonable nightly rate and does not include the cost of a working space.

71

chose the Staybridge Suites on Genesee Street, which had rates much lower than the other options we explored. Indeed, as we informed the Court during trial, that is the same hotel the Western District deemed reasonable to use to house a juror for the duration of the trial.

272.    Other significant travel-related expenses were transportation to and from Rochester and meals while in town. While these costs were necessary for any team at trial, we took steps to ensure that we were being cost-effective and reasonable. For instance, while the WilmerHale associates flew up from New York, Mr. Rudin, Ms. Perio, and I each drove our personal cars to Rochester. This not only saved the cost of five additional flights—Mr. Rudin brought David Rudin and his paralegal, Amariah Thurston, with him—but we were then able to use our cars to transport our teams to and from court each day and anywhere else we needed to travel, without the need to rent and pay for multiple cars. For meals, with exceptions principally on weekend evenings, we generally ordered catering for the whole group, which was more cost-effective than leaving each individual to order on their own.[6]

273.    One additional significant travel expense resulted from the County's expert, Mr. Gagan, inability to testify in person at trial. As Mr. Gagan did not attend the trial, Mr. Walker needed to pay for an attorney to travel to North Carolina to be present for Mr. Gagan's testimony and ensure Mr. Gagan's cross examination could proceed smoothly.

274.    Another significant expense was equipment rental, totaling $14,354.15. These were the charges for all of the equipment we needed to procure in order to set up an offsite office

---

[6] Merely dividing the total meal expense reimbursement by the ten individuals WilmerHale had present for the trial across twenty-five days yields a daily result of $44.44 per person. This number would not include the meals during prior trips to Rochester and Buffalo, or any meal expenses beyond those for attorneys attending trial.

our teams could work out of for the duration of the trial. We rented computer monitors and cables, printers, display screens, internet routers, photocopiers, and office supplies for use during the trial.

275.    Finally, the largest single expense we incurred outside of travel was $45,007.54 in professional fees for our trial vendor, Impact Trial. As the majority of our evidence was presented electronically, our "hot seat operator," Adrianna Rivas, attended trial daily, displaying exhibits when referenced in exams, highlighting and calling out portions of documents in real time, and clipping video segments. Beyond her in court work, Ms. Rivas spent hours each day with us in our office space, doing run throughs of the next day's exams to ensure all of the exhibits were ready, practicing to work with different attorneys, and assembling deposition videos so they would play seamlessly and accurately. The County also attempted to present evidence electronically and used an attorney instead of a vendor to do that work. While I am unaware of how that attorney's billing rate compares to Impact Trial's, and so I cannot say whether we saved money by comparison, I would expect that it was more cost-effective to leave that work to a professional in the relevant field.

276.    We are not submitting all costs we incurred for reimbursement. We wrote off over $80,000 of expenses, including over $70,000 in fees for research services including Westlaw and Lexis. While certainly critical to any case, and billed to many clients in other matters, we have excluded them, as we did for many other individual expenses. We also wrote off travel and meal expenses in Rochester submitted by non-core team members, local transportation and meal expenses for team members who worked late in the office prior to trial, as well as expenses for the purchase of items necessary for our war room but that which the firm would retain after the fact.

73

277.    Ultimately, we reduced the costs for which we are seeking reimbursement from $314,975.94 to $171,141.52.

278.    For the reasons set forth here, in my colleagues' declarations, in the accompanying Memo, and in the expert declarations, we respectfully request that the Court grant our Fee Application in full and allow us to submit supplemental fee applications on a quarterly basis for fees and costs reasonably incurred after April 30, 2025.

Dated:        May 30, 2025

/s/ *Ross E. Firsenbaum*
Ross E. Firsenbaum
**WILMER CUTLER PICKERING**
  **HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com

*Attorney for Plaintiff John Walker, Jr.*