**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOHN WALKER, JR. | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| - against - | ) |
|  | ) |
| THE COUNTY OF ERIE, | ) |
|  | ) |
| Defendant. | ) |

**Case No. 1:22-cv-520**

**DECLARATION OF SPENCER L. DURLAND IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES**

I, Spencer L. Durland, an attorney duly admitted to practice in the State of New York and in the United States District Court for the Western District of New York, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following statements are true:

1.     I am a partner in the law firm of Hoover & Durland LLP ("Hoover & Durland"), co-counsel for Plaintiff John Walker, Jr. in the above-captioned matter. I am fully familiar with the facts and circumstances of this case, and I make this declaration in support of Plaintiff's application, pursuant to 42 U.S.C. § 1988, for reasonable attorneys' fees incurred by Hoover & Durland. The relevant law in support of this application is discussed in the accompanying Memorandum of Law (the "Memo"). Joel B. Rudin and Ross E. Firsenbaum are submitting separate declarations in support of Plaintiff's application for attorneys' fees and costs incurred by the Law Offices of Joel B. Rudin P.C. (the "Rudin Firm") and Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale").

2.      The Memo and the Rudin and Firsenbaum declarations comprehensively address the relevant law and the vast amount of work Mr. Walker's case demanded from his attorneys. I adopt and endorse those documents in full.

3.      This declaration provides additional facts specific to my firm's representation of Mr. Walker, as support for that portion of Plaintiff's fee application seeking Hoover & Durland's fees.

**INTRODUCTION**

4.      Hoover & Durland began work on this matter in September 2022, as local counsel.

5.      Starting on January 1, 2024, Hoover & Durland's role expanded to that of co-counsel with the Rudin Firm and WilmerHale. I was co-lead counsel during Mr. Walker's 15-day jury trial, held in March and April 2025, which resulted in a comprehensive victory for Mr. Walker against the Defendant County of Erie (the "County").

6.      Plaintiff requests a total of $290,959.26 in attorneys' fees incurred by Hoover & Durland from January 1, 2024 through April 30, 2025. To arrive at this figure, Hoover & Durland calculated a lodestar by multiplying the hours worked by each timekeeper and an hourly rate ($390 per hour for me and $425 per hour for Mr. Hoover), as more fully set out below. The Hoover & Durland time records used for this fee application are attached as Exhibit A.[1]

7.      Hoover & Durland's rates are eminently reasonable, given its skill and experience

---

[1]      Hoover & Durland attorneys record their time entries in the firm's practice-management software. To prepare this fee application, the time entries for this matter were exported to Microsoft Excel and a new "Adjusted Hours" column was created. (The "Adjusted Hours" calculations are described below.) The spreadsheet with the "Adjusted Hours" tabulation was exported to PDF for submission to the Court. Entries for which we are not seeking fee-shifting are not included in the spreadsheet. The descriptions given for the included time entries were lightly edited to correct typographical errors, spell out abbreviations, and otherwise enhance readability.

in high-stakes litigation in federal court, and the hours worked are commensurate with the demands of a complex case culminating in a multi-week jury trial.

8.    Plaintiff intends to supplement this request for fees incurred by Hoover & Durland after April 30, 2025 on a periodic basis, as the Court deems appropriate.

**HOOVER & DURLAND LAWYERS**

9.    The Hoover & Durland lawyers representing Mr. Walker were myself and my partner, Timothy W. Hoover.

10.    From 2023 to March 2024, Mr. Walker was also represented by an associate in our firm, Samuel L. Yellen, but as discussed below, we are not seeking to shift fees incurred by Mr. Yellen.

**<u>Spencer L. Durland</u>**

11.    I graduated from Brighton High School in 2004, graduated with honors from Trinity College in 2008, and graduated *summa cum laude* from Notre Dame Law School in 2012.

12.    Between 2012 and 2021, I worked as a litigation associate in Buffalo's two largest law firms, Phillips Lytle LLP and Hodgson Russ LLP. In February 2021, Mr. Hoover and I formed Hoover & Durland. He and I are equal partners in the firm.

13.    Since graduating from law school, I have concentrated on representing witnesses, subjects, and targets in criminal investigations, and litigating complex criminal and commercial matters and issues, primarily in federal district court in Buffalo and Rochester, and in state and federal appellate courts, including in the Second Circuit. In that time, I have been lead, solo, or co-counsel in several trials and numerous hearings, sentencings, arguments, and other courtroom proceedings.

