UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN WALKER, JR.

                Plaintiff,

   -against-                        22-cv-520 (MAV)

THE COUNTY OF ERIE,

                Defendant.

---

## DECLARATION OF NICK J. BRUSTIN, ESQ., IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES AND COSTS

NICK J. BRUSTIN, an attorney admitted to practice in the State of New York, hereby declares, under the penalties of perjury, as follows:

1.     I am a partner of the law firm of Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP ("NSBHF"). I write in support of the application submitted in the above-captioned matter by Plaintiff's counsel, Joel B. Rudin, for reasonable attorneys' fees and costs under 42 U.S.C. Sect. 1988, including a ruling that Mr. Rudin's firm, which has unique expertise in *Monell* litigation, be awarded its normal, as opposed to upstate, hourly rates.

2.     My firm, NSBHF, is based in New York City. We are a four-partner firm. Our practice is devoted almost entirely to civil rights cases involving law enforcement misconduct, including cases involving excessive force, false arrest, malicious prosecution, and due process violations. Our primary focus has been litigating wrongful conviction claims, including claims alleging systemic misconduct by police and prosecutors. We

1

regularly litigate highly complex civil rights cases of these types in federal courts in New York and all around the country. To my knowledge, we are one of the few private law firms in the country that focuses exclusively on Section 1983 individual and systemic law enforcement misconduct claims. Virtually all NSBHF's work is contingency fee civil rights work, and I am familiar with the prevailing market rates charged by firms such as mine, and Mr. Rudin's, which have substantial expertise in federal civil rights litigation.

3.      Since graduating from law school in 1995, I have focused almost exclusively on civil rights litigation and, since 2000, almost exclusively on cases involving individual and systemic police misconduct. Between 1995 and 1997, I served as an Honors Program Trial Attorney with the Civil Rights Division of the U.S. Department of Justice. As a DOJ trial attorney, I worked on a variety of complex civil rights cases including *United States v. Mellete,* a case that resulted in a comprehensive consent decree designed to facilitate the integration of women at The Citadel. From 1997 to 2000, I was affiliated with Beldock Levine & Hoffman, LLP ("BLH") in New York, New York. While at BLH, I litigated and tried a variety of civil rights and employment discrimination cases, including cases involving police misconduct. Since 2000, I have been associated with NSBHF (formerly Cochran Neufeld & Scheck) and have been a member of the firm since 2004. Since 2000, my practice has been devoted almost entirely to civil rights cases involving individual and systemic police misconduct. I have successfully tried many civil rights cases to verdict including numerous wrongful convictions cases involving individual and systemic misconduct and cases involving other types of law enforcement misconduct.

4.      At NSBHF, I have had the opportunity to work with a variety of law firms as

2

co-counsel and opposing counsel in civil rights cases, including lawyers from major law firms and top civil rights lawyers from around the country. I have become familiar both with the prevailing rates charged by these lawyers and the quality of their work. Both through my own experience with him, and through his reputation in the community of civil rights attorneys, I have come to consider Mr. Rudin among the finest civil rights lawyers in the country, especially in the areas of police and prosecutorial misconduct and municipal liability. Based on my own knowledge of Mr. Rudin's work and his reputation, I believe the hourly rates requested by Mr. Rudin for his time and his associates' time are reasonable.

5.      My partners and I have consulted with Mr. Rudin informally in connection with several of our civil rights cases that were based on theories of recovery that he has successfully pursued. NSBHF has sought Mr. Rudin's assistance based on his achievements in litigating novel and difficult civil rights cases involving prosecutorial and police misconduct and especially municipal liability under *Monell*. Indeed, much of the case law in the Second Circuit establishing *Monell* liability for prosecutor misconduct has been developed by Mr. Rudin.

6.      Barry Scheck and Peter Neufeld, my former partners now Of Counsel to our firm also consider him an expert on litigating such claims involving prosecutorial and investigative misconduct. We recently were co-counsel with his firm in two wrongful conviction cases involving police and prosecutorial misconduct allegations. In those cases, we relied heavily on Mr. Rudin in developing our mutual claims of municipal liability for misconduct by a District Attorney's Office. Both cases settled for a high amount.

3

7.    As founders of the Innocence Project, Barry Scheck and Peter Neufeld also have worked often with Mr. Rudin on issues of mutual concern, such as reforming eyewitness identification and police interrogation procedures, guidelines for conviction review units, and disciplinary systems for prosecutorial misconduct.

