**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| JOHN WALKER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:22-cv-520** |
| | ) | |
| - against - | ) | |
| | ) | |
| COUNTY OF ERIE, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION**
**FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

FACTS .........................................................................................................................1

ARGUMENT ................................................................................................................3

I. THE GOVERNING LEGAL PRINCIPLES MAKE IT EXCEEDINGLY DIFFICULT FOR THE COUNTY TO PREVAIL..........................................................3

    A. As the party seeking to overturn a jury verdict, the County bears a very heavy burden. ...........................................................................................3

    B. The County's motion must be denied if there is sufficient evidence for the *Brady* claim or the summation-misconduct claim, under either a widespread-practice theory or a deliberate-indifference theory. .........................3

    C. Arguments not specifically raised in the County's Rule 50(a) motion are waived. .........................................................................................................6

II. A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR A *BRADY* VIOLATION. ...............................................................................................6

    A. A reasonable juror could find that the prosecutors handling Walker's criminal case violated *Brady*...............................................................................7

    B. A reasonable juror could find that the *Brady* violations in Walker's case were caused by County policy, custom, or practice.............................................9

III. A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR SUMMATION MISCONDUCT. ...............................................................................29

    A. A reasonable juror could find that ADA Henry committed summation misconduct. .........................................................................................................29

    B. A reasonable juror could find that ADA Henry's summation misconduct was caused by County policy, custom, or practice. ...........................................33

CONCLUSION............................................................................................................40

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Advance Pharmaceutical, Inc. v. United States*,
    391 F.3d 377 (2d Cir. 2004)....................................................................................4

*AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*,
    386 F. App'x 5 (2d Cir. 2010) ...............................................................................4

*Amnesty America v. Town of West Hartford*,
    361 F.3d 113 (2d Cir. 2004)............................................................................25, 26

*Batista v. Rodriguez*,
    702 F.2d 393 (2d Cir. 1983)..................................................................................20

*Bellamy v. City of New York,*
    914 F.3d 727 (2d Cir. 2019)............................................................................29, 31

*Benitez v. Lopez*,
    372 F. Supp. 3d 84 (E.D.N.Y. 2018) ....................................................................23

*Bordanaro v. McLeod*,
    871 F.2d 1151 (1st Cir. 1989)...............................................................................27

*Boyd v. City of Buffalo*,
    2025 WL 92362 (W.D.N.Y. Jan. 14, 2025).........................................................10

*Buari v. City of New York*,
    530 F. Supp. 3d 356 (S.D.N.Y. 2021)..................................................................26

*Cash v. County of Erie*,
    654 F.3d 324 (2d Cir. 2011)...............................................................................3, 25

*Chepilko v. City of New York*,
    2012 WL 398700 (E.D.N.Y. Feb. 6, 2012)...........................................................23

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014).....................................................................................5

*City of Canton v. Harris*,
    489 U.S. 378 (1989)..............................................................................................25

*Connick v. Thompson*,
    563 U.S. 51 (2011).................................................................................................19

*Ferrari v. County of Suffolk*,
2013 WL 4017022 (E.D.N.Y. Aug. 6, 2013),
*rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016)............................................................17

*Floyd v. City of New York*,
813 F. Supp. 2d 417 (S.D.N.Y. 2011),
*on reconsideration* 813 F. Supp. 2d 457 (S.D.N.Y. 2011) ................................................22

*Garnett v. Undercover Officer C0039*,
838 F.3d 265 (2d Cir. 2016)...................................................................................................3

*Gentile v. County of Suffolk,*
926 F.2d 142 (2d Cir. 1991)...........................................................................................22, 27

*Giglio v. United States*,
405 U.S. 150 (1972)..............................................................................................................13

*Gleeson v. County of Nassau*,
2019 WL 4754326 (E.D.N.Y. Sept. 30, 2019) ....................................................................23

*Gravelet-Blondin v. Shelton*,
728 F.3d 1086 (9th Cir. 2013) ..............................................................................................17

*Greene v. City of New York*,
742 F. App'x 532 (2d Cir. 2018) ..........................................................................................20

*Griffin v. United States*,
502 U.S. 46 (1991)..................................................................................................................4

*Hayvin Gaming, LLC v. Workinman Interactive, LLC*,
2024 WL 2702202 (W.D.N.Y. May 24, 2024)......................................................................6

*Houston v. Cotter*,
2016 WL 1253391 (E.D.N.Y. Mar. 30, 2016) .......................................................................4

*Indu Craft, Inc. v. Bank of Baroda*,
47 F.3d 490 (2d Cir. 1995)......................................................................................................4

*Isaac v. City of New York*,
2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018),
*report and recommendation adopted*, 2018 WL 4583481 (Sept. 24, 2018).....................21

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000)....................................................................................................33

*Jenkins v. Artuz*,
294 F.3d 284 (2d Cir. 2002)............................................................................................31, 32

*Jones v. City of New York*,
    603 F. App'x 13 (2d Cir. 2015) ......................................................................11

*Jones v. Town of East Haven*,
    493 F. Supp. 2d 302 (D. Conn. 2007),
    *rev'd on other grounds*, 691 F.3d 72 (2d Cir. 2012)...................................22, 23

*Jones v. Town of East Haven*,
    691 F.3d 72 (2d Cir. 2012).....................................................................10, 20, 25

*Leevson v. Aqualife USA Inc.*,
    770 F. App'x 577 (2d Cir. 2019) ......................................................................6

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012)...............................................................................6

*Lucente v. County of Suffolk*,
    980 F.3d 284 (2d Cir. 2020)........................................................................10, 22

*Martinez v. Port Authority of N.Y. & N.J.*,
    2005 WL 2143333 (S.D.N.Y. Sept. 2, 2005)....................................................11

*Matusick v. Erie County Water Authority*,
    757 F.3d 31 (2d Cir. 2014)...............................................................................37

*McCants v. City of Newburgh*,
    2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014)..................................................23

*Melvin v. County of Westchester*,
    2016 WL 1254394 (S.D.N.Y. Mar. 29, 2016) ..................................................23

*Miller v. County of Monroe*,
    2024 WL 2804435 (W.D.N.Y. May 31, 2024).............................................20, 21

*Morse v. Fusto*,
    804 F.3d 538 (2d Cir. 2015)........................................................................3, 4, 5

*Mosca v. City of New York*,
    2019 WL 938936 (E.D.N.Y. Feb. 25, 2019)....................................................20

*Moses v. Westchester County Dep't of Correction*,
    2017 WL 4386362 (S.D.N.Y. Sept. 29, 2017)..................................................23

*O'Neal v. City of New York*,
    196 F. Supp. 3d 421 (S.D.N.Y. 2016)..............................................................20

*Ortiz v. Stambach*,
    137 F.4th 48 (2d Cir. 2025) ...............................................................................3

*Parkinson v. Desormeau,*
   2024 WL 4973490 (E.D.N.Y. Dec. 4, 2024) .............................................................21, 23

*People v. Balsano,*
   51 A.D.2d 130 (4th Dep't 1976)..................................................................................35

*People v. Colon,*
   13 N.Y.3d 343 (2009) ..................................................................................................31

*People v. Donaldson,*
   49 A.D.2d 1004 (4th Dep't 1975)................................................................................35

*People v. Herlan,*
   99 A.D.2d 647 (4th Dep't 1984)..................................................................................35

*People v. Ivey,*
   83 A.D.2d 788 (4th Dep't 1981)............................................................................35, 36

*People v. Johnson,*
   62 A.D.2d 555 (4th Dep't 1978)............................................................................35, 36

*People v. Keller,*
   67 A.D.2d 153 (4th Dep't 1979)..................................................................................35

*People v. Vance,*
   89 A.D.2d 347 (4th Dep't 1982)..................................................................................35

*Poventud v. City of New York,*
   750 F.3d 121 (2d Cir. 2014) (en banc).........................................................................7

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC,*
   193 F. Supp. 3d 133 (N.D.N.Y. 2016).........................................................................4

*Rasmussen v. City of New York,*
   766 F. Supp. 2d 399 (E.D.N.Y. 2011) ........................................................................24

*Rivera v. City of New York,*
   594 F. App'x 2 (2d Cir. 2014) ......................................................................................6

*Rodriguez v. County of Westchester,*
   2017 WL 11802 (S.D.N.Y. Jan. 11, 2017) .................................................................23

*Russo v. City of Bridgeport,*
   479 F.3d 196 (2d Cir. 2007)..........................................................................................2

*Silva v. San Pablo Police Dep't,*
   805 F. App'x 482 (9th Cir. 2020) ...............................................................................17

- v -

*Sorlucco v. New York City Police Dep't,*
    971 F.2d 864 (2d Cir. 1992)......................................................................................18

*Sornberger v. City of Knoxville,*
    434 F.3d 1006 (7th Cir. 2006) ................................................................................17

*Su v. Filion,*
    335 F.3d 119 (2d Cir. 2003)...............................................................................31, 32

*Torcivia v. Suffolk County,*
    17 F.4th 342 (2d Cir. 2021) ....................................................................................10

*United States v. Agurs,*
    427 U.S. 97 (1976)...................................................................................................14

*Vann v. City of New York,*
    72 F.3d 1040 (2d Cir. 1995)...........................................................................25, 26, 27

*Vassiliou v. City of New York,*
    2021 WL 76916 (E.D.N.Y. Jan. 7, 2021) ..............................................................24

*Walker v. City of New York,*
    974 F.2d 293 (2d Cir. 1992)..............................................................................20, 26

**INTRODUCTION**

Forty-eight years after he was wrongfully convicted for the murder of William Crawford, Plaintiff John Walker, Jr. won a jury verdict finding Defendant County of Erie (the "County") liable for violating his constitutional rights and awarding him $28 million in compensatory damages. The County now asks the Court to annul the jury's verdict and declare it the winner, based on meritless arguments that this Court has already rejected or that the County waived by omitting them from its previous motion for a directed verdict, brought under Federal Rule of Civil Procedure 50(a). The County's motion should be denied.

**FACTS**

The parties went to trial on a *Monell* claim alleging that (i) the prosecutors handling Walker's 1977 criminal case denied him a fair trial by committing *Brady* violations and engaging in summation misconduct; and (ii) these constitutional violations were caused by one or more unlawful practices, policies, or customs within the Erie County District Attorney's Office (the "widespread-practice theory"), and by District Attorney Edward Cosgrove's deliberate indifference to such misconduct as evidenced by Cosgrove's failure to impose discipline (the "deliberate-indifference theory"). Walker's evidence of the County's unlawful policies, customs, and practices and deliberate indifference (the "*Monell* evidence") included, among other evidence, admissions made by Cosgrove, former ADAs Timothy Drury and David Henry, and County expert Kevin Gagan, testimony from attorney James McLeod, and documentary evidence from the trials of co-defendants Darryn Gibson and Darryl Boyd. The *Monell* evidence also included judicial decisions finding that Erie County District Attorney's Office ("ECDAO" or "Office") prosecutors had committed *Brady* violations and summation misconduct in other contemporaneous criminal cases (the "other-case evidence").