14.    Over the course of my career, I have had several opportunities to litigate non-*Monell* civil-rights cases. Early in my career, Mr. Hoover and I handled a Second Circuit appeal

2

implicating the intersection between 42 U.S.C. § 1983, habeas corpus, and *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Teichmann v. New York*, 769 F.3d 821 (2d Cir. 2014) (per curiam).

15.    In 2023 and 2024, I defended against the City of Buffalo's appeal from a jury verdict rendered in another wrongful-conviction case, *Ortiz v. Wagstaff et al.*, No. 16-CV-321-EAW-MJR (W.D.N.Y.). Earlier this month, the Second Circuit issued a published decision ratifying all of Mr. Ortiz's arguments, rejecting all of the City's challenges, and affirming the judgment. *Ortiz v. Stambach*, 2025 WL 1350063, — F. 4th — (2d Cir. May 9, 2025).

16.    Though our firm's billing rates vary from matter to matter, based on a variety of factors, my standard billing rate for 2025 (and 2024) is $390 per hour, which is commensurate with other attorneys of my experience and skill at leading firms in the Buffalo area.

**Timothy W. Hoover**

17.    Mr. Hoover graduated from Fairport High School in 1990, graduated with High Honor from Michigan State University in 1994, and graduated from Vanderbilt University Law School in 1997 with Order of the Coif recognition.

18.    He was a litigation associate at Vorys, Sater, Seymour & Pease LLP, a large law firm in Columbus, Ohio, from September 1997 to April 2001, then joined the Federal Defender's Office in Buffalo, as an Assistant Federal Defender, in April 2001.

19.    In 2008, Mr. Hoover returned to private practice. He was an associate (2008-2010) and an equity partner (2011-2015) at Phillips Lytle LLP, and then an equity partner at Hodgson Russ LLP (2015-2021), before forming Hoover & Durland in February 2021.

20.    Mr. Hoover has extensive experience litigating complex criminal, regulatory, and commercial matters and issues in federal court, in the Western District of New York and elsewhere. He has been lead, solo, or co-counsel in several trials and countless hearings, sentencings, arguments, and other courtroom proceedings.

21.      Mr. Hoover has been a member of the Pro Bono Panel of the United States Court of Appeals for the Second Circuit since 2008, and in that capacity, was appointed as counsel or amicus in 22 appeals or petitions before the Court of Appeals. In a number of those appointments, following favorable decisions from the Court of Appeals, Mr. Hoover and his colleagues continued representation on remand to the applicable agency or district court. *See, e.g.*, *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227 (W.D.N.Y. 2019) (with Mr. Durland as lead counsel, representing Mr. Hechavarria in the W.D.N.Y., in Immigration Court, and in the Court of Appeals on various due-process challenges to prolonged administrative detention). Among other substantive or coordinating pro bono work, Mr. Hoover serves on this Court's Senior Pro Bono Panel, volunteers through the W.D.N.Y. Pro Se Assistance Program at the Buffalo federal courthouse, and previously volunteered in-person at the PSAP Program at the Rochester federal building.

22.      Over the course of his career, Mr. Hoover has, with skilled colleagues, litigated several non-*Monell* civil-rights matters, including *Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014) (suit over the use of constant illumination in Vermont men's prisons; Mr. Hoover's firm was appointed class counsel by the district court on remand, and discovery commenced until the case settled favorably), and *Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015) (an individual action by a prisoner challenging his treatment and conditions in New York State DOCCS; representation continued on remand until the matter settled), and the *Teichmann* and *Ortiz* matters noted above.

23.      Mr. Hoover was not significantly involved in trial preparation and he did not try Mr. Walker's case. He provided strategic guidance on trial and settlement strategy, knowledge of local practice, and assistance with several discrete pretrial issues, including discovery motions to unseal documents (which, due to the County's baseless opposition, had to be litigated in state and

4

federal court), a motion to expedite trial, the Franco Kroese deposition, and a short motion for an order allowing trial attorneys to bring personal devices into the courthouse.

24.    Though our firm's billing rates vary from matter to matter, based on a variety of factors, Mr. Hoover's standard billing rate for 2025 (and 2024) is $425 per hour, which is commensurate with other attorneys of his experience and skill at leading firms in the Buffalo area.

## HISTORY OF THE CASE

**Mr. Walker's Retention of Hoover & Durland**

25.    In 1977, Mr. Walker was convicted of the robbery-homicide of William Crawford. In 2021, a state Supreme Court Justice vacated his conviction under Criminal Procedure Law § 440.10, finding that the Erie County District Attorney's Office (the "ECDA") had violated his *Brady* rights by failing to disclose crime-scene photographs in its possession.