8.    Mr. Rudin's successes in this field began with *Ramos v. City of New York*, in which, after eight years of litigation, he won what is still the leading appellate decision in New York State holding a municipality liable for a pattern of prosecutorial misconduct and for the failure to discipline prosecutors. *Ramos v. City of New York*, 285 A.D.2d 2001 (1st Dep't 2001). In that case, he succeeded in obtaining discovery concerning the personnel and disciplinary practices of a county District Attorney's Office (the Bronx) that, to my knowledge, no other plaintiff had succeeded in obtaining anywhere else in the country, and then obtained what was at the time the highest wrongful conviction settlement ever in New York State. In *Su v. City of New York*, he prevailed in similar litigation involving the Queens County District Attorney's Office that also resulted in a substantial settlement, and he later prevailed as well in two leading cases involving police and prosecutors in Brooklyn, *Zahrey v. Coffey* and *Jabbar Collins v. City of New York, et al.* In each of these cases, the scope of discovery he succeeded in obtaining about the personnel and disciplinary policies and practices of the county district attorneys was, to my knowledge, unprecedented.

9.    In *Zahrey*, Mr. Rudin won a leading Second Circuit decision upholding individual prosecutorial liability for evidence fabrication and other investigative misconduct, rejecting qualified immunity, and applying broad causation principles in such cases, and then, after an extraordinarily hard-fought case over 11 years, won a substantial settlement for his

4

client and an attorneys' fees award. Our firm frequently cites the *Zahrey* and *Ramos* cases in support of our Section 1983 plaintiffs and we have directly incorporated Mr. Rudin's extraordinary factual record and legal theories from these cases in similar cases we have litigated within and outside New York City.

10.    In the *Jabbar Collins* case, Mr. Rudin, after winning highly unusual federal *habeas* relief for his client after battling for four years, then brought an exceedingly difficult *Monell* claim alleging systemic misconduct by the sitting Brooklyn D.A., Charles J. Hynes. After extensive, hard-fought discovery litigation, he succeeded not only in winning $13 million in damages for his client, but in unearthing a wealth of information about systemic misconduct by Mr. Hynes' office, including *Brady* violations, summation misconduct, and the improper use of hotels to house witnesses against their will, that led to the election of Kenneth J. Thompson as District Attorney and the formation of his Conviction Review Unit ("CRU"), which in turn then overturned approximately two dozen criminal convictions. He has since won extraordinarily large settlements in other cases involving police and prosecutorial misconduct, including $15.45 million for William Vazquez, who also was falsely convicted in Brooklyn and spent 29 years in prison on that conviction before it was overturned by the CRU, and $19 million for Jaythan Kendrick, whose conviction was overturned by the Conviction Review Unit in Queens after he served 26 years in prison.

11.    In *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014)(en banc), Mr. Rudin convinced a Second Circuit panel, and then a majority of the Court sitting *en banc*, to uphold his client's extraordinary lawsuit seeking damages for a *Brady* violation even though, after the vacatur of his initial trial conviction, the client pleaded guilty to a lesser version of

5

the same offense. Mr. Rudin and his co-counsel, Julia Kuan, then settled the action for $2.75 million.

12.     In *Bellamy v. City of New York,* 914 F.3d 727 (2d Cir. 2019), Mr. Rudin defeated the decade-long campaign of the New York City Corporation Counsel's office to convince the courts to reject municipal liability for prosecutorial misconduct. In a resounding opinion by Judge John Walker, a Second Circuit majority not only rejected the City's challenge to *Monell* liability for *Brady* violations but also recognized *Monell* liability for a District Attorney's deliberate indifference to summation misconduct.

13.     Following *Bellamy,* an Albany attorney retained Mr. Rudin to seek *en banc* review of the Second Circuit's adverse decision in *McDonough v. Smith,* 898 F.3d 259 (2d Cir. 2018), dismissing an evidence fabrication lawsuit as untimely because the plaintiff had waited until after his case was dismissed to bring his claim. Mr. Rudin then was co-counsel with Neal Katyal when the latter successfully argued the case to the Supreme Court and won a reversal. *McDonough v. Smith*, 139 S. Ct. 2149 (2019). Following *McDonough,* Mr. Rudin won an important victory in the Second Circuit, convincing the court that the "favorable termination" rule adopted by the Supreme Court in *McDonough* did not require an indication of innocence, just a result that the civil lawsuit does not impugn. *See Smalls v. Collins,* 10 F.4th 117 (2d Cir. 2021).

14.     In 2023, in *Fraser v. City of New York,* 20 CV 4926 (CM)(OTW), Mr. Rudin, together with another small New York City firm, Bloch & White, tried and won a *Monell* claim involving the *Brady* policies of the New York City Police Department. The jury awarded the plaintiff, who had been imprisoned for 1 ½ years, $1.5 million against the City

plus $425,000 in punitive damages against the individual police defendants. The City then settled the case, including $1.7 million in legal fees. To my knowledge, this is the only successful plaintiff's trial verdict in New York City for wrongful conviction under a *Monell* theory.

15.     Based on my experience litigating complex civil rights cases, I am aware of the substantial time commitment a plaintiff's attorney must make in order to achieve success and the ever-present danger of failure, particularly in *Monell* cases. Such cases involve complex depositions and document discovery both to establish the underlying facts of the plaintiff's case, including the bad faith or malice of the defendants, and to overcome difficult defenses such as qualified immunity and lack of causation. Frequently in such cases the amount of time that plaintiff's counsel must reasonably spend is determined by the litigation strategy of defendants' counsel, which plaintiff's counsel, of course, cannot control.