On March 31, 2025, upon the close of Walker's proof, the County moved for a directed verdict under Rule 50(a), arguing that the other-case evidence could not support *Monell* liability. Dkt. 342; Dkt. 342-1.[1] The Rule 50(a) motion ignored the admissions supporting *Monell* liability. *See generally* Dkt. 342-1. The Court denied the motion. Trial Tr. 2126:13–19.[2]

On April 8, 2025, after hearing three weeks of proof and counsels' summations, the jury unanimously found that: (i) the prosecutors handling Walker's criminal case violated his right to a fair trial by withholding *Brady* material; (ii) these *Brady* violations were caused by County policy, custom, or practice; (iii) ADA David Henry violated Walker's right to a fair trial by engaging in summation misconduct; (iv) Henry's summation misconduct was caused by County policy, custom, or practice; (v) Walker was entitled to $28 million in compensatory damages; and (vi) no apportionment of damages should be attributed to certain City of Buffalo police officers. *See* Dkt. 366.

On May 20, 2025, the County moved for a directed verdict under Rule 50(b), *see* Dkt. 384, and separately moved for a new trial or remittitur under Rule 59, *see* Dkt. 383.

---

[1] The notation "Dkt. __" refers to documents filed in *Walker v. County of Erie*, No. 22-CV-520 (W.D.N.Y.). Pinpoint citations generally refer to the cited document's internal page numbering, but the notation "ECF p. __" refers to the page numbers contained in the CM-ECF banner at the top of the page. The notation "Trial Tr." refers to the transcript of Walker's civil-rights trial.

[2] The Court granted a directed verdict in favor of the County to the extent that Walker's *Monell* claim rested on a failure to disclose favorable material as required by *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007). Trial Tr. 2126:13–19.

**ARGUMENT**

I. **THE GOVERNING LEGAL PRINCIPLES MAKE IT EXCEEDINGLY DIFFICULT FOR THE COUNTY TO PREVAIL.**

A. **As the party seeking to overturn a jury verdict, the County bears a very heavy burden.**

A party seeking a directed verdict under Rule 50 bears "a heavy burden," and "[t]hat burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (cleaned up). A district court reviewing a Rule 50(b) motion "may not make credibility determinations or weigh the evidence," "must draw all reasonable inferences in favor of the nonmoving party," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016) (cleaned up). Having thus construed the evidence in the non-movant's favor, the Court must uphold the jury's verdict unless there is "a complete absence of evidence" to support it, or "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (cleaned up); *see also id*. at 550 (courts may not upset verdicts merely because they "feel that other results are more reasonable." (cleaned up)).

B. **The County's motion must be denied if there is sufficient evidence for the *Brady* claim or the summation-misconduct claim, under either a widespread-practice theory or a deliberate-indifference theory.**

The jury found the County liable for *Brady* violations and summation misconduct. *See* Dkt. 366. Because these distinct constitutional violations produced the same injury—Walker's wrongful conviction and imprisonment—the County cannot prevail on its Rule 50(b) motion unless it is entitled to judgment as a matter of law on both claims. *See, e.g.*, *Ortiz v. Stambach*, 137 F.4th 48, 66 (2d Cir. 2025).

The same principle applies to the two theories of *Monell* liability presented to the jury, even though those theories were not itemized on the verdict form. It has long been settled that even when a defense request for special interrogatories is denied, "a general jury verdict [i]s valid so long as it [i]s legally supportable on one of the submitted [theories of liability]," because, even if an alternative theory lacked sufficient evidentiary support, the jury is presumed to have relied on the theory supported by sufficient evidence. *Griffin v. United States*, 502 U.S. 46, 48–49, 59 (1991); *see Advance Pharm., Inc. v. United States*, 391 F.3d 377, 391 (2d Cir. 2004) (same); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 193 F. Supp. 3d 133, 140–41 (N.D.N.Y. 2016) (same). Thus, in *Houston v. Cotter*, 2016 WL 1253391 (E.D.N.Y. Mar. 30, 2016), then-District Judge Bianco held that where the verdict form posed a general question on *Monell* liability, sufficient evidence as to either a widespread-practice theory or a deliberate-indifference theory required denial of a Rule 50(b) motion. *Id.* at *6 & n.7, 9 (citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995)).[3]

---

[3] For the sake of completeness and to avoid any potential confusion, we note that under a separate doctrine known as the general-verdict rule, a defendant can seek a *new trial* on the ground that (i) one of the plaintiff's theories of liability should not have been submitted to the jury; (ii) the verdict form does not indicate which theory of liability the jury relied upon; and (iii) the defendant properly requested, in accordance with FED. R. CIV. P. 51, a verdict form itemizing each theory of liability. *See Morse*, 804 F.3d at 550–53.

However, it is the *Griffin* doctrine discussed above that applies here, not the general-verdict rule, for several reasons. *First*, the County's Rule 50(b) motion seeks a directed verdict in its favor, not a new trial. *Second*, neither of the County's post-verdict motions invokes the general-verdict rule, so any such argument is forfeited. *Third*, the County could not have invoked the general-verdict rule anyway because it did not, prior to the jury receiving the case, attack the legal validity of Walker's claims, but only the sufficiency of the trial evidence. *See generally* Dkt. 342-1; *see AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 386 F. App'x 5, 8 (2d Cir. 2010) (defendant "cannot rely on the general verdict rule" to seek a new trial where its Rule 50(a) motion "did not argue to the district court that any of Plaintiffs' theories of liability . . . were invalid as a matter of law," but instead "limit[ed] its arguments to whether the trial evidence was sufficient to support Plaintiffs' theories"). *Fourth*, the County could not have invoked the general-verdict rule for the additional reason that, as explained more fully in Walker's Rule 59 opposition, it did not properly

The County accepts that its Rule 50(b) motion must be denied if *any* reasonable juror could have found it liable on *any* combination of constitutional and *Monell* theories, *see* Dkt. 384-1 ("Mem.") at 3–5, 39–40, but seeks to downplay the weight of the burden imposed, *id.* at 4. To see the error in such minimization, consider Andre Hough's recantation of February 11, 1976. A reasonable juror could conclude (and the County's post-verdict motions do not dispute) that Hough's recantation was favorable to Walker, was not disclosed to Walker's counsel, and, given the weakness of the prosecution's case, was material. A reasonable juror could also conclude that the County was the moving force behind this *Brady* violation. Henry admitted to having "made the judgment" that, due to "the circumstances," Hough's recantation "was not truly a recantation" but was mere "waffling," such that he (Henry) was "not required to disclose [it]" under *Brady*. Trial Tr. 2041:5–2043:3. Henry also testified that he "learned about *Brady* from the [ECDAO] appeals bureau and from Joseph McCarthy, the first assistant," *id.* at 2026:8–9, and that his decision to withhold Hough's recantation was "consistent with the training [he] received at the DA's Office," *id.* at 2043:12–22. The County's expert likewise admitted that "prosecutors in Erie County in 1976 and 1977" made a practice of withholding statements exactly like Hough's recantation, on the ground that "inner-city" witnesses invariably lie to the police—a plainly unlawful practice of *Brady* suppression. *Id.* at 1344:20–1348:25; PX 292-A, 137:20–138:16, 225:23–226:8 (pp. 19–22).[4] So, while Walker's proof obviously goes well beyond the Hough recantation, and while this

---

request a verdict form itemizing each *Monell* theory submitted to the jury. *See Morse*, 804 F.3d at 550–53 (failure to request itemized verdict form with the specificity and legal argumentation that Rule 51 requires waives reliance on the general-verdict rule). *Finally*, the general-verdict rule does not compel a new trial where the court can be "reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support." *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014) (cleaned up).

[4] Citations to PX or DX numbers refer to exhibits admitted in evidence at Walker's civil-rights trial.

memorandum comprehensively addresses Walker's proof, it is worth remembering that what we have just said about Hough's recantation—and we could have made the same point with the Larry Watson evidence, the footprints photograph, and so on—is reason enough to deny the Rule 50(b) motion.

## C.   Arguments not specifically raised in the County's Rule 50(a) motion are waived.

Because a Rule 50(b) motion is simply the renewal of a Rule 50(a) motion, any arguments not specifically raised in the Rule 50(a) motion are waived and may not be raised in a Rule 50(b) motion or on appeal. *See Lore v. City of Syracuse*, 670 F.3d 127, 152–53 (2d Cir. 2012); *see also Leevson v. Aqualife USA Inc.*, 770 F. App'x 577, 580–81 (2d Cir. 2019) (reversing district court for setting aside verdict based on argument not raised in Rule 50(a) motion); *Rivera v. City of New York*, 594 F. App'x 2, 6 (2d Cir. 2014) (same). The "specificity requirement is obligatory," and "[a] Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." *Lore*, 670 F.3d at 152 (cleaned up). As discussed in more detail below, many of the County's Rule 50(b) arguments were not raised in the Rule 50(a) motion, and so are waived.[5]

## II.   A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR A *BRADY* VIOLATION.

Construed in Walker's favor, the trial evidence amply supports the jury's findings that the prosecutors handling Walker's criminal case violated *Brady*, and these *Brady* violations were caused by County policy, custom, or practice.

---

[5] Waiver may be excused only "to prevent manifest injustice." *Lore*, 670 F.3d at 153. The County does not argue that the manifest-injustice exception applies, and it is now foreclosed from doing so, *see, e.g.*, *Hayvin Gaming, LLC v. Workinman Interactive, LLC*, 2024 WL 2702202, at *5 (W.D.N.Y. May 24, 2024) (issues raised for the first time in reply are waived). In any event, there is no manifest injustice here for the reasons set forth below.

**A.**    **A reasonable juror could find that the prosecutors handling Walker's criminal case violated *Brady*.**

A *Brady* violation occurs when a prosecutor intentionally or inadvertently withholds evidence that is favorable to the criminal defendant (either because it is impeaching or because it is exculpatory) and the withheld evidence is material to the outcome of the case. *See Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Here, the proof of each of these elements, which the County's motion does not challenge, was overwhelming.