26.    Mr. Walker and Darryl Boyd (Mr. Walker's co-defendant in the underlying criminal case) elected to bring civil-rights suits against the County, the City of Buffalo (the "City"), and the individual police officers who investigated the Crawford case (together with the City, the "City Defendants").

27.    Mr. Boyd and Mr. Walker initially retained the Rudin Firm and WilmerHale to handle their civil-rights cases. In my and Mr. Hoover's view, based on our experience working at Phillips Lytle LLP and Hodgson Russ LLP, Mr. Walker needed out-of-district counsel to effectively handle his case, given the breadth and scope of the legal issues involved and the age of the underlying facts. Only the very largest Buffalo or Rochester law firms have the capacity the handle Mr. Walker's case; while some of these firms do occasionally handle plaintiff-side contingency matters in the personal injury or False Claims Act space, such firms rarely handle plaintiff's civil-rights litigation, and when they do it is usually a pro bono appointment in a prisoner-conditions or prisoner-abuse suit that does not involve *Monell* claims; such firms likely could not afford to

5

pursue a case like Mr. Walker's pro bono (and even if they theoretically could, would not do so); they lack expertise investigating, formulating, and litigating *Monell* cases; and many of them, Phillips Lytle and Hodgson Russ included, have municipal practices that would pose direct or positional conflicts in a *Monell* case, including with the City, or County, or both.

28.    After the County filed its Answer, the Rudin Firm and WilmerHale decided that it would serve Mr. Walker's interests to retain a Buffalo law firm as local counsel. I understand that they selected Hoover & Durland because, as noted above, Mr. Hoover and I have extensive experience litigating cases and issues in the Western District of New York, we have solid contacts in the Buffalo bar, and we are familiar with both criminal procedure and § 1983 litigation.

29.    Hoover & Durland's local-counsel arrangement with the Rudin Firm called for effective rates of $600 per hour for Mr. Hoover and $525 per hour for me. Specifically, (i) Hoover & Durland would render an invoice at reduced rates ($400 per hour for Mr. Hoover and $350 per hour for me); (ii) half of the invoice was payable immediately; and (iii) at the end of the case, if the client prevailed, Hoover & Durland would be paid twice the outstanding balance, or 1.5 times the reduced hourly rate.

30.    At the end of 2023, Hoover & Durland's role expanded from local counsel to full-fledged co-counsel with the Rudin Firm and WilmerHale, and a new agreement was reached between Hoover & Durland and the Rudin Firm, under which Hoover & Durland's future time charges would be included in any fee application made under § 1988. The new agreement applied as of January 1, 2024, and the fees sought in this application are limited to the period beginning January 1, 2024.

31.    As summarized below and as detailed in the attached billing records, the primary tasks my firm performed between January 1, 2024 and the end of trial were: (i) assisting in the

6

deposition of Franco Kroese; (ii) helping to prepare the motion to set a trial date; (iii) helping to prepare various expert reports; (iv) participating in mediation; (v) taking a leading role in preparing the summary-judgment opposition; (vi) taking a leading role in preparing motions *in limine*, deposition designations, and other pre-trial filings; (vii) preparing jury voir dire and the trial testimony of John Walker, Jr., Darryl Boyd, and Dr. Sanford Drob; and (viii) appearing as co-lead counsel at trial.

**Franco Kroese deposition**

32.　Mr. Firsenbaum's declaration accurately describes the County's belated disclosure of Franco Kroese, a juror in Floyd Martin's 1977 trial, and the scheduling of Mr. Kroese's deposition for February 2, 2024.

33.　Before the deposition took place, Mr. Hoover consulted with Gideon Hanft (of WilmerHale) and David Rudin (of the Rudin Firm) regarding the strategy for the Kroese deposition, and Mr. Hoover attempted to interview Mr. Kroese in person and by telephone.

34.　Mr. Hanft attended the deposition in Buffalo and examined Mr. Kroese under the supervision of Mr. Hoover.

35.　This level of staffing for a deposition—where a lawyer steeped in the facts takes a deposition with assistance from a colleague—is typical even in firms as small as Hoover & Durland. The County's counsel routinely staffed depositions in this matter the same way.

**Motion to expedite trial**

36.　Even before Mr. Walker and Mr. Boyd brought this suit, Mr. Walker had been dealing with a heart condition that caused him to suffer multiple heart attacks, chronic lung disease and a growth on his lung, a debilitating back injury, and various dental issues.