16.     Peter Neufeld referred the Walker and Boyd case to Mr. Rudin, after the clients initially approached our firm, because we already were handling another complex Buffalo matter which was taking up a great deal of our time and resources and because of Mr. Rudin's unique background handling *Monell* claims. I am familiar from my firm's own practice with the law firms that handle plaintiffs' litigation in Buffalo and Western New York and do not believe that any such firm would have had the experience and resources in this unique area of practice to handle this matter successfully. Such a case requires not only challenging the local Police Department and the District Attorney's Office, which would deter a law firm that also has a criminal defense practice, but also an enormous investment of attorney time, costs and expenses. I understand that Mr. Rudin's firm, together with the impressive co-counsel team

7

he assembled, spent many thousands of hours investigating, taking discovery, and trying this case, with no guarantee of success, and spent approximately $500,000 in overall costs and expenses in handling the litigation. Firms like Mr. Rudin's could not take on such a matter if compensated based upon upstate lawyer rates.

17. To begin, the overhead of firms in New York City, including salaries and rent, in particular, is much higher than it is for law firms upstate. Compensation at upstate rates would cover such a firm's overhead, with little if anything left over for profit, and given the inherent uncertainties and risks in this area of law, would discourage future such litigation despite the purpose of the fee-shifting statute to encourage it. To take this case as an example, the County has announced an intention to appeal and, if successful, would deny any compensation to Mr. Rudin and his co-counsel while requiring additional outlays for a re-trial. It would be very difficult for a New York City law firm to take on such risks in the future if the compensation was at upstate rates.

18. I am informed that Mr. Rudin has made an application for fees for his services in the amount of $950 per hour. Considering Mr. Rudin's professional qualifications, reputation, and experience, as well as the rates charged by myself and other similarly experienced and successful civil rights attorneys, I believe his rate is, if anything, below market for his specialized services. Also reasonable are the rates he is requesting for his senior associates and paralegal. These rates are well within the norm in such matters for attorneys of similar experience.

19. NSBHF charges comparable rates to Mr. Rudin's firm. Although we rarely have had to seek court assistance to obtain our fees in NSBHF settlements and judgments, we

8

have received comparable hourly rates where such formal fee applications have had to be made following wrongful conviction trials. For example, in 2023, in *Rosario v. City of New York,* 2023 WL 2523624, No. 18-cv-4023 (S.D.N.Y.), which I tried with a number of partners and associates in my firm, Judge Schofield awarded a total of $4,008,544.50 in attorneys' fees and costs for our approximately 7,906 hours of work, including $900 per hour for my time, $800 per hour for my partners, $425-450 per hour for senior associates, $325-400 for associates, and $200 per hour for paralegal time. In 2015, in *Restivo and Halstead v. Nassau County, et al.,* 2015 WL 7734100, No. 06-cv-6720 (E.D.N.Y.), in the Eastern District of New York, the court (Seybert, D.J.) awarded $4,997,914.55 in attorneys' fees and costs for our approximately 11,000 hours of work. Although the case was in the Eastern District of New York and tried in Suffolk County, the court awarded fees based on Southern District of New York rates, including a rate of $700/hour for partner Peter Neufeld, a rate of $700/hour for partner Barry Scheck, and a rate of $600/hour for myself, as well as junior partner and associate rates as high as $500/hour and $400/hour, respectively. Of course, these rates were awarded nine years ago and presumably would be much higher now in present dollars.

20. As a civil rights litigator who works almost exclusively on a contingency fee basis, I believe that it is extremely important for civil rights attorneys to be compensated at full market rates for their time. Firms such as my own, and Mr. Rudin's, which devote substantial parts of their practice to law enforcement misconduct and civil rights litigation, must be fairly compensated at these rates in order to ensure that high-quality representation in these critical areas remains available. These are difficult, risky cases that sometimes end in failure, either through dismissal by the court or an unfavorable verdict. Plaintiffs must

9

overcome contrary testimony by police defendants and prosecutors to persuade fact finders to credit their testimony, even though they usually are inexperienced witnesses and have criminal records, over that of government officials. In cases that end in failure or limited success, the plaintiff's counsel may be paid little or nothing for hundreds or thousands of hours of time and after the investment of tens of thousands of dollars in expenses. Section 1983 litigation has the laudable purpose of exposing official misconduct, deterring it in the future, and bringing about institutional reform, and it is essential that high-quality attorneys be adequately compensated for their efforts so that they are not discouraged from pursuing such matters.

21.    Finally, it is especially important to award attorneys' fees at counsel's full rate where the defendants have litigated the case all the way through trial and forced the plaintiff's counsel to put aside all other work in the buildup to trial and the trial itself while taking on an even greater risk in investment of time and expense.

_____
NICK J. BRUSTIN

Dated:        May 2/, 2025
              New York, New York

10