The prosecution's proof at Walker's criminal trial in 1977 consisted of testimony by Tyrone Woodruff claiming he witnessed Walker and their other three friends committing the robbery-homicide of Crawford; Andre Hough accusing Walker of being present at a meeting at the Glenny Drive Projects, prior to the crime, where their friend Darryn Gibson discussed getting money that night; and Joseph Tatar, a jailhouse informant, claiming Walker confessed his involvement to him. In addition, several witnesses whom the prosecution described as giving consistent, unimpeachable testimony, *see* PX 83 (*People v. Walker* Trial Tr.) at 132:18–133:18 (pp. 336–37),[6] contributed to the case, including Sgt. Gerald Dove, who testified he saw no footprints in the backyard of Crawford's house or adjoining properties, *id.* at 75:21–76:20 (pp. 75–76), and Larry Watson, who testified that Crawford left the Golden Nugget Bar at the same time he did, *id.* at 51:13–54:1 (pp. 51–54). Measured against this record, the 21 items of *Brady* evidence plainly were both favorable and material. The evidence included, but was not limited to, the following:

1.    Undisclosed police reports and witness statements which, read together, showed that Woodruff and Walker left the Glenny Drive Projects in a Fillmore Cab Company taxi about 11:28 p.m. to go home and that this was *before* Crawford either left the bar or arrived at his house, impeaching Woodruff's testimony that he was

---

[6] The page numbering of the *People v. Walker* criminal trial transcript, PX 83, restarts on page 205 of the pdf. For clarity, we cite the original transcript page and line number, followed by the pdf page.

present for and observed Walker and their friends committing the crime and supporting an alibi defense for Walker. *See* Trial Tr. 1434:23–1443:1 (Zeidman); PX 6, 14, 29; DX 500.16, 500.32.

2. Undisclosed police reports and Drury's own notes which showed that Woodruff and Hough were repeatedly coerced, recanted, and conformed their stories after being induced to do so by police, and that Hough refused to take a polygraph examination after changing his story. *See* Trial Tr. 1409:25–1414:18, 1416:3–1420:1, 1420:18–1427:4, 1427:12–1429:12, 1433:7–1434:17, 1449:25–1452:22 (Zeidman); Trial Tr. 996:2–997:3, 1102:23–1106:22, 1114:9–1115:19, 1117:19–1119:15 (Drury); PX 31, 33, 46, 47, 48, 54, 300.

3. Interviews at Simpson's Store contradicting Woodruff's account that the five boys were outside the Store just before the assault occurred and contradicting Hough's account that Boyd flashed money while visiting the Store the next day. *See* Trial Tr. 1431:11–1432:24 (Zeidman); PX 44.

4. Evidence that Tatar was promised Youthful Offender status in exchange for his testimony against Walker. *See* Trial Tr. 1336:15–1338:21, 1453:6–1454:1 (Zeidman); PX 302.

5. Police crime-scene photographs showing footprints in the backyard of Crawford's property leading towards Larry Watson's property, which impeached Dove's testimony and supported a third-party culpability defense, *see* Trial Tr. 1399:25–1402:13 (Zeidman); Trial Tr. 548:9–551:9 (McLeod); Trial Tr. 2162:13–19 (Henry); PX 88A, 88B, and showing an absence of drag marks in the driveway of Crawford's property, which impeached Woodruff's testimony, *see* 551:14–553:1 (McLeod); Trial Tr. 1430:19–1431:10 (Zeidman).

6. Evidence pointing towards Larry Watson and/or Jerome Boyd as the assailants, which impeached Watson and Woodruff while establishing a third-party culpability defense that exculpated Walker. *See* Trial Tr. 1380:19–1386:1, 1392:2–1396:21, 1399:25–1403:17, 1403:25–1406:2, 1406:10–1407:8, 1407:16–1409:15, 1445:8–1447:5 (Zeidman); PX 6, 7, 8, 9, 18, 29, 53; DX 500.16.

A reasonable juror could easily find that this favorable and material evidence was not disclosed to Walker's defense attorney, David Jay. Drury admitted he had no record or memory of disclosing any of these items during pretrial proceedings that he conducted on behalf of the Office and disclosed none of them to Walker's counsel. *See* Trial Tr. 1018:20–1029:1, 1030:25–1041:15, 1042:18–23, 1073:8–1083:15, 1087:22–1089:2, 1106:14–1107:18, 1124:22–1125:8. Henry conceded that he made a record of evidence he disclosed under *Brady* or *Rosario* but had no record

or memory of disclosing any of the above material, and did not recall disclosing *any Brady* material. *See* Trial Tr. 1951:8–1953:18, 1971:11–1972:1, 2004:24–2011:3, 2028:14–2031:1, 2088:20–24; PX 264-A, 226:1–227:10 (pp. 37–38). The hearing and trial transcripts do not show that any of the above items were disclosed to Walker's counsel. *See* Trial Tr. 1454:2–24, 1456:18–25 (Zeidman). The documents bear no exhibit markings from Walker's trial. *See* Trial Tr. 1383:9–19, 1390:13–22, 1396:22–1397:5, 1403:18–24, 1406:3–9, 1407:9–15, 1409:16–24, 1414:19–1416:2, 1420:2–17, 1427:5–11, 1430:11–18, 1432:25–1433:6, 1436:6–12, 1441:13–17, 1447:16–23, 1452:23–1453:5. And, as Professor Zeidman testified, while a reasonably competent criminal defense attorney would have used these materials if they had been disclosed to him, the Walker trial transcript shows that Jay did not use them, thereby implying he did not have them.[7] *See* Trial Tr. 1455:7–10, 1563:22–25.

**B.    A reasonable juror could find that the *Brady* violations in Walker's case were caused by County policy, custom, or practice.**

There was also ample evidence allowing a reasonable juror to find that the numerous, egregious *Brady* violations committed in Walker's criminal case were caused by County policy, custom, or practice. As noted above, Walker advanced a widespread-practice theory (arguing that the County had a de facto policy, custom, and widespread practice of failing to disclose *Brady* material) and a deliberate-indifference theory (arguing that County policymakers were deliberately indifferent to the commission of *Brady* violations by line prosecutors). Both theories were supported by direct and circumstantial evidence.

---

[7]That 4 of the 21 items were disclosed to *Gibson's* counsel in the middle of the Gibson trial, and retrieved by Drury, as Drury admitted, does not prove that the content of even these 4 documents was known to *Walker*'s counsel.

In arguing that Walker failed to meet his burden of proving an unlawful policy, custom, or practice, *see* Mem. at 25–28, the County fixates on Walker's other-case evidence, claiming (incorrectly) that Walker cannot prove *Monell* liability because he did not present a sufficient number of prior, similar cases of *Brady* violations and summation misconduct. This argument ignores all of the powerful direct evidence that Walker presented at trial (and that the Court relied upon when denying the County's Rule 50(a) motion). This direct evidence, standing alone, is more than sufficient to establish *Monell* liability, and the other-case evidence further strengthens Walker's proof.

### 1.     The ECDAO's policy, custom, or practice of violating Brady.

#### a.     The law on widespread-practice liability.

As this Court noted in denying summary judgment, "[i]t is well settled that a policy or custom can be found in an act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker … but is so widespread as to have the force of law," where "widespread" means "common or prevalent throughout the entity." *Boyd v. City of Buffalo*, 2025 WL 92362, at *11 (W.D.N.Y. Jan. 14, 2025) (cleaned up). For a plaintiff to prevail on a widespread-practice theory, "actual notice by the policymakers need not be proven." *Lucente v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020). Rather, liability may be imposed if unconstitutional acts "were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities *must have been aware*." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (emphasis added).

The County claims that a plaintiff presenting a widespread-practice theory must put forth "a sufficient record of prior misconduct that was tolerated over time," apparently meaning that a plaintiff must identify specific instances of misconduct going back many years. Mem. at 24. The County points to no case that stands for this proposition, and it is plainly incorrect. In *Torcivia v.*

*Suffolk County*, 17 F.4th 342 (2d Cir. 2021), for example, the Second Circuit held that the existence of a practice could be established merely through a single police officer's deposition testimony describing the municipality's "standard procedure." *Id.* at 355–56 & n.20; *see also Jones v. City of New York*, 603 F. App'x 13, 15 (2d Cir. 2015) (suggesting that police officer's deposition testimony acknowledging "[t]hat is what we do" "could support a finding of custom or policy under *Monell*"); *Martinez v. Port Auth. of N.Y. & N.J.*, 2005 WL 2143333, at \*7 (S.D.N.Y. Sept. 2, 2005) ("jury was entitled to credit [plaintiff's] testimony [that police officer admitted there was an arrest quota] as establishing that the Port Authority had a custom of performing public lewdness arrests pursuant to a quota"). As discussed below, similar admissions of standard procedure appear throughout the trial record in this case.

> b.    *ADA Drury and ADA Henry admitted that their non-disclosure decisions in Walker's case reflected County policy, custom, and practice.*

Former District Attorney Cosgrove testified that he did not have a written *Brady* policy, but he trusted his staff to conform to the policies he set for the Office. PX 274-A, 62:13–21, 84:20–85:20. The ADAs who prosecuted Walker essentially conceded that the ECDAO's *Brady* policies, customs, and practices caused them to withhold *Brady* material from Walker's counsel. ADA Drury, the lead prosecutor who was in charge of all pretrial *Brady* disclosures as well as *Brady* compliance during the Gibson and Boyd trials, testified that he tried to conform with ECDAO *Brady* policies; that he did not withhold anything he believed ECDAO policy or practice required him to disclose; that any decision he made not to disclose information under *Brady* was consistent with ECDAO policy and practice; and that in connection with the Gibson and Boyd trials, he tried to conform to his understanding of the Office's *Brady* policies. Trial Tr. 974:15–17, 975:14–976:6. ADA Henry made similar admissions tending to show that his decisions to withhold *Brady* material were based upon the Office's, policy, custom, and practice. Trial Tr. 2013:17–2017:21,

- 11 -

2021:2–2024:11, 2026:5–13, 2040:2–2043:22, 2048:22–2064:25; PX 264-A, 218:4–21, 353:10–355:11 (pp. 17, 84–86); PX 264-B, 222:23–223:12 (pp. 5–6).

Further indicating that ADA Henry's views of his *Brady* obligations were also the County's, the County designated him as its Rule 30(b)(6) witness in this case, notwithstanding the contents of the trial record and the allegations against him in Walker's Amended Complaint, and as its representative at this trial. On top of that, the County's attorneys argued that Henry made "no procedural error," Trial Tr. 92:22–24, thereby adopting his testimony that none of the material he withheld had to be disclosed under *Brady,* and it elected to present Gagan's testimony that Henry did not do anything wrong and properly understood his *Brady* obligations, *id.* at 2273:9–15. Plainly, Henry's actions were consistent with the County's own views, which continue to this day.