37.　In December 2023, Darryl Boyd was diagnosed with Stage IV pancreatic cancer.

38.    Plaintiffs' delicate health, combined with the risk that witnesses would pass away before trial could commence, prompted Plaintiffs to file a February 15, 2024 motion to set trial dates. Given my familiarity with the Western District docket and practice, I assisted in preparing this motion and appeared at the March 1 hearing before Judge Vilardo, where he granted Plaintiffs' motion and set October 2024 trial dates. Given his knowledge of local practice and practice within Judge Vilardo's chambers, Mr. Hoover assisted with finalizing and filing the motion and ensuring that confidential medical information was properly sealed.

**Expert reports and depositions**

39.    After substantial research and investigation by the Rudin Firm and WilmerHale, Mr. Walker retained Professor Alan Hirsch, an expert in police-interrogation practices and false confessions, Professor Steven Zeidman, an expert in criminal-defense practices, Dr. Sanford Drob, a forensic psychologist, and Christopher Puckett, a crime-scene reconstructionist. All of these experts served an expert report and sat for a deposition, and all but Mr. Puckett testified at trial. (Though Mr. Walker's counsel ultimately decided that they did not need to call Mr. Puckett as a witness at trial, counsel's work with Mr. Puckett remained highly useful in informing their examinations of other witnesses.)

40.    Mr. Zeidman's expert report was particularly extensive, as he was asked to cover a range of crucial topics including New York State criminal procedure, the *Brady* rule, rules regarding summation misconduct, the investigation and prosecution of the Crawford case, what a reasonably competent defense attorney could have done with the allegedly undisclosed *Brady* material, and the propriety of the summations delivered in Plaintiffs' cases. I spent many hours reviewing, commenting on, verifying, and otherwise providing input on Mr. Zeidman's expert report.

8

41.    The County noticed one expert, Kevin Gagan, who served an expert report and sat for a deposition. Because Mr. Gagan's expert report and expected testimony bore on the *Monell* issues, which I would be handling in the forthcoming summary-judgment briefing, I contributed to Mr. Rudin's outline for Mr. Gagan's deposition.

**<u>Mediation</u>**

42.    Plaintiffs, the County, and the City Defendants conducted their initial mediation session with Michael A. Brady on June 10, 2024.

43.    In preparation for this mediation session, the Rudin Firm and WilmerHale prepared materials outlining the pertinent facts and legal issues and supporting Plaintiffs' settlement demand. Mr. Hoover and I provided insight and suggestions for these materials, and for settlement strategy generally, based on our observations of the City's and County's approach to other civil-rights cases. Mr. Hoover attended the mediation session in person and consulted with co-counsel regarding mediation strategy.

44.    A second mediation session involving the City, County, and Plaintiffs was scheduled and occurred on July 18, 2024.

45.    Discussions with the County were not productive.

46.    Discussions with the City Defendants were reasonably productive, and they ultimately resulted in a settlement with the City Defendants in November 2024. Though the settlement figure was far less than Plaintiffs deserved from the City Defendants, it ensured that they could spend their final years—or, as it turned out for Mr. Boyd, final months—of their lives in comfort, and their families could be provided for.

**Summary judgment**

47.     Mr. Firsenbaum's declaration accurately describes the vast amount of work required to oppose the County's and the City Defendants' motions for summary judgment.

48.     To complete this undertaking as effectively and efficiently as possible, Plaintiffs' counsel divided the work among the senior lawyers.

49.     I took principal responsibility for preparing the *Monell* arguments, and this proved to be a time-consuming process. Through pre-suit investigation and post-suit discovery, the Rudin Firm and WilmerHale had built an enormous factual record to support Plaintiffs' *Monell* claims, and numerous theories of *Monell* liability were available to Plaintiffs. To competently oppose the City's and the County's motions for summary judgment, and leave no doubt that summary judgment dismissing Plaintiffs' key claim was wholly unwarranted, we had to research and brief every *Monell* theory on which a reasonable juror could find the City or the County liable, and demonstrate that the factual record contained at least some support for each theory.

50.     Knowing that the summary-judgment opposition would be a monumental task, that opposition briefing had to be completed as expeditiously as possible, and that large portions of the affirmative case for denying summary judgment could be prepared ahead of time, I began preliminary summary-judgment work in January 2024 and began drafting in earnest in April 2024. This enabled me to timely complete the *Monell* sections after receiving defendants' summary-judgment motions in early June 2024.

51.     I relied on WilmerHale to integrate the *Monell* arguments into the rest of the opposition memorandum, refining them as appropriate, to verify case and record citations, and to verify cross-references to the 56.1 statement.

52.     In addition to drafting the *Monell* arguments, I reviewed and commented on other sections of the summary-judgment opposition, to ensure that our briefing was consistent, effective, and aligned with the strategy we expected to pursue at trial.