The County's Rule 50(b) motion tries to remedy the Cosgrove, Drury, Henry, and Gagan admissions by selectively citing *other* testimony more favorable to the County's position. *See* Mem. at 31, 33–34. But the County waived such arguments by failing to raise them in its Rule 50(a) motion. *See supra* § I.C. Moreover, the County's arguments impermissibly construe the evidence in the light most favorable to itself. The jury was entitled to, and doubtless did, reject the self-serving trial testimony given by Cosgrove, Drury, Henry, and Gagan, while crediting their previous, sworn admissions.

The County's Rule 50(b) motion also argues that Drury's disclosure of some *Brady* material during the Gibson trial (4 of the 21 pieces) "was consistent with the view that disclosure was required." Mem. at 33. But again, this argument is waived because the County did not raise it in the Rule 50(a) motion, and it is meritless because it impermissibly construes the evidence in the County's favor. The jury was entitled to reject the inference the County proposes. The record

shows that Drury, under pressure from defense counsel during trial, disclosed three police reports and a signed handwritten statement as *Rosario* material. In belatedly disclosing the four items of *Rosario* material solely to Gibson's counsel, he referred to just one of the reports as "possibly" *Brady* material while never identifying as *Brady* material any of the information contained in these documents that Walker relies on. PX 74 (*People v. Gibson* Trial Tr.), 181:16–182:15, 184:6–20 (pp. 191–92, 194). This mid-trial disclosure was far too late to be used effectively even by Gibson's counsel (a *Brady* violation in itself). Meanwhile, Drury entirely withheld 17 additional pieces of *Brady* material from Gibson and all 21 pieces from Boyd at the next trial. A juror could easily find this evidence indicative of an Office practice *against* disclosure.

In short, based solely on the testimony of Cosgrove, Drury, and Henry, a reasonable juror could find that the *Brady* violations committed in Walker's case were caused by ECDAO policy, custom, or practice.

> c. *Direct evidence established that ECDAO prosecutors unlawfully limited Brady to exculpatory evidence.*

In addition to the testimony of County witnesses effectively conceding Walker's widespread-practice theory, Walker presented ample direct evidence establishing three specific *Brady* practices that caused the *Brady* violations in his case. Specifically, the ECDAO unlawfully limited *Brady* to exculpatory evidence and withheld impeachment evidence; it withheld *Brady* material not specifically requested by the defense; and it withheld *Brady* evidence, no matter how favorable to the defense, that the prosecutor subjectively disbelieved. We begin with the first of these illegal practices.

In *Giglio v. United States*, decided five years before Walker's criminal trial, the Supreme Court held that the *Brady* rule includes impeachment evidence. 405 U.S. 150, 154–55 (1972). Despite this requirement, the evidence at trial supports a finding that much of the *Brady* evidence

at issue in this case was not disclosed because of an Office policy, custom, and practice limiting *Brady* to exculpatory evidence. Kevin Gagan's deposition testimony, admitted as an adoptive admission of the County, conceded that in the 1970s and 1980s, the ECDAO limited *Brady* to exculpatory evidence. PX 292-A, 208:18–209:20 (pp. 17–18). Henry, deposed as a County representative under Rule 30(b)(6), was asked about the scope of the *Brady* obligation in 1977 and responded: "[p]rosecutors had an obligation to turn over information that – that tended to be useful to the defendant in proving his innocence." PX 264-A at 60:19–61:14 (pp. 23–24). At trial, Henry testified that in 1977 he believed that much of the allegedly undisclosed impeachment evidence did not need to be disclosed, and that his belief was consistent with the Office's policy or training. Trial Tr. 2013:17–2017:21, 2021:2–2024:11, 2026:5–13, 2040:2–2043:22.

The County's Rule 50(b) motion seeks to neutralize these concessions by pointing to other testimony in which Henry claimed that he followed *Brady*, Mem. at 31, and Gagan disclaimed knowledge of ECDAO practice and asserted that *Brady* includes impeachment material, *id.* at 34–35. Again, though, this argument is waived because it was not raised in the Rule 50(a) motion, and it is meritless because it construes the evidence in the County's favor. The jury was entitled to credit Gagan's and Henry's deposition testimony, to reject their change of position at trial, and to find that any allegedly undisclosed *Brady* material qualifying as impeachment—which is most of it—was not disclosed to John Walker pursuant to the ECDAO's unlawful practice of restricting *Brady* to exculpatory evidence.

> d.    *Direct evidence established that ECDAO prosecutors unlawfully withheld Brady material without a specific demand.*

In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held that prosecutors must disclose evidence favorable to the accused without waiting for a defense request. Walker introduced ample direct evidence supporting a finding that *Brady* material was kept from him

- 14 -

pursuant to an unlawful ECDAO practice of withholding *Brady* material in the absence of a specific demand.

In deposition testimony introduced at trial, Henry testified that at the time of Walker's criminal case, he understood that *Brady* material only had to be disclosed following a defendant's demand or request, PX 264-A at 218:7–21 (p. 17), and he agreed, in his capacity as the County's Rule 30(b)(6) representative, that his practice of requiring a demand was "based upon the practices of the office generally," PX 264-B at 223:7–12 (p. 6).

The jury saw evidence of this practice memorialized in contemporaneous documents. When James McLeod, attorney for Floyd Martin, made a general written request for *Brady* material, Henry declined unless McLeod made his request specific. PX 84, 85. Henry testified, and the record of the Walker trial confirms, that, having received no specific request from Walker's counsel, Henry disclosed nothing he characterized as *Brady* material. PX 264-A at 226:12–227:10 (pp. 37–38). Similarly, during pretrial discovery, ADA Drury disclosed no *Brady* material in response to the *general* request of made by Walker's attorney. Trial Tr. 976:8–11, 979:22–980:2. Since the 21 pieces of *Brady* material were self-evidently favorable, the jury reasonably could have concluded that Drury and Henry evaded their disclosure obligations in reliance on the ECDAO's unlawful practice of requiring a specific request.

The County's principal response to this evidence is to cite Henry's trial testimony disavowing his deposition. Mem. at 31. Once again, this argument is waived because it was not raised in the County's Rule 50(a) motion, and it is meritless because it construes the evidence in the County's favor. The jurors who observed Henry testify in his videotaped deposition and at trial were entitled to credit his admissions and reject his "recantation" at trial.

The County's two additional points—also unpreserved in the Rule 50(a) motion—are equally meritless. First, the County claims that the demand issue is "moot" because Walker's counsel did make a *Brady* demand. Mem. at 31. But of course, as Henry's interaction with McLeod illustrates, the Office practice was to require a *specific* request, something more than the generic demand for all *Brady* material that Walker's counsel made. Second, the County seeks to discount Henry's admissions on the ground that Drury handled pretrial discovery. Mem. at 31. But here, too, the County misses the point. Henry's testimony and his letter to McLeod support a finding that the Office made a practice of withholding *Brady* material absent a specific demand from the defense. Henry (correctly) conceded that he had an independent *Brady* obligation at the trial he was handling, Trial Tr. 1943:16–21, and the file he inherited made clear that Drury had not made any *Brady* disclosures. The jury could easily find that Drury and Henry both acted pursuant to the same unlawful practice of withholding *Brady* material absent a specific demand.

> e.     *Direct evidence established that ECDAO prosecutors unlawfully withheld Brady material if they deemed it unreliable.*

Walker also introduced direct evidence supporting a finding that ECDAO prosecutors made a practice of withholding favorable evidence that they subjectively disbelieved—a tactic the Court correctly instructed the jury was contrary to law, Trial Tr. 2773:1–3—and that this practice caused Drury and Henry to withhold favorable evidence from Walker and his attorney.

In deposition testimony introduced against the County at trial, Kevin Gagan testified that the ECDAO practice was to withhold favorable evidence coming from an "inner city witness" (such as Woodruff and Hough) if the prosecutor subjectively disbelieved the evidence. PX 292-A, 225:23–226:8, 137:20–138:22 (pp. 19–22). Henry corroborated Gagan's concession when he testified that he did not consider Hough's recantation to be *Brady* material, even though on its face it was favorable to the defense, because Hough ultimately retracted it and he (Henry) believed

- 16 -

Hough was "waffling." Trial Tr. 2040:2–2043:11. Similarly, Henry testified that the evidence tending to corroborate Gibson's statement to police that Woodruff and Walker went home in a taxicab at 11:30 p.m. (DX 500.32), together with the evidence tending to show the crime occurred after 11:30 p.m. (PX 6, 14, 29; DX 500.16), did not need to be disclosed under *Brady* because he subjectively disbelieved Gibson's statement and the witness statements did not convince him that the crime occurred after Woodruff and Walker went home. PX 264-A, 340:21–342:23, 346:14–355:6 (pp. 74–86). Henry further testified that his decision to withhold the Hough recantation and the evidence supporting the taxicab alibi, on the ground that he subjectively disbelieved this evidence, was consistent with the ECDAO's *Brady* policies or training at the time. Trial Tr. 2043:9–22; PX 264-A, 354:22–355:11 (pp. 85–86).[8]

As before, the County tries to evade these admissions by cherry-picking lines from Gagan's and Henry's trial testimony. Mem. at 31, 35. But here again, the County waived these arguments by failing to raise them in its Rule 50(a) motion, and these arguments are meritless because they impermissibly construe the evidence in the County's favor. The jury was entitled to credit Gagan's and Henry's admissions, to reject the testimony selectively cited in the County's Rule 50(b) motion, and to find that Drury and Henry suppressed crucial *Brady* material pursuant to the

---

[8] Courts have repeatedly relied upon similar testimony to uphold *Monell* claims. *See, e.g.*, *Ferrari v. County of Suffolk*, 2013 WL 4017022, at *10 (E.D.N.Y. Aug. 6, 2013) (deposition testimony from an assistant county attorney "that her training … consisted of observing other assistant[s] … conduct hearings and that the legal arguments [] she asserted at Plaintiff's hearing . . . was consistent with the training she received"), *rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006) (deposition testimony by a police officer that "in his understanding, telling a person in [plaintiff]'s situation, 'you need to come with me to the police department' is consistent with 'policies and practices of the Galesburg police department'"); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (officer's writing that "he had 'never [t]asered anyone inappropriately or *out of policy*' . . . . reflect[ing] [his] belief that all of his taser deployments, including, of course, the one at issue here, were consistent with City policy"); *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020) (expert testimony that officer's conduct was "consistent with . . . departmental policies").