53.     Our *Monell* briefing proved successful. The Court denied the County's motion for summary judgment on Plaintiffs' *Monell* claims and directed that those claims proceed to trial.

**Case reassignment, the City Defendants' settlement, and rescheduled trials**

54.     On September 11, 2024, Plaintiffs' cases were reassigned from Judge Vilardo to Judge Vacca. Plaintiffs requested a scheduling conference to get new trial dates, and the Court held a conference in Rochester on October 7, 2024. As one of the attorneys who would be trying the case, I traveled to Rochester for the conference, along with Mr. Rudin and Mr. Hanft. (Mr. Firsenbaum and Ms. Perio were unavailable.)

55.     At the October 7 conference, the Court set Mr. Boyd's trial for January 27, 2025, and set Mr. Walker's trial for March 10, 2025.

56.     As noted above, Plaintiffs settled with the City Defendants about a month later, in November 2024.

57.     On December 5, 2024, Plaintiffs and the City Defendants filed a stipulation of dismissal of the claims against the City Defendants. The County responded by baselessly refusing to consent to dismissal of the City Defendants, and moving to add various affirmative defenses to its answer. Since I would be one of the lead trial attorneys, and this briefing was important to the way the case would be tried, I reviewed the County's filings on these matters, and reviewed and revised Plaintiffs' filings.

58.     The Court ultimately granted Plaintiffs' motion to dismiss their claims against the City Defendants and denied the County's motion to add affirmative defenses to its answer, save for the affirmative defense of apportionment.

11

59.     The County's belated and largely groundless briefing delayed Mr. Boyd's trial from January 27, 2025 (when Mr. Boyd was alive) to March 10, 2025 (by which time Mr. Boyd had passed away), and pushed Mr. Walker's trial to March 24.

60.     In the meantime, in December 2024, with Mr. Walker's health fragile and Mr. Boyd's health progressively worsening, I researched the standard for medical unavailability under FRE 804(a)(4) to ensure that Plaintiffs would be prepared to adapt to any emergency that arose just before or during trial.

**Pretrial preparation, filings, and conference**

61.     As noted above, the Court initially scheduled Mr. Boyd's trial to begin in January 2025. Had that date held, it would have prevented Mr. Firsenbaum and Ms. Perio from participating in Mr. Boyd's trial, as they were involved in a multi-week arbitration at that time, and both Mr. Hoover and I would have tried the case with the Rudin Firm and other members of the WilmerHale team.[2] Therefore, when I began preparing for trial in 2024, my work encompassed strategy and examination outlines for John Walker, Darryl Boyd, Tyrone Woodruff, Alan Hirsch, Christopher Puckett, Sanford Drob, and the County's records custodian. When Mr. Boyd's trial was moved to March 10, 2025, I provided WilmerHale with my work product relating to Mr. Woodruff, Mr. Hirsch, and the County records custodian, and they picked up where I left off.

62.     The weeks and months before trial were also filled with discussions among the principal trial attorneys regarding trial strategy and tactics. Key decision-points included the trial themes to highlight, the witnesses to call in our case in chief, the sequence in which the

---

[2]     Given the scheduling conflict for Mr. Firsenbaum and Ms. Perio, Mr. Rudin and I agreed to the January 2025 trial date very reluctantly, and only because it was the soonest that our terminally ill client could get to trial.

testimonial and documentary evidence would be most clearly presented, how and through whom each piece of evidence would be admitted, and how best to address potential defenses. The complexity of this case meant that many strategic and tactical questions had no obvious answer, but required a choice among imperfect alternatives, each of which had implications for other aspects of the case and other key decision-points. The case's complexity also meant that it was of the utmost importance for Plaintiffs' counsel to resolve these difficult issues ahead of time, so as to enter trial with a clearly defined direction and set of themes.

63.     During late January and early February 2025, Plaintiffs' counsel spent a great deal of time on pretrial submissions. With Mr. Firsenbaum and Ms. Perio engaged on another matter, Mr. Rudin and I led much of the preparation of pretrial submissions, with more junior attorneys at the Rudin Firm and WilmerHale working under our direction.

64.     Given the number of evidentiary issues Plaintiffs' cases raise, motions *in limine* required a great deal of attention. As explained in Mr. Firsenbaum's declaration, the trial team brainstormed evidentiary issues warranting a motion *in limine*, assigned drafting responsibility to individual lawyers, and then tasked the senior lawyers with reviewing and revising drafts to ensure that Plaintiffs' arguments were correct, consistent with one another, and aligned with the overarching litigation strategy. I spent many hours drafting motions *in limine* and revising motions drafted by others.