- 17 -

unlawful ECDAO practice permitting prosecutors to withhold *Brady* material they subjectively disbelieved.

> f.    *Other-case evidence reinforced the direct evidence of an unlawful custom or practice and were not dissimilar or remote in time.*

Though the direct evidence summarized above suffices to establish an unlawful widespread practice many times over, Walker's proof was strengthened by the other instances of *Brady* violations proved at trial.

To start, the experienced prosecutors who handled the four Crawford murder prosecutions—Drury, Henry, and James Verrastro—all made the same unlawful *Brady* judgments. A fair inference is that the uniformity of these errors, made across four separate trials, was not coincidental but resulted from the application of an overarching Office policy and practice. *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 872–73 (2d Cir. 1992) (where employees in two separate NYPD offices reflexively assumed that female officer was lying about complaint, jury could interpret the consistency as evidence of a widespread practice).

In addition, Walker introduced evidence of six *Brady* violations occurring during the five-year period surrounding his trial. Trial Tr. 1284:17–1290:14; PX 100, 108, 109, 110, 120, 126. The evidence included a February 1976 *Buffalo Evening News* article reporting that a court vacated two murder convictions and ordered a new trial after it was discovered that ECDAO had withheld favorable fire investigator's reports, *see* PX 100; an April 1978 *Buffalo Evening News* and *Buffalo Courier-Express* articles reporting that a court declared a mistrial in a murder prosecution after the prosecutor withheld favorable evidence, *see* PX 108; a January 1979 *Buffalo Evening News* article reporting that a court declared a mistrial in a murder case because of a *Brady* violation, *see* PX 109; a March 1979 court decision ordering the prosecution to disclose exculpatory evidence over the prosecutor's opposition, *see* PX 110; an April 1980 *Buffalo Evening News* article reporting that

- 18 -

a court declared a mistrial and dismissed the charges because the prosecutor withheld *Brady* material, *see* PX 120; and a November 1981 *Buffalo Evening News* article reporting that a court had vacated a guilty verdict and dismissed sexual-assault charges after finding that ECDAO prosecutors withheld favorable evidence, *see* PX 126.

Cosgrove testified that he read the Buffalo newspapers every day while he was District Attorney, including articles written about the Office, and that part of his job was being aware of Buffalo newspaper articles written about his Office. *See* PX 274-A at 32:10–34:1 (pp. 4–6). However, in not one instance did Cosgrove or his administration conduct a disciplinary investigation of the prosecutors involved or take any remedial action for their apparent *Brady* violations. Trial Tr. 1136:13–1137:5 (Drury). Consistent with this Court's charge, Trial Tr. 2778:25–2779:14, the District Attorney's complete failure to investigate even the possibility of discipline, let alone impose it, when he learned of judicial findings of *Brady* violations, permits the inference that withholding *Brady* material of every kind was consistent with his Office's policies and practices, and that such policies and practices were the moving force behind the *Brady* violations committed in Walker's case.

The County argues that the *Brady* violations in these six other cases were insufficiently similar to the violations alleged in Walker's case, and that some of them occurred after Walker's trial. Mem. at 15–18. These similarity and temporality arguments are misguided.

Starting with factual similarity, there is no requirement that other-case evidence involve a factually similar *Brady* violation. The Court's draft decision on the admissibility of *Monell* evidence recognized that the high degree of similarity required by *Connick v. Thompson*, 563 U.S. 51 (2011), is limited to failure-to-train claims. *See* Dkt. 383-2 at 18 ("a failure to train theory . . . requires a more rigorous matching than the above to prove a municipal policy was the 'moving

- 19 -

force' behind the constitutional violation due to the requirement to point to a specific deficiency in a training program that the policymaker was on notice of and failed to correct"). While this Court recognized that, even in the context of other *Monell* theories, other-case evidence "must be sufficiently similar to the type of constitutional violations alleged," *id.* at 9, it illustrated this principle by citing cases indicating that the other-case evidence must involve the same *category* of constitutional violation, not a similar fact pattern. *See id.* at 10 (citing *Jones*, 691 F.3d at 82, and emphasizing that the Second Circuit contemplated other-case evidence of the category "the abuse of the rights of black people"); *id.* at 16 n.1 (noting that the "'persistent' failures contemplated by *Batista* [*v. Rodriguez*, 702 F.2d 393 (2d Cir. 1983),] were of the same nature as the underlying violation alleged," i.e., "instances of unusual brutality"; and that in *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992), the Second Circuit contemplated further discovery "to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury)"). The Court's draft decision makes clear that, outside the context of a failure-to-train theory, it is enough that the other-case evidence likely involves one or more of the categories of *Brady* violations at issue in the plaintiff's case.[9]

---

[9] The cases that the County cites in support of its similarity argument are inapposite and/or distinguishable. As noted above, this Court has recognized that *Connick*'s similarity requirement is limited to failure-to-train cases, and Walker did not pursue a failure-to-train theory at trial. *Greene v. City of New York*, 742 F. App'x 532 (2d Cir. 2018), besides being unpublished, involved a theory of failure to train or supervise, not a widespread-practice or failure-to-discipline theory. The quoted statements from *O'Neal v. City of New York*, 196 F. Supp. 3d 421, 436 (S.D.N.Y. 2016), and *Mosca v. City of New York*, 2019 WL 938936, at *3 (E.D.N.Y. Feb. 25, 2019), likewise concerned failure-to-train.

The County cites reasoning concerning dissimilarity in a case involving both custom and deliberate indifference theories, *Miller v. County of Monroe*, 2024 WL 2804435 (W.D.N.Y. May 31, 2024) (Geraci, J.), where the Court was considering a motion to dismiss for failure to state a claim. The Court acknowledged that a plaintiff could proceed on a custom theory by showing that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions," but noted that "[a] plaintiff may *also* plead" such a

The evidence withheld in Walker's case was multi-faceted, and included third-party culpability, alibi, recantation, and other exculpatory evidence, as well as numerous types of impeachment evidence, including polygraph-testing procedures, recantation evidence, various types of prior inconsistent statements, evidence of motive, bias, and interest, including coercion and the promise or receipt of benefits, general credibility evidence, and evidence of investigative misconduct by detectives and prosecutors. These violations implicate every category of *Brady* material and so were necessarily congruent with the other-case evidence. Cosgrove's complete inaction in response to the newspaper articles—especially when viewed in conjunction with all the other evidence in the case—supports a finding that Cosgrove knew (or must have known) about the ECDAO's unlawful *Brady* practices and knowingly tolerated them.

As for the timing of the *Brady* violations reflected in the other-case evidence, numerous court decisions hold that the existence of a widespread policy, custom, or practice may be inferred not just from the policymaker's pre-incident failure to act but also from his post-incident failure to take remedial action. *See, e.g.*, *Parkinson v. Desormeau*, 2024 WL 4973490, at *5 (E.D.N.Y. Dec.

---

theory "by citing [ ] complaints in other cases that contain similar allegations," i.e. complaints "involv[ing] factually similar misconduct." *Id.* at *4 (cleaned up). In considering whether the plaintiff had satisfied the requirements of the latter route, the Court stressed the factual dissimilarity between the *Brady* violations cited by plaintiff's complaint and those at issue in his case. *See id.* at *6. The court did *not* hold that a plaintiff cannot prove a *Monell* claim by sworn testimony evidencing a widespread practice, combined with other-case evidence corroborating that practice, where the other-case evidence likely involves one or more of the categories of misconduct at issue in the plaintiff's case—which was the case here. Nor did the district court so hold in another case cited by the County, *Isaac v. City of New York*, 2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, 2018 WL 4583481 (Sept. 24, 2018). There, the court recommended judgment on the pleadings to the defense, where the plaintiff made a "boilerplate assertion[]" that "the City has a custom of arresting innocent people and fabricating evidence to satisfy arrest quotas," and the court found no support in other-case evidence that did not "involve[] police officers providing prosecutors with false information or coercing witnesses into providing false testimony." *Id.* at 17. None of the cases cited by the County support its apparent contention that the jury could not rely on corroborative other-case evidence to prove Walker's widespread-practice theory.

4, 2024) ("Given that plaintiffs allege 'an actual, albeit informal, policy' as a basis for their *Monell* claim, '[s]ubsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom.' (citation omitted)); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 449 (S.D.N.Y. 2011) (considering subsequent conduct as evidence of a policy and finding that "[e]ven if plaintiffs' evidence of quotas or pressure post-dates the last stop alleged in the Complaint, plaintiffs allege an ongoing pattern that includes, but is not limited to, the specifically alleged incidents"), *on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011); *Jones v. Town of East Haven*, 493 F. Supp. 2d 302, 331–32 (D. Conn. 2007) (subsequent conduct "is probative for purposes of showing the existence of a municipal policy or custom"), *rev'd on other grounds*, 691 F.3d 72 (2d Cir. 2012).

The County's argument that "temporally remote conduct—ranging from two to four years—is either too stale to be considered or is so attenuated as to be 'minimally, if at all, probative,' of a municipal policy in effect at the relevant time," Mem. at 29, is meritless. The Second Circuit has stressed the significance of a "long history" of a policymaker's deliberate indifference. *Gentile v. County of Suffolk,* 926 F.2d 142, 152 n.5 (2d Cir. 1991). In *Lucente v. County of Suffolk*, 980 F.3d 284 (2d Cir. 2020), where the underlying constitutional violations occurred between 2009 and 2011, the Second Circuit held that the "plaintiffs should be able to utilize [] reports *from the 1990s* as background to attempt to demonstrate that the Sheriff's lack of response to the earlier allegations against [the officer who committed the misconduct] evidenced the beginning of a policy or custom of inaction and acquiescence that continued for well over a decade . . . ," noting that "[i]t is squarely within the province of the jury to decide, in determining municipal liability, what weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case." *Id.*

- 22 -

at 301 (emphasis added); *see also Benitez v. Lopez*, 372 F. Supp. 3d 84, 89 (E.D.N.Y. 2018) (a

municipal "[p]olicy or practice may have originated well before the ten years prior to the filing of

the lawsuit"); *McCants v. City of Newburgh*, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014)

(past claims "removed in time from the instant action . . . simply evidences the City has allegedly

long condoned police misconduct"); *Parkinson*, 2024 WL 4973490, at *5 (granting discovery of

other-case evidence up until the year 2018, where the underlying constitutional violations occurred

between 2013 and 2015, because it could serve as "circumstantial evidence of the existence of

preceding municipal policy or custom"); *Jones*, 493 F. Supp. 2d at 331–32, 337 (holding that

subsequent conduct "is probative for purposes of showing the existence of a municipal policy or

custom," and relying upon such conduct from January 2000, nearly three years after the April 1997

constitutional violation). Compared especially to the evidence at issue in *Lucente*, the other-case

evidence that Walker cites is very close in time to his 1977 trial.[10]