65.     One of Plaintiffs' *in limine* motions sought to introduce, under FRE 1006, charts summarizing the 1977 criminal trials, to help the jury digest and understand what took place. With the other members of our team consumed by other projects, I took the lead on preparing these charts. Though the Court ultimately decided that witness testimony and read-backs were more appropriate means of summarizing the 1977 criminal trials, there was good authority for presenting

13

this information in a summary chart (Dkt. 230-5 at 5-6), and the time spent on this potentially invaluable summary evidence was warranted.

66.    I also assisted in the preparation and revision of various other pretrial filings required by the Court, including the voir dire questions, the exhibit list, and the proposed jury instructions. As one of the attorneys presenting witnesses at trial, I needed to ensure that any exhibit I intended to use in a direct or cross-examination was properly disclosed, and that each of our trial submissions, from the proposed voir dire to the proposed jury instructions, was legally correct and consistent with our trial themes and strategy.

67.    The trial team took a similar divide-and-conquer approach to responding to the County's pretrial submissions. The team reviewed the County's submissions, identified any areas of agreement, assigned initial drafters for submissions requiring a response, and then asked the senior lawyers (myself included) to review and revise the first drafts. I researched and drafted several of the more significant *in limine* oppositions (responding to the County's motion to give preclusive effect to prior appellate and 440 decisions, and responding to the County's motion to exclude admissions made by former District Attorney John Flynn), and reviewed and revised oppositions drafted by others.

68.    In addition, given my work on the summary-judgment briefing and Plaintiffs' proposed jury instructions, I took the lead on responding to the County's proposed jury instructions. Naturally, our response needed to comprehensively raise and preserve every objection we had to the County's proposed jury instructions. And this proved to be a time-consuming process, because the County's proposed instructions were filled with inaccurate statements of law. To give just a few examples, the County's proposed instruction on § 1983 would have limited *Brady* material to exculpatory evidence—an incredible proposal, since confining *Brady* to

14

exculpatory evidence is one of the unlawful municipal policies supporting Plaintiffs' *Monell* claims—and would have authorized the County to blame Plaintiffs' defense lawyers for failing to uncover *Brady* material that Plaintiffs' prosecutors had suppressed. (Dkt. 273 at 17-18.) The County's proposed instruction on summation misconduct omitted the prohibition on making false statements, the central type of summation misconduct alleged by Mr. Walker. (*Id.* at 19.) And the County's proposed instruction on the affirmative defense of apportionment neglected to place the burden of proof on the County and inexplicably drew on irrelevant New York law rather than *Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017), the case that led the Court to permit an apportionment defense in the first place. (Dkt. 273 at 23-25.)

69.     I also handled designations of deposition testimony given by Mr. Boyd. After the exchange of deposition designations, I reviewed the County's deposition designations, analyzed its positions, attended meet-and-confers in an attempt to resolve disagreements, and, at the Court's direction, created a chart showing outstanding disputes, which was filed with the Court on March 12, 2025.

70.     Unfortunately, there were more stalemates than I had hoped. These stalemates generally resulted, I respectfully submit, from the County's adherence to untenable positions. For example, in Mr. Boyd's deposition, the County designated three separate references to young women living in the Glenny Drive apartments having young children. (Dkt. 298 at 21, 24 (objecting to designations of Boyd Dep. at 149:1-149:8 (defense counsel eliciting the fact that in 1977, Mr. Boyd's girlfriend (Giselle Washington) had young children and Mr. Boyd was not the father), Boyd Dep. at 217:17-20 (defense counsel again eliciting the fact that Giselle Washington lived in the Glenny Drive apartments with her two young children), and Boyd Dep. at 250:12-17 (defense counsel eliciting the fact that Dorothy Wilson, a young woman living at the Glenny Drive

15

apartments, had a newborn baby).) I objected to these designations and expected little resistance, as teenage motherhood had zero probative value and an obvious propensity to evoke invidious stereotypes. But the County would not agree to withdraw these designations, insisting that this testimony remain part of Mr. Walker's trial. The County likewise insisted on designating deposition testimony about marijuana use, even after the Court ruled this evidence inadmissible. (Dkt. 298 at 21-23 (objecting to designation of Boyd Dep. at 159:13-20, 161:7-162:4, 166:1-167:9, 192:21-193:14).)