> g.      *Walker's widespread-practice theory is not too general.*

Finally, the County argues that Walker's *Monell* theory regarding *Brady* noncompliance is

overly broad. This argument was not raised in the County's Rule 50(a) motion, so it is waived. *See*

---

[10] The cases the County cites are inapposite. In *Rodriguez v. County of Westchester*, 2017 WL 11802 (S.D.N.Y. Jan. 11, 2017), the municipality changed contractors in the intervening time. *See id.* at *7. That was also the case in *Melvin v. County of Westchester*, 2016 WL 1254394, at *15 (S.D.N.Y. Mar. 29, 2016). *Gleeson v. County of Nassau*, 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019), merely cited *Rodriguez*, *Melvin*, and *Moses v. Westchester Cnty. Dep't of Correction*, 2017 WL 4386362, at *12–*13 (S.D.N.Y. Sept. 29, 2017), in which the plaintiff failed to cite more than a couple of incidents proximate in time to the underlying incident, *id.* at *13. As for *Chepilko v. City of New York*, 2012 WL 398700 (E.D.N.Y. Feb. 6, 2012), that case supports Walker's position. As the County notes, the court recognized that "subsequent conduct can be circumstantial evidence of the existence of a preceding municipal policy or custom." *Id.* at *15 n.11. However, the evidence of custom presented by that plaintiff was insufficient because he *only* cited post-incident conduct, totaling five instances, all of which were three or more years after the violation of his constitutional rights. *See id.* at *15. Here, by contrast, Walker cited both pre- and post-incident conduct, including conduct close in time to the underlying constitutional violations, and, above all, *introduced direct evidence* establishing the relevant practices.

*supra* § I.C. It is also wrong on the merits. As we have explained, Walker's theory was that prosecutors withheld 21 pieces of *Brady* material pursuant to a widespread practice of unlawfully suppressing impeachment evidence, a widespread practice of suppressing all *Brady* material (exculpatory as well as impeachment) that was not specifically requested, and a widespread practice of suppressing all *Brady* material that a prosecutor claimed to subjectively disbelieve. Walker showed as well that Cosgrove and his executive team tolerated all forms of *Brady* violations, including these. We introduced ample evidence to support this theory of widespread practice.[11]

### 2.     *DA Cosgrove's deliberate indifference to Brady violations.*

As explained above, the evidence establishing a widespread practice of *Brady* violations, standing alone, requires the Court to deny the County's Rule 50(b) motion. The same evidence also establishes Walker's alternative claim of deliberate indifference to *Brady* violations, although the elements of that theory are somewhat different.[12]

---

[11] The cases the County cites in support of its "overbreadth" argument are inapposite or distinguishable because they involved dismissal motions attacking the plausibility of the plaintiff's factual claims and/or far broader generalities or categories of misconduct, and because the plaintiffs lacked the direct evidence of municipal practice that Walker presented here. The two cases the County cites that were in a summary-judgment posture involved far broader theories than the theories at issue here and the absence of admissions like those Walker presented at trial. *See Vassiliou v. City of New York*, 2021 WL 76916, at *4–5 (E.D.N.Y. Jan. 7, 2021) (plaintiff alleged custom of "falsely stopping, frisking, and arresting individuals and using excessive and unjustified force," which was supported only by a list of lawsuits filed against the individual defendants (cleaned up)); *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 408–10 (E.D.N.Y. 2011) (plaintiff claimed municipality "purposely ignores violations of individuals' constitutional rights," supporting this only with unproven allegations of misconduct).

[12] For the reasons stated in § II.B.1.g, which apply also to Walker's deliberate-indifference theory, the County's overbreadth argument is both waived and meritless.

a.        *The law on deliberate-indifference liability.*

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). Municipalities may also be liable where "rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Id.* (cleaned up); *accord Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A municipal policymaking official's 'deliberate indifference' to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage . . . ."). Thus, "when a subordinate municipal official is alleged to have committed the constitutional violation, . . . [o]ne means of [establishing municipal liability] . . .is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the subordinate's actions." *Amnesty Am.*, 361 F.3d at 126.

"Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Jones*, 691 F.3d at 81–82 (quoting *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and dissenting in part)). Under a failure-to-discipline or failure-to-supervise theory, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Canton*, 489 U.S. at 390), such that a failure to take meaningful action after such

- 25 -

notice was "tantamount to deliberate indifference," *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021).

Plaintiffs most commonly establish deliberate indifference "through proof of repeated complaints of civil rights violations . . . followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049. But, as this Court recognized in its draft *Monell* decision, this is not the only way a plaintiff can establish that a need for discipline is obvious. *See* Dkt. 383-2 at 15–16 (Draft Decision) ("At the outset, cases binding on this Court establish that a plaintiff is not limited to proving 'deliberate indifference' through a pattern of specific failures to, for example, discipline its employees") (citing *Vann*, *Gentile*, and *Jones*); *id.* at 22–23 ("Walker has proffered evidence regarding ECDA's lack of attention or commitment to disciplining . . . assistant district attorneys—such as witness testimony of . . . failures to recall any instances of attorney discipline, and admissions of a party opponent during discovery. Like the plaintiffs in *Vann* and *Gentile*, as footnoted below, such evidence can support a jury's reasonable inference of a deliberate indifference theory"). As the Second Circuit noted in *Amnesty America*, "[w]hile we have held that proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference, we have never required such a showing. The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing." 361 F.3d at 128; *see also Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) (failure to take remedial action despite knowledge of police violations of constitutional rights one way to establish deliberate indifference).

Actual or constructive notice to a policymaker of an unconstitutional practice, combined with systemic disciplinary failings, may also constitute deliberate indifference. In *Vann v. City of*

*New York*, the Second Circuit noted that "[d]eliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was contrary to the practice of most police departments and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated." 72 F.3d at 1049 (cleaned up). The court went on to find that evidence of the NYPD's deficient system for monitoring problem policemen, and its lack of a response to past incidents involving the individual defendant, reflected a deliberate indifference by the municipal defendants to the dangers posed by problem officers restored to full-duty service. *See id.* at 1050–51.

Similarly, in *Gentile v. County of Suffolk*, the Second Circuit affirmed a jury verdict on a deliberate-indifference theory based on a government report detailing incidents of misconduct, supporting a finding of at least constructive knowledge by policymakers followed by inaction. *See Gentile*, 926 F.2d at 153; *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1162–63 (1st Cir. 1989) (affirming jury *Monell* verdict where the "absence of a strictly enforced disciplinary system led the officers . . . to believe they were above the law and would not be sanctioned for their misconduct").

> b.    *Direct evidence established that DA Cosgrove was deliberately indifferent to ECDA prosecutors' Brady violations.*

The same direct evidence that supports Walker's widespread-practice theory also supports his deliberate-indifference theory. The difference is that, for a deliberate-indifference claim, the underlying office policy need not necessarily be unlawful, nor need there be proof that instances of unlawful behavior are widespread. If there are sufficient violations to put the policymaker on notice of a need for remedial action, such as discipline, for unlawful behavior, but the policymaker shows his indifference through a failure to act, causation may be established.

For the reasons stated above, a reasonable juror could find that ECDAO prosecutors had a practice of withholding *Brady* material that they believed was "merely" impeaching, that they disbelieved, or that had not been specifically requested by the defense. As a practice of the Office, such conduct was necessarily widespread and it may be inferred that DA Cosgrove had at least constructive notice of it, yet he never disciplined any prosecutor throughout his entire tenure as District Attorney. *See* PX 274-A, 102:7–9, 105:10–18, 106:4–107:14, 108:20–109:15 (pp. 12–17). He did not even recall any instance in which he instructed his secretary to place a note relating to misconduct in an ADA's personnel file or memorialize a finding that an ADA committed misconduct. *See id.* at 108:2–109:15 (pp. 16–17). He adopted no written policy indicating what types of errors or misconduct could lead an ADA to be punished. *See id.* at 101:11–15 (p. 11). And he had no procedure for issuing regular written evaluations of ADAs and had no knowledge of any procedure for oral evaluations. *See id.* at 117:3–15 (p. 18). The County's expert acknowledged the necessity of disciplining ADAs for intentional, reckless, and even negligent misconduct to maintain the legitimacy of an office. PX 292-A at 109:5–110:10 (pp. 25–26). And Henry acknowledged that the failure to punish even one prosecutor for unethical actions "can poison an entire office." PX 264-B at 239:2–10 (p. 47). In short, a reasonable juror could easily find that Cosgrove's abject failure to investigate or discipline prosecutors engaging in unlawful *Brady*-related practices rose to the level of deliberate indifference and caused the violations that occurred in Walker's case.

                *c.*     *Other-case evidence supported the direct evidence of deliberate indifference.*

In addition to the admissions from County witnesses establishing several widespread and unlawful *Brady* practices, of which Cosgrove was at least constructively aware yet deliberately indifferent to, Walker established specific notice to Cosgrove of a *Brady* violation committed just

one year before Walker's trial. In February 1976, the *Buffalo Evening News* reported that a judge ordered a new trial for two men convicted of murder in 1976 after discovering that the prosecution had withheld evidence favorable to the defense. *See* PX 100.[13] Cosgrove testified he read the Buffalo newspapers every day while he was District Attorney, including articles about the Office, and that part of his job was being aware of Buffalo newspaper articles about his Office. *See* PX 274-A at 32:10–34:1 (pp. 4–6). A reasonable juror could infer that Cosgrove read the article about the 1976 *Brady* violation resulting in the vacatur of two murder convictions, but failed to even investigate the matter. Such evidence provides further support for a finding that Cosgrove knew about, but remained indifferent to, *Brady* violations committed by ECDAO prosecutors.

## III.    A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR SUMMATION MISCONDUCT.

The trial proof amply supports the jury's finding that Henry violated Walker's right to a fair trial by engaging in summation misconduct, and that Henry's misconduct was caused by County policy, custom, or practice.

### A.    A reasonable juror could find that ADA Henry committed summation misconduct.

In upholding a *Monell* claim based on summation misconduct, the Second Circuit explained that summation misconduct is judged by looking to (1) the severity of the misconduct, (2) the measures if any taken by the trial court to cure the errors, and (3) the likelihood of conviction absent the misconduct. *Bellamy v. City of New York,* 914 F.3d 727, 762 (2d Cir. 2019).