71.     I was also required to retrieve and review court files related to habeas submissions made by Mr. Walker and Mr. Boyd which the County—on the eve of trial and in blatant violation of the discovery cut-off—sought to obtain from the Western District Clerk's Office. Though Plaintiffs immediately objected to these materials coming into evidence, the County maintained its right to seek their introduction, requiring someone on the trial team to retrieve and review them, in order to understand their contents and, if necessary, address the matter intelligently with the Court. Because I was nearest to the Clerk's office and was presenting the testimony of Mr. Walker and Mr. Boyd, I took on this responsibility.

72.     Between February 28 and March 2, 2025, I spent a great deal of time preparing for the March 3 pretrial conference. I was tasked with arguing the *in limine* motions with which I was most familiar, and with arguing all issues regarding the Darryl Boyd deposition designations. The designation argument, in particular, required painstaking preparation to ensure that I could address all of the relevant issues and points of evidence. On March 3, I traveled to Rochester for the pretrial conference, appeared before the Court, argued the issues assigned to me, assisted in arguments made by others, and consulted with the principal trial attorneys on matters of trial strategy and tactics.

16

73.     Throughout the months before trial, I had been preparing for the trial proceeding itself, and these preparations naturally intensified following the March 3 pretrial conference.

74.     In terms of proceedings before the jury, I was responsible for conducting voir dire and leading jury selection, for the direct examinations of Darryl Boyd, John Walker, and Dr. Sanford Drob, and for the cross-examination of Franco Kroese.

75.     To prepare for voir dire and jury selection, Mr. Hoover, Ms. Perio, Mr. Rudin, and I interviewed jury consultants in October 2024, I reviewed jury research conducted by the jury consultant we selected, Dr. John Gilleland, I consulted with Dr. Gilleland to design a strategy for questioning prospective jurors, and I then prepared and practiced lines of questioning directed at the areas Dr. Gilleland and I had identified.

76.     In the immediate run-up to trial, the bulk of my time was devoted to the direct examinations of John Walker, Darryl Boyd, and Dr. Drob.[3] All three were very important witnesses, and Mr. Walker was perhaps the most important witness of all.

77.     I took the lead in drafting Mr. Walker's direct examination, with assistance from WilmerHale associate Phoebe Silos. It took a great deal of time to condense Mr. Walker's life—from his childhood in Buffalo, to his wrongful arrest and conviction, to his decades of torment in prison, on work release, and on parole, to his efforts to obtain vindication, to his injuries and hopes for the future—into a reasonably concise direct examination. Proper preparation also demanded that we thoroughly research potential lines of cross-examination; periodically realign the direct examination with changes in trial strategy and, later, rulings from the Court; and meet with Mr.

---

[3]     After Mr. Boyd passed away, I prepared the deposition designations that would serve as his direct testimony.

Walker to prepare him for his direct and cross-examination.[4] These meetings had to be kept short, because Mr. Walker's fragile health and the emotional toll of the subject-matter made lengthy preparation sessions impossible.

78.     I followed a similar process in preparing for Dr. Drob's direct examination, with assistance from WilmerHale associate Melissa Zubizarreta. Dr. Drob's testimony did not require as much preparation as Mr. Walker's, but it was still a significant undertaking to synthesize his lengthy report into a presentation readily comprehensible and useful to the jury.

79.     I relied on Ms. Silos and Ms. Zubizarreta to cite-check examination outlines, help research potential lines of cross-examination, and participate in witness-preparation sessions. Without their assistance and deep knowledge of the case, these tasks would have been far more time-consuming.

80.     To prepare for cross-examination of Franco Kroese, I relied on WilmerHale's Gideon Hanft (who had taken Mr. Kroese's deposition) to draft a cross-examination outline, which I revised until I was comfortable with it. Though the County ultimately did not call Mr. Kroese, it maintained its right to do so deep into the defense case, and never affirmatively said it would not call him, requiring me and Mr. Hanft to prepare as though Mr. Kroese was going to testify.

81.     In addition to these tasks, as one of the lead trial attorneys, I was responsible for collaborating with co-counsel on every other aspect of the case. This included reviewing and revising drafts of the opening statement and frequently discussing trial strategy and tactics.

**Trial**

82.     After the final pretrial conference on March 17, 2025, trial in Mr. Walker's case began with jury selection on March 18 and concluded with the jury's verdict in Mr. Walker's favor

---

[4]     I also had more general client meetings with Mr. Walker, to keep him informed, ensure that he understood the proceedings, and solicit his input on trial strategy and tactics.

on April 8. I arrived in Rochester on March 16. From that point through the day of the verdict, I devoted all of my time and attention to securing a favorable result for Mr. Walker.

83.    I, along with Mr. Firsenbaum, Ms. Perio, and Mr. Rudin, appeared in court every day and participated, in either a lead or support role, in all of the courtroom proceedings.