Starting with the severity of the misconduct, based upon Professor Zeidman's testimony about the summation rules that applied in 1977, Gagan's testimony agreeing with those standards,

---

[13] For the reasons explained above, any argument that this incident is too remote in time or dissimilar from the constitutional violations in Walker's case is meritless.

and this Court's instructions, the jury was entitled to find that the following statements constituted

egregious summation misconduct:

1. Arguing that Woodruff had no motive to lie and implicated himself and his friends out of conscience, PX 83 (*People v. Walker* Trial T.) at 145:18–147:12 (pp. 349–51), when Henry was withholding multiple items of *Brady* material showing Woodruff had been coerced and promised extraordinary leniency.

2. Arguing that Hough had no motive or other reason to lie PX 83, 134:14–135:7 (pp. 338–39), when he was withholding *Brady* material showing that Hough had been threatened with arrest and prosecution for murder and for perjury and other coercion.

3. Arguing that Hough's testimony was totally consistent, PX 83, 133:23–134:14 (pp. 337–38), while failing to disclose Hough's recantation, the accusations against him of lying and perjury, and his refusal, after changing his story, to take a polygraph exam.

4. Arguing that Woodruff, Hough, and Tatar should be believed because they told similar stories without having had any opportunity to conform their accounts, PX 83, 147:19–148:2 (pp. 351–52), while withholding *Brady* material showing that police, with Drury's knowledge and at his direction, had fed Woodruff a new story extracted from Hough, and caused Woodruff to adopt that new story as his own.

5. Arguing that Tatar was credible, PX 83, 136:19–139:5 (pp. 340–43), while withholding *Brady* material showing that Drury had promised him Youthful Offender treatment on 11 counts of burglary in exchange for his testimony against Walker.

6. Arguing that prosecution witness Larry Watson had no conceivable motive to lie, PX 83, 132:18–133:18 (pp. 336–37), while withholding *Brady* material implicating Watson in the murder.

7. Arguing that Watson, Debbie Jeffrey, Margaret Crawford, and Sgt. Dove were neutral witnesses whose testimony was uncontradicted and fully consistent, PX 83, 132:18–133:18 (pp. 336–37), while withholding the following *Brady* material:

   (a) Police reports showing that Watson and Jeffrey had contradicted each other about what happened at the Golden Nugget Bar immediately before and after the assault on Crawford and Jeffrey had told police she suspected Watson of the murder;

   (b) Police reports showing that Watson's statements to police and his testimony at trial were contradicted by another bar patron, Frances Kalb;

   (c) A police photograph depicting footprints leading from Crawford's property to Watson's, which directly contradicted Sgt. Dove's testimony denying there were any such footprints; and

- 30 -

(d) A police report showing that, contrary to Margaret Crawford's trial testimony, the collision with the side of her house, which the prosecution offered as the presumed time of the assault, occurred at 11:30 p.m. (after Woodruff and Walker already were going home in a taxicab), not at 11 p.m.

8. Appealing to racial prejudice by dismissing contradictions and illogic in Hough's and Woodruff's testimony as the result of how "16-year-old black kids plan," PX 83, 136:13–17 (p. 340); and

9. Exaggerating the amount of blood found by police and excessively referring to such blood evidence, PX 83, 130:14–16, 131:9–11, 146:3–5, 152:22–153:7 (pp. 334–35, 350, 356–57), in an improper attempt to inflame and mislead the jury, when in fact the evidence was that small amounts of blood were found only next to Crawford's body.

As the above list of summation misconduct shows, Henry violated several fundamental rules of summation advocacy. Most of these violations involved making false or misleading arguments. In *Jenkins v. Artuz*, in which the prosecutor capitalized on a *Brady* violation in summation, the Second Circuit noted that a deceptive summation can amount to an independent due-process violation:

> Standing alone, a prosecutor's comments upon summation can "so infect [ a] trial with unfairness as to make the resulting conviction a denial of due process." *Darden* [*v. Wainwright*], 477 U.S. [168, 181 (1986)] (quoting *Donnelly* [*v. DeChristoforo*], 416 U.S. [637, 643 (1974)] (internal quotation marks omitted); *see also Mills* [*v. Scully*], 826 F.2d [1192, 1195 (2d Cir. 1987)] ("[T]here may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument ….").

294 F.3d 284, 294 (2d Cir. 2002). The Court condemned similar misconduct in *Bellamy*, 914 F.3d at 762–65, and *Su v. Filion,* 335 F.3d 119, 127 (2d Cir. 2003). The New York State courts have done so as well. *See, e.g.*, *People v. Colon*, 13 N.Y.3d 343, 350 (2009).

The County ignores the false or misleading arguments of Henry and his exploitation of his *Brady* violations while fixating on aspects of the summation that Walker does not rely on. It makes factual arguments about Henry's racial remark and fidelity to the blood evidence that the jury was not required to accept. The jury was entitled to find that Henry's summation was permeated with

falsities and misrepresentations that took advantage of his withholding of clear *Brady* material and that he made inflammatory appeals to emotion.

Looking at the second factor, the trial court took no action to minimize the effect of Henry's summation misconduct. Of course, neither the judge nor defense counsel knew that Henry was exploiting false testimony and *Brady* violations, since the *Brady* material had been suppressed. As for Henry's exaggeration of the blood evidence, the trial judge *overruled* the defense lawyer's objection. PX 83 (*People v. Walker* Trial Tr.), 153:8–13 (p. 357). The court gave no curative instruction as to any of the summation errors. In short, the jury was entitled to conclude that Henry's egregious misconduct was not at all mitigated by the intervention of the trial judge.

As for the third *Bellamy* factor—the likelihood of conviction absent the misconduct—a prosecutor capitalizing on false or misleading testimony and *Brady* violations regarding an important witness's motive to lie presents a "heightened opportunity for prejudice." *Su v. Filion*, 335 F.3d at 129 (quoting *Jenkins*, 294 F.3d at 284). Here, Henry did so with respect to *four* witnesses: Woodruff, Hough, Tatar, and Watson. And he engaged in this misconduct in a prosecution that was, as District Attorney Flynn admitted and Professor Zeidman agreed, a "weak case" to begin with. *See* PX 245; Trial Tr. 1373:24–1375:11. Indeed, Henry and Drury both testified that Woodruff was the prosecution's indispensable witness, whose credibility was essential to conviction and already in serious question. Trial Tr. 997:4–11 (Drury), 2000:12–20 (Henry); PX 264-A (Henry Dep.), 296:22–298:1 (pp. 62–64). They conceded as well that Hough's testimony was essential to corroborate Woodruff. Trial Tr. 1096:4–19 (Drury). Tatar, too, was a corroborating witness whose credibility as a jailhouse informant already was in doubt. Given this testimony, the jury was entitled to conclude that conviction would have been unlikely absent Henry's summation misconduct.

In sum, because the evidence amply supports the jury's ultimate finding of summation misconduct that so prejudiced Walker as to deny him his constitutional right to due process and a fair trial, that finding may not be disturbed.

**B.    A reasonable juror could find that ADA Henry's summation misconduct was caused by County policy, custom, or practice.**

Causation under Section 1983 is quintessentially a jury issue. *E.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000). Here, there was ample evidence from which the jury could properly infer that Henry's summation misconduct was caused by a widespread practice maintained by ECDAO prosecutors or Cosgrove's deliberate indifference to summation misconduct.

*1.    The ECDAO's custom or practice of summation misconduct.*

As with the *Brady* claim, Walker's principal evidence of a widespread practice of summation misconduct comes from the County's witnesses themselves. For example, Henry defended the propriety of his summation regarding Hough and testified that his comments were consistent with the training he received from the Office. Trial Tr. 2080:6–2083:5. Henry likewise testified that his argument about how "16 year old black kids plan" was consistent with the Office's training, policies, and practices. Trial Tr. 2088:2–2092:3. Drury gave similar testimony regarding the racially-infected arguments he made at the Boyd trial. Trial Tr. 1143:25–1144:12, 1153:20–1155:12. And Gagan, when confronted with Drury's racial comments, opined that they were "consistent with the practices of prosecutors in Erie County at that time to make such remarks." PX 292-A, 433:16–25, 441:6–11 (pp. 27–28). All this evidence permitted the jury to infer the existence of unlawful summation practices.

As we argued in the above with respect to *Brady*, *see* § II.B.1.b, *supra,* the jury also could infer unlawful policy and practice because the County, knowing of Henry's performance at Walker's trial and the allegations against him in Walker's Amended Complaint, ratified his

misconduct by electing to offer him as its representative witness for deposition under Rule 30(b)(6) and, after he was deposed, by adopting him as its representative at the civil trial. Indeed, the County fully endorsed Henry's summation. It argued that "everything that Mr. Henry did was perfectly fine and adequate." Trial Tr. 102:6–8. And it elected to offer similar testimony from its expert, Kevin Gagan:

> Q. Mr. Gagan, do you have an opinion based on a reasonable degree of professional certainty as to whether the trial as conducted by Mr. Henry, did it meet the professional and ethical standards of a prosecutor at the time of the trial?
>
> A. Yes. It's my opinion it was well within the professional ethics and standards for a trial at that period.
>
> Q. Mr. Gagan, do you have an opinion based on a reasonable degree of professional certainty, did the summation Mr. Henry deliver meet the professional and ethical standards at the time of the trial?
>
> A. Again, it was well within the those (sic) standards. Well within.

Trial Tr. 2308:15–2309:3; *see also id.* at 2309:12–16 (agreeing as to Henry that "not a single comment . . . [was] inconsistent with the rules"). Gagan testified that he found nothing improper in Drury's summation in the Boyd trial either. Trial Tr. 2318:10–18. Gagan then testified that the summations given by Henry and Drury, in the Walker and Boyd trials, respectively, were consistent with the Erie County District Attorney's Office's "practice." *Id.* at 2319:7–2320:9.