84.    Before each trial day, I joined the trial team in discussing and strategizing for the next day's proceedings, and identifying and assigning necessary tasks. If I was presenting evidence the next day, I would work to refine and finalize that presentation, prepare for potential evidentiary issues, practice with the graphics professional to ensure a smooth presentation, make any required redactions to exhibits, and so on. If I was not presenting evidence the next day, I would support the attorneys who were presenting evidence, and research and prepare to address the legal issues that consistently arose throughout this trial. The next morning before court began, I would make final preparations for whatever my responsibilities were that day and then proceed to court. During the court day, I presented evidence, argued legal issues, consulted with co-counsel on trial tactics, and consulted with Mr. Walker. After the court day ended, the trial team met to begin strategizing for the next day's proceedings. This cycle repeated itself through the verdict.

85.    Mr. Firsenbaum's summation was a particular focus for the entire trial team. Throughout the trial, attorneys collected evidence, arguments, and illustrations for potential use in closing. As the trial drew to a close, I and the other members of the trial team spent increasing amounts of time drafting sections of the summation, searching the record for the most important evidence elicited, creating clarifying visuals, commenting on drafts, and otherwise supporting Mr. Firsenbaum's preparation.

**This fee application**

86.    In preparing this fee application, I met briefly with James W. Grable, Esq.; reviewed Hoover & Durland's time records and made the adjustments described below in Microsoft Excel;

exported the Excel file to PDF; and prepared this declaration to explain, without needlessly duplicating the comprehensive accounts given by Mr. Firsenbaum and Mr. Rudin, what Hoover & Durland did in this case and why its time charges and billing rates are appropriate.

## REQUESTED RATES AND FEES

87.     Hoover & Durland is requesting its standard billing rates for 2025: $390 per hour for me and $425 per hour for Mr. Hoover.

88.     Based on my and Mr. Hoover's experience, these rates are more than reasonable, particularly given the complexity of this matter.

89.     As set forth in his expert declaration, Mr. Grable has reached the same conclusion based on his considerable experience litigating in the Western District of New York.

90.     Mr. Rudin reached the same conclusion as well, when he hired Hoover & Durland to serve as local counsel. As discussed above, our agreement with Mr. Rudin called for effective billing rates of $525 per hour for me and $600 per hour for Mr. Hoover. Thus, even when Mr. Rudin would be going into his own pocket to pay the bill, he believed that $525 to $600 per hour for local counsel in the Western District of New York is a fair and appropriate rate.

91.     Like the Rudin Firm and WilmerHale, and for the reasons stated in the Memo and the Rudin and Firsenbaum declarations, Hoover & Durland has voluntarily reduced its hours to account for the fact that through March 3, 2025, most of its work was done on behalf of two plaintiffs. Through March 3, 2025, time charges clearly applicable to Mr. Boyd only are omitted from this application; time charges applicable to both Mr. Boyd and Mr. Walker are included with a 50% reduction; and time charges clearly applicable to Mr. Walker only are included without a 50% reduction. From March 4 on, all time charges are applicable solely to Mr. Walker, and so are included without a 50% reduction.

20

92.     Also like the Rudin Firm and WilmerHale, and again for the reasons stated in the Memo and the Rudin and Firsenbaum declarations, Hoover & Durland has further reduced its hours to account for the fact that until December 5, 2024, Mr. Walker was litigating against the City Defendants and the County. Any work clearly applicable solely to the City Defendants is omitted from this fee application. Time charges through December 5, 2024, if applicable to both the City Defendants and the County, are reduced by an additional 15%, in keeping with the City Defendants' proportionate share of Mr. Walker's $32.35 million combined recovery. Work clearly applicable only to the County is included without an additional 15% reduction. Any work after December 5, 2024 is applicable solely to the County, and so is included without an additional 15% reduction.

93.     Hoover & Durland further elected to not submit time charges for its former associate, Mr. Yellen, and to limit Mr. Hoover's time charges to the most significant and substantive tasks that he undertook.

94.     In sum, Hoover & Durland's work in this complex and important case was impactful, efficient, and successful, and its rates and time charges are more than reasonable. If I were preparing invoices in a retained case, I would have no hesitation in billing the time charges submitted in this application.

95.     For the reasons set forth above and in the accompanying Memo and declarations, I respectfully request that the Court grant Plaintiff's fee application in full.

Dated:        May 30, 2025                          **HOOVER & DURLAND LLP**

*Spencer Durland*
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2605
sdurland@hooverdurland.com

*Attorneys for Plaintiff John Walker, Jr.*

22