District Attorney Cosgrove's history of tolerating the summation practices conceded by Henry, Drury, and Gagan permits the inference that such misconduct was the widespread, permitted practice of his Office, for otherwise, the jury was entitled to infer, he would have taken corrective action. Cosgrove, and Henry as the County's Rule 30(b)(6) witness, each admitted that, to their knowledge, the Office's executives and supervisors did not discipline a single prosecutor for summation misconduct from 1966 to 1985, a period that included Cosgrove's eight years in Office (1975–83). PX 274-A (Cosgrove Dep.), 107:8–11 (p. 15); PX 264-B (Henry Dep.), 253:8–

13 (p. 20). This was so even though the trial record contains seven Appellate Division decisions, admitted for the truth, which found summation misconduct that was similar to at least some of the misconduct that occurred in Walker's case. *See, e.g., People v. Donaldson,* 49 A.D.2d 1004, 1005 (4th Dep't 1975) (improperly bolstering witness's credibility by going outside the record) (PX 153); *People v. Balsano,* 51 A.D.2d 130, 134 (4th Dep't 1976) ("inflammatory remarks") (PX 157); *People v. Johnson,* 62 A.D.2d 555, 561, 569–71 (4th Dep't 1978) (Hancock, J., dissenting) (detailing inflammatory comments) (PX 175); *People v. Keller,* 67 A.D.2d 153, 160 (4th Dep't 1979) ("inflammatory" argument and arguing "facts" not in evidence) (PX 180); *People v. Ivey,* 83 A.D.2d 788, 789 (4th Dep't 1981) ("inflammatory … summation" and many other types of misconduct) (PX 104); *People v. Vance,* 89 A.D.2d 347, 350–51 (4th Dep't 1982) (PX 188)*; People v. Herlan,* 99 A.D.2d 647 (4th Dep't 1984) (improper credibility argument) (PX 192).[14]

Some of the most compelling evidence of tolerated widespread practice involves Cosgrove's chief of felony trials, Albert Ranni. Ranni tried the *Ivey* case in 1976, before the Walker trial. PX 264-B (Henry Dep.), 261:19–262:10 (pp. 29–30). Henry testified that Ranni either was felony bureau chief then or was promoted to that position after the *Ivey* trial. *Id.* at 268:8–269:13 (pp. 34–35). In reversing the *Ivey* conviction due to pervasive summation misconduct of various types, the Appellate Division condemned Ranni because "unadulterated unfairness and deceit have become *the rule.*" 83 A.D.2d at 789 (PX 104, p. 2); PX 264-B (Henry Dep.), 270:5–13 (p. 36)

---

[14] As discussed above, outside the context of a failure-to-train theory, there is no requirement that other-case evidence of constitutional violations involve the same fact pattern as the constitutional violations suffered by the plaintiff. It is enough that the evidence involve the same type of constitutional violation—here, summation misconduct. Accordingly, the County's argument that the other-case evidence is not sufficiently similar is without merit. Likewise, as discussed above, the County's argument that this other-case evidence is too temporally removed from Walker's 1977 trial is without merit; the incidents are far closer in time to the underlying trial than incidents the Second Circuit has deemed admissible.

(emphasis added). While noting that it was not itemizing "all the incidents," it condemned Ranni's "inflammatory" comments which served to "obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence." 83 A.D.2d at 789 (PX 104, p. 2).

Also contemporaneous with the Walker trial, Ranni tried the *Johnson* case. Henry said Ranni definitely was chief of the felony trial bureau by that time, PX 264-B, 282:7–9 (p. 44), meaning he either was promoted after his performance in *Ivey* or kept in his position despite that performance. The Appellate Division in *Johnson* took the extraordinary step of identifying Ranni by name and again quoted the remarkable language it had used in *Ivey* to characterize how Ranni conducted trials: "unadulterated unfairness and deceit have become *the rule*." 62 A.D.2d at 560 (majority); 571 (dissent) (PX 175, pp. 3, 8) (emphasis added). While the majority affirmed the conviction because of the strong evidence of guilt, it wrote: "[W]e must express our concern with the misconduct of Mr. Ranni through the course of the trial." 62 A.D.2d at 560 (PX 175, p. 3). The dissenting opinion, which a federal judge later adopted in granting habeas corpus relief, was even stronger than the majority opinion's condemnation, terming Ranni "an overbearing prosecutor obsessed with the idea of obtaining a conviction at all costs." *Id*. at 570–71 (PX 175, p. 8).

*Ivey* and *Johnson* were important trials to the Office: *Ivey* was a murder case originally handled by Drury, while *Johnson* was a high-profile rape case. PX 264-B (Henry Dep.) at 284:9–14. Ranni's direct supervisors, given his high position, were Cosgrove's two highest-ranking aides: Executive Assistant D.A. Joseph McCarthy and Chief of Appeals Judith Manzella. PX 264-B (Henry Dep.), 282:10–283:14 (pp. 44–45). Cosgrove delegated training functions to Manzella, PX 274-A (Cosgrove Dep.), 62:13–21 (p. 7), and she was his "expert about what was permitted at trial." PX 264-B (Henry Dep.), 282:10–283:14 (pp. 44–45). That McCarthy and Manzella did

- 36 -

nothing about Ranni's misconduct while it was occurring, despite being his direct supervisors, supports a finding that Ranni's summation misconduct reflected widespread Office practice. *See Matusick v. Erie County Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (fact that supervisor in "high-level position" failed to address unlawful conduct "supports an inference that [the policymaker] also knew of the [conduct] and allowed for the conduct to become the accepted custom or practice of the [municipality]").

Cosgrove's own testimony supports this conclusion. He testified that an ADA would not be a supervisor unless he could be trusted to conform to Office policy, PX 274-A, 85:4–12 (p. 9), and, as noted above, Cosgrove *promoted* Ranni to be chief of felony trials and then left him in that position after the Appellate Division's decisions finding summation misconduct. Besides keeping him as chief of felony trials, Cosgrove admittedly took no other disciplinary action against Ranni, *id.* at 133:23–134:1 (pp. 45–46), even after the two Appellate Division decisions were handed down, which Cosgrove admitted he was aware of. *Id.* at 140:8–15 (p. 35) (*Ivey*); 148:10–16 (p. 43) (*Johnson*). Cosgrove further admitted that, while Ranni should have been disciplined, *id.* at 142:11–143:4 (pp. 37–38) (*Ivey*), 148:3–8 (p. 43) (*Johnson*), he had done "nothing, apparently." *Id.* at 141:5–21 (p. 36). Henry, as the County's Rule 30(b)(6) witness, also admitted that Ranni's conduct in *Ivey* was improper and that Ranni at least should have been "corrected." PX 264-B, 261:19–264:14, 265:6–18 (pp. 29–33). That Cosgrove did "nothing" when the Appellate Division twice condemned his chief of felony trials for egregious summation misconduct and lamented that "unadulterated unfairness and deceit have become the rule" is powerful evidence of unlawful policy, custom or widespread practice, to achieve convictions through summation misconduct. Cosgrove's chief of felony trials would not have engaged in such practices if it was not consistent

- 37 -

with Office policy and practice, which, as chief of felony trials and as Drury's and Henry's supervisor, he undoubtedly helped to formulate and carry out.

The jury could also reasonably conclude that the Office's unlawful summation policies influenced Henry to conduct himself in conformity therewith. If the condoned "practice" in the ECDAO was to give summations like Ranni's, the jury could readily and properly infer that Henry's unlawful behavior was caused by that same practice.

But there is still more evidence of causation in this record. Cosgrove conceded that ADAs learned from their supervisors, PX 274-A, 84:20–85:3 (pp. 8–9), and a felony ADA such as Henry would logically follow the lead of his bureau chief. Henry, as a Rule 30(b)(6) witness testifying on behalf of the County, conceded that "unethical actions of a prosecutor, if discovered, can poison an entire office." PX 264-B, 239:2–8 (p. 47). He also conceded that ADAs would regularly observe Ranni's trials, *id.* at 284:15–18 (p. 46), and that Ranni's behavior in the *Ivey* case was known around the office, *id.* at 262:21–264:10 (pp. 30–32). This was *before* the Walker trial. In order words, a juror could, based on Henry's admissions alone, find that the Office was already "poisoned" by the time Henry gave his summation in Walker's case.

### 2.     *DA Cosgrove's deliberate indifference to summation misconduct.*

There is also ample evidence in the record to support Walker's alternative theory that Cosgrove's deliberate indifference to summation misconduct caused Henry to violate Walker's due-process rights. As explained above, the evidence shows that no prosecutor was investigated, let alone disciplined, for summation misconduct from 1966 through 1985, including the eight years of the Cosgrove regime. This includes not just the two Appellate Division decisions admitted into evidence, and the Ranni trials, but also the trials making up the pattern of conduct, admitted by Henry, Drury, and Gagan, with which Henry's summation misconduct during the Walker trial was "consistent."

Cosgrove recognized the need for discipline in order to deter future transgressions. While he never disciplined any prosecutor, he testified that he hoped lower-level executives and supervisors imposed discipline. PX 274-A, 105:13–106:3 (pp. 13–14). However, he had no knowledge that they ever did so, *id.* at 106:8–11 (p. 14), and he and Henry admitted they had no knowledge that anyone ever was disciplined. Cosgrove failed to discipline Ranni even though he conceded he should have. The Administration's indifference to summation misconduct by prosecutors, especially a leader and "role model" such as Ranni, could not have gone unnoticed by the Office's ADAs, including a young prosecutor such as David Henry, and would have encouraged them to put winning over the due-process rights of criminal defendants they wanted to convict, just as Ranni did. Henry's Rule 30(b)(6) admission is worth repeating: "Unethical actions of a prosecutor, if discovered, can poison an entire office." Here, the jury could find that the Office was poisoned at the time of Walker's trial and that the attitude of indifference at the top caused Henry, in his role as Walker's prosecutor, to commit the rampant summation misconduct that helped bring about Walker's wrongful conviction.

### 3. The County's overbreadth argument is waived and meritless.

In § II.B(g) above we explained that the County waived its "overbreadth" argument by failing to raise the argument in its Rule 50(a) motion, and this is true for its summation misconduct "overbreadth" argument as well. As noted in that section, the Second Circuit has permitted theories far broader than summation misconduct, which is a specific subcategory of violations of the right to a fair trial under the Due Process Clause of the Fourteenth Amendment. Moreover, even assuming *arguendo* that a greater level of specificity is required, as discussed in § III.B.1, *supra*, a jury could reasonably find that ECDAO prosecutors customarily engaged in the same categories of summation misconduct—false or misleading argument, inflammatory rhetoric, and appeals to

- 39 -

racial prejudice—that occurred in this case, and the District Attorney's deliberate indifference to such forms of misconduct caused the summation misconduct in this case.

## CONCLUSION

The Court should issue an order denying the County's Rule 50(b) motion in its entirety.

Dated:          June 20, 2025                    Respectfully submitted,

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
By: /s/ Ross E. Firsenbaum
Ross E. Firsenbaum
Gideon A. Hanft
Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizarreta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
By: /s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
Partha Sharma
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

**HOOVER & DURLAND LLP**
By: /s/ Spencer L. Durland
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*

*Attorneys for Plaintiff John Walker, Jr.*

- 40 -